# EXHIBIT A

```
 1              CAUSE NO. 2022-63980
 2  JIMMY RECINOS,          :  IN THE DISTRICT COURT
    INDIVIDUALLY AND AS     :
 3  REPRESENTATIVE OF ESTATE :
    OF DELMY RECINOS,       :
 4  DECEASED, JIMMY A.      :
    RECINOS, MARK A. BUESO  :
 5  SANDOVAL,               :
         Plaintiffs,        :
 6  VS.                     :  HARRIS COUNTY, TEXAS
 7  JACINTOPORT INTERNATIONAL, :
 8  LLC, SEABOARD CORPORATION, :
    AND DIEGO LOPEZ SILVA,    :
 9       Defendants.        :  215TH JUDICIAL DISTRICT
10  _____
11       ORAL AND VIDEOTAPED DEPOSITION OF
12              OMAR CONTRERAS
                FEBRUARY 27, 2024
13  _____
14      ORAL AND VIDEOTAPED DEPOSITION OF OMAR CONTRERAS,
15  Produced as a witness at the instance of the PLAINTIFFS,
16  and duly sworn, was taken in the above-styled and
17  numbered cause on Tuesday, the 27th day of
18  February, 2024 from 10:23 a.m. to 5:21 p.m., before
19  PAT ENGLISH-ARREDONDO, CSR(TX), CRR, RMR, CLR, in and
20  for the State of Texas, reported by machine shorthand,
21  at the law offices of Phelps Dunbar, 910 Louisiana
22  Street, Suite 4300, Houston Texas 77002, pursuant to the
23  Texas Rules of Civil Procedure and the provisions stated
24  on the record.
25
```

```
 1       A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
 3     Mr. Kevin C. Haynes
 4     Mr. Mark Carter
 5     KHERKHER GARCIA, LLP
 6     2925 Richmond Avenue, Suite 1560
 7     Houston, Texas  77098
 8     khaynes@kherkhergarcia.com
 9     Mcarter@kherkhergarcia.com
10
11  FOR THE DEFENDANT JACINTOPORT INTERNATIONAL, LLC:
12     Mr. Andrew R. Nash
13     Mr. Marc G. Matthews
14     PHELPS DUNBAR, LLP
15     901 Louisiana Street, Suite 4300
16     Houston, Texas 77002
17     Andy.nash@phelps.com
18     Marc.matthews@phelps.com
19
20
21
22
23
24
25
```

```
 1  FOR THE DEFENDANT Diego Silva LOPEZ (INCORRECTLY NAMED
 2  "DIEGO LOPEZ SILVA"):
 3     Mr. Collin D. Seipel
 4     BROWN SIMS
 5     1177 West Loop South, Tenth Floor
 6     Houston, Texas 77027
 7     Cseipel@brownsims.com
 8
 9  VIDEOGRAPHER:
10     Mr. Les Pate, Videographer
11     SB Company
12
13  CERTIFIED STENOGRAPHIC REPORTER:
14     Ms. Pat English-Arredondo
15     CSR(TX), CRR, RMR, CLR
16     SB Company
17
18
19
20
21
22
23
24
25
```

```
 1            EXAMINATION INDEX
 2  WITNESS:  OMAR CONTRERAS
 3                     PAGE
 4     EXAMINATION BY MR. HAYNES          8
 5     EXAMINATION BY MR. SEIPEL        338
 6
 7
 8  SIGNATURE REQUESTED                  341
 9
10  REPORTER'S CERTIFICATION             343
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1          EXHIBITS
2
3   NO.          DESCRIPTION          PAGE
4
5   EXHIBIT 1                    53
6   Omar Contreras' LinkedIn page, 1 page
7
8   EXHIBIT 2                    66
9   Seaboard Jacintoport Safety Manual (Excerpt)
10  updated date of June 2022, Bates JPI000045-46
11
12  EXHIBIT 3                    131
13  Jacintoport Internal Memo dated 6-13-18; Re:
14  Safety Compliance, Bates JPI001384
15
16  EXHIBIT 4                    154
17  OSHA Document excerpt titled "Preventing
18  Backovers" in regards to spotters, 2 pages
19
20  EXHIBIT 5                    166
21  Jacintoport's Powered Industrial Truck (PIT)
22  Training, Bates JPI000300 - 304
23
24
25

Page 6

1   EXHIBIT 6                    206
2   Taylor Forklift Safety Manual, 124 pages
3
4   EXHIBIT 7                    222
5   Human Resources Determination dated 6/18/12,
6   outlining Safety Incident Investigation
7   Report, 8 pages
8
9   EXHIBIT 8                    233
10  Jacintoport Safety Investigation Incident
11  Report dated 8-25-15, 7 pages
12
13  EXHIBIT 9                    241
14  Jacintoport Incident Investigation Report
15  regarding Mr. Silva dated 7-22-16, 9 pages
16
17  EXHIBIT 10                   252
18  Human Resources Department - Findings
19  Document, 8 pages
20
21  EXHIBIT 11                   281
22  Text document dated 9-2 to 9-5-22 with JPI
23  Group, between White, Contreras, Betancourt,
24  Omar, Xavier and Figueroa, 5 pages
25

Page 7

1   EXHIBIT 12                   305
2   Text chain dated 9-2 to 9-13-22 between Owner
3   and Warfel regarding accident, Bates JPI001631
4   - 39
5
6   EXHIBIT 13                   317
7   OSHA Violation Worksheet with print date
8   2-17-23, 4 pages
9
10
11
12      (REPORTER'S NOTE:  All quotations from exhibits are
13  reflected in the manner in which they were read into the
14  record and do not necessarily denote an exact quote from
15  the document.)
16
17
18
19
20
21
22
23
24
25

Page 8

1       (Following commenced at 10:23 a.m.)
2          THE VIDEOGRAPHER:  Today is February 27,
3   2024.  We are now on the record at 10:23 a.m.
4          THE REPORTER:  Sir, will you go ahead and
5   raise your right hand to be administered the oath.
6          OMAR CONTRERAS,
7   being called as a witness, and having been duly sworn,
8   testified as follows:
9          THE WITNESS:  I do.
10         THE REPORTER:  Thank you, sir.
11         EXAMINATION
12  BY MR. HAYNES:
13  Q.  Good morning.
14  A.  Good morning, sir.
15  Q.  State your name, please.
16  A.  Omar Contreras.
17  Q.  Mr. Contreras, my name is Kevin Haynes.  I
18  represent the family of Delmy Recinos in a case they've
19  brought against Jacintoport and Seaboard Marine arising
20  from her death that was caused by a forklift crash back
21  in September of 2022.
22         Do you understand who I am and who I
23  represent?
24  A.  Yes, sir.
25  Q.  Have you been deposed before?

Page 9

1  A.  Yes, sir.
2  Q.  How many times?
3  A.  Like, several times.
4  Q.  Okay.
5  A.  I don't remember exactly how many times.
6  Q.  If you had to estimate, do you think it's more
7  than ten?
8  A.  Yes.
9  Q.  Okay.  And you've been with Seaboard Marine
10  since 2006?
11  A.  Yes.
12  Q.  And were the depositions in connection with
13  your employment with Seaboard Marine?
14  A.  Yes.
15  Q.  So you're familiar with the process, but let
16  me ask you:  When was the last time you were deposed?
17  A.  About three years ago.
18  Q.  Let's go through the ground rules just to make
19  sure we're on the same page.
20        It's obviously question and answer.
21  Everything that's being said is being taken down by the
22  court reporter.  It's therefore important for us to have
23  a clear record.  We can do that by you letting me finish
24  my entire question.  I will let you finish your entire
25  answer.  Okay?

Page 10

1  A.  Yes.
2  Q.  It's important to answer verbally, instead of
3  a head nod, things like that, because those are harder
4  to take down.
5        Do you understand?
6  A.  Yes.
7  Q.  I am going to ask probably some bad questions
8  today, and I apologize for that in advance.  If I ask a
9  question that you don't understand or you need me to
10  repeat it or rephrase it, please let me know so we can
11  make sure we're on the same page.  Fair?
12  A.  Yes.
13  Q.  If you answer the question, however, I'm going
14  to assume you understood it.  Is that fair?
15  A.  Yes.
16  Q.  I'm going to be showing you some documents
17  today.  Most, if not all, will be on a screen in front
18  of you.  Please make sure you can see it, and I will
19  give you as much of time or an opportunity as you want
20  to look at it before you answer questions about it.
21  Okay?
22  A.  Okay.
23  Q.  And if you have any issues from a technology
24  standpoint, which happen from time to time, just let us
25  know.  We don't want you to suffer in silence.  Okay?

Page 11

1  A.  Okay.
2  Q.  We can take breaks, we can take as many as you
3  want; just please answer the question that's on the
4  table.  Okay?
5  A.  Okay.
6  Q.  Are you on any medications, or is there any
7  other reason that you might not be able to give clear
8  testimony today?
9  A.  No.
10  Q.  You understand that we're taking your
11  deposition in connection with a lawsuit arising from the
12  death of Delmy Recinos.  Right?
13  A.  Yes.
14  Q.  And we're here in downtown Houston at your
15  lawyer's office.  Right?
16  A.  Yes.
17  Q.  And you have been prepared to take this
18  deposition today.  Right?
19  A.  Yes.
20  Q.  Did you prepare with your lawyers?
21  A.  Yes.
22  Q.  When did you prepare with them?
23  A.  Yesterday.
24  Q.  Do you know how long, approximately?
25  A.  About an hour.

Page 12

1  Q.  Had you ever had any prior meetings or
2  sessions with them where you prepared for the deposition
3  today?
4  A.  Yes.
5  Q.  Tell me about those, please.
6  A.  Same as yesterday.
7  Q.  You had a couple of -- or you had at least one
8  prior meeting that was an hour long?
9  A.  One prior meeting.  I think this deposition
10  was scheduled for October at one point, so we had a
11  meeting back then.
12  Q.  Okay.  So you think that the sum total of your
13  preparation time is about two hours for this deposition?
14  A.  Approximately, yes.
15  Q.  Did you review any documentation?
16  A.  Yes.
17  Q.  Could you run down what you reviewed for me,
18  please?
19  A.  Documentation?  I saw some pictures.  There
20  was a copy of the safety policy.  And the rest was just
21  verbal.
22  Q.  Okay.  And you were prepared by the lawyers at
23  Phelps Dunbar.  Is that right?
24  A.  Yes.
25  Q.  Were there any in-house lawyers, Jacintoport

Page 13

1  or Seaboard Marine, present?
2    A.  One of the attorneys walked in at one point
3  but just -- he wasn't part of the conversation.
4    Q.  Who was that lawyer?
5    A.  Steve Irick.
6    Q.  How do you spell his last name?
7    A.  I-R-I-C-K.
8    Q.  Who does he work for?
9    A.  Seaboard Marine.
10   Q.  Does he work in Miami?
11   A.  Yes.
12   Q.  During these preparation meetings did you meet
13 with any jury consultants or psychologists or any other
14 professionals that helped you with tone and how to
15 answer questions?
16   A.  No.
17   Q.  Have you ever met with any such person?
18   A.  No.
19   Q.  Have you ever had any media training?
20   A.  Any?  I'm sorry?
21   Q.  Media training.
22   A.  No.
23   Q.  Have you ever had any kind of training on how
24 to talk to the press or how to report incidents to
25 government entities, things like that?

Page 14

1    A.  Talk to the press, no.  Reporting incidents,
2  yes.
3    Q.  Okay.  And that would be OSHA?
4    A.  OSHA, correct.
5    Q.  You take the oath seriously, don't you?
6    A.  I'm sorry.  Repeat the question.
7    Q.  You take the oath seriously, don't you?
8    A.  Take what seriously?
9    Q.  The oath seriously.
10   A.  The oath?  Yes, absolutely.
11   Q.  And we know that this crash involved
12 Diego Silva who was operating the large forklift.
13 Right?
14   A.  Yes.
15   Q.  The forklift requires special certifications
16 and training to operate it.  Right?
17   A.  Yes.
18   Q.  Because it's very large you need adequate
19 training and qualifications to operate it safely.  True?
20   A.  Yes.
21   Q.  And this forklift was manufactured by a
22 company named Taylor.  Is that right?
23   A.  Yes.
24   Q.  And it was known as "the Big Red."  Right?
25   A.  I don't know what it was known as.

Page 15

1    Q.  Had you ever heard anyone refer to it at the
2  port as "the Big Red"?
3    A.  No.
4    Q.  And we know that Mr. Silva struck and killed
5  Delmy Recinos.  Right?
6    A.  Yes.
7    Q.  And you were part of the investigation team,
8  right?
9    A.  Yes.
10   Q.  And where do you work?  Do you work in Miami
11 or in Houston?
12   A.  Miami.
13   Q.  And were you reviewing video footage of the
14 port in Houston while you were sitting in Miami?
15   A.  Yes.
16   Q.  So you have the capability to do that, right?
17   A.  Yes.
18   Q.  You can, I assume, log on to a computer and
19 literally look and see what's going on at the port from
20 your office in Miami.  True?
21   A.  Yes.
22   Q.  Mr. Recinos had been working as a clerk for
23 Jacintoport for quite some time.  Right?
24   A.  I don't know how much time; but yes, she was
25 working at Jacintoport.

Page 16

1    Q.  It was a number of years, true?
2    A.  I don't know how long she worked for
3  Jacintoport.
4    Q.  Do you know that she wasn't a brand-new
5  employee, right?
6    A.  She was not a brand-new employee, correct.
7    Q.  She wasn't a short-service employee, right?
8    A.  She was an employee of Jacintoport.
9    Q.  And you don't think that she had anything to
10 do with her own death, do you?
11   A.  She was part of the -- she was part of the
12 cause.  I mean, she was there; so there was no -- you
13 know, from my understanding of the investigation, there
14 was some conversations that were had between her and
15 Diego before she went on her way and Diego went on his
16 way.  So they both took part in that accident,
17 unfortunately.
18   Q.  So you think that she bears responsibility for
19 her own death?
20   A.  I did not say that.
21   Q.  Do you think that she has any role in causing
22 her own death?
23   A.  She does have a role.
24   Q.  Please explain what her role is.
25   A.  Again, there was communications between her

Page 17

1  and Diego. That's what we concluded after the
2  investigation. And they both went on their own way.
3  She walked in a certain direction, and Diego drove in a
4  certain direction; and as a result of that, the accident
5  took place.
6      Q.  What was the substance of these
7  communications?
8      A.  I -- it's not clear what the exact
9  communication was. I haven't been able to speak to
10 Mr. Silva in regarding to that communication per se, so
11 it's not clear what the communication was at the time.
12     Q.  Is -- strike that.
13          You're aware that Mr. Silva was deposed
14 under oath in this case. Right?
15     A.  Yes.
16     Q.  You did not review his deposition transcript
17 prior to this deposition today, right?
18     A.  No.
19     Q.  Why not?
20     A.  It was never made available to me.
21     Q.  Did you ask for it?
22     A.  No.
23     Q.  Why not?
24     A.  My investigation was concluded.
25     Q.  So your investigation -- strike that.

Page 18

1          Were you the lead on the investigation
2  for Jacintoport?
3      A.  Yes.
4      Q.  And your testimony is that Delmy is at least
5  partially responsible for her own death because there
6  were communications between her and Diego Silva. Right?
7      A.  I didn't assign responsibility. I said they
8  both took part in the accident.
9      Q.  That's a big question we have in our mind.
10 Right? Because you understand that I represent
11 Delmy Recinos and her sons also. Right?
12     A.  I understand.
13     Q.  And they want to get to the bottom of exactly
14 what happened.
15          Do you understand that?
16     A.  Yes.
17     Q.  And you don't have a problem with them filing
18 the lawsuit, hiring experts, hiring lawyers to try to
19 get to the bottom of it. Right?
20     A.  No.
21     Q.  Because you can at least agree that there may
22 be more facts and information that was acquired during
23 your investigation, right?
24     A.  All the facts and information I provided to
25 the attorneys.

Page 19

1      Q.  But you understand that we might hire expert
2  witnesses, we might uncover documents, witnesses, that
3  could provide additional information that would shed
4  light on the cause. Right?
5      A.  I understand.
6      Q.  And you're okay with us doing that, aren't
7  you?
8      A.  Yes.
9      Q.  And your testimony is that, as the lead
10 investigator, at least she had some role in her own
11 death because there was a conversation between her and
12 Mr. Silva. Right?
13     A.  Yes.
14     Q.  But you don't know what the conversation
15 entailed, right?
16     A.  Correct.
17     Q.  And you have not learned what the conversation
18 entailed since September of 2022 when this incident
19 happened. Right?
20     A.  Correct.
21     Q.  And you are aware -- and you were aware before
22 today -- that Mr. Silva was deposed under oath. Right?
23     A.  Yes.
24     Q.  And you never requested to see a copy of that
25 transcript. Right?

Page 20

1      A.  Correct.
2      Q.  And that transcript could reveal what was said
3  between him and Ms. Recinos. Right?
4      A.  Possibly.
5      Q.  And it could reveal more information about why
6  this happened. Right?
7      A.  Potentially.
8      Q.  And it never occurred to you to ask for that
9  information. Right?
10     A.  No.
11     Q.  And you did not swear in Mr. Silva when you
12 talked to him after this incident, did you?
13     A.  No.
14     Q.  Did anyone from your company swear in
15 Mr. Silva and put him under oath and ask him questions?
16     A.  That I'm aware, no.
17     Q.  Did any other government agency swear him in
18 and ask him questions under oath?
19     A.  I don't know.
20     Q.  Would that surprise you if they did?
21     A.  No.
22     Q.  Have you ever seen a government agency at an
23 investigation in a port swear someone and ask them
24 questions?
25     A.  No.

# EXHIBIT A

1   Q.  Do you have any plans to review his transcript
2   between now and trial?
3   A.  No.  Unless I'm guided so by my attorneys.
4   Q.  So there is also a lot more information in
5   Mr. Silva's deposition than just the substance of what
6   he said to Ms. Recinos.
7       Are you aware of that?
8   A.  No.
9   Q.  Do you know how long he was deposed?
10  A.  No.
11  Q.  You have reviewed deposition transcripts of
12  employees before, haven't you, in litigation?
13  A.  Yes.
14  Q.  When you were deposed three years ago, did you
15  have occasion to review any deposition transcripts of
16  employees at that time?
17  A.  It was not a case involving an employee.
18  Q.  Well, setting that aside, did you review any
19  deposition transcripts in connection with that case?
20  A.  No.
21  Q.  But you have before, right?
22  A.  Yes.
23  Q.  Is there any particular reason you didn't this
24  time?
25  A.  It was -- the transcripts were not made

1   available to me.
2   Q.  The transcripts are not confidential as far as
3   you know, right?
4   A.  I don't know.
5   Q.  Well, when you say "not made available," does
6   that mean you were told they were not available to you
7   to review?  Or no one ever bothered to just kind of tell
8   you that they were available?
9   A.  No one told me they were available.
10  Q.  When did you first learn that Mr. Silva had
11  been deposed?
12  A.  I don't remember the date.
13  Q.  Well, if he was deposed in 2023, did you learn
14  about it in 2024?
15  A.  No.  It was in 2023.  I heard he had been
16  deposed.
17  Q.  So today is September -- strike that.
18      Today is February 27 of 2024.  Right?
19  A.  Yes.
20  Q.  So it's almost March, right?
21  A.  Yes.
22  Q.  So it's been at least two months since you
23  knew that Mr. Silva was deposed.  Right?
24  A.  Yes.
25  Q.  And probably more, right?

1   A.  Yes.
2   Q.  And in that over two-month period no one has
3   ever told you, hey, there is a transcript of Mr. Silva,
4   of his under oath sworn testimony, if you would like to
5   review it as part of your ongoing investigation.  Right?
6   A.  No.
7   Q.  And is the investigation, according to you,
8   closed?
9   A.  According to me, it's closed, yes.
10  Q.  And is that part of company policy, or is that
11  just based on your review of the facts?  Why are you
12  making the decision that it's closed?
13  A.  Once our report is complete and we turn it
14  over to our claims and legal division, as far as we're
15  concerned, our investigation is complete.  We wouldn't
16  turn over a report unless our investigation was
17  complete.
18  Q.  Okay.  So you generated a report as part of
19  your investigation?
20  A.  Correct.
21  Q.  And it's complete, right?
22  A.  To the best of our knowledge at that time,
23  yes.
24  Q.  And it was completed back in 2022, right?
25  A.  Yes.

1   Q.  And because the report that you prepared was
2   completed back in 2022, from the company's standpoint
3   the investigation is closed?
4   A.  Correct.
5   Q.  But we can agree that this litigation has been
6   going on for over a year now, right?
7   A.  Yes.
8   Q.  And depositions have been taken in this
9   litigation, right?
10  A.  Yes.
11  Q.  And depositions are under oath testimony,
12  right?
13  A.  Yes.
14  Q.  Are you aware of who else has been deposed?
15  A.  No.
16  Q.  Did you know that the other gentleman involved
17  in the cash was deposed, Mr. Ramirez?
18  A.  I don't remember that name coming across.  I
19  do remember one of the drivers.  I heard one of the
20  drivers was deposed.
21  Q.  He was the driver that was in the same
22  vicinity as Ms. Recinos and Mr. Silva.
23  A.  Okay.  So maybe that's the same driver.
24  Q.  Yes, sir.
25  A.  I didn't remember the name.

### Page 25

1  Q.  Yes, sir.  The truck driver.
2  A.  The truck driver.  I didn't remember the name.
3  Q.  So you're aware that the truck driver,
4  Mr. Ramirez, was deposed.  Right?
5  A.  Yes.
6  Q.  And as far as you know Mr. Silva and
7  Mr. Ramirez were the only two eyewitnesses to this
8  incident.  Right?
9  A.  Yes.
10  Q.  Did you ever interview Mr. Ramirez?
11  A.  No.
12  Q.  The truck driver?
13  A.  No.
14  Q.  Was there anything that prevented you from
15  interviewing him?
16  A.  He was not there.
17  Q.  Did you call him up and try to get ahold of
18  him and try to interview him?
19  A.  Yes, I tried.  I called his dispatcher.  I got
20  the phone number to the dispatcher and I had several
21  conversations with the dispatcher trying to get ahold of
22  Mr. Ramirez.
23        And I asked for Mr. Ramirez to call me
24  back so we can -- I can gather some information, and I
25  never got that call back.

### Page 26

1  Q.  Other than leaving that message with the
2  dispatcher, did you make any attempts to follow up?
3  A.  Yes.  With the dispatcher.
4  Q.  How many times did you follow up?
5  A.  I would say maybe three.  Three, four times.
6  Q.  Prior to issuing your final report did you
7  ever see any written statements from the truck driver,
8  Mr. Ramirez?
9  A.  No.
10  Q.  So -- strike that.  New question.
11        Mr. Arriola was another gentleman who was
12  at the port that day, right?
13  A.  Yes.
14  Q.  And he was not literally an eyeball witness to
15  the event, but he heard screaming and he ran to the
16  scene after the fact.  Right?
17  A.  I don't remember specifically his statement
18  because we only -- we were focused on anyone who
19  actually witnessed the incident --
20  Q.  Okay.
21  A.  -- at the time.
22  Q.  Were you ever made aware at any time that
23  there was another employee at the port who was working
24  on some Conex boxes and he heard a scream and then,
25  after that, he ran over to where the forklift was?  Did

### Page 27

1  you ever become aware of that?
2  A.  I did become aware of that after the
3  investigation was closed.
4  Q.  Did you ever interview him at that time?
5  A.  I did not, personally, no.
6  Q.  Did anyone at the company interview him to
7  find out what happened?
8  A.  Someone did.  I think it was Stephen White
9  that interviewed him.
10  Q.  Okay.  Is Stephen White the local safety man
11  based in Houston?
12  A.  Yes.
13  Q.  And so are you over Mr. White?
14  A.  Yes.
15  Q.  Do you know what Mr. White did with that
16  information, if anything, that he obtained from
17  Mr. Arriola?
18  A.  I don't remember.
19  Q.  Certainly it didn't warrant or -- strike that.
20        That information, whatever it was
21  obtained from Mr. Arriola, did not cause you or anyone
22  else to issue an amended report or a supplemental
23  report.  Right?
24  A.  No, the information we obtained from
25  Mr. Arriola did not provide any other details at that

### Page 28

1  time that we didn't already know.
2  Q.  Were you aware that he's been deposed?
3  A.  Yes.
4  Q.  And have you reviewed his deposition
5  transcript?
6  A.  No.
7  Q.  Is there any particular reason you have not?
8  A.  I just learned about it yesterday.
9  Q.  So no one at the company has told you that
10  this gentleman had been deposed under oath.  Right?
11  A.  Until yesterday.
12  Q.  And do you have any plans to review that
13  deposition?
14  A.  No.
15  Q.  Because, again, as far as you're concerned or
16  the company is concerned, the investigation is closed.
17  Right?
18  A.  As far as -- right, for my department, my --
19  the investigation of my department is closed.
20  Q.  We can agree that there are sources of
21  information that exist that could change what you put in
22  your report.  Right?
23  A.  Yes.
24  Q.  Those include, at minimum, Mr. Arriola's
25  testimony, right?

# EXHIBIT A

## Page 29

1   A. Yes.
2   Q. Mr. Ramirez's testimony, right?
3   A. Yes.
4   Q. Did you consult with any experts, consulting
5 experts, anything like that, as part of your
6 investigation?
7   A. I'm trying to think back. No.
8   Q. We will talk about it more; but just to make
9 sure I'm clear, can you sort of specify why you
10 believe -- in more detail, if you can, than what you've
11 shared so far?
12   Can you specify in more detail why you
13 believe Delmy Recinos played a role in her own death?
14   A. So when you work in a marine terminal, it has
15 inherent dangers and part of the training we provide to
16 employees is that you have to have, basically, your head
17 on a swivel, right?
18   You have to be aware of your
19 surroundings. You have to be aware of moving equipment.
20 You have to be aware of backup alarms. And you have to
21 make sure that you always have eye contact with the
22 operator.
23   So in that regard -- and I don't
24 know -- again, we don't -- you know, based on the
25 investigation that I concluded, the video footage did

## Page 30

1 not show exactly what took place and we -- I didn't have
2 at that time an eyewitness that could tell me exactly
3 what took place.
4   So based on that information, you know,
5 if Ms. Recinos walked away or was in the process of
6 walking away in the vicinity of that forklift -- and,
7 again, I don't know where she was standing exactly;
8 there is no video footage -- and, again, at that time I
9 didn't have -- I didn't have information from the truck
10 driver. I couldn't get ahold of the truck driver.
11   So based on, you know, basic safety, best
12 practices, she played a role in that accident,
13 unfortunately.
14   Q. Do you also agree that Mr. Silva played a
15 role?
16   A. Yes.
17   Q. Could you expound upon that? Specify how and
18 why you believe he played a role.
19   A. Again, there are a lot of unknowns that I
20 didn't have information at that time. Video would have
21 been crucial, to see video.
22   You know, the operator has a similar set
23 of responsibilities. You know, make sure you have eye
24 contact with, you know, a walking pedestrian, make sure
25 you look back when you're, you know, backing up.

## Page 31

1   And again, you know, if we would have had
2 video, it would have probably confirmed some of these
3 things; but we don't, unfortunately.
4   Q. And you don't always have video. Right?
5   A. We don't always have video.
6   Q. Would you say that in many cases you don't
7 have video?
8   A. In -- correct.
9   Q. So oftentimes when you're investigating
10 incidents at the port, you have to rely upon eyewitness
11 testimony, correct?
12   A. Correct.
13   Q. You have to rely upon forensic data. And what
14 I mean by that is measurements, photographs, things like
15 that, right?
16   A. Correct.
17   Q. And so you were aware at that time -- well,
18 strike that.
19   Did you interview Mr. Silva as part of
20 your investigation?
21   A. Yes.
22   Q. What did he tell you?
23   A. I don't remember exactly what he said, but
24 what -- anything that he would have said at the time
25 would have been part of that report.

## Page 32

1   Q. And is this a report that you provided to the
2 lawyers to give us in the lawsuit?
3   A. I'm sorry. Repeat the question.
4   Q. Is this a report that you provided to the
5 lawyers to give us in the lawsuit?
6   A. I provided the report to our legal, yes.
7   Q. It's not confidential, is it?
8   A. No.
9   Q. You said that there are inherent dangers in a
10 marine terminal. Right?
11   A. Yes.
12   Q. It's an inherently dangerous place, isn't it?
13   A. There are dangers associated with the
14 environment, yes, which this is where training comes in
15 and we make sure everybody is trained in their -- to
16 their respective duties so they can identify these
17 dangers and stay away from these dangers.
18   MR. HAYNES: I'm going to object to the
19 responsiveness.
20   Q. Because it's an inherently dangerous place, it
21 is important to have clear rules, procedures that the
22 employees are aware of and trained on, right?
23   A. Yes.
24   Q. And that's the company's obligation. Right.
25   A. Yes.

Page 33

1  Q. The employee don't write the rules, do they?
2  A. No.
3  Q. The employees don't decide, for example, where
4  you put barriers to control traffic at the port. Right?
5  A. They can recommend and make suggestions; and
6  then we would review those recommendations, suggestions
7  and act accordingly.
8  Q. But you're supposed to be proactive instead of
9  reactive when it comes to safety. Right?
10  A. Yes.
11  Q. You're not supposed to wait for your employees
12  to complain or recommend something for you to -- from
13  the corporate side to be looking at these sorts of
14  things, right?
15  A. Generally, yes. But employees are more
16  familiar with their work environment than we are. They
17  are the ones out there doing the job.
18      So many times when an employee approaches
19  us and says, hey, I think it would be a good idea to
20  make this change or make that change, we would
21  definitely, you know, take their recommendation and
22  review it; and if it's something that merits a change,
23  we would make the change.
24  Q. But ultimately it's the company's
25  responsibility to have good, safe policies and

Page 34

1  procedures and to educate the employees on those, right?
2  A. Yes.
3  Q. And, in fact, you have a bird's-eye view of
4  the port in Houston, right? You have the cameras.
5  A. Yes.
6  Q. So if you like, you can literally watch what's
7  going on day in and day out, can't you?
8  A. Yes.
9  Q. Is that what you do?
10  A. Yes. I go into the cameras from time to time
11  when I'm not in Houston.
12  Q. So even though you're saying that the
13  employees might know more about how it works, you quite
14  literally can look into what's going on at any moment in
15  time that you want. Right?
16  A. Well, the same way the camera didn't capture
17  the accident, the cameras don't capture every single
18  corner of the terminal.
19  Q. The cameras capture the area where this
20  incident happened, right?
21  A. No. The general area, yes, from afar. I
22  think there is one camera that captured from a distance
23  and I believe there was another camera that was pointed
24  at vessels at the time; and then after the incident took
25  place, it got moved to the incident area.

Page 35

1      But again, you know, these cameras are
2  moved for different reasons by different people. So
3  today that camera could be pointing to that area and
4  have a great shot of the area. Tomorrow it will be
5  pointing to a vessel and completely -- which is what
6  happened during that incident.
7  Q. Right. The cameras that we're talking
8  about -- and we can go through the footage, but the
9  cameras we're talking about can turn 360, right?
10  A. Some cameras can. Some cameras are --
11  Q. Stationary?
12  A. -- stationary, correct.
13  Q. And there is one camera in particular that I
14  think we're both thinking of where it's looking out at
15  the water, but it can swivel --
16  A. Yes.
17  Q. -- and look back at the cargo area, including
18  a longer view or a farther away view from where this
19  happened. Right?
20  A. Yes.
21  Q. And is it on an automated swivel, or does it
22  always have to be manually moved?
23  A. So at that time that camera was manual.
24  Manual. The system does allow us to place the cameras
25  on an automated swivel, where it can look at different

Page 36

1  areas, a tour. They call it a tour.
2      But that camera at that time, it was on
3  manual mode.
4  Q. How do you spell tour, if you know?
5  A. T-O-U-R.
6  Q. So you or someone at your company can control
7  where the cameras are placed so you can get a bird's-eye
8  view of what's going on pretty much at any time. Right?
9  A. Yes.
10  Q. Those are 24-hour cameras. Right?
11  A. Yes.
12  Q. And obviously at the port there are Homeland
13  Security issues, potentially. Right?
14  A. Yes.
15  Q. Is that one of the reasons you have so many
16  cameras there?
17  A. Yes.
18  Q. Is that one of the reasons you have the
19  cameras pointing at the vessels sometimes?
20  A. No.
21  Q. What's the purpose of pointing the cameras at
22  the vessels?
23  A. For cargo operations. So if managers who are
24  on the cargo side, they like to look at the vessels to
25  see how -- what the production is, you know, how

**EXHIBIT A**

Page 37

1 everything is flowing, to make sure everybody is -- you
2 know, everything is moving according to plan, to
3 schedule.
4    Q.  Mr. Contreras, I assume we can agree this is a
5 very serious case.
6    A.  Yes.
7    Q.  When someone loses their life at any time it's
8 serious, but particularly when someone loses their life
9 at their workplace.  Right?
10    A.  Yes.
11    Q.  And you wouldn't be surprised if the family is
12 experiencing a lot of anguish, right?
13    A.  Absolutely.
14    Q.  And you agree that the family has a right to
15 know what happened, right?
16    A.  Yes.
17    Q.  And they have a right to engage lawyers, file
18 a lawsuit, hire experts, inspect the scene, things like
19 that, to help them find out what happened.  Right?
20    A.  Yes.
21    Q.  And you're aware that Delmy's husband actually
22 used to work at the port.  Right?
23    A.  No.
24    Q.  Did you know that?
25    A.  No, I didn't know that.

Page 38

1    Q.  So he and his wife both had long-term
2 employment at the port.  Did you know that?
3    A.  No.
4    Q.  And so I assume you're okay with me asking you
5 tough questions today, right?
6       MR. NASH:  Object to form.
7    A.  I'm not okay with it, but...
8       If you have to ask a tough question.
9    Q.  (By Mr. Haynes)  What I mean is you're okay
10 with me asking questions and the answer might not help
11 the defense in the case, it might not put the company in
12 a positive light.
13       Are you okay if that's what happens?
14       MR. NASH:  Objection, form.
15    A.  No, I'm not okay.
16    Q.  (By Mr. Haynes)  Okay.  Do you think that the
17 company has any responsibility at all for what happened?
18    A.  No.
19    Q.  Do you think the company could have done
20 anything better than it did?
21    A.  No.
22    Q.  And that's based upon your investigation and
23 report that you finished back in 2022.  Right?
24    A.  Correct.  This is without having transcripts
25 or information that you may have, which I don't have

Page 39

1 access to.
2    Q.  We're in the Shell building in downtown
3 Houston, aren't we?
4    A.  Yes.
5    Q.  We're on the 43 floor, aren't we?
6    A.  Yes.
7    Q.  It's your lawyer's office, right?
8    A.  Yes.
9    Q.  Your lawyers have copies of all of those
10 documents, don't they?
11    A.  I don't know.
12    Q.  You would hope that they would, right?
13    A.  Right.
14    Q.  So there is nothing stopping you from, as soon
15 as we leave here today, from asking them, hey, can I get
16 a copy of those depositions Mr. Haynes was asking me
17 about.  Right?
18    A.  Well, that's not -- that's not -- that's not
19 part of my role in the company.  I don't ask attorneys
20 for information.  I provide attorneys with information.
21 It's the other way around.
22    Q.  Okay.  Setting aside lawyers, attorneys.
23 Okay?  If a catastrophic event like a death happens at
24 the port, okay?  Are you with me so far?
25    A.  Yes.

Page 40

1    Q.  And you're doing an investigation, right?
2    A.  Yes.
3    Q.  You want to get as much information as you can
4 to find out what happened, right?
5    A.  Yes.
6    Q.  That's your job, isn't it?
7    A.  Absolutely.
8    Q.  And you owe that to the workers there, don't
9 you?
10    A.  Yes.
11    Q.  You owe that to their families, right?
12    A.  Yes.
13    Q.  Because you agree that every worker has a
14 right to go home to their families at night, right?
15    A.  Hundred percent.
16    Q.  And that's what -- your job, you're in safety,
17 you're responsible for ensuring that, aren't you?
18    A.  Yes.
19    Q.  And so when you're conducting an investigation
20 of a catastrophic event like a death, you want to get as
21 much information as you can from as many sources as you
22 can, right?
23    A.  Yes.
24    Q.  And in other words, leave no stone unturned.
25 Right?

Page 41

1    A.  Correct.
2    Q.  Because you try to learn from catastrophic
3  events like this so you can potentially implement
4  changes and prevent them in the future.  Right?
5    A.  Yes.
6    Q.  It's very common in the safety field to try to
7  do what are called lessons learned.  Right?
8    A.  Yes.
9    Q.  Or root cause analysis.  Right?
10   A.  Yes.
11   Q.  And once you find out what you think happened
12 based on as much information as you have or can obtain,
13 then you teach your employees about what happened.
14 Right?
15   A.  Yes.
16   Q.  And you say, here's what we could have done
17 better, what our employees could have done better, and
18 this is how we're going to prevent this in the future.
19 Right?
20   A.  Yes.
21   Q.  And you -- if you become aware of information
22 that exists during that period where you're making a
23 report, prior to the time you make a report, you're
24 going to go try get it, aren't you?
25   A.  If the information is -- yes, I would try to

Page 42

1  get it.
2    Q.  And so now, fast-forward to now, you're aware
3  there is information that exists that could shed light
4  on what happened, right?
5    A.  No.  I'm aware that there were depositions
6  made.  I don't know what information is in that
7  deposition.
8    Q.  Well, but that's like saying I'm aware there
9  was a witness who gave a statement before I do my
10 report, but I'm not going to go get the statement
11 because I don't know what's in it.  Right?
12   A.  Again, the investigation was concluded in
13 September of '22.
14   Q.  Is there anything from preventing the company
15 from reopening the investigation and looking at
16 additional information that comes out?
17   A.  That's not a normal practice.
18   Q.  Well, this wasn't a normal incident, was it?
19   A.  No.
20   Q.  People don't normally get split in half at the
21 port, do they?
22   A.  No.
23   Q.  And that's what happened to Ms. Recinos, isn't
24 it?
25   A.  She was involved in a fatality.

Page 43

1    Q.  She was split in half.  You know that, don't
2  you?  You've seen the pictures.
3        MR. SEIPEL:  Object to form.
4    A.  I haven't seen the pictures.
5    Q.  (By Mr. Haynes)  You've never seen the
6  pictures?
7    A.  I don't want to see the pictures.
8    Q.  Why don't you want to see the pictures?
9    A.  Well, it's not -- in my line of work this is
10 something that this is the worst-case scenario, what
11 happened to Ms. Recinos; and I had never -- I didn't
12 feel the need to look at the pictures.
13       I think we gathered enough information to
14 know what took place, how it took place, and, you know,
15 that was an enough at that time.
16   Q.  Well --
17       MR. HAYNES:  Let me object to the
18 responsiveness.
19   Q.  (By Mr. Haynes)  Mr. Contreras, you agree with
20 me -- let me back up.  New question.
21       Is it your testimony that you have never
22 seen any photography of Ms. Recinos's body as it lay
23 when everything came to rest?
24   A.  Correct.
25   Q.  And you're aware that that is available.

Page 44

1  There are many photographs taken.  Right?
2    A.  Yes, I was aware at the time that the photos
3  were available.  I didn't think they would provide -- I
4  met with the team that was there that day.  We talked
5  about in length about all the information that was
6  gathered from that day and the days after.
7        I was there for a full week at the
8  terminal following the incident.  I think the incident
9  was and the 2nd, on a Friday, and I took a flight on
10 Sunday with our HR manager, as well, from Miami.
11       We both came over and we spent a whole
12 week investigating the case.  I met with the team, they
13 described the whole scene, they described what they saw.
14 They described, you know, all the details.  I didn't
15 feel the need to look at the pictures per se.
16       I think, you know, for me, personally,
17 these things -- these are things I don't forget.  So if
18 I have the opportunity to avoid looking at a picture of
19 somebody injured, then -- unless it's going to shed some
20 light into the investigation, then I just avoid looking
21 at the injured person.
22       MR. HAYNES:  Let me object to the
23 responsiveness.
24   Q.  (By Mr. Haynes)  Is it your testimony that you
25 intentionally did not look at the photographs of the

Page 45

1  incident, including where Ms. Recinos's body came to
2  rest?  Right?
3      A.  I looked at pictures of the incident, yes.  I
4  didn't look at pictures of the body per se.
5      Q.  Well, I mean, you're aware that there are
6  pictures of how everything came to rest right after it
7  happened.  Right?
8      A.  Yes.
9      Q.  Where she -- before her body was moved, in
10 other words, right?
11     A.  Yes.
12     Q.  Have you seen those pictures?
13     A.  No.
14     Q.  And that was a choice that you made.  You did
15 not want to see those pictures?
16     A.  Right, based on the meetings that we had with
17 the staff that was there, the personnel that was there
18 on the ground, the area was not moved or tampered with.
19         The cameras were placed in the area where
20 Ms. Recinos was.  I did see her body through the
21 cameras.
22     Q.  From afar?
23     A.  From afar, right.  From that angle looking
24 down.
25         So I did get to see where the body was in

Page 46

1  relation to the forklift.  I did get to see the entire
2  area, how it was laid out following the accident; and
3  again, I didn't feel that I needed any closeup of
4  Ms. Recinos's body to add any context to the
5  investigation whatsoever.
6      Q.  It's upsetting to look at a photograph like
7  that, isn't it?
8      A.  It's upsetting to see somebody fatally wounded
9  at the job.
10     Q.  It's disturbing, isn't it?
11     A.  Yeah.
12     Q.  And that's the reason you don't want to look
13 at it.  Right?
14     A.  Correct.
15     Q.  You can imagine if you didn't want to look at
16 a photograph of Ms. Recinos when she was passed away,
17 can you imagine the anguish that the family is feeling?
18     A.  I can't imagine.
19     Q.  It's unimaginable, isn't it?
20     A.  Correct.
21     Q.  You can't put a price on it, can you?
22         MR. NASH:  Object to form.
23     A.  It's unimaginable.
24     Q.  (By Mr. Haynes)  And your testimony is that
25 you don't think that there is any forensic value, any

Page 47

1  data that you could have obtained from looking at her
2  body, right?
3      A.  Correct.
4      Q.  And are you a certified accident
5  reconstructionist?
6      A.  No.
7      Q.  Do you have any specialized knowledge in that
8  field?
9      A.  Yes.
10     Q.  Okay.  Tell me about that, please.
11     A.  I have a Nova University certification for
12 incident management.  So I have several certifications,
13 but that's one them.
14     Q.  Could you spell the name of the university,
15 please?
16     A.  Nova Southeastern University.
17     Q.  N-O-V-A?
18     A.  N-O-V-A, yes.
19     Q.  Okay.  Where is that based?
20     A.  I don't remember, to be honest.  It's in, I
21 think, Fort Lauderdale, Florida.
22     Q.  And you said you have a certification in
23 incident management?
24     A.  Yes.
25     Q.  How does that relate to accident

Page 48

1  reconstruction?
2      A.  It's more about how to manage an incident site
3  and incident response; gathering information,
4  interviewing witnesses, so on and so forth.
5      Q.  So it's more about acquiring information?
6      A.  Correct.  And manage an incident after it
7  takes place.
8      Q.  And you understand that's different from
9  accident reconstruction, where you take data that's been
10 acquired and try to determine exactly how something
11 happened.  Right?
12     A.  I understand.
13     Q.  So would you say that you're not qualified in
14 accident reconstruction?
15     A.  I am not qualified in accident reconstruction.
16     Q.  And so would it surprise you to learn that you
17 can obtain valuable information about how a crash
18 happened by looking at how the body was injured and
19 ultimately --
20     A.  Yes.
21     Q.  -- how the death was caused?
22     A.  I'm aware of that.
23     Q.  And you issued a report that you're now saying
24 at least you hold Ms. Recinos responsible or you feel
25 like she played a role in the crash, in part, right?

## Page 49

1  A.  Correct.
2  Q.  But you didn't look at the photographs of her
3  body which you agree has valuable information, right?
4  A.  Again, I met with the team, I got the
5  description of how the body was laid out.  I saw in the
6  camera how the body was laid out.
7  So I got to see Ms. Recinos's body before
8  it was covered, you know, how it was from a distance,
9  how it was laid out in relation to the forklift.
10  Q.  Did you see the tire marks on her body?
11  A.  No.  From the camera angle, I couldn't see the
12  tire marks.
13  Q.  Are any of the -- the team that you mentioned,
14  are they qualified as accident reconstruction experts?
15  A.  No.
16  Q.  So you really don't know what you could have
17  missed in terms of the data you could have acquired from
18  reviewing her body and the injuries to it?
19  MR. NASH:  Objection to form.
20  A.  In regards to accident reconstruction, no.
21  Q.  (By Mr. Haynes)  Do you know whether or not
22  she was struck once or twice or more times?
23  A.  My understanding is she was struck once.
24  Q.  Do you agree that reviewing the damage and
25  injury to her body can help us understand whether she

## Page 50

1  was struck more than once?
2  A.  I don't know.  That's --
3  Q.  That's beyond your expertise?
4  A.  That's before -- yeah, correct, that's beyond
5  my expertise.
6  Q.  Do you agree that whether she was struck once
7  or twice sheds light on the respective
8  responsibilities of the people involved?
9  MR. SEIPEL:  Objection, form.
10  A.  Again, that's not my area of expertise.
11  Q.  (By Mr. Haynes)  Can we just agree that your
12  report could be wrong?
13  A.  Again, my report was factual at the time that
14  the report was created.
15  Q.  Well, it could be wrong, couldn't it?
16  A.  It could be wrong, yes.
17  Q.  And you really aren't in a position to say
18  today whether it was right or wrong because of all of
19  this extra information.  Right?
20  A.  Well, again it was correct with the
21  information that was provided to me at that time.
22  Q.  And I don't mean that you weren't writing
23  things down that people told you accurately.  I'm
24  talking about whether your ultimate conclusion was
25  right.

## Page 51

1  Isn't it fair that ultimately there is a
2  lot more information that you would need to review now
3  to determine that Delmy played a role in her own death?
4  MR. NASH:  Objection to form.
5  A.  There was no ultimate conclusion.  There has
6  been no speak of an ultimate conclusion.
7  Q.  (By Mr. Haynes)  Do you have an ultimate
8  conclusion, even if you didn't put it in the report?
9  A.  No.
10  Q.  So is the report -- it's inconclusive as far
11  as who caused the crash?
12  MR. SEIPEL:  Objection, form.
13  Q.  (By Mr. Haynes)  Or caused Ms. Recinos' death?
14  A.  There was no conclusion, correct.
15  Q.  So are you willing to keep an open mind and
16  review additional information that might reveal whether
17  or not it's fair to say that she played a role in her
18  own death.
19  MR. NASH:  Objection, form.
20  A.  I'm open.  Yes, I would be willing to see, you
21  know, what other folks had to say.  But again, it's
22  not -- I think the end result, unfortunately, is, you
23  know, Ms. Recinos was struck and was fatally wounded and
24  nothing we talk about today can change that.
25  Q.  (By Mr. Haynes)  And that's very tragic, isn't

## Page 52

1  it?
2  A.  It is.
3  Q.  Have you ever apologized to the family?
4  A.  I've never spoken to the family.
5  Q.  So you've never apologized to them?
6  A.  No.
7  Q.  Will you apologize today?
8  MR. NASH:  Objection, form.
9  A.  I would prefer to do it in person, to be
10  honest.  I think, you know, this is very impersonal.
11  Q.  (By Mr. Haynes)  Well, have you ever bought a
12  plane ticket and flown to Houston and tried to talk to
13  me or arrange a meeting with the family to say you're
14  sorry?
15  A.  No, no.
16  Q.  Is there anything preventing you from saying
17  you're sorry here today?
18  MR. NASH:  Objection, form.
19  A.  No.
20  Q.  (By Mr. Haynes)  I will give you the
21  opportunity if you would like it.
22  MR. NASH:  Same objection.
23  A.  I just -- again, I think it's very personal in
24  nature.  My mom passed away.  I wouldn't want to see a
25  video of somebody saying they're sorry, so...

Page 53

1     Q.  (By Mr. Haynes)  Okay.  Has anybody from the
2 company ever said they're sorry?
3     A.  I don't know.
4          MR. NASH:  Objection, form.
5     Q.  (By Mr. Haynes)  Anything preventing them from
6 doing so?
7          MR. NASH:  Same objection.
8     A.  I don't know.
9     Q.  (By Mr. Haynes)  I'm going to show you
10 Exhibit 1.
11        (Marked was Contreras Exhibit 1.)
12     Q.  (By Mr. Haynes)  Can you see it on your
13 screen, sir?
14     A.  Very -- if I'm supposed to read text, no.
15     Q.  Let me blow it for you.  Okay?
16       Do you recognize that?
17     A.  Yes.  That's me.
18     Q.  Is this a copy of your LinkedIn page?
19     A.  Yes.
20     Q.  We can see your name, right, "Omar Contreras"?
21     A.  Yes.
22     Q.  And it says that you work for Seaboard Marine.
23 True?
24     A.  Yes.
25     Q.  And it says you're the Safety and Hazardous

Page 54

1 Materials Compliance Manager at Seaboard Marine.  Is
2 that right?
3     A.  Yes.
4     Q.  Is that a correct title?
5     A.  Well, my official title at Seaboard is
6 safety/hazmat manager.
7     Q.  And it says you're based in Miami, Florida.
8 Right?
9     A.  Yes.
10     Q.  And then there is a section called Experience
11 that provides more detail.  Right?
12     A.  Yes.
13     Q.  It says you've been working at the company for
14 18 years.  Right?
15     A.  Yes.
16     Q.  And you are based in the Port of Miami,
17 Florida.  Right?
18     A.  Yes.
19     Q.  And it says that you "design, direct and
20 implement effective compliance programs for adherence at
21 DOT and international rules governing transportation of
22 hazardous materials as well as adherence to OSHA
23 guidelines by U.S.-based employees in multiple
24 facilities and locations."
25       True?

Page 55

1     A.  Yes.
2     Q.  And that's accurate, isn't it?
3     A.  Yes.
4     Q.  It also says that you serve as the
5 "company lead trainer for OSHA and DOT compliance."
6       Right?
7     A.  Yes.
8     Q.  "Developing internal training programs to meet
9 job specific functions of employees working in
10 specialized areas."
11       True?
12     A.  Yes.
13     Q.  And all of that is accurate, isn't it?
14     A.  Yes.
15     Q.  Tell me about these "multiple facilities and
16 locations" where you're "designing, directing and
17 implementing compliance programs," please.
18     A.  So we're a global company.  We have offices
19 throughout the United States.  We have tumoring
20 terminals.  One in Miami, one in Houston.
21       And we have also international offices
22 throughout different countries in Central, South America
23 and the Caribbean.
24     Q.  And do you have responsibility over all of
25 those locations?

Page 56

1     A.  I have responsibility when it comes to the
2 safety program, domestically, under what OSHA governs,
3 and then the hazardous cargo program internationally,
4 globally, as far as how to transport hazardous cargo.
5     Q.  So you have a big job?
6     A.  Yes, some would say.
7     Q.  And your shirt today says "Seaboard Marine,"
8 doesn't it?
9     A.  Yes, sir.
10     Q.  And part of the OSHA guidelines or rules,
11 really, they govern forklift safety, don't they?
12     A.  Yes.
13     Q.  Is that part of what you're responsible for?
14     A.  Yes.
15     Q.  Are you a certified forklift operator?
16     A.  No.
17     Q.  Have you ever operated a forklift?
18     A.  Yes.
19     Q.  Have you ever operated a forklift like
20 Mr. Silva was operating?
21     A.  No.
22     Q.  What kind of forklifts have you operated?
23     A.  Small forklifts, under 30,000-pound capacity.
24     Q.  And do those require any special
25 certifications or training?

1    A.  You have to be trained, yes.
2    Q.  When did you operate those?
3    A.  I operated up to 2006.  When I started at
4  Seaboard I didn't operate anymore, but previous to that
5  I spent eight years at Aeropia, Inc., which was there on
6  the LinkedIn.
7        So I operated forklifts there; and
8  previous to that, in my previous job, I also operated
9  forklifts.
10    Q.  So in the past 18 years you have not regularly
11  operated a forklift?
12    A.  Correct.
13    Q.  And you're responsible for training employees
14  at the ports on how to operate these forklifts?
15    A.  I'm responsible for the training programs that
16  are administered to employees.
17    Q.  So in other words, you come up with the
18  training policies, the training modules.  Right?
19    A.  Correct.
20    Q.  You may not literally be the one training
21  them, but you're deciding how they get trained?
22    A.  Correct.
23    Q.  Have you ever sat inside one of those
24  forklifts?
25    A.  Yes.

1    Q.  Why?
2    A.  Just to understand the operator's line of
3  sight, the operator's -- when he's sitting, you know,
4  what he has to deal with, the controls.
5        There's a lot of things that go into, you
6  know, the safety program.  You know, there are a lot of
7  things that come our way that we have to look into, from
8  an operator, you know, a machine not working properly,
9  to an operator, you know, complaining regarding, you
10  know, the seat or how comfortable he is.
11        So it's a large scope that we have to
12  deal with as far as equipment.
13    Q.  Okay.  Setting aside forklifts, what other
14  kinds of OSHA rules and regulations are you responsible
15  for implementing training programs on?
16    A.  Everything that OSHA encompasses.  So for
17  example, hearing conservation.  So areas that are high
18  noise areas, so we have those employees in hearing
19  conservation program.
20        If there is -- you know, fall protection,
21  so we have employees working at heights.  So fall
22  protection training is another big one that we do a lot
23  of.
24        So there's a lot of -- a lot of things
25  that OSHA requires and then, you know, we -- that's the

1  baseline for what we do.  And in some areas we go above
2  and beyond from what OSHA requires to make sure
3  employees are safe.
4    Q.  So OSHA sets the minimum requirement.  Right?
5    A.  Correct.
6    Q.  And in some cases Seaboard decides to go above
7  that.  Right?
8    A.  Correct.
9    Q.  So you -- are you familiar with Section 19.10
10  of OSHA?
11    A.  Yes.
12    Q.  Is that the general OSHA safety rule?
13    A.  Yes.
14    Q.  And it encompasses in its subsections pretty
15  much everything you can imagine in terms of safety.
16  Right?
17    A.  Right.  So most of 19.10 doesn't apply to the
18  marine terminal.
19    Q.  Okay.
20    A.  There is only some parts of 19.10 that apply
21  to the marine terminals.
22    Q.  So you have responsibility for all the
23  sections of 19.10 that apply to marine terminals?
24    A.  Yes.
25    Q.  And the forklift certainly apply to marine

1  terminals.  Right?
2    A.  Yes.
3    Q.  So you have a very big job, as we said.
4  Right?
5    A.  Yes, sir.
6    Q.  You have a lot of responsibility, don't you?
7    A.  Yes, sir.
8    Q.  How many employees do you -- are you
9  responsible for training in terms of implementing a
10  program at the ports?
11    A.  So I think the port in Houston has
12  about -- again, I don't know the exact count.  I think
13  it's over -- close to 400, if not a little over or a
14  little under.
15        And then in Miami we have about 250.
16  They are not all operational employees.  Some employees
17  work in the office.  But again, you know, there's
18  ergonomics and sort of other things that apply to office
19  employees that don't apply to operational employees,
20  what we call operational employees, somebody working out
21  in the terminal yard.
22    Q.  And in terms of DOT -- strike that.
23        In terms of the US Department of
24  Transportation hazardous material regulations, are you
25  responsible for the training programs when it comes to

Page 61

1  say a truck driver or a vessel or how does that work?
2      A.  No.  So I'm only responsible for training
3  employees.  So truck drivers are not employees of the
4  company.  Vessels are not -- the crew are not employees
5  of the company.
6          The crews are chartered, for the most
7  part.  So I only deal directly -- my responsible is only
8  for employees of the company.
9      Q.  And just give me an example or two of when the
10  employees are handling hazardous materials.
11      A.  So, for example, if Mr. Silva -- to use
12  Mr. Silva as an example -- if he, you know, moves a
13  hazardous container from Point A to Point B, he gets
14  general awareness on hazmat, right, which tells you this
15  is hazardous, this is a placard, this color means
16  flammable, this color means toxic.
17          So he will get a general training.  If
18  the person is more in-depth with documentation, then
19  they get a more in-depth training on, you know, the
20  regulations and the books and how to look up information
21  for hazmat.
22      Q.  Because some of these containers, if not all
23  of them, that Mr. Silva will be handling are going to be
24  going on the back of an 18-wheeler at some point.
25  Right?

Page 62

1      A.  Correct.
2      Q.  And so we know that 18-wheelers sometimes
3  transport hazardous materials that have a whole host of
4  regulations that govern them.  Right?
5      A.  Correct.
6      Q.  So in addition to your OSHA training and
7  responsibilities you also have training and
8  responsibilities for this entire area of hazardous
9  materials and those regulations that are covered by the
10  US DOT.  Right?
11      A.  Correct.
12      Q.  Have you ever personally worked a job where
13  you handled hazardous materials?
14      A.  Yes.
15      Q.  What job was that?
16      A.  Aeropia, Inc., they were a chemical
17  distributor; so I was a quality control manager at that
18  time.  Previous to that I was a warehouse manager.
19          And part of my job was to -- you know,
20  storage of all the chemicals and handling of the
21  chemicals.  Not pouring chemicals but just storage and
22  distribution.  So we were sort of a distribution center
23  for certain manufacturers of chemicals.
24      Q.  Other than the ports, did you tell me that you
25  have responsibility over any other facilities or

Page 63

1  locations in terms of training?
2      A.  As far as -- no.  So the ports is the bulk of
3  my responsibility.  If there is an issue with an office,
4  you know, I may get an email and, you know, provide
5  guidance.  But mostly my responsibility lies over the
6  ports, Miami and Houston.
7          We do have our corporate headquarters in
8  Miami has a very large warehousing facility.  We're
9  responsible for that facility as well from an OSHA
10  standpoint.
11      Q.  What does that warehouse handle?
12      A.  It's the -- that's where we have our booking
13  offices, where when you call Seaboard and we take
14  bookings for our vessels.  And that's also where there
15  is a large warehouse facility where we do breakbulk
16  cargo and customers will send us -- if you have a
17  small -- you buy some things on Amazon and you want to
18  ship them to Honduras but you don't want to pay for a
19  full container, we will take your shipment, we will put
20  it in a container with other customers just like you to
21  send that one container to Honduras.
22      Q.  And you work for Seaboard Marine, Ltd.
23  right?
24      A.  Yes.
25      Q.  Is that what your checks say?

Page 64

1      A.  Yes.
2      Q.  And who is your boss?
3      A.  Daniel O'Neill.
4      Q.  Who does he work for?
5      A.  Seaboard Marine.
6      Q.  Is he based in Miami also?
7      A.  Yes.
8      Q.  What is his job title?
9      A.  Director of compliance.
10      Q.  That's obviously a safety job, right?
11      A.  He oversees several divisions.  So my division
12  is safety and hazardous cargo.  He oversees security,
13  and he oversees the breakbulk cargo in the corporate
14  office.
15      Q.  Do you know who his boss is?
16      A.  Bruce Brecheisen.
17      Q.  How do you spell that, if you can?
18      A.  B-R-E-C-H-E-I-S-E-N, I think.  I hope.
19      Q.  It's a good guess.
20      A.  He's the vice president, senior vice-president
21  of the company.
22      Q.  And does he have a specific title, like senior
23  vice-president of something?
24      A.  I don't remember.
25      Q.  Does he have a safety job, or is he more just

Page 65

1 an executive?
2    A.  He's an executive.
3    Q.  So is Mr. O'Neill the highest ranking safety
4 employee at the company, or would you say you are?
5    A.  He is the highest ranking, yes.
6    Q.  So you're the second highest safety employee
7 as far --
8    A.  As far as rank, correct.
9    Q.  Technically, Mr. Silva worked for Jacintoport
10 International.  Right?
11    A.  That's correct.
12    Q.  That's a distinct company from Seaboard.
13 Right?
14    A.  I'm sorry?  Repeat.
15    Q.  That's a distinct company from Seaboard.
16 Right?
17    A.  It's an affiliate.  We're all under the
18 Seaboard Corporation umbrella.
19    Q.  But you still have responsibilities for
20 training as it relates to Mr. Silva.  Right?
21    A.  Yes.  I oversee the Jacintoport safety
22 program.  So anything Mr. White does, Mr. White reports
23 to me.
24         Anything safety related that is going to
25 change or needs to change has to be approved by myself

Page 66

1 or Mr. Dan O'Neill.
2         MR. NASH:  Can we take a restroom break?
3         THE VIDEOGRAPHER:  Off the record at
4 11:24.
5         (Recess taken at 11:24 a.m., resuming at
6         11:37 a.m.)
7         THE VIDEOGRAPHER:  On the record at
8 11:37.
9    Q.  (By Mr. Haynes)  Mr. Contreras, we took a
10 brief break.  Are you ready to keep going?
11    A.  Yes.
12    Q.  I want to show you Exhibit No. 2.
13         (Marked was Contreras Exhibit 2.)
14    Q.  (By Mr. Haynes)  Bear with me one second.  Let
15 me try it again.
16         I'm going to show you Exhibit No. 2.  Can
17 you see that on your screen?
18    A.  Yes.
19    Q.  Do you recognize what that is?
20    A.  Yes.
21    Q.  What is that?
22    A.  That's our safety policy.
23    Q.  So let me see if I can pull it up here.  So we
24 obviously can see it's titled "Safety Policy."  Right?
25    A.  Yes.

Page 67

1    Q.  And it says -- it talks about the company,
2 right?
3    A.  Yes.
4    Q.  And it's got Seaboard Marine's logo who you
5 work for.  Right?
6    A.  Yes.
7    Q.  It also has Jacintoport, right?
8    A.  Yes.
9    Q.  That's who Mr. Silva worked for?
10    A.  Yes.
11    Q.  And it's got another company called Seaboard
12 Solutions?
13    A.  Yes.
14    Q.  Does that company still exist?
15    A.  Yes.
16    Q.  Okay.  What do they do?
17    A.  They offer services to customers on solutions
18 to ship their cargo.  So it's not -- for example, if a
19 customer wants to send some cargo that may not be with
20 Seaboard, they can reach out to Seaboard Solutions and
21 they will find the best company to transport their cargo
22 to wherever the customer wants to ship their cargo.
23    Q.  Almost like a broker?
24    A.  Kind of like a forwarder almost, yeah.
25    Q.  So this policy applies to all of those

Page 68

1 companies.  Right?
2    A.  Yes.
3    Q.  And, in fact, the policy itself just kind of
4 refers to the company, meaning them all together.
5 Right?
6    A.  Yes.
7    Q.  But is it fair that Seaboard Marine is the one
8 that wrote this policy?
9    A.  Yes.
10    Q.  And it says, "The Company understands that the
11 firm's most important assets are its workers."
12         Did I read that right?
13    A.  Yes.
14    Q.  No doubt in your mind that Seaboard Marine
15 believes that its most important assets are its workers,
16 right?
17    A.  Yes.
18    Q.  It says, "Further, we believe that our
19 organization's safety culture should recognize that each
20 of our workers has the right to return home in the same
21 good physical condition as he/she arrived to work in."
22         True?
23    A.  Yes.
24    Q.  That's a very important principle that
25 Seaboard Marine follows.  Right?

Page 69

1    A.  Yes.
2    Q.  And it needs to do everything it can to
3  guarantee that.  Right?
4    A.  Yes.
5    Q.  And that didn't happen with Ms. Recinos, did
6  it?  She did not go home in the same condition she came
7  to work that day in, did she?
8    A.  She did not.
9    Q.  And then it says, "Accordingly, the Company
10  will commit itself towards exploring all reasonable and
11  appropriate measures to ensure that such a right is
12  ensured through both word and deed."
13       Did I read that right?
14    Q.  So what this is saying is not only is it
15    Q.  So what this is saying is not only is it
16  appropriate and required to have thorough, clear,
17  effective safety policies on paper; you also have to
18  enforce those policies and make sure they are being
19  followed.  Right?
20    A.  It doesn't exactly say that.
21    Q.  Well, I mean, "word and deed."  That's what
22  I'm talking about.  Right?  You can't just have a safety
23  culture that's based on words in a book.  Right?
24    A.  Yes.
25    Q.  You have to have effective, clear safety

Page 70

1  policies in a book, on paper.  Right?
2    A.  Policies can come in many forms.
3    Q.  But at minimum you have to have it written
4  down somewhere so you can build training programs on
5  them, you can educate people on them.  Right?
6    A.  Not necessarily.
7    Q.  Well, that's an important component of a good
8  safety program, isn't it?
9    A.  Not necessarily.
10    Q.  Well, clearly Seaboard Marine has lots of
11  written safety policies.  Right?
12    A.  We have one safety policy which is the one
13  that you provided as an exhibit here.
14    Q.  You have safety training materials that --
15    A.  We have --
16    Q.  -- written down?
17    A.  -- safety training materials, yes.
18    Q.  We can broaden it.
19       It's important for a company to have
20  clear, effective safety policies and training materials.
21  Is that fair?
22    A.  Yes.
23    Q.  And Seaboard Marine does have that?
24    A.  Yes.
25    Q.  And they require that Jacintoport employees in

Page 71

1  Houston to follow those, right?
2    A.  Yes.
3    Q.  And -- but just having the words on the page
4  is not enough.  The deeds also have to promote that
5  safety culture.  Right?
6    A.  Yes.
7    Q.  That means you have to actually train the
8  employees based on those documents.  Right?
9    A.  Correct.
10    Q.  You have to make sure that the training is
11  updated and current.  Right?
12    A.  Correct.
13    Q.  You have to make sure that they have whatever
14  certifications they need.  Right?
15    A.  Correct.
16    Q.  And you have to make sure that safety policies
17  and those training concepts are being enforced, meaning
18  if somebody is braking the safety rules, you have to
19  monitor that and correct it.  Right?
20    A.  Yes.
21    Q.  You don't want to just let somebody
22  continually break safety rules, do you?
23    A.  Correct.
24    Q.  Because past behavior predicts future
25  behavior, doesn't it?

Page 72

1       MR. SEIPEL:  Objection, form.
2    A.  Sometimes.
3    Q.  (By Mr. Haynes)  Well, when it comes to, for
4  example, forklift safety, if somebody continually
5  engages in unsafe behavior in a forklift, that tends to
6  show that they are going to keep doing that, absent some
7  kind of intervention by training, retraining, things
8  like that.  Right?
9    A.  Correct.
10       MR. SEIPEL:  Objection, form.
11    Q.  (By Mr. Haynes)  So Seaboard Marine believes
12  that a safety culture is based not only on words but
13  also on deeds.  Right?
14    A.  Yes.
15    Q.  Looking again at Exhibit No. 2, this is the
16  safety policy of Seaboard Marines.
17       It says, in light of what we just looked
18  at, "...the Company adopts, within this policy, each of
19  the occupational safety and health regulations that have
20  been promulgated by the Occupational Safety & Health
21  Administration," or OSHA.  Right?
22    A.  Yes.
23    Q.  And specifically it says within section -- or
24  "Part 1917 (Rules for Marine Terminals)," and also
25  (Rules for Longshoring)."  Right?

EXHIBIT A

## Page 73

1    A.   Correct.
2    Q.   And then it also aids "(Rules for General
3  Industry," particularly whenever they are relevant.
4  Right?
5    A.   Correct.
6    Q.   And that's what you were talking about earlier
7  where not everything in 19.10 applies to marine
8  terminals; but if it does, Seaboard Marine is going to
9  follow it.  Right?
10   A.   Correct.
11   Q.   And so the thing that Seaboard Marine has done
12  with this particular policy is it essentially
13  cross-references all the applicable OSHA regulations as
14  though it were Seaboard's own policy.  Right?
15   A.   Correct.
16   Q.   But as you mentioned earlier, sometimes the
17  company will implement policies or practices that
18  actually go above and beyond what the minimum is.
19  Right?
20   A.   Correct.
21   Q.   And that's what the next sentence says.
22       It says, "We believe such regulations
23  provide the necessary baseline in achieving our
24  occupational safety-related goals."
25       Right?

## Page 74

1    A.   Correct.
2    Q.   "Baseline" meaning the minimum, right?
3    A.   That's the minimum, yes.
4    Q.   Do you know who wrote this policy?
5    A.   I don't remember.
6    Q.   Did you play a role in writing this?
7    A.   I think I did, yes; but it's been a long time.
8    Q.   Okay.  It also says in Exhibit 2 (as read):
9  "In addition, the Company" from time to time
10  will -- "will from time to time develop supplemental
11  guidance and procedures within this policy so as to more
12  comprehensively address occupational safety and health
13  issues that have been shown to have greater meaning and
14  application to the work being conducted at our
15  facilities."
16       Did I read that right?
17   A.   Yes.
18   Q.   What does that mean to you?
19   A.   What I said previously, where sometimes we
20  will go above and beyond what OSHA's minimum baseline is
21  to address certain things that we understand are an
22  inherent danger in the terminal and not specifically
23  mentioned in OSHA, in any OSHA regulation.
24   Q.   Because the OSHA regulations can't cover
25  everything.  Right?

## Page 75

1    A.   Correct.
2    Q.   And so Jacintoport -- strike that.
3        The OSHA regulations are not necessarily
4  company specific.  They are really not company specific.
5  They may be industry specific.  Right?
6    A.   Correct.
7    Q.   But it can't cover everything, so the company
8  has an obligation to continually look at operations and
9  find out if there is anything it can do to make the
10  company safer.  Right?
11   A.   Correct.
12   Q.   Does Seaboard Marine track what training is
13  provided to the employees at the ports?
14   A.   Yes.
15   Q.   How does it do that?
16   A.   We have a database that houses the training
17  details.  So if you took a training course today, we
18  enter it into the system and the system will let us know
19  depending on how that course was set up.
20       So for example, some trainings are
21  yearly; some trainings are every three years.  So in
22  three years we will get a prompt that, you're up for
23  training again on February 27th.
24   Q.   Let's talk about forklift training.
25       For the type of forklift that Mr. Silva

## Page 76

1  was operating that day, what kind of periodic training
2  was required?
3    A.   So he would be trained every three years in
4  Powered Industrial Truck.  So we have a classroom
5  training that he would have to take, and that's a
6  Powered Industrial Truck classroom training.
7        And then there would be a practical
8  evaluation to make sure that he's able to properly
9  operate the equipment.
10   Q.   And is the practical application a road test?
11   A.   It's -- right, it would be a road test,
12  obviously in the marine terminal; so we would test him
13  on controls, getting in and out of the forklift, backing
14  up, forwarding, putting freight down, picking up
15  freight, so on and so forth.
16   Q.   And Seaboard is responsible for making sure
17  all of this training is being done.  Right?
18   A.   Yes.
19   Q.   Is anybody from Seaboard actually doing the
20  training?
21   A.   No.  The person who conducts -- so depending
22  on the area and the terminal, it could be -- we have
23  what we call evaluators; so we have different evaluators
24  throughout the terminal.
25       And this evaluator is somebody who

1 has -- you know, is proficient in that specific
2 equipment. So that evaluator would evaluate, in this
3 case, for example, Silva, would evaluate Mr. Silva on
4 his equipment.
5     Q. Okay. What was Mr. Silva's job title?
6     A. I believe he was a foreman.
7     Q. What does a foreman do, in plain English?
8     A. So he -- again, different areas a foreman can
9 have different duties; but a foreman basically is just a
10 supervisor or a team leader for that crew or that group
11 or that area.
12     Q. A foreman is not a sort of dedicated forklift
13 operator, right?
14     A. Not dedicated, but most of our foremen are
15 able to operate equipment. They're expected at any
16 time, if there is a shortage of staff or if it's extra
17 busy, that they can hop on a machine and conduct, you
18 know, whatever the operation requires.
19     Q. Okay. But to be clear, a foreman's only job
20 is not running a forklift. Right?
21     A. No.
22     Q. They have multiple jobs, essentially. Right?
23     A. Correct.
24     Q. They're more of in a supervisory role. Is
25 that fair?

1     A. More of a team leader, yes.
2     Q. And there are, however, dedicated forklift
3 operators at the port. Right?
4     A. There are personnel -- there are employees
5 which -- whose only job is to operate equipment. But at
6 Jacintoport it's a very dynamic operation, so you could
7 be operating a forklift -- you could be a forklift
8 operator, your title is a forklift operator, but you
9 could be asked at any time to come off that forklift and
10 perform another job as the terminal deems necessary.
11     Q. Okay, fair. But there is such a job title at
12 the port in Houston called forklift operator. Right?
13     A. Yes.
14     Q. And the general expectation is that will be at
15 least the primary role of that employee. Right?
16     A. Correct.
17     Q. And so that's not what Diego Silva was.
18 Right?
19     A. No.
20     Q. He was a foreman. True?
21     A. Yes.
22     Q. Was he ever a forklift operator? Do you know?
23     A. I don't remember. He's been with the company
24 a long time.
25     Now, it's the same training. Right? So

1 if you're a forklift operator or you're a foreman or
2 you're a, you know, any other title that may require for
3 you to operate equipment, the training is exactly the
4 same for everyone, where you're going to take that
5 Powered Industrial Truck classroom training and you're
6 going to get that practical evaluation on the equipment.
7     MR. HAYNES: Let me object to
8 responsiveness.
9     Q. (By Mr. Haynes) Do you know when he was last
10 trained on that forklift before this incident?
11     A. I don't remember the exact date, no.
12     Q. Do you have an estimate?
13     A. I think it was in '22. I think it was earlier
14 that same year that he took his last training, if memory
15 serves me right.
16     Q. Was it classroom training?
17     A. I don't remember which one of the two it was.
18     Q. Would it needed to have been both?
19     A. He would have taken both. Not on the same
20 day; but, you know, at sometime during that period,
21 depending -- if you give the class on the same -- you
22 know, normally you don't give the class on the same day
23 because the classroom, obviously, you have to sit there
24 for X amount of time.
25     And then, the practical, he has to be

1 out, you know; so that kind of has to be scheduled. So
2 they rarely fall on the same day.
3     So normally we would do one on one day
4 and then one on a separate day, so I don't remember the
5 dates for each.
6     Q. But what I mean is if he was up for training,
7 a refresher training or a renewal training, he would
8 have to do both types of training. Right?
9     A. Correct. So in the system they are separate
10 courses. So, you know, my team will be prompted
11 to -- that he's up for training on the practical
12 evaluation or he's up for training on the classroom.
13     Q. And so when you said that you think his last
14 training was in '22, earlier in the year, where would
15 you, as a Seaboard employee in Miami, go to determine
16 that?
17     A. So the database that we house all the training
18 data, so that database, Stephen White has access to it.
19     So I would ask him for a report and you,
20 know, he would give me a report just for me to see who
21 is due, who is not due, make sure that the Jacintoport
22 team is up-to-date with the training and making sure
23 there is nobody past due.
24     Q. Do you get these reports regularly?
25     A. No. From time to time. We have -- I meet

**EXHIBIT A**

## Page 81

1 with the Jacintoport safety team once a week obviously
2 on Teams.
3        So we have weekly meetings where we
4 discuss things happening at Jacintoport; and then, you
5 know, from time to time during those meetings I will
6 request to see where the training is at to make sure the
7 training is up-to-date.
8    Q.  So -- strike that.
9        You are relying upon the Jacintoport
10 employees in Houston to tell you, let you know what the
11 status of training is, right?
12    A.  Correct.
13    Q.  You don't have any independent knowledge of
14 the training that's going on in Houston.  True?
15    A.  What do you mean by "independent knowledge"?
16    Q.  You weren't there watching them do it, you
17 weren't filling out certificates, you aren't checking
18 off the box.  You're relying upon people in Houston --
19    A.  Correct.
20    Q.  -- to give you that information.  Right?
21    A.  Yes.
22    Q.  And periodically, or once a week you're
23 saying, you meet with the safety team at Jacintoport
24 through a Zoom or Microsoft Teams.  Right?
25    A.  I meet with Stephen White on --

## Page 82

1    Q.  Mr. Stephen --
2    A.  -- a weekly basis.
3    Q.  -- White?
4    A.  I meet with Stephen White weekly, and then
5 from time to time one of his team members will be on
6 there, but mostly it's with him.  And then I get an
7 update from him with anything that happened throughout
8 the week.
9    Q.  And was that going on back in 2022?
10    A.  Yes.
11    Q.  How long has that weekly meeting been going
12 on?
13    A.  I took over -- I was made responsible for
14 Jacintoport in 2018, so I would say 2018.
15    Q.  Okay.
16    A.  I wasn't always responsible for Jacintoport.
17    Q.  Were you-all using Microsoft Teams back in
18 2018?
19    A.  No.  So it would just be a phone call.
20    Q.  I ask because that's like a pre-COVID thing.
21 Right?
22    A.  Yes.
23    Q.  So how often would you visit the Port of
24 Houston?
25    A.  I come at least once a quarter, sometimes

## Page 83

1 more.
2    Q.  Okay.  Prior to this incident, when was the
3 last time you had been to the port?
4    A.  Prior to the -- Ms. Recinos's incident?
5    Q.  Yes.
6    A.  I don't remember the exact date.
7    Q.  Do you think it was in 2022?
8    A.  For sure.
9    Q.  When you had these meetings since 2018, are
10 there any records kept of them?
11    A.  No.
12    Q.  Emails sent?  Anything like that?
13    A.  No.
14    Q.  There's no -- no kind of written communication
15 one way or the other?
16    A.  No.
17    Q.  Does anybody keep notes or reports to show
18 these meetings are happening?
19    A.  We keep notes on action items.  But just, you
20 know, on a pad.  Whatever I ask Stephen that needs to
21 get done or I want an update on, or whatever he tells me
22 is happening that I need to escalate further to make
23 sure we get some action.
24    Q.  Do you email with him regularly?
25    A.  I email him from time to time, yes.

## Page 84

1    Q.  And that's just -- strike that.
2        What is his job title?
3    A.  He's a safety supervisor.
4    Q.  Is he the chief safety employee at
5 Jacintoport?
6    A.  Yes.
7    Q.  And would he email you to just say, Hey, I've
8 made some updates to the training database, things like
9 that?
10    A.  No.  He would ask me, you know, if I approve
11 for him to make any changes to the database.  Or if he
12 wants to do a different type of training or reach out to
13 a vendor, he would normally give me a heads-up and tell
14 me, Hey, you know, I want to do this; it's better
15 because of this reason.
16        And I tell him, Absolutely, go ahead.
17    Q.  Is he doing this by email?
18    A.  Sometimes it's an email.  Sometimes it's just
19 a phone call.
20    Q.  Okay?
21    A.  Or we have that discussion during one of our
22 meetings.
23    Q.  Would he have ever e-mailed you about
24 Diego Silva for any reason at any time?
25    A.  No.

Page 85

1   Q. Not even after the incident?
2   A. No. I mean, I don't have any emails on
3 Diego Silva; but, you know, he can email me about an
4 employee who, you know, he may have a question about or
5 something.
6         But normally we don't email things
7 regarding employees. We will have a conversation.
8   Q. Okay. The material -- strike that. New
9 question.
10        You mentioned earlier that foremen also
11 receive Powered Industrial Truck training at
12 Jacintoport?
13  A. Some.
14  Q. Some?
15  A. I can't testify for all.
16  Q. Some foremen or some training?
17  A. So it depends, right? Your title doesn't
18 necessarily hold you to a specific -- you know, if
19 you're a forklift operator, it doesn't mean you just sit
20 there and drive a forklift all day and then just sit
21 around until there is more forklift stuff to do.
22        So it's not -- you know, we're not union.
23 Right? So if you're a forklift operator, you will
24 operate that forklift as your primary job function; but
25 you may be asked to go to another area of the terminal

Page 86

1 and, you know, lift bags or help out, you know, do some
2 other job function.
3         Same thing with a foreman. Right?
4 Foreman, you're a team lead, if you need to jump on a
5 forklift at some point.
6         So I can't say that all foremen can
7 operate forklifts because I don't have that detail in
8 front of me. But it wouldn't be out of the question
9 that a foreman in a certain area, operational area,
10 would most likely be certified in some sort of
11 equipment.
12  Q. Let me put it this way. A foreman should not
13 be operating a forklift like the one Diego Silva was
14 operating unless he's had training and certification?
15  A. Correct.
16  Q. So even if he may have coincidentally had
17 practical experience on it, that's not enough for him to
18 operate it safely?
19  A. Correct. So everyone knows -- and we train
20 our employees -- that you can only operate equipment
21 that you've been trained on and evaluated on.
22        So if you have not been trained or
23 evaluated on that equipment, you cannot operate that
24 equipment.
25  Q. And your belief is that he was trained,

Page 87

1 Mr. Silva was trained on forklifts, for this forklift,
2 at some point earlier in 2022 before this incident
3 happened?
4   A. I believe he had some training -- if memory
5 serves me right, he did have some training in 2022. I
6 do know he was an experienced operator. He has been
7 with the company for a long time, and he's been
8 operating equipment for a long time.
9   Q. Okay. Do you know if he was certified?
10  A. At the time I'm not sure which one of the two
11 courses he took in 2022, and I don't remember the exact
12 date of the trainings.
13        I would lead to say yes; but, again, I'm
14 not a hundred percent sure of the dates of the training.
15  Q. Would he be allowed to operate the forklift if
16 he wasn't certified?
17  A. He should not have been operating the forklift
18 if he wasn't certified.
19  Q. So you hope that he was certified?
20  A. I'm pretty sure he was certified.
21  Q. But you don't remember fully?
22  A. I don't remember exactly the dates.
23  Q. And you're not aware of any reason that he was
24 not qualified or fit to operate the forklift?
25  A. No. Not at the time that I conducted the

Page 88

1 investigation.
2   Q. What about now?
3   A. Now I'm aware that, you know, there were some
4 medical issues; but again, that doesn't -- it doesn't
5 really speak to his qualification to be able to operate
6 the forklift.
7   Q. What medical issues have you become aware of?
8   A. I think he had an eye problem with one of his
9 eyes.
10  Q. Okay.
11  A. But, again, under OSHA, if you have -- if that
12 is correctable, you're able to operate equipment.
13        MR. HAYNES: Let me object to the
14 responsiveness.
15  Q. (By Mr. Haynes) How did you learn about the
16 eye problem?
17  A. Legal brought it up to my attention.
18  Q. So in this lawsuit you have now learned that
19 he had an eye problem?
20  A. Yes.
21  Q. And this is you, meaning Seaboard Marine.
22 That's who you work for, right?
23  A. Yes.
24  Q. Do you know if anybody at Jacintoport knew
25 about the eye problem?

## Page 89

1   A.  I think we -- there were -- when we learned --
2   when I learned of it, I don't know who else was notified
3   of it. I can't -- I can't say who knew at Jacintoport
4   or didn't know at Jacintoport. I know I was made aware
5   of it.
6   Q.  Would you expect people at Jacintoport to try
7   to make themselves aware of something like that?
8   A.  I don't know.
9   Q.  I mean, you want somebody that's operating a
10  forklift that big that has good eyesight. Right?
11  A.  Right. Well, Mr. Silva hasn't operated a
12  forklift since the incident.
13          MR. HAYNES:  Let me object to the
14  responsiveness.
15  Q.  (By Mr. Haynes)  You want someone operating a
16  forklift like that that has good eyesight. Right?
17          MR. NASH:  Objection, form.
18  A.  Good eyesight is subjective. So under OSHA,
19  eyesight is correctable.
20          So as long as you have -- for example, I
21  don't have 20/20 vision anymore; but I put on these
22  glasses and I have corrected that problem.
23          I can operate a forklift, if I'm
24  certified and took my training.
25  Q.  Okay. That's one of those bare minimums,

## Page 90

1   right?
2   A.  Correct.
3   Q.  I assume you're going to agree with me that
4   Seaboard Marine thinks that safety is its No. 1
5   priority. Right?
6          MR. NASH:  Objection, form.
7   A.  We take safely high -- safety high -- high --
8   highly.
9   Q.  (By Mr. Haynes)  Is there anything more
10  important than safety?
11  A.  Not as far as I'm concerned.
12  Q.  And if the minimum requires someone who has
13  correctable vision, that means that Jacintoport or
14  Seaboard Marine, or everybody, could require people who
15  have vision that is not required to be correctable.
16  Right?
17  A.  So let me backtrack real quick to that
18  specific OSHA regulation.
19          The main point in that regulation is that
20  someone who operates equipment -- if the employer has
21  knowledge or makes it -- the employee makes it known,
22  right, that the person has some type of physical
23  impediment, then at that point, you know, the employer
24  can take action. We didn't know at the time that
25  Mr. Silva had, you know, an eye issue.

## Page 91

1          So, again, under the current OSHA rule he
2   can operate equipment because his eyesight is
3   correctable. But at the time we didn't know. And we're
4   not required to, you know, test him. We're not required
5   to do anything of that sort.
6          It's really up to him to let us know.
7   And that goes along with any other ailment; you know,
8   diabetes, epilepsy, for example, great example.
9          MR. HAYNES:  Let me object to the
10  responsiveness.
11  Q.  (By Mr. Haynes)  When you keep saying "at the
12  time," are you talking about at the time of the
13  incident --
14  A.  At the time of the incident.
15  Q.  -- with Delmy.
16          So your testimony to the jury is at the
17  time of this incident you did not know about his
18  eyesight issue?
19  A.  Correct.
20  Q.  And you're aware that he wasn't using any
21  corrective lenses. Right?
22  A.  I don't know.
23          MR. SEIPEL:  Objection, form.
24  Q.  (By Mr. Haynes)  You can answer.
25  A.  I don't know.

## Page 92

1   Q.  So you don't know whether or not he was able
2   to operate the forklift safety at all. Right?
3          MR. SEIPEL:  Objection, form.
4          MR. NASH:  Objection, form.
5   A.  I don't know what his physical impediment was
6   at the time of the incident. I didn't know if he had
7   one. I wasn't aware. And I don't know if he uses
8   glasses. I really don't know.
9   Q.  (By Mr. Haynes)  That's probably another
10  reason why you should read his deposition. Right?
11          MR. NASH:  Objection, form.
12  A.  It's not going to change what happened.
13  Q.  (By Mr. Haynes)  Okay. The training modules
14  that are written in Spanish that we've been provided in
15  this case for forklifts -- are you aware of what I'm
16  talking about?
17  A.  Yes.
18  Q.  Seaboard Marine created those, right?
19  A.  Yes.
20  Q.  And Seaboard Marine is the one that's
21  responsible for ensuring employees get those trainings,
22  right?
23  A.  Yes.
24  Q.  And ultimately it's Seaboard Marine's job to
25  make sure that the operators are qualified. They have

**EXHIBIT A**

### Page 93

1  to make sure their training is working, it's effective,
2  it's being done.  Right?
3      A.  Yes.
4      Q.  And you have to hold not only yourself
5  accountable but also hold the safety people in Houston
6  accountable, meaning Mr. White.  Correct?
7      A.  So Jacintoport has -- you know, we provide
8  guidance and we have oversight of the safety program at
9  Jacintoport.
10         But I just want to clarify that, you
11  know, Jacintoport as its own entity also has
12  responsibility to make sure, you know, certain things
13  are being done.
14         Even though we're the one saying, hey,
15  this is what you need to do and this is how you're going
16  to do it, you know, they also have responsibility to
17  make sure that these things are done.
18         So that safety team in Jacintoport, they
19  are Jacintoport employees; and, you know, that is a
20  Jacintoport terminal.  So they have a responsibility
21  also to make sure they are doing their part.
22      Q.  Right.  And Seaboard Marine also has the
23  responsibility to make sure they're doing what they are
24  supposed to.  Right?
25      A.  Yes.

### Page 94

1      Q.  Can we agree that if an operator or any
2  employee that's going to operate a forklift like the one
3  Mr. Silva was operating was not properly trained, that
4  that's extremely dangerous?
5      A.  Yes.
6         MR. NASH:  Objection, form.
7      Q.  (By Mr. Haynes)  Can we agree that if an
8  operator was going to operate a forklift like that, that
9  did not have good eyesight that was being corrected,
10  that that's extremely dangerous.
11         MR. NASH:  Objection, form.
12         MR. SEIPEL:  Objection, form.
13      A.  Repeat the question, please.
14      Q.  (By Mr. Haynes)  If someone is operating a
15  forklift such as the one Mr. Silva was operating on the
16  day of the incident and that person doesn't have good
17  eyesight and that has an eye condition that is not being
18  corrected -- like you gave the example of I put my
19  glasses on.  Well, let's just say you didn't have
20  glasses on.  That's extremely dangerous, isn't it?
21         MR. SEIPEL:  Objection, form.
22         MR. NASH:  Objection, form.
23      A.  It could potentially be.
24      Q.  (By Mr. Haynes)  I mean, how could it only be
25  potentially?  Let's say someone is blind, they put a

### Page 95

1  blindfold on and they're operating that forklift.
2  That's extremely dangerous, right?
3         MR. SEIPEL:  Objection, form.
4         MR. NASH:  Objection, form.
5      Q.  (By Mr. Haynes)  That's not potentially
6  dangerous.  That is extremely dangerous.
7         MR. SEIPEL:  Objection, form.
8      A.  Where is he operating this forklift?
9      Q.  (By Mr. Haynes)  At the port.
10      A.  Then it would be, yes, dangerous.
11      Q.  So if someone has eyesight that is not good,
12  that is not being corrected and they're operating at the
13  port, one like Silva, that is extremely dangerous.
14         MR. SEIPEL:  Objection, form.
15         MR. NASH:  Objection, form.
16      A.  I don't know what the condition of his
17  eyesight is or how bad it is.
18      Q.  (By Mr. Haynes)  I'm talking about -- I'm not
19  talking about Mr. Silva.
20         I'm talking about hypothetically
21  speaking, based upon your education, training,
22  experience as the second highest ranking safety officer
23  overseeing about 650 employees at two ports in the
24  United States of America.
25         If someone is operating a forklift that

### Page 96

1  does not have good eyesight, that's not being corrected,
2  and they're operating a forklift like Mr. Silva was,
3  okay, that's extremely dangerous.
4         MR. NASH:  Objection, form.
5         MR. SEIPEL:  Objection, form.
6      A.  That -- I can't say it's extremely dangerous.
7  There's a lot of factors that we're leaving
8  out -- you're leaving out of that statement.
9         So I don't know what that person's
10  hypothetical eyesight is, whether they have short
11  vision, long vision, blurry vision.  I don't know.  And,
12  again, I don't know what part of the terminal you're
13  hypothetically having them operating in.
14         So whether it's slightly dangerous,
15  dangerous, more dangerous, extremely dangerous, I don't
16  know.  I can't answer that.
17      Q.  (By Mr. Haynes)  So is it your testimony to
18  the jury that there could be parts of the terminal where
19  someone with bad eyesight or not good eyesight that's
20  not being corrected could operate the forklift like
21  Mr. Silva was and it would be safe?
22      A.  No.
23         MR. NASH:  Objection, form.
24         MR. SEIPEL:  Objection, form.
25      Q.  It's never going to be safe.  Right?

Page 97

1  A. Correct.
2      MR. NASH: Objection, form.
3      MR. SEIPEL: Objection, form.
4  Q. (By Mr. Haynes) So you just have a problem
5  with the word "extremely"?
6  A. Yes.
7  Q. It's always going to be dangerous, isn't it?
8      MR. SEIPEL: Objection, form.
9  A. It depends.
10  Q. (By Mr. Haynes) Well, if it's not always
11  dangerous, does that mean sometimes it's safe?
12  A. No.
13  Q. There's nothing in between? Or there is
14  something in between that I'm not aware of?
15  A. There's something in between. There's always
16  something in between.
17  Q. Okay. When you said earlier, Mr. Contreras,
18  that if the company had known about his eye issue,
19  that's still not going to bring him back -- or bring her
20  back, rather.
21      Are you with me?
22  A. Yes.
23  Q. Do you remember saying that?
24  A. Yes.
25  Q. But Seaboard Marine does not run its safety

Page 98

1  program and training program based upon the idea that
2  learning information about how an incident happened is
3  not going to undo the incident. Right?
4  A. Correct.
5  Q. That's not the correct safety philosophy and
6  that doesn't promote a good safety culture, does it?
7      MR. NASH: Objection, form.
8  A. That's not our philosophy.
9  Q. (By Mr. Haynes) So when you say things like,
10  "Well, that's not going to bring her back," that's not
11  consistent with the safety culture that your company is
12  trying to promote. Right?
13      MR. NASH: Objection, form.
14  A. Correct.
15  Q. (By Mr. Haynes) So do you want to change that
16  testimony?
17      MR. NASH: Objection, form.
18  A. No.
19  Q. (By Mr. Haynes) Do you know if Mr. White is
20  certified and trained to drive a forklift like Mr. Silva
21  was driving?
22  A. I don't remember right now. I don't think so.
23  Q. Do you know he's being deposed tomorrow?
24  A. Yes.
25  Q. Are you going to read his transcript?

Page 99

1  A. No.
2  Q. You said earlier that Seaboard Marine has no
3  obligation to determine if an employee has some sort of
4  medical issue like you said, like epilepsy or an eye
5  problem.
6      Is that what you said?
7  A. Something to that effect.
8  Q. What are you basing that on?
9  A. That specific OSHA regulation pertaining to
10  operating equipment.
11  Q. Okay. Could you elaborate on that, please?
12  A. So like I said previously, that regulation
13  talks about if someone has a known impediment, physical
14  impediment, then that person should not be operating an
15  equipment. Right?
16      But the word "known" is the key, where
17  it's okay, well, it's up to the employee to let us or
18  let the employer know, I have an impediment that you
19  can't see and you can't -- you know, obviously if you're
20  missing an arm, I can see you have a physical
21  impediment. It's clear.
22      But if you have diabetes or you have
23  epilepsy, I can't see that; and if you don't tell
24  me -- I can give you all the training in the world. I
25  can put you in classroom training every day and I can

Page 100

1  give you evaluation training every day; but it's not
2  going to negate the fact that, you know, it's going to
3  be a -- it could potentially be a problem if you're
4  operating that equipment with epilepsy.
5  Q. Are you aware of any guidance or
6  interpretations of that rule that differ from your
7  interpretation that you just gave?
8  A. There are interpretations to that rule and
9  they don't differ from what I've just stated, from what
10  I remember when I looked at it at that time.
11  Q. When was the last time you looked at that?
12  A. Maybe six months ago.
13  Q. So your testimony to the jury, as the second
14  highest ranking safety employee at the company, is that
15  because the regulation says "known health issues," that
16  the company has no obligation to investigate any health
17  issues. It's just relying and is allowed to rely solely
18  upon the employee to tell you about them?
19  A. Yes.
20  Q. And you're comfortable saying that that is
21  consistent with the guidance and interpretations that
22  OSHA has issued. Right?
23  A. I am -- that's consistent with OSHA's
24  guidance, yes, and regulations.
25  Q. And so we can understand, OSHA obviously has

Page 101

1  regulations that are actually the binding laws, right?
2      A.  Correct.
3      Q.  And those are numbered and we can look at
4  those.  Right?
5      A.  Yes.
6      Q.  But from time to time OSHA will issue guidance
7  or interpretations of those laws to help clarify them or
8  breathe life in them --
9      A.  Yes.
10      Q.  -- so to speak.  Right?
11      A.  Yes.
12      Q.  And you're responsible not only for knowing
13  and forcing the written rules but also for knowing and
14  enforcing the interpretations.  Right?
15      A.  No.  So the interpretations is something that
16  I take it upon myself to learn, whenever possible, so I
17  can further understand if there is something that's
18  vague or difficult to ascertain the purpose of the
19  regulation.  It's not something that we're required to
20  do.
21      Q.  Well, do you do it regardless of whether
22  you're required?
23      A.  I do personally.  I do personally look at
24  interpretations whenever I have a question and I'm not
25  sure how something should or could be applied.

Page 102

1      Q.  And your testimony is that the word "known" in
2  that regulation, you have reviewed guidance or
3  interpretations that support your view on what that
4  really means?
5      A.  Yes.
6      Q.  Are you aware of any requirements or good
7  practices that obligate Seaboard to make sure that its
8  forklift operators or people who will be operating a
9  forklift medically qualified?
10      A.  There are some good practices that I looked
11  into and we've adopted some of those after the fact,
12  yes, after the incident.
13      Q.  After Ms. Recinos was killed.  Right?
14      A.  Yes, sir.
15      Q.  What was -- strike that.
16          Was there anything preventing Seaboard
17  from implementing those prior to this incident?
18      A.  No.
19      Q.  Is there any particular reason it didn't have
20  those practices before?
21      A.  It wasn't something that -- as we all know,
22  regulations are -- they basically get written following,
23  you know, catastrophes.  Right?
24          Then the government goes and writes a
25  regulation to prevent that catastrophe.

Page 103

1          So at the time of Ms. Recinos's incident,
2  you know, physical impairments were not something that
3  was known to us as being a major -- or a hazard that we
4  wanted -- that needed to be addressed.
5          Following the incident and following the
6  information with Mr. Silva's condition, we took it upon
7  ourselves to go ahead and make adjustments so that
8  doesn't happen.  So, you know, we now would know if
9  somebody has a physical impairment.
10      Q.  So now you actually investigate it?
11      A.  Investigate how?
12      Q.  You ask.
13      A.  I'm sorry.  I don't understand the question.
14      Q.  I think you said that before your
15  interpretation of that regulation was the -- with the
16  word "known" was that you only have to do something
17  about medical conditions you know about.
18      A.  Correct.
19      Q.  And you had no obligation to inquire or
20  investigate them?
21      A.  It's still true, yes.
22      Q.  And now you're saying you do investigate or
23  inquire about medical issues.
24      A.  No.  So -- no.
25          So we have a policy in place now that

Page 104

1  requires an operator to undergo a DOT physical test.
2  And that DOT physical test would bring up any issues
3  that that operator may have, like epilepsy or eyesight
4  issues or diabetes.
5      Q.  Did Seaboard Marine have a requirement that
6  employees undergo prejob physicals before this incident?
7      A.  I -- I'm not sure.  That's an HR component.
8  I'm not responsible for that part.
9      Q.  Can you see the relationship between safety
10  and HR when it comes to prejob physicals and people
11  being able to --
12      A.  There is some --
13      Q.  -- operate equipment?
14      A.  Yes, there is some overlap; but in our
15  company, you know, HR handles certain things and safety
16  handles certain things.
17      Q.  So if there are prejob physicals required at
18  Seaboard even before this incident and those include
19  eyesight, wouldn't that be information available to you
20  in the safety department to look at to see if there was
21  an issue with a particular forklift operator?
22      A.  If my memory serves me right, I was advised
23  that there were physicals; but the issue in Mr. Silva's
24  case was that he's been in the company for so long, his
25  physical took place back in -- at his hire date.  I

Page 105

1  think it was 2000.
2        So that -- that -- that was kind of the
3  detail of where, you know, we realize, okay, if you're
4  in the company for 40 years, certain things are going
5  to -- you know, physical things may deteriorate; your
6  hearing, your vision.  You know, you may get diabetes,
7  whatever the case may be.
8        So that was kind of the detail with that,
9  Mr. Silva's scenario, that I believe he was physically
10  tested, if memory serves me right; but it was so long
11  ago and he's been with the company for so long, I guess
12  his eyesight deteriorated through that period.
13    Q.  He was required to get refresher training on a
14  forklift.  Right?
15    A.  Yes.
16    Q.  But he was not required to get an updated
17  physical?
18    A.  Correct.
19    Q.  And there was nothing preventing Seaboard from
20  requiring that, right?
21    A.  Well, from a company perspective, you know, we
22  did our due diligence of, you know, doing the physicals
23  at the time of hire.  Right?  And there is nothing in
24  the rules that said we had to continue to do physicals.
25  So that's how the system was at that point.

Page 106

1        MR. HAYNES:  Let me object to the
2  responsiveness.
3    Q.  (By Mr. Haynes)  Nothing prevented Seaboard
4  from requiring an updated physical?
5    A.  No.
6    Q.  And it's a good safety practice, isn't it?
7        MR. SEIPEL:  Objection, form.
8    A.  Yes.
9    Q.  (By Mr. Haynes)  And just because --
10    A.  In hindsight.  At the time of
11  the incident, again, we had no knowledge.  So the key
12  is, we didn't know.
13    Q.  Right.  I can tell it's a talking point.
14        Okay.  You're not here to give me talking
15  points, are you?
16        MR. NASH:  Objection, form.
17    A.  Do I have to answer?
18    Q.  (By Mr. Haynes)  Yeah.
19    A.  No.  I'm here to serve my deposition.
20    Q.  You're not here to try to debunk substantial
21  certainty, an intentional tort, or gross negligence by
22  saying, keep saying, and repeating over and over again,
23  "I didn't know," "We didn't know," "I didn't know," "We
24  didn't know."
25        Right?

Page 107

1        MR. NASH:  Objection, form.
2        MR. SEIPEL:  Objection, form.
3    A.  No, sir, I'm here to -- I'm being deposed, so
4  I'm here to serve my deposition.
5    Q.  (By Mr. Haynes)  Got it.
6        And Seaboard Marine and/or Jacintoport
7  did not cover up anything with regard to this incident.
8  Right?
9    A.  Absolutely not, sir.
10    Q.  No one fabricated any documents.  Right?
11    A.  No.
12    Q.  No one spoliated evidence.  Right?
13    A.  No.
14    Q.  You can say that, so help you God, under oath.
15  Right?
16    A.  That's not something we do.
17    Q.  So if anyone comes out and says that, they're
18  just flat out lying.  Right?
19        MR. SEIPEL:  Objection, form.
20    A.  Again, no.  I don't know of us ever having
21  done anything of that sort.  Nor would I expect anyone
22  in our organization to do that.
23    Q.  (By Mr. Haynes)  Because that would be --
24  strike that.
25        That would be unacceptable.  Right?

Page 108

1    A.  That would be unacceptable, yes.
2    Q.  That would be grossly negligent, wouldn't it?
3        MR. NASH:  Objection, form.
4    A.  That would be unacceptable.
5    Q.  (By Mr. Haynes)  Okay.  Is it fair of me to say
6  that Silva did not exercise reasonable care that day?
7        MR. SEIPEL:  Objection, form.
8        MR. NASH:  Objection, form.
9    A.  I don't know.  Again, unfortunately, I
10  couldn't speak to the truck driver, I couldn't speak to
11  Ms. Recinos, and I couldn't get an eyewitness account of
12  what Mr. Silva did or didn't do.
13    Q.  Will you do me a favor?  Will you please read
14  Mr. Silva's transcript before trial?
15        MR. NASH:  Objection, form.
16    A.  Under the guidance of my attorneys, if that's
17  what they ask me to do, I will do so.
18    Q.  (By Mr. Haynes)  Well, so I'm asking you, on
19  behalf of the family:  Would you please read his
20  deposition before trial?
21        MR. NASH:  Objection, form.
22    A.  Again, I work for Seaboard Marine and, you
23  know, I have to follow what I'm told to do.  I'm an
24  employee of the company.  I'm not the president.  So I
25  can't make these decisions.

Page 109

1  Q.  (By Mr. Haynes)  Well, Mr. Contreras, this
2  case is probably going to end in a jury trial.  Do you
3  understand that?
4  A.  I understand.
5  Q.  The insurance tower is not going to pay the
6  case.  They think it's a frivolous lawsuit.  Do you
7  understand that?
8          MR. NASH:  Objection, form.
9  A.  No, I don't --
10  Q.  (By Mr. Haynes)  Do you understand that the
11  insurance companies think this is a frivolous lawsuit?
12          MR. NASH:  Objection, form.
13  A.  No, but --
14  Q.  (By Mr. Haynes)  They're trying to get it
15  thrown out of court.  Did you understand that?
16          MR. NASH:  Objection, form.
17  A.  No.
18  Q.  (By Mr. Haynes)  Did you know that?
19          MR. NASH:  Objection, form.
20  A.  No, I didn't.
21  Q.  (By Mr. Haynes)  They filed a motion to
22  dismiss this lawsuit.  Did you know that?
23          MR. NASH:  Objection, form.
24  A.  No, I did not.
25  Q.  (By Mr. Haynes)  What do you think about that?

Page 110

1          MR. NASH:  Objection, form.
2  A.  I have no thoughts on the matter.  That's
3  their attorneys.  They're getting paid to do their job.
4  Q.  (By Mr. Haynes)  Okay.
5  A.  Just like I get paid to do mine.
6  Q.  Do you think that this family is not entitled
7  to any compensation for what they lost?
8          MR. NASH:  Objection, form.
9  A.  That's not my decision to make.
10  Q.  (By Mr. Haynes)  I'm not asking if it's your
11  decision.  I'm asking you what you think.
12          MR. SEIPEL:  Objection, form.
13  A.  I prefer not to share my thoughts.
14  Q.  (By Mr. Haynes)  Why?
15  A.  Well, it's not relevant to the case, I don't
16  think.  Again --
17  Q.  Why not?
18  A.  What matters most is that someone was lost.
19  To me, honestly, that's what matters the most to me.
20  Everything else is just between attorneys.
21  Q.  What has the company done -- if it matters the
22  most to you, what have you done, what has the company
23  done, to try to make it right?
24          MR. NASH:  Objection, form.
25  A.  We've tried to -- we've made some changes to

Page 111

1  try to, you know, prevent something like this from
2  happening again.  I think that's our due diligence and
3  that's what we need to focus on and that's what we've
4  been working on ever since.
5  Q.  What changes?
6  A.  Well, what I just explained to you, you know,
7  regarding doing -- requiring physicals for operators, to
8  make sure that the operators are physically fit.  You
9  know, that was a big change; a costly one.  Right?
10          We have to pay for all of those
11  physicals.  We have to pay for transportation, you know,
12  of the employee to the facility to get tested and so on
13  and so forth.
14          So, you know, we've adopted some changes
15  to that area to make it safer.  And, you know, it's easy
16  to come in the next day and Monday quarterback
17  everything.
18          But, again, we're doing our due diligence
19  to make sure something like this doesn't ever happen
20  again.
21  Q.  Any other changes you can share with the jury?
22  A.  Off the top of my head, that's pretty much it.
23  You know, we've made some significant changes in that
24  area and -- where the incident took place, and then we
25  have this policy in place to make sure that, moving

Page 112

1  forward, operators are physically fit and that we know
2  that they are physically fit.
3  Q.  And it's fair of me to say that you concluded
4  your investigation back in 2022.  Right?
5  A.  That's correct.
6  Q.  You had no idea, as you've already testified,
7  that Mr. Silva had some sort of physical problem, if
8  any, right?
9  A.  Correct.
10  Q.  So when did your company decide to implement
11  this policy of requiring physicals?
12  A.  Shortly after -- it was discussed shortly
13  after we were advised of the issue with Mr. Silva's
14  eyes.
15  Q.  When was that?
16  A.  I don't know when the deposition was.  Shortly
17  after the deposition, I'm assuming.  I don't have a date
18  exactly.  It was 2023.
19  Q.  To make sure I'm clear, you're saying the
20  company has done its due diligence, to use your word, to
21  make this incident right and make sure it doesn't happen
22  again.  Right?
23  A.  To make sure it doesn't happen again.
24  Q.  And your due diligence includes learning for
25  the first time in a deposition, that you haven't read,

Page 113

1  that Mr. Silva had some sort of physical issue. Right?
2           MR. NASH: Objection, form.
3           MR. SEIPEL: Objection, form.
4     A.  I -- it was brought to my attention.
5     Q.  (By Mr. Haynes)  Is that a "yes"?
6           MR. NASH: Objection, form.
7     A.  No.  It was brought to my attention.
8     Q.  (By Mr. Haynes)  Yeah.  You haven't read his
9  depo.  Right?
10    A.  I have not read his depo.
11    Q.  So you learned about something he said in his
12 deposition, that you haven't read.  True?
13    A.  Correct.
14    Q.  And that was after this lawsuit had been going
15 on for a year.  Right?
16    A.  Yes.
17    Q.  And then the company decides to implement a
18 policy change.  Right?
19    A.  Yes.
20    Q.  And so Seaboard Marine now requires DOT
21 physicals of its forklift operators and anybody who is
22 going to be operating a forklift.  Right?
23    A.  Yes.
24    Q.  And are those every year?
25    A.  I don't remember the -- I don't remember that

Page 114

1  detail of the policy.
2     Q.  Okay.  Well, it's more frequently than once
3  every 30 years, right?
4     A.  Yes.
5     Q.  Which is what happened with Mr. Silva.  Right?
6           MR. NASH: Objection, form.
7     A.  20 years, plus a little bit.
8     Q.  Okay.  20 years.  Right?
9           So your testimony to the jury is that
10 doing due diligence means learning about an issue after
11 a lawsuit is filed and a deposition is taken and then
12 implementing a policy change.  Right?
13          MR. NASH: Objection, form.
14    Q.  (By Mr. Haynes)  That's part of the due
15 diligence you've been talking about?
16    A.  Incorrect.
17    Q.  Maybe I need to get my hearing checked.
18          I thought you said you've been doing your
19 due diligence, and one of the ways you're doing that is
20 to require physicals.  Right?
21    A.  Yes.
22    Q.  So the reason you made the change is because
23 you were informed about Mr. Silva's deposition in which
24 he described some sort of physical issue.  Right?
25    A.  It was made known to us that Mr. Silva had a

Page 115

1  physical ailment.
2     Q.  Correct.  You didn't talk to him, you didn't
3  interview him, and you didn't read his deposition.
4     A.  Incorrect.  I talked to him and I did
5  interview him, and he never stated to me that he had any
6  issues whatsoever, physically.
7           MR. HAYNES:  Let me object to
8  nonresponsive.
9     Q.  (By Mr. Haynes)  You didn't talk to him and
10 learn that he had a physical issue.  Right?
11    A.  I talked to him, and he did not divulge his
12 personal medical information to me.
13    Q.  Did you ask him?
14    A.  No.
15    Q.  Did you ask him:  Are you physically fit?
16    A.  No.
17    Q.  Did you ask him about any range of medical
18 conditions that might help explain this incident?
19    A.  I'm not allowed to.
20    Q.  Okay.
21          MR. HAYNES:  Objection, nonresponsive.
22    Q.  (By Mr. Haynes)  Did you ask him anything like
23 that?
24    A.  I'm not allowed to ask any employee about
25 their physical conditions or their medical history.

Page 116

1     Q.  So no, you did not ask him?
2     A.  No, I did not.
3     Q.  And you weren't going to review his deposition
4  because you said you never asked for it and it was not
5  made available to you, right?
6     A.  Correct.
7     Q.  If Mr. Silva had -- let me back up.  Strike
8  that.
9           If this lawsuit had never been filed,
10 obviously Mr. Silva would have never been deposed.
11 Right?
12    A.  Correct.
13    Q.  So if this lawsuit had never been filed, your
14 company never would have changed the policy about
15 physicals.  Right?
16          MR. NASH: Objection, form.
17    A.  We don't know.
18    Q.  (By Mr. Haynes)  Were you planning on deposing
19 him at some point without a lawsuit and finding out
20 these physical issues?
21          MR. NASH: Objection, form.
22    A.  No.
23    Q.  (By Mr. Haynes)  Was anybody at the company?
24    A.  No.
25          MR. NASH: Objection, form.

Page 117

1    Q.   (By Mr. Haynes)  Did you hire outside lawyers
2    to conduct an investigation to audit the company to try
3    and make it safer?
4              MR. NASH:  Objection, form.
5    A.   No.
6    Q.   (By Mr. Haynes)  So is the fact that you've
7    implemented this policy change just something you did as
8    a result of a lawsuit?
9              MR. NASH:  Objection, form.
10   A.   When information was made available to us and
11   it became known that an operator had a physical ailment
12   or imp- -- you know, ailment, at that point, yes, we
13   took measures to change the policy.
14   Q.   (By Mr. Haynes)  I thought you told me that
15   his deposition was not made available to you.
16   A.   The deposition was not made -- the
17   information, some of the information from his
18   deposition, was made available to me.  I never read his
19   transcripts.
20   Q.   You got an email from somebody in safety or
21   somebody in the C suite telling you, we need to change
22   this policy?
23   A.   No.
24   Q.   Who sent you the email?
25   A.   There was no email.

Page 118

1    Q.   Who told you?
2    A.   Legal counsel.
3    Q.   These guys (indicating)?
4    A.   No.
5    Q.   In-house legal counsel?
6    A.   Yes, sir.
7    Q.   Did they say, Hey, we better fix this before
8    we have to go to trial --
9    A.   No.
10   Q.   -- because this is going to look real bad?
11   A.   No.
12             MR. NASH:  Objection, form.
13   Q.   (By Mr. Haynes)  Well, let me put it this way,
14   Mr. Contreras.  You don't believe that his physical
15   ailment had anything to do with crash.  Right?
16             MR. NASH:  Objection, form.
17   A.   I don't know.
18   Q.   (By Mr. Haynes)  Well, if you don't know, you
19   certainly don't believe it.  Right?
20             MR. SEIPEL:  Objection, form.
21   A.   Again, I don't know.
22   Q.   (By Mr. Haynes)  Do you think you will ever
23   know?
24   A.   I don't think I will ever know.
25   Q.   Are there things you can do to try to find it

Page 119

1    out?
2    A.   It's not going to change what happened.
3    Q.   Is that part of a good safety culture?
4    A.   No.  It has nothing to do with safety culture.
5    Once you lose someone, they're gone.
6    Q.   You just move on and don't investigate?
7              MR. NASH:  Objection, form.
8    A.   We investigated it.  We completed our
9    investigation in September of '22.
10   Q.   (By Mr. Haynes)  And then, when he was deposed
11   in a lawsuit, you made a significant policy change.
12   Right?
13             MR. NASH:  Objection, form.
14   A.   When information became known to us that there
15   was a physical impairment, we did.
16   Q.   (By Mr. Haynes)  Do you think you closed the
17   investigation a little too soon?
18             MR. NASH:  Objection, form.
19   A.   No.
20   Q.   (By Mr. Haynes)  You've been at the company
21   18 years?
22   A.   Yes, sir.
23   Q.   And in year 18 or 19 you-all came up with a
24   new policy about physicals.  Right?
25   A.   Yes, sir.

Page 120

1    Q.   And you did so because one of your employees
2    was deposed in a lawsuit?
3    A.   Because information regarding his medical
4    physical status became available to us.
5    Q.   You know, you can get a release from him to
6    get his medical information.  Right?
7    A.   I didn't know that.  Again, I've been told
8    that we're not allowed to ask employees regarding their
9    medical past or medical information.
10   Q.   Well, obviously you're allowed to require them
11   to get DOT physicals.  Right?
12   A.   Yeah, but I don't get his medical information.
13   Q.   So your testimony is that you could not obtain
14   permission to ask the forklift operators for their
15   medical histories to ensure that they were medically fit
16   to operate a forklift?
17   A.   Again, I'm not allowed to ask employees
18   regarding their medical conditions.
19   Q.   Who is telling you that?  Where are you
20   getting that information?
21   A.   Human resources.  Human resources handles
22   everything that has to do with medical in our company.
23   So even today with those physicals, I don't know, you
24   know, the employee's condition.  That information is not
25   made available to me.

Page 121

1  I just get told, this person failed the
2  physical and he cannot operate -- he or she cannot
3  operate an equipment.
4  Q.  You -- Seaboard Marine does not want its HR
5  department to run its safety department, right?
6  A.  No.
7  Q.  You can't let whatever the HR department does
8  outstrip or overtake what the safety department's
9  responsibilities are.  Right?
10  A.  That's the decision of the company.  It's not
11  my decision.
12  MR. HAYNES:  I'm going to object as
13  nonresponsive.
14  Q.  (By Mr. Haynes)  Seaboard Marine cannot let
15  the HR department overtake the safety department, can
16  it?
17  MR. NASH:  Objection, form.
18  A.  Seaboard Marine can do whatever
19  Seaboard Marine wants to do with their departments.  I'm
20  not the president of Seaboard Marine.
21  Q.  (By Mr. Haynes)  Well, do you see a problem
22  here, where if the HR department is restricting you from
23  getting medical information from your employees to make
24  sure they're safety to operate forklifts, that that
25  could be a big problem?

Page 122

1  MR. NASH:  Objection, form.
2  A.  I can't speak to HR's rules and regulations
3  within the company.
4  Q.  (By Mr. Haynes)  Well, you know that they
5  won't let you talk to the drivers about their medical
6  history.  You know that rule.  Right?
7  A.  Yes.
8  Q.  So I'm talking about that rule.
9  Don't you think that that is restrictive
10  unnecessarily of your ability to do your job?
11  MR. NASH:  Objection, form.
12  A.  No.
13  Q.  (By Mr. Haynes)  No?  It's okay with you?
14  A.  That's the rules placed, you know, by the
15  company.
16  Q.  Just follow the company's rules?
17  A.  I follow the company rules.
18  Q.  That's your job?
19  A.  Yes, sir, that's how I keep my job.
20  Q.  That's important, isn't it?
21  A.  Everything is important.
22  Q.  And you want to keep your job, right?
23  A.  Life is about balance.
24  Q.  Okay.  When you were told by in-house counsel
25  that there was some kind of medical issue that came up

Page 123

1  in Mr. Silva's deposition, did they tell you what kind
2  of medical issue?
3  A.  Eyesight.
4  Q.  Did they specify what it was?
5  A.  No.
6  Q.  What did they say?
7  MR. NASH:  Objection, form.
8  A.  That -- I can't remember the exact words, but
9  just basically that he had some vision problems.
10  Q.  (By Mr. Haynes)  And this policy change you're
11  talking about where you're requiring physicals of the
12  forklift operators, that was not done because of this
13  incident, was it?
14  A.  I'm sorry.  Rephrase the question.
15  Q.  This new policy that was implemented in 2023
16  where you require forklift operators to get physicals,
17  that was not a policy change that was implemented
18  because of this incident with Ms. Recinos, was it?
19  A.  It was implemented because we got knowledge
20  that an equipment operator had a physical ailment.
21  Q.  But you're not saying this incident was caused
22  by any physical ailment, are you?
23  A.  No.
24  Q.  So in that sense you didn't implement the
25  policy change because of this incident.

Page 124

1  A.  We implemented it because we -- it was made
2  known to us that an operator, any operator, had a
3  physical ailment.
4  Q.  Not that that ailment caused this incident?
5  A.  No.
6  Q.  So you just decided it doesn't -- strike that.
7  You're not saying that this is supposed
8  to be designed to prevent incidents like this in the
9  future because you don't think the physical ailment had
10  anything to do with this incident.
11  A.  I don't know if the physical ailment has
12  anything to do with this incident.
13  Q.  Well, if you don't know, then you certainly
14  can't believe that it did.  Right?
15  A.  I don't know if it did or not.
16  Q.  Did this in-house lawyer tell you whether they
17  thought it did?
18  A.  No.
19  MR. NASH:  Objection, form.
20  Q.  (By Mr. Haynes)  What's the lawyer's name?
21  A.  Steve Irick.
22  Q.  Can we agree that this incident was
23  preventable, Mr. Contreras?
24  A.  Every incident is preventable.
25  Q.  So it should have been prevented?

Page 125

1   A. It could have been.
2   Q. Well, it should have been.
3   A. Is there a question?
4   Q. Yeah. It should have been prevented.
5   A. I don't know how you could -- you know,
6  accidents are accidents because normally either
7  something fails: there is a failure in communication,
8  there is a failure, you know, on behalf of, you know,
9  the equipment itself.
10      I mean, there could be so many things
11  that lead to an accident happening.
12      MR. HAYNES: Let me object to the
13  responsiveness.
14   Q. (By Mr. Haynes) This incident should have
15  been prevented. Right?
16   A. Could have been.
17   Q. Why is it hard to say it should have been?
18   A. Again, I can't control and I don't know what
19  took place between Ms. Recinos and Mr. Silva. Right?
20  There was a communication, and there was a clear
21  breakdown of communication at that point.
22      So, you know, could it have been
23  prevented? Absolutely. Maybe there could have been
24  clearer communication. You know, there could have
25  been -- it could have been prevented. I can't say for

Page 126

1  sure -- I can't say it should have. I can say it could
2  have been prevented, yes, absolutely.
3   Q. It's not acceptable to run over someone on one
4  of those forklifts, is it?
5   A. It's not acceptable.
6   Q. Mr. Silva ran over Delmy in the forklift,
7  didn't he?
8   A. He struck her with the forklift, yes.
9   Q. So what he did was unacceptable, right?
10      MR. SEIPEL: Objection, form.
11   A. Again, yes, it's --
12      (Simultaneous speaking.)
13   Q. (By Mr. Haynes) And you expect employees
14  working at the port, operating these very large
15  forklifts, not to engage in unacceptable behavior,
16  right?
17   A. Correct.
18   Q. So should he have prevented it?
19      MR. NASH: Objection, form.
20   A. It could have been prevented. I think, again,
21  both parties had their own part in this scenario and
22  both parties could have done -- potentially done things
23  to prevent this accident from happening.
24   Q. (By Mr. Haynes) Exactly how could Delmy have
25  prevented this? Please explain.

Page 127

1   A. Don't turn your back on moving equipment. If
2  you hear the backup alarm, turn around, see where it's
3  coming from. Keep eyesight with the operator to make
4  sure the operator sees you.
5   Q. Anything else?
6   A. Justify off the top of my head those are the
7  main ones.
8   Q. You have no idea if her back was turned to
9  him.
10   A. I don't know.
11   Q. You have no idea if she was looking at him or
12  not.
13   A. I don't know.
14   Q. You have no idea if a backup alarm was heard
15  or being used.
16   A. I don't know.
17   Q. So how can you say that --
18   A. The backup alarm was being used.
19   Q. Were you there?
20   A. The backup alarm was functional when we looked
21  at the equipment.
22   Q. When you came a week later?
23   A. It wasn't a week later. It was that Monday
24  following the incident.
25   Q. When you came 48 hours later?

Page 128

1   A. Yes. The forklift was not touched.
2   Q. Right. Okay.
3      You don't know if the backup alarm was
4  functioning at the time.
5   A. There is no reason to believe it was not.
6      MR. HAYNES: Let me object to the
7  responsiveness.
8   Q. (By Mr. Haynes) You don't know on personal
9  knowledge if it was functioning at the time.
10   A. I wasn't there at the scene of the accident
11  when it happened, no.
12   Q. So all of these things that you're listing,
13  you don't have any knowledge whether or not they are
14  applicable because you don't know if they were actually
15  true or not.
16   A. I know the backup alarm was working when I got
17  there Monday morning.
18   Q. We will get to that.
19      What about all the other things that you
20  said you didn't know? Can we at least agree that you
21  can't sit here under oath and say that Delmy should have
22  prevented the incident based upon those because you have
23  no idea if --
24      (Simultaneous speaking.)
25   A. I never said "should."

Page 129

1       THE REPORTER:  One at a time.
2    Q.  (By Mr. Haynes)  -- they were true or untrue.
3    A.  I said it could have been prevented.
4    Q.  Well, that's a distinction without a
5  difference, Mr. Contreras.
6          You're saying she could have, which
7  suggests that those were actually factors that were in
8  play; but you're telling me also that you don't know if
9  they were.  Right?
10       MR. NASH:  Objection, form.
11       MR. SEIPEL:  Objection, form.
12    A.  I wasn't there.
13    Q.  (By Mr. Haynes)  Right.  So you don't know if
14  those were in play or not, do you?
15    A.  I don't know for certain.
16    Q.  So if you don't know if they were in play, you
17  can't say that she could have done something as far as
18  those things go.  Right?
19    A.  Yes.
20    Q.  Okay.  So we can take those off.  So the only
21  thing left, it sounds like, is the backup alarm.  Right?
22       MR. SEIPEL:  Objection, form.
23    A.  Again, I still stand by my statement.  She
24  could have done these things to prevent the accident
25  from happening.

Page 130

1    Q.  (By Mr. Haynes)  How do you know if you don't
2  know if she wasn't doing them?
3    A.  She's not here.
4    Q.  Is that how you investigate incidents?  You
5  just kind of throw things against the wall and because
6  the person tragically died, they can't defend
7  themselves?
8       MR. SEIPEL:  Objection, form.
9       MR. NASH:  Objection, form.
10    A.  No.  No, sir.
11    Q.  (By Mr. Haynes)  Okay.  All right.
12       MR. NASH:  Mr. Haynes, when you get to a
13  stopping point, can we take a lunch recess?
14       MR. HAYNES:  Sure.  We can take one right
15  now.
16       THE VIDEOGRAPHER:  Off the record at
17  12:47.
18       (Recess taken for lunch at 12:47 p.m.,
19        resuming at 1:27 p.m.)
20       THE VIDEOGRAPHER:  On the record at 1:27.
21    Q.  (By Mr. Haynes)  Okay, Mr. Contreras, we took
22  a lunch break.  Are you ready to keep going?
23    A.  Yes, sir.
24    Q.  I'm going to show you the next exhibit.  I
25  think it's 3.

Page 131

1       (Marked was Contreras Exhibit 3.)
2    Q.  (By Mr. Haynes)  Can you see that, sir?
3       THE VIDEOGRAPHER:  It's not up.
4       MR. HAYNES:  Oh, not yet.
5    Q.  (By Mr. Haynes)  Can you see that now?
6    A.  Yes.
7    Q.  Have you seen this before?
8    A.  It does not look familiar.
9    Q.  Let me blow it up a little so you can see it a
10  little better.
11       This is what's called an Internal Memo,
12  and it's got Jacintoport's logo on the top.  Right?
13    A.  Yes.
14    Q.  And it's dated June 13, 2018.  Right?
15    A.  Yes.
16    Q.  And the subject is "Safety Compliance."  True?
17    A.  Yes.
18    Q.  And it's addressed to All Stevedoring and
19  Terminal Operations Supervisors.  Right?
20    A.  Yes.
21    Q.  We can see that Stephen White is copied on it.
22  True?
23    A.  Yes.
24    Q.  And it's from Juan Benitez.  Do you see that?
25    A.  Yes.

Page 132

1    Q.  Who is Juan Benitez?
2    A.  I don't know his exact title; but he's, I
3  think, a director.
4    Q.  Okay.
5    A.  He's the main person in the terminal.
6    Q.  At Jacintoport?
7    A.  At Jacintoport terminal, yes.
8    Q.  Is he still there today?
9    A.  Yes.
10    Q.  At the bottom here you can see that there is
11  an Acknowledgment section, right?
12    A.  Yes.
13    Q.  And you can see that Diego Silva has printed
14  his name?
15    A.  Yes.
16    Q.  And he's put his title as foreman.  Right?
17    A.  Yes.
18    Q.  You can see this is back in 2018.  Right?
19    A.  Yes.
20    Q.  And this is saying, "Please return this
21  document to your supervisor on or before June 22, 2018."
22       Right?
23    A.  Yes.
24    Q.  So this is a document we got from Jacintoport
25  in the case.  You can see the Bates stamp, can't you?

1    A.  Yes.
2    Q.  So if we look at the substance of it -- and
3   take as long as you need to read the who whole thing.
4   I'm not going to ask you about every word in here.  I
5   just kind of want to get an overview.
6        At the beginning it says, (as read):  "In
7   December 2017, all Jacintoport supervisory terminal
8   personnel were advised of our corporate dedication and
9   commitment to safety.  Everyone was asked to support and
10  enforce the company's safety policies via the
11  Performance Feedback Notice booklets when an infraction
12  was observed."
13       Right?
14   A.  Right.
15   Q.  Have you heard of these Performance Feedback
16  Notices?
17   A.  Yes.
18   Q.  What are those?
19   A.  If it's what I'm thinking of, it's sort of a
20  booklet where you -- if you notice the employee doing
21  something wrong, you write -- you know, you write a note
22  to the employee, letting them know that, you know, we
23  witnessed you committing this infraction; and it's kind
24  of like a ticket, for lack of better words.  Right?
25   Q.  All right.  And the expectation is that the

1   employees are supposed to be looking for potentially
2   unsafe behaviors, observing; and if they see one, they
3   fill out this notice and they give it to their
4   supervisor?
5    A.  No.  So the supervisory terminal personnel are
6   the ones that have that notice; and if they witness one
7   of their employees doing something unsafe, then they
8   write the employee up.
9        They write the employee a ticket or a
10  notice and then that notice goes to HR and then this
11  disciplinary action, based on how many notices you've
12  had for X amount of time.
13   Q.  Got it.  So this is not -- this is not sort of
14  bottom up.  This is top down.  This is the supervisors
15  observing or supposed to be monitoring any unsafe
16  behaviors; and if they see them, they write up this
17  evaluation or a ticket, to say it loosely, and they turn
18  it in.  Right?
19   A.  Correct.
20   Q.  And so that's to track its safety incidents
21  with certain employees to try to improve safety at the
22  company.  Right?
23   A.  Correct.
24   Q.  And then it says (as read):  "For the past
25  six" months --

1    A.  "Six weeks."
2    Q.  I'm sorry.  Let me start over and say that
3   again.
4        Then it says (as read):  "For the past
5   six weeks numerous safety violations have been cited by
6   the safety team, yet nearly no safety violations have
7   been cited by the group/department leaders.  This is a
8   clear indicator that insufficient attention has been
9   given by the terminal supervisory personnel concerning
10  safety.  On several occasions, a verbal message has been
11  given that we need to do a better job."
12       Did I read all of that right?
13   A.  Yes.
14   Q.  So Mr. Benitez is saying that there has been
15  numerous safety violations over the course of about a
16  month and a half and they need to do a better job of
17  recording these, of memorializing them in the way they
18  described so the company can get safer.  Right?
19   A.  Yes.
20   Q.  And then it says (as read):  "All terminal
21  supervisors and managers must identify and address any
22  safety infractions within your department or area.
23  Failure to do so will be considered in evaluations as it
24  is part of your scope of responsibilities."
25       Right?

1    A.  Yes.
2    Q.  And then it says (as read):  "Effective
3   immediately the safety team has been instructed to issue
4   warning notices directly to employees committing safety
5   infraction in the event that there isn't a supervisor
6   nearby.  A copy of the safety warning will be provided
7   to the employee's supervisor and to me."
8        Did I read that right?
9    A.  Yes.
10   Q.  So this, to me, is saying that there's not
11  just a supervisor at the terminal; there is also a
12  safety employee, right?
13   A.  The safety team.  So that's Stephen White's
14  team.
15   Q.  Okay.
16   A.  And then each area has their own supervisor.
17  Each department has their own supervisor.
18   Q.  Okay.  So when it says "safety team" right
19  here, is that Stephen White?
20   A.  Stephen White's team, yes.
21   Q.  Who does he working underneath him?  Do you
22  know?
23   A.  He has -- I mean, in 2018, I don't remember.
24  But right now he has two safety specialists under him.
25   Q.  What are their names?

Page 137

1    A.  Wagner Betancourt and Troy Hudson.
2    Q.  Were they working back in 2022 when this
3  incident happened?
4    A.  Wagner Betancourt was.  He was there the day
5  of the incident.
6    Q.  And he goes on to say (as read):  "I urge you
7  to openly show support for the company's safety policies
8  by actively addressing and documenting safety
9  infractions.  Only working together as a team can we
10  improve our safety culture."
11        Right?
12    A.  Yes.
13    Q.  So at this time an employee, a supervisor of
14  sorts, Mr. Benitez, who was high up at the terminal, was
15  recognizing the need to improve safety culture.  Right?
16    A.  Yes.
17    Q.  And he required there to be more consistent
18  reporting of safety infractions that were observed by
19  supervisors.  Right?
20    A.  Yes.
21    Q.  And so can we agree that it's important to be
22  proactive instead of reactive when it comes to safety?
23    A.  Yes.
24    Q.  You should be actively monitoring operations
25  at the terminal to identify safety infractions,

Page 138

1  potential safety issues, so you can correct them before
2  they hurt somebody or cause some sort of bigger problem.
3  Right?
4    A.  Yes.
5    Q.  And that's a commonly held principle in the
6  safety field, right?
7    A.  Yes.
8    Q.  Are you familiar with leading and lagging
9  indicators?
10    A.  Yes.
11    Q.  Leading indicators are data points that you
12  can look at when it comes to safety that might predict
13  whether there's some need to change, to make a safety
14  change.  Right?
15    A.  Right.
16    Q.  And lagging indicators are things you're
17  looking backwards, you're looking at things that are
18  showing things in the past.  Right?
19    A.  Yes.
20    Q.  And so the preference in the field of safety
21  is to rely upon leading indicators when you can because
22  it helps you prevent things in the future.  True?
23    A.  Correct.
24    Q.  Part of the required training of forklift
25  operators or anyone who is operating a forklift at the

Page 139

1  ports is that they need to be familiar with the
2  manufacturer's manual.  Right?
3    A.  No.
4    Q.  Okay.  You're saying that the forklift
5  operator doesn't need to be familiar with the
6  manufacturer's manual, meaning the manufacturer of the
7  forklift?
8    A.  No.
9    Q.  Okay.  Is there any requirement that they have
10  to know and be trained and educated upon the manual?
11    A.  No.
12    Q.  Why not?
13    A.  We take any safety information provided by the
14  manufacturer and then we put that in our Powered
15  Industrial Truck training and kind of "nub" it down for
16  them, right, in plain English, you know, do this, do
17  that, don't do this, don't do that, so on and so forth.
18    Q.  So you're saying that you incorporate the
19  principles in the manufacturer's manual into your own
20  training?
21    A.  Yes.
22    Q.  So there's no need, you're saying, to go read
23  or learn the --
24    A.  Read the manual.
25    Q.  -- big manual?

Page 140

1    A.  Correct.
2    Q.  Who is responsible for deciding what to take
3  from the manual to put into your training?
4    A.  Some of the training was created by us
5  internally, the person that was there previous to me,
6  and it's been updated through the years and some -- and
7  I believe that Powered Industrial Training is one of
8  those that was created by someone previous to me.
9        And then we've just been updated -- we
10  would update it with new information as new information
11  is available.  Or as incidents happen, we will add it on
12  there, watch out for this, watch out for that.
13    Q.  And the training provided to forklift
14  operators at the ports -- or I say that loosely.  I mean
15  anybody that's going to operate one of those forklifts.
16  Okay?  Are you with me?
17    A.  Right.
18    Q.  It says that the operator always has to look
19  in the direction of travel.  Right?
20    A.  Correct.
21    Q.  They always have to keep a clear view of the
22  path of travel.  Right?
23    A.  That sounds familiar, yes.
24    Q.  They always have to slow down and sound the
25  horn.  Right?

Page 141

1  A. I'm not sure if that one is in all the
2  equipment. I would have to refer to a specific
3  equipment manual.
4  Q. Okay. Well --
5  A. I'm just going from memory.
6  Q. Right. But I mean, we can agree as a general
7  rule that if a forklift operator is going to move the
8  forklift, they need to sound the horn before they do so,
9  right?
10       MR. SEIPEL: Object to form.
11  A. Well, the purpose of the horn is to have an
12  audible sign that there's movement, which is why we
13  incorporate the backup alarms on our equipment.
14  Q. (By Mr. Haynes) So you're saying that if the
15  equipment has a backup alarm, there is no need to sound
16  the horn if you're moving the forklift?
17  A. If you're moving back, right. If you're
18  moving forward, if there is an area where, for example,
19  you're in a warehouse and there is a blind spot and
20  you're coming up to that blind spot, you're supposed to
21  sound the horn.
22  Q. Okay.
23  A. So it's dependent on circumstance, right? And
24  obviously with the backup alarm, it kind of negates the
25  need for you to sound the horn when you're backing up

Page 142

1  because the whole purpose of the horn is to have an
2  audible alarm signifying that the forklift is moving and
3  you already do that on the reverse side with the backup
4  alarm.
5  Q. We can agree that it can be loud at these
6  ports, right?
7  A. Yes.
8  Q. There are machines going in the background,
9  there's vessels, you name it. Right?
10  A. Yes.
11  Q. There's trucks driving in and out, true?
12  A. Yes.
13  Q. In fact, do the employees have to wear hearing
14  protection?
15  A. Some.
16  Q. So it's possible that the backup alarm might
17  be -- the sound or its audibility might be affected by
18  all of that noise. Is that true?
19  A. Any sound could be --
20       MR. SEIPEL: Objection, form.
21  A. Any sound in the terminal could be, you know,
22  taken over by another sound.
23  Q. (By Mr. Haynes) Including a backup alarm on a
24  forklift?
25  A. And including a horn as well.

Page 143

1       MR. HAYNES: Let me object to the
2  responsiveness.
3  Q. (By Mr. Haynes) Let's go step by step.
4      You said any sound can be overtaken.
5  That includes the sound of a backup alarm on a forklift.
6  Right?
7       MR. SEIPEL: Objection, form.
8  A. Yes.
9  Q. (By Mr. Haynes) And that also includes
10  potentially the sound of a horn on a forklift. Right?
11  A. Yes.
12  Q. But it takes no effort -- virtually no effort
13  to sound the horn when you're about to move the
14  forklift. Right?
15       MR. SEIPEL: Objection, form.
16  A. Little effort, yes.
17  Q. (By Mr. Haynes) So there is really no good
18  reason not to sound the horn out of caution if you're
19  going to move the forklift.
20  A. It's just an extra step. I mean, if I'm
21  moving the forklift and there's nobody in my vicinity,
22  why would I need to sound the horn?
23  Q. Well, why would you need to have a backup
24  alarm? I mean, that's the point. Like --
25  A. Right.

Page 144

1  Q. -- it's a redundancy. Right?
2  A. Yes.
3  Q. You're familiar with redundancies in safety.
4       (Simultaneous speaking.)
5  A. So we install backup alarms to make sure
6  that -- you know, obviously most accidents happen when
7  you're backing up, right?
8      So sometimes there is limited visibility.
9  So we have backup alarms on all our equipment so that
10  the operator doesn't have to, you know, have that
11  thought process and we can signal to any pedestrian
12  that, hey, there is equipment moving.
13  Q. Okay. So can you say one way or the other
14  whether the training that was provided to Mr. Silva to
15  operate this forklift, whether it said that he needs to
16  sound the horn when he moves the forklift?
17  A. I don't remember the contents of that training
18  at this time specifically to the horn. I don't remember
19  if it's there or not.
20  Q. Are you aware of any training for any forklift
21  at the company that said says you need to sound the
22  alarm -- excuse me, you need to sound the horn when you
23  move the forklift?
24  A. Again, from memory, I think that the training
25  does talk about sounding the horn if you're coming

## Page 145

1 across an area where you have low visibility or a blind
2 spot -- sorry, a blind spot.
3     Q. Okay. Fair of me to say that it's possible
4 that, to the extent the backup alarm is not functioning
5 or it's drowned out by noise, the horn could be a
6 backup, a redundancy, to try to have an extra layer of
7 protection to make sure somebody hears an audible
8 warning when the forklift is moving. Right?
9     A. Yes.
10         MR. SEIPEL: Objection, form.
11     Q. (By Mr. Haynes) And there is no really -- it
12 doesn't take a lot of effort to hit that horn, right?
13     A. No.
14     Q. So there is really no good reason not to
15 require the operators to hit the horn. Right?
16         MR. NASH: Objection, form.
17     A. We don't require operators to hit the horn
18 when they're backing up.
19     Q. (By Mr. Haynes) Yeah, but there is no good
20 reason not to. Right?
21     A. If they have backup alarms, there is no good
22 reason to require them to do so.
23     Q. Well, give the jury one good reason why you
24 couldn't just require them to do both, to have -- to hit
25 the horn out of caution, even if there is a backup

## Page 146

1 alarm?
2         MR. NASH: Objection, form.
3     A. It wasn't a requirement. It's not a
4 requirement.
5     Q. (By Mr. Haynes) I'm not asking you if there
6 is a requirement.
7         MR. HAYNES: Object to the
8 responsiveness.
9     Q. (By Mr. Haynes) I'm asking you: Can you give
10 the jury one good reason why you can't require it?
11         MR. NASH: Objection, form.
12     A. It's an extra step for the operator to
13 remember.
14     Q. Pretty simple step, isn't it?
15     A. Yeah, pretty simple step.
16     Q. And it could save a life, couldn't it?
17     A. Yes.
18     Q. So there is no good reason not to require them
19 to do that. Right?
20         MR. SEIPEL: Objection, form.
21         MR. NASH: Objection, form.
22     A. Again, it's not a requirement.
23     Q. (By Mr. Haynes) Do you understand my
24 question? I'm not asking you if it's a requirement.
25 I'm asking you if there is any good reason not to

## Page 147

1 require it.
2         MR. SEIPEL: Objection, form.
3     A. It's just an additional step that we have to
4 add to our training, so...
5     Q. (By Mr. Haynes) And you require additional
6 steps in certain cases when it comes to OSHA regulations
7 and going above and beyond. Right?
8     A. Correct.
9     Q. And if an additional step takes very little
10 effort, is there any reason not to do it?
11         MR. SEIPEL: Objection, form.
12     A. We could do it.
13     Q. (By Mr. Haynes) Okay. What about a spotter?
14 Does Seaboard Marine require spotters for forklift
15 operations?
16     A. No.
17     Q. Could it?
18     A. Sure, if we wanted to do so; but that requires
19 extra labor.
20     Q. Okay. And a spotter is essentially somebody
21 who is an extra set of eyes to help guide and
22 communicate with the forklift operator to make sure they
23 are doing a safe job. Right?
24     A. Yes.
25     Q. And spotters are recognized as a common type

## Page 148

1 of personnel that's used in forklift operations. Right?
2         MR. NASH: Objection, form.
3     A. No.
4     Q. (By Mr. Haynes) What are you basing that on?
5         MR. NASH: Objection, form.
6     A. Just personal knowledge. Different terminals
7 I've been to, different work sites. Normally spotters
8 are reserved for more intricate operations. Not
9 forklift use. Forklift use is considered a basic
10 operation.
11     Q. (By Mr. Haynes) Do you know what Mr. Silva
12 testified to under oath about spotters?
13     A. I'm sorry? Repeat.
14     Q. Do you know what Mr. Silva testified to under
15 oath about spotters?
16     A. No, I do not.
17     Q. If he testified that a spotter would have
18 helped him, what's your reaction to that?
19         MR. SEIPEL: Objection, form.
20     A. I can see that.
21     Q. (By Mr. Haynes) Why can you see that?
22     A. Well, spotters help. Right? So if I was
23 driving down the road and I had a spotter in the corner
24 telling me that somebody is going to blow the red light,
25 I could stop and avoid an accident. That would be great

Page 149

1  to have that spotter. Insurance companies are not going
2  to pay for people to have their spotters, you know, in
3  every corner of the United States.
4       So equally, in a marine terminal, labor
5  is really expensive and, you know, we assign spotters,
6  for example, if we're going to do some sort of lift, a
7  critical lift with a crane, and we're going to move that
8  crane. Right? Big piece of machinery, you know, lots
9  of intricacies involved, we would assign a spotter to
10 that crane to assist the crane operator in moving that
11 crane and maneuvering that crane to whatever, you know,
12 the operation needs.
13      A forklift, whether it's in the
14 warehouse, in the terminal, on the dock, it's
15 just -- you know, we have a hundred forklifts. We can't
16 assign a spotter to every forklift that's in the
17 terminal. It's not -- it's just not -- not good -- not
18 good for business.
19 Q. Okay.
20      MR. HAYNES: Let me object to the
21 responsiveness.
22 Q. (By Mr. Haynes) You said that labor at marine
23 terminals is very expensive. Right?
24 A. Yes, sir.
25 Q. Is that true relative to other industries?

Page 150

1  A. I can't speak for other industries.
2  Q. But as far as you're concerned, labor at
3  marine terminals is very expensive. Right?
4  A. Yes.
5  Q. And that's one reason why Seaboard doesn't
6  have spotters for forklift operations.
7       MR. NASH: Objection, form.
8  A. Again, when I was at Aeropia, Inc. I managed
9  the warehouse and I had six forklift operators. If I
10 was to have a spotter for each operator, that means we
11 would have to hire six extra persons to just be there
12 spotting each forklift operator.
13      So it's just not -- it's not a common
14 practice when it comes to forklift operation.
15      MR. HAYNES: Let me object to the
16 responsiveness.
17 Q. (By Mr. Haynes) One of the reasons why
18 Seaboard does not have spotters for forklift operations
19 is because of the expense, the cost?
20      MR. NASH: Objection, form.
21 A. There is several reasons. Cost is one of
22 them.
23 Q. Okay. And you said earlier that insurance
24 companies are not going to pay for people to have
25 spotters. What do you mean by that?

Page 151

1  A. I mean, meaning, you know, I'm insured by
2  GEICO. GEICO is not going to, you know, give me a
3  spotter or ask me to have a spotter when I leave my
4  driveway, to make sure I don't hit something.
5       I mean, it's my job to make sure, you
6  know, I'm trained, right? I have my driver's license
7  and I'm trained on operating my vehicle and I can drive
8  my vehicle out of the driveway and drive my vehicle on
9  US roads.
10      Same thing at an industrial site. If
11 you're operating a crane, a forklift, manlift, whatever
12 it is, if you're trained to operate that equipment, you
13 shouldn't need a spotter, unless there are a specific
14 set of circumstances that require for us to go above and
15 beyond, right, because there is some issue that, you
16 know, may come up as a result of moving that equipment.
17      A forklift is just not -- I've never seen
18 spotters for forklifts. Again, it has to be some sort
19 of critical move that you're making. You know, maybe
20 you're lifting something that's a really, really long
21 piece that, you know, something that's 100 feet long and
22 it's just odd and unbalanced, then you want to have a
23 spotter available.
24      So these are just scenarios I can
25 envision. Normally, in a day-to-day operation,

Page 152

1  forklifts do not require spotters.
2       MR. HAYNES: Let me object to the
3  nonresponsiveness.
4  Q. (By Mr. Haynes) If Mr. Silva said it would
5  have helped him and you can understand why he said that,
6  then certainly it would have been worth it to Delmy
7  Recinos and her family for Seaboard to have paid for a
8  spotter. Right?
9       MR. NASH: Objection, form.
10 A. I think, in hindsight, a lot of things would
11 have helped the situation. But again, spotters is not
12 something that's commonly used for forklifts.
13      MR. HAYNES: Let me object to the
14 responsiveness.
15 Q. (By Mr. Haynes) If Mr. Silva said a spotter
16 would have helped prevent this incident, then it
17 would have been worth it and cost shouldn't have made a
18 difference to Seaboard and it should have provided one.
19 Right?
20      MR. NASH: Objection, form.
21 A. No.
22 Q. No?
23 A. No.
24 Q. Even if it would have saved her life?
25      MR. NASH: Same objection.

Page 153

1    A.  We wouldn't have known at the time that we
2  were making the decision to get the spotter that this
3  would have saved somebody's life.
4    Q.  Do you only learn about lifesaving technique
5  after people get killed?
6          MR. NASH:  Objection, form.
7    A.  Getting a spotter is not a lifesaving
8  technique.
9    Q.  (By Mr. Haynes)  According to you, as the
10  second highest safety employee at Seaboard Marine.
11  Right?
12    A.  In this case?  Yes.
13    Q.  And you're telling me that you only use
14  spotters in critical lift crane operations?
15    A.  If there is a critical -- if there is a move
16  that's going to require -- again, you know, I can come
17  up with different scenarios; but the first one that
18  comes to my mind is the crane.
19          If we're moving the rail yard, for
20  example, right, normally when we're moving the train
21  through the facility, there is always a spotter that is
22  directing traffic and directing the train conductor so
23  we make sure there is not an accident with the train and
24  any car coming through.
25          So when it's something like that, right,

Page 154

1  yes, spotters are used in different areas in the
2  terminal.  Again, we have 100 forklifts, we have 100
3  forklift operators.  We cannot have 100 spotters in
4  every location, you know, doing spotting for forklift
5  operators.  It's just not good business.
6    Q.  What if someone has really bad vision and
7  they're operating a forklift, wouldn't a spotter help
8  them?
9          MR. SEIPEL:  Objection, form.
10          MR. NASH:  Objection, form.
11    A.  If the company knew that the person had bad
12  vision, they wouldn't be operating the equipment.
13          MR. HAYNES:  Let me object to
14  nonresponsive.
15    Q.  (By Mr. Haynes)  I don't need the talking
16  points.  Let's just focus on the questions.  Okay?  New
17  question.
18          If someone has poor vision that's
19  operating a forklift, a spotter would help them.  Right?
20          MR. SEIPEL:  Objection, form.
21    A.  Yes.
22    Q.  (By Mr. Haynes)  Mr. Contreras, let me show
23  you Exhibit 4.
24          (Marked was Contreras Exhibit 4.)
25    Q.  (By Mr. Haynes)  Can you see it on your

Page 155

1  screen, sir?
2    A.  Yes.
3    Q.  This is from OSHA's website.  Can you see
4  that?
5    A.  Yes.
6    Q.  And, again, OSHA is something you're
7  required -- the regulations and guidance, those are
8  things that you are responsible for knowing.  Right?
9    A.  Yes.
10    Q.  And enforcing.  Right?
11    A.  Yes.
12    Q.  I want to show you a few sections on this.
13  This is section called Preventing Backovers.
14          Can you see that?
15    A.  Uh-huh, yes.
16    Q.  It says, "Spotters are a proven method of
17  protecting employees on foot behind vehicles with an
18  obstructed view."
19          Right?
20    A.  Yes.
21    Q.  And it even says spotters themselves can be a
22  risk for injury or death, right, potentially?
23    A.  Correct.
24    Q.  Because they are another pedestrian around a
25  large --

Page 156

1    A.  Right.
2    Q.  -- vehicle?
3    A.  Yeah.
4    Q.  But these are ways to keep spotters safe.
5  Right?
6    A.  Uh-huh.
7    Q.  Yes?
8    A.  Yes.
9    Q.  So is there any reason for you to dispute OSHA
10  saying that spotters are a proven method of protecting
11  employees on foot behind vehicles with an obstructed
12  view?
13    A.  No.
14    Q.  And in this case are you aware that the
15  rearview mirrors and sideview mirrors were all not
16  operational on the forklift?
17          MR. NASH:  Objection, form.
18    A.  Not operational how?
19    Q.  (By Mr. Haynes)  They had tape over them.
20    A.  That's not how I remember when we looked at
21  the forklift.
22    Q.  You don't know what Mr. Silva said about that
23  in his deposition, do you?
24    A.  No, I do not.
25    Q.  Okay.

Page 157

1    A.   By the way, this --
2    Q.   There is no question; but if you want to give
3 me some talking points, you can.
4    A.   No, no.  It's just this is --
5         MR. NASH:  Objection, form.
6    A.   -- construction industry and this is just
7 guidance, not requirements, by OSHA.  It's just
8 pamphlets that they put out.
9    Q.   (By Mr. Haynes)  Any other talking points?
10   A.   No.
11        MR. NASH:  Objection, form.
12   Q.   Mr. Silva gave a lot of talking points, too.
13        MR. SEIPEL:  Objection, form.
14   Q.   (By Mr. Haynes)  He was prepared very much.
15        MR. NASH:  Objection to the sidebar.
16   Q.   (By Mr. Haynes)  Do you think he was prepared
17 more than you?
18   A.   I don't know.
19        MR. SEIPEL:  Objection, form.
20        MR. NASH:  Objection, form.
21   Q.   (By Mr. Haynes)  Did Seaboard require the port
22 to have an internal traffic control plan at the time of
23 this incident?
24   A.   No.
25   Q.   Do you know what an internal traffic control

Page 158

1 plan is?
2    A.   No.
3    Q.   Were there any barriers or paint or other
4 markings that directed the flow of traffic at the
5 terminal?
6    A.   There are barriers and painted lines in
7 certain areas.  But again, it's the way the terminal is
8 laid out, it has a main rail that kind of circles the
9 main office building as soon as you go into the
10 terminal.
11        So there is signage.  There is barricades
12 in certain areas.  There are lines painted in certain
13 areas, too, to provide traffic flow throughout the
14 terminal.
15   Q.   What about in the area where Ms. Recinos was
16 killed?  Were there any paint markings and barriers?
17   A.   That I remember at that time, no.  That was a
18 container area; so in the container areas it's a
19 free-flowing area, right?
20        So you have container stacks and then
21 truck drivers can come in and look for their container
22 or drop off their container and they can freely operate
23 throughout that area to do whatever they are -- whatever
24 it is they are going to do, drop off, pick up a
25 container.

Page 159

1    Q.   Are there barriers and paint markings now?
2    A.   Yes.
3    Q.   Did OSHA cite Jacintoport for not having
4 barriers and paint markings?
5    A.   No.
6    Q.   Did OSHA cite them for anything?
7    A.   Not that I remember.
8    Q.   Did you handle or help out with the OSHA
9 investigation?
10   A.   I helped.
11   Q.   And you're sure that there were no citations
12 issued to Jacintoport --
13   A.   I honestly don't remember there being a
14 citation.
15   Q.   I mean, after a fatality incident and OSHA
16 investigates and the police come, isn't a citation
17 something you think you would remember?
18   A.   Unfortunately, I don't remember right now at
19 this time.
20   Q.   They didn't -- strike that.
21        You didn't review any OSHA documents
22 before today?
23   A.   No.
24   Q.   Okay.  Are you aware there is an OSHA report?
25   A.   I'm aware there is a report.

Page 160

1    Q.   Have you ever read it?
2    A.   I don't remember if I read it.  It's been a
3 long time.
4    Q.   Well, if you did read it, what would you have
5 done in response to it?  Would you have recommended
6 changes in the company?  Would you have taken it and
7 used it to train employees?
8        Like what would you have done with that
9 report, assuming you had read it?
10   A.   So I don't know what report we're referencing.
11 I know that OSHA issues an initial, for lack of better
12 words, a posting that we have to post in the area, which
13 we did.
14        But that did not include -- that I
15 remember, I don't remember it including a citation.  I
16 just don't remember what the details of it were.
17   Q.   So, I mean, can you state one way or the other
18 right now whether or not you used any information that
19 OSHA provided you to make changes in the company or
20 train people or anything like that?
21   A.   No.
22   Q.   You just don't know one way or the other?
23   A.   I don't remember the details of the OSHA
24 report, and I don't recollect that there was anything on
25 that report that made us take any corrective actions.

Page 161

1  Q.  Okay.
2  A.  From the report alone.
3  Q.  Well, I'm just talking about OSHA generally.
4  Anything you learned during that process?
5  A.  No.
6  Q.  Okay.  Does Diego Silva still work for the
7  company?
8  A.  Yes.
9  Q.  What does he do?
10  A.  I think he still has a foreman title.  He
11  still works in the same area.
12  Q.  Is he still operating forklifts?
13  A.  No.
14  Q.  Why not?
15  A.  I'm not sure why not.  The decision was made
16  at that time for him not to operate, and at some point
17  it became permanent.  I'm not sure when that point was
18  or who made that decision ultimately.
19  Q.  Okay.  No one ever shared that with you?
20  A.  Not that I remember.  It just kind of stayed
21  that way following the incident.
22  Q.  So the fact that he has been -- strike that.
23       He has been prohibited now from operating
24  forklifts.  Is that true?
25  A.  I don't know if he's been prohibited

Page 162

1  or -- well, he was taken off the forklift immediately
2  following the incident.  After that he hasn't operated
3  it again.  That's as far as I know.
4       I don't know if there is a prohibition
5  currently.  My understanding was he didn't want to drive
6  the forklift anymore after the incident happened.
7  Again, I don't know if there is an existing prohibition.
8       MR. HAYNES:  Let me object to the
9  responsiveness.
10  Q.  (By Mr. Haynes)  When you say you thought that
11  he didn't want to do it anymore, operate the forklift
12  anymore, where are you getting that?
13       MR. NASH:  Objection, form.
14  A.  When I met with him, you know, he wasn't
15  comfortable operating the equipment; and I told him he
16  didn't have to operate the equipment.  And that
17  conversation kind of ended that way.
18  Q.  (By Mr. Haynes)  Did he say why he wasn't
19  comfortable?
20  A.  Well, he was traumatized from what had just
21  taken place days prior.
22  Q.  So you are not aware, as you sit here today on
23  February 27, 2024, whether or not he has been
24  disqualified from operating a forklift.
25  A.  I don't know the reasons why he's not

Page 163

1  currently operating.  I just know he's currently not
2  operating it.
3  Q.  Does anyone at the company know?
4  A.  HR would know.
5  Q.  Why would HR know and not the safety man?
6  A.  I think it has to do -- well, I'm not going to
7  speculate.  I don't know.
8  Q.  Well, if you think HR would know, what is your
9  basis for saying that?
10  A.  Well, HR has more -- has all the access to the
11  employees.  Again, going back to the medical situation.
12  So they make decisions based on that situation, and
13  those decisions are just communicated to me.
14       But again, ever since the incident took
15  place, I know he hasn't operated the equipment.  I don't
16  know at what point it became an official thing or a
17  prohibition.  I don't know if there is such a thing.  I
18  don't know.
19  Q.  So as far as you know, he could operate one
20  tomorrow?
21  A.  No.  I don't think so.  I've been led to
22  believe that he's no longer operating equipment.
23  Q.  But you don't if it's a prohibition, a
24  specific --
25  A.  I haven't asked why.  I haven't asked why.

Page 164

1  I've just been led to believe he's not operating
2  equipment.
3  Q.  Who is leading you to believe that?
4  A.  HR.
5  Q.  Who at HR?
6  A.  Nobody in specific.  But different people that
7  you ask, whether it's Jacintoport or Seaboard.
8  Q.  Who do you deal with at HR?
9  A.  Gilma Lieber.  She's the HR manager in Miami,
10  so I normally go to her first.  And we haven't spoken
11  about it.  Again, he hasn't operated it since the
12  incident took place; so I just thought that it was just
13  a done thing that he's not operating equipment.
14  Q.  So it's just the fact he hasn't operated one
15  is the reason you're saying you think that he's not
16  allowed to operate one.
17  A.  I think he's not allowed to operate one.
18  Q.  But you didn't make that decision?
19  A.  No.
20  Q.  And no one in safety made that decision?
21  A.  No.
22  Q.  You think that someone in HR made that
23  decision?
24  A.  Or legal.  I'm not sure.  I'm not sure.
25  Q.  So the decision to -- if there is a

EXHIBIT A

## Page 165

1 decision -- strike. New question.
2 Your belief that he's been restricted
3 from using a forklift was not a result of a safety
4 department decision. Right?
5 A. Correct.
6 Q. It was the result of either a legal department
7 decision or an HR department decision?
8 A. I'm assuming. I don't know.
9 Q. To the best of your knowledge working for the
10 company --
11 (Simultaneous speaking.)
12 A. To the best of my knowledge, it would have to
13 be one of those two.
14 THE REPORTER: Please let him finish the
15 question.
16 THE WITNESS: Sorry.
17 MR. NASH: Yes. Full question, full
18 answer.
19 Q. (By Mr. Haynes) You don't want the legal
20 department to run the safety department, do you?
21 A. No.
22 MR. NASH: Objection, form.
23 Q. (By Mr. Haynes) You don't want the HR
24 department to run the safety department, do you?
25 A. No.

## Page 166

1 Q. Let me show you the next exhibit. Can you see
2 it on the screen, Exhibit 5?
3 (Marked was Contreras Exhibit 5.)
4 A. Yes.
5 Q. (By Mr. Haynes) Let me actually go to the
6 page that I want to show you.
7 Do you recognize what this is?
8 A. The Powered Industrial Truck training.
9 Q. This is the Jacintoport's Powered Industrial
10 Truck training. Right?
11 A. Yes.
12 Q. And Powered Industrial Truck is a term under
13 the OSHA rules that actually includes a forklift.
14 Right?
15 A. Yes.
16 Q. And that would include the forklift that Silva
17 was driving.
18 A. Yes.
19 Q. And this is training that Seaboard Marine came
20 up with, and it requires Jacintoport to follow. Right?
21 A. This particular training -- this one, I think,
22 was made in Jacintoport. I'm not sure. Can you -- do
23 you have more copies of this or...
24 Q. I don't have a physical copy, but I can scroll
25 through it.

## Page 167

1 A. Right, right. That's what I meant. I'm
2 sorry.
3 Q. Just for the record, this starts on Bates
4 Page JPI300 and it goes to JPI304.
5 And so let me go back and let you kind of
6 look at it. Can you see it enough on the screen?
7 A. Yes. So this is a Jacintoport document. This
8 is not a Seaboard training.
9 Q. Okay. But is this approved by Seaboard? I
10 mean, you don't allow them to do training that you
11 don't --
12 A. Yes. This is approved, yes.
13 Q. So it's approved by Seaboard but Jacintoport
14 came up with it?
15 A. Yes.
16 Q. And it's actually referencing -- as you
17 mentioned earlier, it's referencing the Taylor
18 documents. Right?
19 A. Yes.
20 Q. And Taylor is the manufacturer of the
21 forklift?
22 A. Yes.
23 Q. And it's also saying that it's in accordance
24 with OSHA. Right?
25 A. Yes.

## Page 168

1 Q. And that's 19.10. That's one of the sections
2 you have responsibility for. Right?
3 A. Yes.
4 Q. And then also ANSI. Right?
5 A. Yes.
6 Q. What is ANSI?
7 A. ANSI is another institution that regulates
8 equipment and tools, so they set standards for equipment
9 and tools.
10 Q. And so at least according to this it's a
11 training document that Jacintoport created, but it was
12 approved by Seaboard. It's claiming to comply with the
13 OSHA standard and the ANSI standard. Right?
14 A. Yes.
15 Q. And it's got things called "modules." Okay?
16 What are modules?
17 A. Just sort of chapters.
18 Q. I don't want to go through every one of these,
19 but this section is called module tool -- strike that.
20 This section is called Module 2. Right?
21 A. Yes.
22 Q. And it says the "Operator must:" and there are
23 five things. Right?
24 A. Yes.
25 Q. No. 1, know the machine size. True?

Page 169

1  A. Yes.
2  Q. No. 2, know the machine capacity. Right?
3  A. Yes.
4  Q. And that means how much it can lift. Right?
5  A. Correct.
6  Q. And this machine could lift 52,000 pounds?
7  A. I don't remember the capacity specifically;
8  but, yes, it's one of the largest machines.
9  Q. No. 3, know machine operation. Right?
10 A. Yes.
11 Q. No. 4, know safety features. Right?
12 A. Yes.
13 Q. No. 5, know safe operating procedures. Right?
14 A. Yes.
15 Q. And No. 5, basically, is how do you operate it
16 safely. True?
17 A. No. 5 is know safe operation procedures,
18 right.
19 Q. And there's a few more.
20     It says, check the machine daily. Right?
21 A. Yes.
22 Q. Do the forklift operators have to check the
23 machine every day?
24 A. Yes.
25 Q. Do they have to fill out pretrip inspection

Page 170

1  reports?
2  A. Yes.
3  Q. And what is the purpose of the pre --
4  A. Well, strike that. Sorry.
5     It's not called a pretrip. It's just an
6  inspection report on the machine, yes.
7  Q. And what's the purpose of those?
8  A. Just to make sure the machine is in good
9  functioning order, mechanically.
10 Q. And that has to be done every day?
11 A. Yes.
12 Q. And it has to be turned in. Right?
13 A. Yes.
14 Q. No. 7, it says, use every safety feature.
15 Right?
16 A. Yes.
17 Q. No. 8, follow safe operating procedures.
18 Right?
19 A. Yes.
20 Q. So that's similar to No. 5, which was know the
21 safe operating procedures; and No. 8 is follow the safe
22 operating procedures. Right?
23 A. Yes.
24 Q. No. 9, be alert. True?
25 A. Yes.

Page 171

1  Q. And No. 10 is use common sense. Right?
2  A. Yes.
3  Q. And these are all things that you expect every
4  forklift operator at the company to do at both ports.
5  Right?
6  A. Yes.
7  Q. There is an entire module that's dedicated to
8  pedestrian-related issues.
9     Do you see that?
10 A. Yes.
11 Q. That's because pedestrian-related issues are
12 very important when it comes to forklifts. Right?
13 A. When it comes to what? I'm sorry.
14 Q. Forklifts.
15 A. Yes.
16 Q. One of the main safety concern of a forklift
17 is it hitting a pedestrian. Right?
18 A. Yes.
19 Q. Because it's well known that forklifts operate
20 in areas and environments where there are pedestrians.
21 Right?
22     MR. NASH: Objection, form.
23 A. Yes.
24 Q. (By Mr. Haynes) Certainly that's true for the
25 ports. Right?

Page 172

1  A. Yes.
2  Q. At the time there were no restriction on
3  pedestrians walking in the area where Delmy Recinos was
4  walking. Right?
5  A. So pedestrians are urged to stay away from
6  moving equipment.
7  Q. Okay.
8  A. But as far as -- no, there is no restrictions.
9  Employees can walk throughout the facility.
10 Q. Right. I mean, there was nothing stopping
11 Delmy Recinos walking in the area she was walking on the
12 day of this incident?
13 A. Correct.
14 Q. And that also holds true for the truck driver,
15 Mr. Ramirez?
16 A. Correct.
17 Q. In fact, you're aware that they were trying to
18 do their job. They were trying to find out where the
19 additional container was. Right?
20     MR. NASH: Objection, form.
21 A. Correct.
22 Q. (By Mr. Haynes) Because you understand that
23 Mr. Silva made a mistake, didn't he?
24     MR. NASH: Objection, form.
25     MR. SEIPEL: Objection, form.

Page 173

1  A.  I'm not aware.
2  Q.  (By Mr. Haynes) He loaded the wrong box onto
3  Mr. Ramirez's truck.  Did you know that?
4      MR. SEIPEL:  Objection, form.
5  A.  I had heard that they had loaded a container,
6  and I don't remember if it was the correct one or
7  incorrect one.
8  Q.  (By Mr. Haynes) Okay.  You don't remember
9  much about this investigation, do you?
10      MR. NASH:  Objection, form.
11  A.  I remember plenty.  There's some details that
12  are foggy.  It's been two years, almost.
13  Q.  (By Mr. Haynes) You don't remember -- strike
14  that.
15      Did Mr. Silva tell you that he loaded the
16  wrong container?
17  A.  No.
18  Q.  And that was the reason that they were looking
19  for the other container, the correct container.
20      MR. SEIPEL:  Objection, form.
21  Q.  (By Mr. Haynes) Does that refresh your
22  recollection?  Do you remember that now?
23  A.  There was discussions regarding where the
24  container was, and I don't remember the loading of the
25  wrong container.

Page 174

1  Q.  Well, I'm representing it to you.  I don't
2  think it's disputed in the lawsuit.  He said it under
3  oath.  It's in other documents.
4      He loaded the wrong container onto
5  Mr. Ramirez's truck at first.  Okay?  Are you with me?
6  A.  Okay.
7      MR. SEIPEL:  Objection, form.
8  Q.  (By Mr. Haynes) So that caused Ms. Recinos
9  and Mr. Ramirez to try to find out where the correct
10  container was.  Okay?  Are you with me?
11  A.  Okay.
12  Q.  So there is nothing wrong with them attempting
13  to do their job and trying to find the right container,
14  is there?
15  A.  Correct.
16  Q.  And there was no rule by Seaboard or
17  Jacintoport that banned them from walking in the area
18  that they were in.  Right?
19  A.  Correct.
20  Q.  There could have been.  There could have been
21  a rule that said you can't walk in this area, right?
22  A.  Yes.
23  Q.  And there was no restriction on where
24  Mr. Silva could park his forklift.  Right?
25  A.  No.

Page 175

1  Q.  He could park as close to that building as he
2  wanted.  Right?
3  A.  I mean, there weren't any -- I mean, common
4  sense, using common sense, you can't park the forklift
5  in the middle of the roadway.
6      So there's area where they normally park
7  the equipment.  But there is -- you know, we don't have
8  anything in writing that says, don't park the equipment,
9  you know, here or there.
10      But it's known, it's common knowledge,
11  you don't park the equipment on the roadway.  You don't
12  park the equipment where the trucks are.  And you don't
13  park the equipment, you know, where it can impede the
14  operation.
15  Q.  Right.  Or where it's unsafe?
16  A.  Or where it's unsafe, correct.
17  Q.  And he was parked very close to those bays,
18  right, those open doors?
19  A.  I don't remember where he was parked.
20  Q.  Did your investigation ever reveal any
21  discussion or finding that he was parked too close to
22  the office or the bays?
23  A.  No.  The parking of the forklift never came up
24  in the investigation.
25  Q.  So help you God under oath?

Page 176

1  A.  Yes.
2  Q.  And if anybody else says that, they're just
3  wrong?
4      MR. NASH:  Objection, form.
5  A.  I'm the one that led the investigation.
6  Q.  (By Mr. Haynes) So if anyone says otherwise,
7  they're wrong.  Right?
8  A.  They could be right.  It just wasn't made -- I
9  wasn't notified of it.
10  Q.  Did Jacintoport change the way incident
11  reporting forms were generated after this incident?
12  A.  Not the way they were generated, no.
13  Q.  Did they change the format of the forms?
14  A.  A little bit, yes.
15  Q.  How did they change them?
16  A.  So it's a software and then sometimes if I
17  need to -- I'm the one who controls what goes on that
18  document, on that report, as far as the design of it.
19      So if I want to add a line or if I want
20  to take away a line or I want to amend the verbiage on a
21  specific -- for example, Name, if I want to change from
22  "Name" to "Person's Name," I can do that.
23      So there were some minor changes to the
24  actual format.  Nothing to do with the incident.  It's
25  just standard, making adjustments and updates to that

## Page 177

1 form so it could better capture information.
2     Q. There were no modifications ever made after
3 this incident in a way that prohibited someone like you
4 or someone else filling out the report from putting
5 blame on the company. Right?
6     A. No.
7         MR. NASH: Objection, form.
8     Q. (By Mr. Haynes) That never happened, right?
9     A. No, no.
10     Q. So if anybody says that, they're totally
11 wrong?
12     A. Totally.
13     Q. Let me go back to Exhibit No. 5 real quick.
14         So back on Exhibit No. 5, this is the
15 training that is given to forklift operators. Okay?
16 And Module 4 is talking about pedestrian-related issues.
17 Right?
18     A. Yes.
19     Q. It says forklift operators should always look
20 in the direction of travel. Right?
21     A. Yes.
22     Q. Keep a clear view of the path of travel,
23 right?
24     A. Yes.
25     Q. Slow down and sound the horn. Right?

## Page 178

1     A. Yes.
2     Q. So this is saying that forklift operators
3 should always sound the horn. Yes?
4     A. Yes. That's what it says.
5     Q. So can we agree that Mr. Silva should have
6 sounded the horn when he moved that forklift, according
7 to the training that your company approved?
8     A. Well, that's open for interpretation, too.
9     Q. Please tell the jury how that's open for
10 interpretation.
11     A. Well, do I sound the horn the entire time I'm
12 on the forklift? Or do I sound the horn only when I'm
13 backing up? Or only when I'm going forward? Or...
14         I mean, you sound the horn -- typical
15 best practice, you sound the horn when you're coming up
16 to an area that you need to advise someone that, you
17 know, you're coming.
18     Q. Okay. Does it say that on this document?
19     A. No.
20     Q. Does it caveat it like that?
21     A. No.
22     Q. It's talking about pedestrian-related issues.
23 Yes?
24     A. Yes.
25     Q. And it says, sound horn always. Right?

## Page 179

1     A. No. It doesn't say "always."
2     Q. Tell the jury -- why don't you read No. 1 out
3 loud. Just read the whole thing.
4     A. Oh, I see where you say "always." Okay, yes.
5         "Forklift operators should always: Slow
6 down and sound the horn."
7     Q. Are you just trying to fight with me and give
8 me talking points because you want to keep your job and
9 get this case dismissed?
10     A. No.
11         MR. SEIPEL: Objection, form.
12         MR. NASH: Objection, form.
13     Q. (By Mr. Haynes) I mean, can you just like
14 recognize how horrible this was?
15         MR. SEIPEL: Objection, form.
16         MR. NASH: Objection, form.
17     A. It was horrible.
18     Q. (By Mr. Haynes) She got split in half. Do
19 you understand that?
20     A. I do.
21         MR. SEIPEL: Objection, form.
22     Q. (By Mr. Haynes) Do you understand that she
23 didn't die instantly?
24         MR. SEIPEL: Objection, form.
25         MR. NASH: Objection, form.

## Page 180

1     Q. (By Mr. Haynes) Do you understand that?
2         MR. SEIPEL: Objection, form.
3     A. I don't know that.
4     Q. (By Mr. Haynes) Maybe you should read the
5 deposition of Mr. Arriola where he testified about that.
6 What do you think?
7         MR. NASH: Objection, form.
8         MR. SEIPEL: Objection, form.
9     A. I think that's up to my attorneys.
10     Q. (By Mr. Haynes) You think this is cute and
11 funny? You think it's funny? You're going to smirk?
12         MR. SEIPEL: Objection, form.
13         MR. NASH: Objection, form.
14     A. I'm not smiling.
15     Q. (By Mr. Haynes) It's not funny at all, is it?
16         MR. SEIPEL: Objection to form.
17         MR. NASH: Objection, form.
18     Q. (By Mr. Haynes) It's not funny, is it?
19     A. It's not funny.
20         MR. NASH: Objection, form.
21     Q. (By Mr. Haynes) This is very serious, isn't
22 it?
23         MR. NASH: Objection, form.
24     A. Yes, it is.
25     Q. (By Mr. Haynes) Do you know how many people

# EXHIBIT A

Page 181

1 have died at Jacintoport in the past ten years?
2     MR. NASH: Objection, form.
3   A. No one.
4   Q. (By Mr. Haynes) Tell the jury.
5   A. Just one.
6   Q. Really? You sure about that?
7   A. I'm pretty sure there has not been a facility
8 at Jacintoport.
9   Q. You're pretty sure? As the second in command
10 of safety?
11   A. That I remember, this was the first fatality.
12   Q. Well, you don't remember other things; so is
13 it possible that somebody else got killed there?
14   A. Not that I recollect.
15   Q. If this is the first fatality that you can
16 remember, then why did you not do any more to
17 investigate it, besides the limited amount of things
18 that you did?
19     MR. NASH: Objection, form.
20   A. That's subjective. Right? You say limited.
21 I say I did everything I could under the circumstances
22 of what I had at the time.
23   Q. (By Mr. Haynes) You don't even know if he's
24 prohibited from operating a forklift today, in 2024, do
25 you?

Page 182

1   A. He's not driving a forklift.
2   Q. Well, you don't know if it's because someone
3 said he couldn't. Right?
4   A. I don't know.
5   Q. How is that possible, as the second in command
6 on the safety side, that you don't know if this man has
7 been prohibited from operating a forklift at the
8 company?
9     MR. SEIPEL: Objection, form.
10     MR. NASH: Same objection.
11   Q. (By Mr. Haynes) Do you think that's
12 acceptable?
13     MR. NASH: Objection, form.
14   A. Yes.
15   Q. (By Mr. Haynes) That's perfectly fine,
16 according to you?
17     MR. NASH: Objection, form.
18   A. Yes.
19   Q. (By Mr. Haynes) No big deal. Right?
20     MR. NASH: Same objection.
21   Q. (By Mr. Haynes) No big deal. Right?
22     MR. NASH: Objection, form.
23   A. I didn't say that.
24   Q. (By Mr. Haynes) You're okay if I ask you
25 tough questions. Right?

Page 183

1   A. I'm perfectly fine with it.
2   Q. You're an open book, aren't you?
3     MR. NASH: Objection, form.
4   A. Yes, I am, sir.
5   Q. (By Mr. Haynes) You're not here to defend the
6 company at all costs just to save your job. Right?
7     MR. SEIPEL: Objection, form.
8     MR. NASH: Objection, form.
9   Q. (By Mr. Haynes) Are you?
10   A. I'm here to take part in this deposition.
11   Q. Please explain to the jury how it is possible
12 that the second highest safety employee at the company
13 does not know whether Mr. Silva has been prohibited from
14 operating a forklift.
15   A. I don't have any documentation in my hands
16 that tells me that he's prohibited from driving
17 equipment.
18   Q. How is that possible?
19     MR. SEIPEL: Objection, asked and
20 answered.
21   A. It hasn't been provided to me.
22   Q. (By Mr. Haynes) So we can agree that the
23 document that your company approved says that forklift
24 operators should always slow down and sound their horn.
25 Right?

Page 184

1   A. Yes.
2   Q. So you're not going to walk that back, you're
3 not going to give me talking points. We can agree
4 that's what it says?
5   A. That's what it says.
6   Q. And that's what Mr. Silva should have done,
7 right?
8   A. That's what it says.
9   Q. Is that what he should have done?
10   A. The backup alarm was functional. It served
11 the same purpose as a horn.
12   Q. Is that what this says?
13   A. No, that's not what that says.
14   Q. You're going to rewrite the policy now?
15   A. No.
16     MR. NASH: Objection, form.
17   Q. (By Mr. Haynes) Do you think you should
18 enforce the rules as they are written and communicated
19 to your employees?
20   A. We do that.
21   Q. Did you do it here?
22   A. In the training we talk about, make sure your
23 backup alarm is functional when you do your inspection
24 every day and --
25     (Simultaneous speaking.)

Page 185

1    Q.  This is --
2    A.  -- that backup alarm was functional.
3    Q.  -- a hard one, isn't it?  This is a hard one,
4  isn't it?  I know.
5         You didn't look at this before your depo,
6  so you weren't ready for it.
7         MR. NASH:  Objection, form.
8    Q.  (By Mr. Haynes) But it says you always use
9  the horn when you move that forklift, doesn't it?
10        MR. NASH:  Objection, form.
11   A.  Yes, it does.
12   Q.  (By Mr. Haynes)  And Mr. Silva did not use his
13  horn, did he?
14        MR. SEIPEL:  Objection, form.
15   A.  I don't know if he used the horn.  I don't
16  think so.  He never said he did.
17   Q.  (By Mr. Haynes)  If he didn't use his horn, he
18  violated this rule (indicating), didn't he?
19        MR. SEIPEL:  Objection, form.
20   A.  If he didn't.
21   Q.  (By Mr. Haynes)  Right.  If he didn't use his
22  horn, he violated this rule.  Right?
23   A.  If he didn't.
24   Q.  And according to your company, this is how you
25  operate a forklift safely.  Right?

Page 186

1    A.  Yes.
2    Q.  So if he didn't follow this rule, he was not
3  operating it safely.
4    A.  That's not correct.
5    Q.  Tell the jury your logic on how that's not
6  correctly, please.
7    A.  If the backup alarm was functional, which it
8  was, he didn't need to sound the horn.  Again, the
9  purpose of the horn is an audible alarm that alerts a
10  pedestrian or anybody in the vicinity that there is a
11  forklift moving.
12   Q.  So according to you, the second in command of
13  safety at Seaboard Marine, as long as the backup alarm
14  is working you don't have to use the horn.  Right?
15   A.  Yes.
16   Q.  In other words, you can rely solely on the
17  backup alarm.  Right?
18   A.  Yes.
19   Q.  Notwithstanding what the training that was
20  allegedly given to Mr. Silva says?
21   A.  Yes.
22   Q.  So maybe -- or after today, since you-all are
23  changing your policies based on lawsuits, are you going
24  to rewrite this and clarify that it says always sound
25  horn, but only if there is no backup alarm?

Page 187

1         MR. NASH:  Objection, form.
2    A.  We have -- I have the choice of changing it if
3  I want to.
4    Q.  (By Mr. Haynes)  Are you going to?
5    A.  I don't know.  I haven't made up my mind.
6    Q.  Will you consider it?
7    A.  I will consider it.
8    Q.  And do you think that's going to make the
9  company safer?
10        MR. NASH:  Objection, form.
11   A.  No.
12   Q.  (By Mr. Haynes)  So you don't -- you're just
13  going to change it without it having any safety effect?
14   A.  It's just a -- you know, I will make that
15  decision after.
16   Q.  Are you just here to kind of spar with me and
17  smirk at me and try to defend the company?
18        MR. NASH:  Objection, form.
19        MR. SEIPEL:  Objection, form.
20   A.  I'm not smirking, and I'm not sparring.
21  That's not the purpose of the deposition.  You're here
22  to ask me some questions.  I'm here to provide some
23  answers.
24   Q.  (By Mr. Haynes)  No. 3 in the module, the
25  training module talking about pedestrian-related issues

Page 188

1  that your company approved, it's called "Audible
2  & Visible Warning Devices."  Right?
3    A.  Yes.
4    Q.  And the first subsection is Alarms.  Right?
5    A.  Yes.
6    Q.  And then it talks about "Factors to consider:"
7    A.  Yes.
8    Q.  The first one is Ambient Noise.  True?
9    A.  Yes.
10   Q.  The second one is Habituation.  Right?
11   A.  Yes.
12   Q.  The third one is Filtering.  Right?
13   A.  Yes.
14   Q.  The fourth one is Dependency.  Right?
15   A.  Yes.
16   Q.  And the fifth one is Fatigue.  Right?
17   A.  Yes.
18   Q.  Those are factors to consider in determining
19  whether an alarm on the forklift is actually effective
20  in going to provide a sufficient warning to a
21  pedestrian.  Right?
22   A.  Yes.
23   Q.  So we can agree that relying on a backup alarm
24  alone is not enough.
25   A.  Depending on the circumstance.

Page 189

1  Q. The circumstances that are written in the
2  document that your company approved right there. Right?
3  A. Where?
4  Q. Under "Factors to consider:"
5  A. Yes.
6  Q. So ambient noise, habituation, filtering,
7  dependency, fatigue, those things can all affect whether
8  or not a backup alarm is effective. True?
9  A. Those are factors to consider, yes.
10  Q. Right. Which means you can't just rely on the
11  backup alarm. Right?
12  A. That's not how I interpret that.
13  Q. How do you interpret that as the second in
14  command of safety for Seaboard Marine, please?
15  A. It's factors to consider. You consider those
16  factors when, you know, talking about alarms. We let
17  the employees know, Listen, just because you're always
18  hearing it doesn't mean you don't have to pay attention
19  to it. So you may hear it all day long, but you still
20  have to pay attention to it.
21  So we let them know -- and this is the
22  conversation we have in this portion of the training.
23  Right? Ambient noise, you know, it's -- yes,
24  habituation, you're hearing it all the time. There's
25  ten forklifts working around you. That doesn't mean you

Page 190

1  ignore it. Right?
2  You have to work in your area. If you're
3  a pedestrian, you have to, you know, be looking out
4  behind you, in front of you, and keep eye contact with
5  all the operators.
6  If you're an operator, the same thing.
7  Keep contact, eye contact, with the pedestrians, make
8  sure, you know, you stay away from the area where you
9  know there are pedestrians walking around.
10  Q. Did Silva do any of that?
11  A. I don't know.
12  Q. Did you ask him?
13  A. I did.
14  Q. What did he say?
15  A. He said he didn't see here.
16  Q. Does that speak to whether he considered these
17  factors?
18  A. There was no other equipment in that area at
19  the time.
20  Q. What about habituation, filtering, dependency
21  and fatigue?
22  A. Again, if you're -- it depends on the area.
23  Right? You're reading from a blank sheet of paper and
24  applying it, you know, to this one situation.
25  Some of these things are factors to

Page 191

1  consider when you have, for example, on the dock by the
2  ship and then you have a crane working that's making
3  noise, you have other machinery that's making noise and
4  then you have ten forklifts.
5  That was the only forklift working there
6  in that area. That audible alarm was clearly -- you
7  know, you could hear it. I mean, we tested it on
8  different days with different ambiance with different
9  trucks in the area, and you could clearly hear the
10  alarm.
11  Q. And you don't know if it was working on the
12  day of, do you?
13  A. I wasn't there the day of.
14  Q. If information comes to light that it was not
15  working on the day of, we can agree that that's
16  unacceptable. Right?
17  A. It's unacceptable. That alarm should be
18  functioning.
19  Q. And that's going to change your opinions,
20  right?
21  MR. NASH: Objection, form.
22  A. It doesn't change my opinion.
23  Q. (By Mr. Haynes) Really?
24  A. If the alarm wasn't working, then obviously it
25  changes things. But still, the forklift should have

Page 192

1  been inspected at the beginning of the work, work day,
2  and the alarm could have been working in the morning and
3  then stopped working, you know, later that morning. I
4  don't know.
5  Q. Are you telling the jury that if the alarm was
6  not working when this happened, that that does not
7  change your opinions?
8  A. It changes -- what opinion are you referring
9  to?
10  Q. Anything. Any finding that you made as a
11  result of this investigation that was over in 2022.
12  A. Okay. Then if the alarm was not working, that
13  tells me then the equipment was malfunctioning. That's
14  all that changes. We still had a terrible accident.
15  Q. Are you saying that -- I believe you're saying
16  that the backup alarm is one of the reasons why you
17  think Delmy played a role in her own death.
18  A. That is not what I said earlier.
19  Q. Well, then how does the backup alarm have
20  anything to do with anything?
21  A. You tell me. You're the one asking about the
22  backup alarm.
23  Q. As the second in command of safety for
24  Seaboard Marine, who has oversight for training of
25  numerous, countless forklift operators, okay, do you

Page 193

1 believe the backup alarm has anything to do with this
2 crash or not?
3    A.  Yes.
4    Q.  How?
5    A.  If the backup alarm was working like it was,
6 okay, then Ms. Recinos should have heard it and looked
7 back or reacted to it in some form.
8    Q.  All right.
9    A.  I do.  I walk in the terminal all the time;
10 and if I hear a backup alarm, I'm running away from it.
11    Q.  If it wasn't working?
12    A.  Then it changes thing.
13    Q.  How?
14    A.  Because then she wouldn't have heard it and
15 maybe would explain why she didn't react.  She was just
16 maybe walking and didn't hear it, and then she didn't
17 have a chance to react it.
18    Q.  What about Mr. Ramirez?  Would it explain why
19 he didn't react either?
20    A.  I don't know if Mr. Ramirez reacted or not.  I
21 never got to speak to Mr. Ramirez.
22    Q.  You know that he was hurt.
23    A.  I don't know, you know, how he was hurt.
24    Q.  He got struck by the forklift.
25       MR. SEIPEL:  Objection, form.

Page 194

1    Q.  (By Mr. Haynes)  We can pull the text messages
2 where you say that with your own words, if you want.
3    A.  I remember that somebody said that, but it
4 wasn't clear -- so there were some -- a lot of things
5 that were being -- again, it was a very active
6 investigation, and there was a lot of things being said
7 and it was -- you know, we had to take the role of
8 deciphering what was fact and what was hearsay.
9       So, you know, there were some -- some
10 folks were saying that Ms. Recinos pushed him out of the
11 way and saved his life.  And then, you know, I heard
12 that Mr. Ramirez may have been struck by the forklift.
13       So, you know, that's -- that's what was
14 going on at that time during the investigation.
15    Q.  So the testimony of Mr. Ramirez is pretty
16 important to determine whether or not he got struck with
17 the forklift.  Right?
18    A.  Yes.
19    Q.  So if he got struck with the forklift and we
20 know Delmy got struck with the forklift, that's two
21 people who were not able to respond to this backup
22 alarm, right, that you're saying was working?
23    A.  Potentially.
24    Q.  Yes.  So does that kind of move the needle in
25 favor of suggesting that maybe it wasn't working?

Page 195

1       MR. NASH:  Objection, form.
2    A.  I don't know.
3    Q.  (By Mr. Haynes)  Is that something you should
4 look into?
5    A.  Again, the forklift -- the alarm was working
6 when I arrived on that Monday morning.
7    Q.  Okay.  So the fact that two people were not
8 able to hear this alarm is just irrelevant because --
9    A.  How do you know that they didn't hear it?
10    Q.  Excuse me.  I'm not answering questions today.
11    A.  Okay.
12    Q.  The fact that two people were not able to hear
13 this alarm is irrelevant to you in your investigation
14 that's already closed because you went there and you saw
15 it working.
16       MR. SEIPEL:  Objection, form.
17       MR. NASH:  Objection, form.
18    A.  I didn't say that.
19    Q.  (By Mr. Haynes)  Well, tell me, is it relevant
20 to you at all that these two people apparently allegedly
21 were not able to hear a backup alarm?
22    A.  It's important.  It's relevant, yes.
23    Q.  What did you do to factor that in?
24    A.  Into what?
25    Q.  To your investigation.

Page 196

1    A.  At the time of the investigation, there was no
2 question whether -- it was not a question whether the
3 alarm was working or not or whether somebody heard it or
4 not.  It was clear to us that the alarm was working.
5    Q.  But we know that that's just -- you don't know
6 that to be true.
7    A.  Again, at the time of the investigation, that
8 week, I did not have a chance to talk to the truck
9 driver and, unfortunately, I couldn't speak to
10 Ms. Recinos.
11    Q.  Well, I will tell you he said he didn't hear
12 an alarm, under oath.
13    A.  Okay.
14    Q.  What do you make of that?
15    A.  He didn't hear it.
16    Q.  Think he's lying?
17    A.  I don't know what his physical condition is.
18 I don't know if he wears hearing aids.  I don't know.
19 There could be so many factors to why he didn't hear it.
20    Q.  Well, certainly important information for you
21 to know, right?
22    A.  It's important infor-- it's good to know.
23    Q.  So if he didn't hear it and I think you're
24 making the assumption that she didn't hear it either --
25    A.  I don't know.

Page 197

1     Q. I mean, you don't think she was suicidal, do
2 you?
3     A. I don't know.
4     Q. Did anyone ever say that during the
5 investigation, that she was suicidal?
6     A. No.
7     Q. Did Stephen White say that?
8     A. No.
9     Q. He never would have said that. Right?
10     A. No.
11     Q. That would be unacceptable?
12     A. Disrespectful.
13     Q. Absolutely. So if it's found that he said
14 something like that, that's unacceptable. Right?
15     A. It's disrespectful.
16     MR. NASH: Objection, form.
17     Q. (By Mr. Haynes) Those shows a bad attitude,
18 doesn't it.
19     MR. NASH: Objection, form.
20     A. It's just disrespectful. It's poor taste.
21     Q. (By Mr. Haynes) That's a reckless attitude,
22 isn't it?
23     MR. NASH: Objection, form.
24     A. That's just disrespectful.
25     Q. (By Mr. Haynes) Isn't it more than

Page 198

1 disrespectful?
2     MR. NASH: Objection, form.
3     A. I don't think so.
4     Q. (By Mr. Haynes) Do you have any evidence that
5 Mr. Silva conducted a preshift inspection of that
6 forklift?
7     A. I don't remember the specifics of the
8 equipment inspection. I don't remember any specifics on
9 the equipment inspection.
10     Q. So as you sit here today, do you have any
11 evidence that he performed an inspection?
12     A. I don't think he did.
13     Q. Do you know if --
14     MR. SEIPEL: Objection, form.
15     Q. (By Mr. Haynes) -- anybody did?
16     A. I don't remember.
17     Q. If no one performed an inspection and the
18 backup alarm was not working, that's a safety failure,
19 isn't it?
20     A. If --
21     Q. Yes.
22     A. -- what you're saying is true, then yes.
23     Q. And you don't know one way or the other.
24     A. I don't remember.
25     Q. I mean, was the plan today to just not educate

Page 199

1 yourself so you could just say "I don't remember" on
2 tough questions?
3     MR. NASH: Objection, form.
4     Q. (By Mr. Haynes) Was that the plan?
5     A. I was educated.
6     Q. Okay. You were educated by the lawyers?
7     A. I was updated, yes.
8     Q. But not with the deposition testimony?
9     A. I'm not going to remember every single detail
10 of the incident that happened a year and a half ago.
11     Q. Well, whether he did an inspection of the
12 forklift that you're saying had an operational backup
13 alarm, that's a pretty big deal, isn't it?
14     MR. NASH: Objection, form.
15     A. Well, I personally saw the backup alarm
16 working. I heard it, so...
17     Q. (By Mr. Haynes) Let's go back to the
18 training.
19     And I want to focus now on -- let me see
20 if I can focus on this section. This is again within
21 the pedestrian incident. Okay?
22     A. Yes.
23     Q. According to the training that your company
24 approved, it says, "Three situations must coincide for a
25 pedestrian and operator accident to occur."

Page 200

1     Are you with me?
2     A. Yes.
3     Q. No. 1, operator, which means the forklift
4 operator, fails to look in direction and keep clear
5 view of path of travel. Right?
6     A. Yes.
7     Q. And we know that an accident happened, so are
8 you agreeing that number A happened?
9     A. It's -- it's a potential, yes.
10     Q. Okay. And the second one is the pedestrian
11 was located in the forklift area and failed to keep a
12 lookout. Right?
13     A. Yes.
14     Q. Are you saying that happened?
15     A. Potentially.
16     Q. So you can't say for sure. It's potential?
17     A. Right. Like I said earlier, it's -- you know,
18 I don't know what took place between them in that
19 communication they had, that breakdown in communication
20 that they had.
21     But, you know, this is -- this plays true
22 to what I said earlier. These things have to coincide
23 for you to have an incident like what happened.
24     Q. Right.
25     A. Right?

Page 201

1    Q.    And would you please read the third one out
2    loud?
3    A.    "Employer failed to establish or enforce
4    forklift/pedestrian lanes."
5    Q.    So that's the third part of what has to
6    coincide for one of these incidents to occur.  Right?
7    A.    Yes, for it to occur.
8          (Simultaneous speaking.)
9    Q.    (By Mr. Haynes)  Did that happen here?
10   A.    The area was an open area and there were no
11   pedestrian lanes and no forklift lanes at the time
12   because of the way the area was laid out.
13          So this is a container terminal.  And a
14   container terminal, you basically have your container
15   stacks and then your traffic resolves around those
16   container stacks and that was kind of the layout of that
17   area at the time.
18   Q.    So did No. 3 happen?
19   A.    No.
20   Q.    So A and B, you're comfortable saying
21   potentially happened.  C didn't happen?
22   A.    There was no -- there is no way for us to
23   establish forklift and pedestrian lanes when you have
24   trucks operating in that area.
25   Q.    So just to be clear --

Page 202

1          MR. HAYNES:  Objection, nonresponsive.
2    Q.    (By Mr. Haynes)  -- you've testified that of
3    the three situations that coincide according to the
4    training your company approved, the other three
5    situations that have to coincide for one of these
6    pedestrian incidents to happen, you can say, 1, it's
7    potential that the operator, meaning Mr. Silva, failed
8    to look in the direction and keep a clear path.  Right?
9    A.    It's a potential, yes.
10   Q.    2, you can say it's a potential that
11   Delmy Recinos was in a forklift area and failed to keep
12   a lookout?
13   A.    Potentially, yes.
14   Q.    But No. 3, you can say with certainty that the
15   employer, meaning Jacintoport or Seaboard, failed to
16   establish or enforce forklift/pedestrian lanes.
17          You can ensure the jury that's not
18   possible.
19   A.    I'm just trying to think back to how that area
20   was laid out at the time.  There is no way to -- there
21   was no way at that time to create a pedestrian lane or a
22   forklift lane without impeding the access to the
23   containers the way the containers were laid out.
24          So as a corrective action so something
25   like this won't happen again, we removed the containers

Page 203

1    from that area.  So the containers are no longer in the
2    area.  And then we were able to create forklift and
3    pedestrian lanes.
4          MR. HAYNES:  Let me object as
5    nonresponsive.
6    Q.    (By Mr. Haynes)  This doesn't break it down
7    like that and say, well, because we have to do business
8    and there are containers in the area, we can't have
9    lanes.
10          This just says it's a failure to
11   establish and enforce forklift and pedestrian lanes.
12   Right?
13   A.    Yes, that's what it says.
14   Q.    And I assume that this is a document that was
15   created by people at Jacintoport who were familiar with
16   the premises.  Right?  Is that a fair assumption?
17   A.    It's fair to a degree.  And, you know, these
18   terminals, they change sometimes without -- without
19   notice.  Right?  They will -- you know, I will give you
20   an example.
21          Right now it's a little bit slow.  Right?
22   Cargo is about -- you know, it's slowed down a little
23   bit.  So if we're taking in extra containers from
24   different countries for storage, the layout of the
25   terminal is going to change to accommodate for that

Page 204

1    extra storage space that's required.
2          So at the time this document was created,
3    which I don't know when it was created, at the time this
4    document was created, then yes, that was true, I'm sure,
5    for that -- for -- you know, in general speaking.
6    Right?
7          But in this particular area at the time
8    of the incident, it just wasn't possible without
9    blocking access to the container stacks and the truck
10   flow and how they deliver cargo and pick up cargo.
11   Q.    And that's a business decision?
12   A.    It's a business decision.  And, you know, we
13   do our best to make sure that anybody that's working in
14   these areas is protected.  Right?
15          We try to make sure, A, you have your
16   safety vest on.  You're visible.  You know, our
17   maintenance shop, the backup alarms are working, you
18   know.
19          Not to say that these things don't fail.
20   Not to say an employee might forget to wear a vest.  But
21   we do our best to make sure that everybody is protected
22   and everybody is doing what they are supposed to be
23   doing with all the constant changes that happen in these
24   terminals, whether it's Miami or Jacintoport.
25   Q.    So you said it just wasn't possible to comply

## Page 205

1 with No. 3 here. Right?
2     A.  At that time in that specific area.
3     Q.  It was not possible?
4     A.  It wasn't possible.
5     Q.  How do you know it was possible for
6 Delmy Recinos to avoid this collision?
7     A.  I don't know if it was possible for her to
8 avoid it. I said potentially. The same way that I said
9 potentially, right, the operator fails to look in the
10 direction.
11          You know, I wasn't there. I didn't see
12 it. So I have no proof if Silva looked back. Right?
13 Same way I wasn't there, I have no proof if Ms. Recinos,
14 you know, had eye contact with the operator and, you
15 know, stayed away from the forklift. I don't have proof
16 of that.
17     Q.  Okay. Have you ever looked at the Taylor
18 manual?
19     A.  Yes.
20     Q.  When was the last time you've done that?
21     A.  It been a while. At least -- I mean, for a
22 forklift? I know I looked at one recently if a
23 container handler, maybe four months ago.
24          For a forklift? Maybe a year.
25     Q.  Let's look at it. Can you see it on the

## Page 206

1 screen?
2     A.  Yes.
3     Q.  This is a copy of the Taylor Forklift Safety
4 Manual that we obtained from OSHA. OSHA actually had a
5 copy of it in their file.
6          Did you know that?
7     A.  No.
8     Q.  This is going to be Exhibit 6.
9          (Marked was Contreras Exhibit 6.)
10     A.  And this includes that model number? I'm
11 sorry.
12     Q.  (By Mr. Haynes) I think. I mean, you can see
13 it kind of in the background here. That looks like the
14 one he was driving. Right?
15     A.  Yes, yes.
16     Q.  So let me just -- this is a long manual. I
17 will be the first to admit that. Let me see if I can
18 get to the section that I want to talk about here.
19          This is on Page 32 of Exhibit No. 6. Do
20 you see how it has this drawing?
21     A.  Yes.
22     Q.  And it's got arrows, doesn't it?
23     A.  Yes.
24     Q.  And that's representing paint on the ground to
25 tell people where to drive. Right?

## Page 207

1     A.  I'm trying to see where there's -- I don't
2 know if that's the drawing pointing in the direction or
3 that's marked on the -- like marked -- supposed to be
4 marked on the floor.
5     Q.  You've never really looked into that, have
6 you?
7     A.  No, this one -- I'm not familiar with this
8 one.
9     Q.  On Page 32 there is a section that starts
10 talking about pedestrian and forklift runover accidents.
11 Right?
12     A.  Yes.
13     Q.  It says, "Pedestrian/Forklift runover
14 accidents are among the most tragic workplace
15 accidents."
16          Did I read that right?
17     A.  Yes.
18     Q.  You agree with that, don't you?
19     A.  Yes.
20     Q.  "The only reliable way to prevent these
21 accidents is to ergonomically design the environment so
22 that pedestrians and forklifts cannot cross paths and
23 for operators to always follow the OSHA rules to:" and
24 then it lists some things. Right?
25     A.  Yes.

## Page 208

1     Q.  So according to the manufacturer of the
2 forklift that Mr. Silva was operating, okay, there are
3 two big-picture ways that are the only reliable ways to
4 prevent a pedestrian accident. Right?
5     A.  Yes.
6     Q.  The first is to "ergonomically design the
7 environment so that pedestrians and forklifts cannot
8 cross paths." Right?
9     A.  Yes.
10     Q.  Is this the first time you've ever seen this?
11     A.  Yeah. I don't remember seeing this one.
12     Q.  At the time of this tragic incident, the port
13 was not ergonomically designed so that pedestrians and
14 forklifts cannot cross paths. Right?
15          MR. NASH: Objection, form.
16     A.  Correct. That area.
17     Q.  (By Mr. Haynes) So according to Taylor, the
18 manufacturer of this very forklift, Seaboard,
19 Jacintoport, the port, were not implementing one of the
20 only reliable ways to prevent the exact kind of accident
21 that happened in this case?
22     A.  According to Taylor, yes.
23     Q.  And you put a lot of faith in Taylor, don't
24 you?
25     A.  We have a lot of their equipment in our

Page 209

1 terminal.
2 Q. Yeah. And you put -- you literally use
3 portions of their safety manuals in your own training
4 that you approved. Right?
5 A. Yes.
6 Q. You didn't put this part in there, did you?
7 A. No.
8 Q. Are you going to put this part in there now?
9 A. I don't know.
10 Q. That's pretty important, isn't it?
11 A. It will be considered.
12 Q. Another thing we're going to consider after
13 this lawsuit was started. Right?
14 MR. NASH: Objection, form.
15 A. It will be considered.
16 Q. (By Mr. Haynes) I mean, it's not a good
17 statement about a safety culture of a company if you're
18 having to be given ideas about how to make a company
19 safer by a lawyer in a deposition. Right?
20 MR. NASH: Objection, form.
21 A. No.
22 Q. (By Mr. Haynes) And then it says the other
23 way that's the only way to prevent these accidents is
24 for operators to always follow the OSHA rules, too.
25 Right?

Page 210

1 A. Yes.
2 Q. And the first one says, "Always look in the
3 direction of and keep a clear view of the path of
4 travel." Right?
5 A. Yes.
6 Q. That's similar to what the Seaboard training
7 says. Right?
8 A. Yes.
9 Q. And then it says, "Slow down and sound the
10 horn at cross aisles and other locations where vision is
11 obstructed." Right?
12 A. Correct.
13 Q. And then it says, "Travel with a load trailing
14 if forward view is obstructed." Right?
15 A. Correct.
16 Q. And that one is not applicable here because at
17 the time he didn't have a load. Right?
18 A. Correct.
19 Q. And so these two things, according to the
20 manufacturer of the exact forklift, they are
21 nonnegotiable. These are the only way you can actually
22 prevent these accidents. Right?
23 A. There are other ways, but these are two of the
24 main ways, yes.
25 Q. It says the only reliable way. Not two of the

Page 211

1 main ways. It doesn't say what you just said. It says
2 the only reliable way. Right?
3 A. Okay. According to Taylor.
4 Q. You don't know more than Taylor does about
5 their own product, do you?
6 A. Not about their product, no.
7 Q. And you don't have any reason to dispute that
8 their manual is based on sound reasoning, data,
9 research, experience. Right?
10 A. No, I do not.
11 Q. In fact, you would consider this a reliable
12 source of information, don't you?
13 A. Yes.
14 Q. Okay. So if they're saying the only reliable
15 way to prevent these accidents and the first thing they
16 list is to design the location to basically just
17 prohibit pedestrians from crossing paths of forklifts,
18 that's something that your company should have known
19 about before Ms. Recinos was killed. Right?
20 MR. NASH: Objection, form.
21 A. We knew that. We knew that, you know, that
22 Taylor recommends, ergonomically designs in
23 environments; but that's not always possible in all
24 locations.
25 Q. (By Mr. Haynes) So you're telling the jury

Page 212

1 that you knew about this, you knew tat the only reliable
2 way to prevent these accidents, first and foremost, is
3 to design the environment to prevent pedestrians and
4 forklifts from crossing paths. Right?
5 A. That's the best way. If you can divide the
6 enviroment, absolutely, that's the best way to do it.
7 Q. So -- but that was not done, was it?
8 A. It's not always possible in all areas.
9 Q. It's not possible according to the business
10 decision of Seaboard. Right?
11 A. It's not possible according to the environment
12 and, you know, the operation you're trying to conduct.
13 Q. Which is a business decision.
14 A. You can call it a business decision, yes.
15 Q. Okay. So you can't let -- business is making
16 money. Right?
17 A. Yes.
18 MR. NASH: Objection, form.
19 Q. (By Mr. Haynes) You can't let making money be
20 more important than safety. Right?
21 MR. NASH: Objection, form.
22 A. No.
23 Q. (By Mr. Haynes) You agree with that?
24 A. I'm a safety-first person.
25 Q. So the business decision to say it wasn't

1  possible to design the environment to prevent
2  pedestrians and forklifts from crossing paths, that's
3  not more important than Delmy Recinos's life, is it?
4        MR. NASH: Objection, form.
5      A. No, it's not.
6      Q. (By Mr. Haynes) And that's not more important
7  than preventing these kinds of incidents from happening,
8  right?
9      A. No.
10      Q. So that shouldn't happen. Right? They should
11  have designed it better.
12      A. It's in -- it's -- again, I go back to -- you
13  know, I ride a bike.
14        MR. HAYNES: Let me just object to
15  nonresponsive.
16      Q. (By Mr. Haynes) But you can continue, if
17  you'd like.
18      A. Well, I mean, you know, when I ride a bike on
19  the street, there are cars right next to me. And you
20  can make -- you know, it's just not possible to divide.
21  Sometimes it's not possible to divide one from the
22  other; and you can't ergonomically design an environment
23  in all areas, in all industries.
24      Q. So you're saying it just wasn't feasible at
25  the time, right?

1      A. It's not always feasible. It's not always
2  possible.
3      Q. And it wasn't this time?
4      A. It wasn't possible at that time --
5      Q. Okay.
6      A. -- in that area, how it was -- you know, with
7  that operation that was going on in that area at that
8  time.
9      Q. Okay. Had you ever meet Diego Silva before
10  December 2022?
11      A. Yes.
12      Q. When did you meet him?
13      A. I don't remember the exact date, but I've
14  known him. Not known him. I'm known of him. He's a
15  foreman.
16      So I generally -- when I go around the
17  terminal, I, you know, talk to the foremen, make sure
18  everything is okay, make sure there's no major issues
19  going on.
20      Q. Okay. Are you aware of his safety record at
21  the company?
22      A. Off the top of my head, no, but -- off the top
23  of my head, no.
24      Q. Have you learned about his safety record at
25  the company since this lawsuit started?

1      A. We looked into it, yes.
2      Q. What did you find?
3      A. It's been a while. Again, it's been a year
4  and a half. We didn't find anything that we felt was
5  significant or that indicated any kind of trend towards,
6  you know, him being a bad operator.
7      Q. What in your mind would be necessary for you
8  to determine that there was a trend?
9      A. Having multiple accidents, you know, in
10  similar scenarios, for example.
11      You know, we had an employee once that
12  had backed up and hit something like three times in a
13  row. And, you know, we terminated that employee because
14  obviously it was a bad trend; and no matter how much
15  training we gave the employee, he continued to back up
16  into things. So that's an example of a trend. Right?
17      Or if somebody is walking around the
18  terminal without a vest and we've caught you
19  three -- you know, multiple times without a vest, then
20  that's -- that's a bad trend. We don't want to see
21  anybody walking around the terminal without a high
22  visibility vest.
23      Q. So it's kind of a "three strikes you're out"
24  situation?
25      A. Not necessarily. It depends on the severity

1  of, you know, the incident and -- or the severity of the
2  action that we witness the employee doing or failing to
3  do.
4      Q. But we can agree that when it comes to
5  forklift operations and determining whether there is a
6  pattern of unsafe driving, it's most important to look
7  at the actual behavior that they are engaging in as
8  opposed to the results of the behavior. Right?
9      A. I'm not understanding the question.
10      Q. Sure. So people can engage in unsafe
11  behaviors habitually and get lucky. They can just not
12  hurt anybody. Right?
13      A. Yes.
14      Q. That's known in the safety field. Right?
15      A. Yes.
16      Q. But you don't want to rely on the coincidence
17  of whether somebody got hurt or not. You want to look
18  at the behaviors.
19      So in other words, if somebody gets into
20  some incidents with a forklift and it may not kill
21  somebody or hurt somebody seriously, it may ding a
22  container, that's not the most important thing to look
23  at.
24      What you're looking at is, are they
25  engaging in an unsafe behavior. Right?

Page 217

1    A. Correct. That's the example I just provided,
2  yes.
3    Q. So when you talk about the severity of the
4  incident, that's not the most important thing. It's
5  certainly a factor, but you're looking at the pattern of
6  the actual behaviors and whether the person is
7  responding to any retraining or re-education or anything
8  like that. Right?
9    A. Yes. That's what I meant to say on -- I
10 thought I was clear on that. I will just go ahead and
11 rephrase it.
12       So yes, in the example I gave with that
13 one employee, he had three minor incidents. Right? He
14 backed up into a backup truck, he backed up into
15 something else, and then he backed up into something
16 else. All very minor. Very minor damage, no injuries.
17       However, that was a bad -- it showed
18 that, you know, this employee has a propensity to back
19 up into things, which is not good. So we terminated
20 that employee. Right?
21       And then we have other scenarios where,
22 you know, the employee does something that's -- I will
23 give you an example. Working three high on a container
24 without fall protection. That's really, really bad.
25 Right? So that could be a fatal fall.

Page 218

1        So in that scenario we would address that
2  a little more firmly and we won't -- you know, it won't
3  be like, okay, we will let this one slide and, you know,
4  just don't do it again.
5    Q. Okay. And your testimony is that you did
6  not -- when you reviewed Mr. Silva's file, you did not
7  see anything that was concerning in terms of his ability
8  to operate a forklift?
9    A. Correct.
10   Q. Did you see anything incidents?
11   A. I don't remember. I think he had maybe one
12 prior. I don't remember the details, and I can't
13 remember if that was the only one.
14       I think there was only one prior, but it
15 wasn't a concern during the investigation.
16   Q. Were you the only one looking into this sort
17 of thing?
18   A. No.
19   Q. Who else was doing that?
20   A. Stephen White.
21   Q. So you and Stephen White kind of jointly made
22 the decision that there was nothing in his background
23 that caused you concern?
24   A. Right. Between me and Stephen White and we
25 had some discussions with HR. Obviously, HR has more

Page 219

1  information as far as, you know, other disciplinary
2  actions that have nothing to do as safety.
3        So we look at everything as a whole,
4  right, whether the employee has issues following
5  instructions, following directions, you know, whether
6  they argue with their supervision or, you know, don't
7  comply with, you know, whatever company policy outside
8  of safety.
9        We kind of look at everything to
10 determine whether there is some sort of trend or
11 habitual flag.
12   Q. Okay. Is there any kind of progressive
13 discipline policy at the company?
14   A. Yes.
15   Q. And I'm talking specifically about forklift
16 operators, infractions, things like that. Is there one
17 of those?
18   A. It's not specific to forklift operators.
19 It's -- basically, it's disciplinary action, progressive
20 disciplinary action, that our HR department enforces.
21   Q. What is the overall policy?
22   A. I don't know the details of that policy.
23   Q. Does that not -- that's not part of your job?
24   A. No. So anybody that's involved in an
25 accident, we perform the investigation. After we

Page 220

1  perform the investigation, we send the information to HR
2  and then they follow up with -- you know, if there is an
3  at-fault for that incident, they follow up with
4  disciplinary action for the employee.
5    Q. So I would need to talk to somebody in HR
6  about that?
7    A. Yes.
8    Q. Is there an employee named Charmaine that
9  investigated this incident?
10   A. Charmaine, she's the HR, I think, manager in
11 Jacintoport.
12   Q. Okay. Do you ever interact with her?
13   A. Yes.
14   Q. Do you know if she investigated this incident?
15   A. She was not part of the investigation, but I
16 know that she was involved in gathering some of the
17 documents following the incident.
18   Q. Is she in Miami?
19   A. She's in Jacintoport. She's local.
20   Q. You never trained Mr. Silva. Right?
21   A. Personally, no.
22   Q. Would Mr. White have trained him?
23   A. Personally? Not on forklift, no.
24   Q. Who would have been the person that trained
25 him?

Page 221

1    A.  So there are the two separate trainings.  I
2  believe on the evaluation part it would be a gentleman
3  called Jorge Mendez, but it could be somebody different.
4        So I would have to check his -- that form
5  you showed earlier, the evaluation form.  The name
6  should be on there, whoever trained Mr. Silva.
7        And then on the Powered Industrial Truck,
8  the classroom training, there should have been a sign-in
9  sheet.  And if he took that training in '22, it was most
10  probably Luis Figueroa, who was our trainer at the time.
11        Again, it could have been somebody else.
12  Stephen sometimes does these PIT trainings from time to
13  time, but it's rare.  Stephen White.  So Luis Figueroa
14  was our main trainer for the classroom, and I believe
15  Jorge Mendez was our main evaluator for the evaluation
16  portion, the practical portion.
17        But I would have to confirm, you know,
18  obviously with the sign-in sheet on the classroom part
19  and then the signature on the evaluation form.
20    Q.  I understand.  And the practical evaluation,
21  I'm calling it a road test; but that's a loose phrase.
22    A.  That's what it is, more or less, yeah.
23    Q.  It means they actually get in the forklift and
24  operate it in the real world.
25    A.  Yes, sir.

Page 222

1    Q.  Do you know what Mr. Mendez's job title is?
2    A.  No.  I don't -- I don't remember that job
3  title.
4    Q.  Do you know what Mr. Figueroa's job title is?
5    A.  He was a safety specialist.
6    Q.  Safety specialist?  All right.
7        Let me show you Exhibit 7.
8        (Marked was Contreras Exhibit 7.)
9    Q.  (By Mr. Haynes)  This is a document provided
10  to us in the lawsuit by your attorneys.  This is a
11  Jacintoport document and it says, "Human Resources
12  Determination."
13        Right?  Can you see that?
14    A.  Yes.
15    Q.  And it's dated June 18, 2012.  Right?
16    A.  Yes.
17    Q.  And it pertains to Diego Silva.  Right?
18    A.  Yes.
19    Q.  And it's just talking about some sort of
20  incident.  True?
21    A.  Yes.
22    Q.  And this is typical of the kind of paperwork
23  you would keep on your employees.  Right?
24    A.  It looks familiar.  Again, this is HR
25  documentation.  I've seen it before, but it's not

Page 223

1  something that I'm super familiar with because I
2  don't -- I don't have access to this.
3    Q.  Okay.  There was action taken, but it was a
4  verbal warning.  Okay?  Do you see that?
5    A.  Yes.
6    Q.  And do you know who Elizabeth Cabezas is?
7    A.  Yes.  She's the HR manager in Miami.
8    Q.  Is she still in Miami?
9    A.  Yes.
10    Q.  And it looks like the date of the review by
11  her was in 2013.  Right?
12    A.  Yes.
13    Q.  Which is about a year later, give or take?
14    A.  Yes.
15    Q.  And then it says, "Due to the delay in
16  finalizing the investigation results and shortage in
17  staff in HR, this incident was addressed verbally."
18        Right?
19    A.  Yes.
20    Q.  Do you know what that's talking about?
21    A.  No.
22    Q.  So there is some reference to a "shortage of
23  staff" and that caused a delay in finalizing an
24  investigation of an incident involving Mr. Silva.
25  Right?  Well, that's what it says.

Page 224

1    A.  Yeah, I'm not sure.  It could be either that
2  they were short staffed in HR and they didn't get to
3  present it to him in a timely manner.  I wasn't involved
4  in this investigation at that time, so...
5        Yeah, it could be either or.
6    Q.  Yeah, it says it was "addressed verbally due
7  to the delay in finalizing the investigation results and
8  the shortage in staff in HR."  Right?  That's what the
9  words say.
10    A.  Yes, that's what it says, yes.
11    Q.  Any reason to believe that's not accurate?
12    A.  No, no.  It could be either/or, or both, a
13  little bit of both, yes.
14    Q.  And then it kind of gets into a little more
15  detail, and it says that this was an incident.  It's
16  calling itself a Safety Incident Investigation Report.
17  Right?
18    A.  Yes.
19    Q.  Now, that says "safety," but you're saying
20  this is still an HR document.  Right?
21    A.  Yes.
22    Q.  Does HR conduct safety inspections -- or
23  strike that.
24        Does HR conduct safety investigations?
25    A.  No.  So this looks like whatever we may have

Page 225

1  sent HR or whatever information we provided to HR on
2  that incident and our investigation, they took that and
3  they filled out this portion of their form.
4      Q.  Okay.  Fair enough.
5          It's talking about the purpose of the
6  report is to "identify root causes and contributing
7  factors of the incident."  Right?
8      A.  Yes.
9      Q.  And it says the purpose is to "help prevent
10 similar incidents and to support preventive actions in
11 our company."  Right?
12     A.  Yes.
13     Q.  And that's a policy of Seaboard and
14 Jacintoport.  Right?
15     A.  Yes.
16     Q.  You want to investigate root causes
17 and contributing factors to prevent things in the
18 future.  Right?
19     A.  Yes.
20     Q.  And it says the report is a product of the
21 investigation concerning an incident at the Jacintoport
22 terminal on June 18.  Right?
23     A.  Yes.
24     Q.  And that includes discussion of facts, as
25 determined by investigators, and the views expressed in

Page 226

1  the report are not intended to establish the existence
2  of a duty at law on the part of Jacintoport.
3          Do you know what that means?
4      A.  No.
5      Q.  And it's signed by Daniel Robledo?
6      A.  Yes.
7      Q.  Do you know who that is?
8      A.  He was the safety supervisor before Stephen.
9      Q.  Okay.
10     A.  So he actually -- we hired Stephen while
11 Daniel Robledo was still in Jacintoport.
12     Q.  And Daniel no longer works there?
13     A.  No.
14     Q.  Do you know where he is now?
15     A.  No.
16     Q.  Was he terminated?
17     A.  I don't remember.  That was 2015, maybe.  It's
18 been a long time.  Yeah, Stephen was hired, I
19 think -- Stephen has been around for, I think, a decade
20 now.  Yeah, it's been a long time.
21     Q.  All right.  So this part of this document
22 is -- it's essentially the incident form.  Right?
23     A.  Yes.
24     Q.  And it happened in the stuffing yard.  Is that
25 right?

Page 227

1      A.  Yes.
2      Q.  What is that?
3      A.  Stuffing yard, I think it's the same -- they
4  just named it differently back then.  It's the same area
5  where this incident took place, more or less.
6          I'm not sure, no.  I'm not sure where the
7  stuffing yard was.  Yeah, this was a long time ago.  The
8  was 2012.
9      Q.  So this may be the same place where --
10         (Simultaneous speaking.)
11     A.  It could be, or it could be a different area
12 on the dock or in the lower warehouse.
13     Q.  (By Mr. Haynes)  Okay.
14     A.  I'm not sure where the stuffing yard is.
15     Q.  And it's referencing Mr. Silva.  Right?
16     A.  Yes.
17     Q.  And it talks about equipment being the
18 forklift.  Right?
19     A.  Yes.
20     Q.  It's a 52,000-pound capacity.  Right?
21     A.  Yes.
22     Q.  And that's the same capacity as the one he was
23 driving the day of?
24     A.  Same one, yeah.
25     Q.  And I think it's a different one, actually.  I

Page 228

1  think it's 52002.
2      A.  Different forklift, same type.
3      Q.  But it's the same type, same manufacturer,
4  right?
5      A.  Yeah.  Well, I don't know the manufacturer
6  but...
7      Q.  Be that as it may, it's the same capacity?
8      A.  It's a big forklift, yes.
9      Q.  And it says, "Damage caused:  Dented and
10 punctured the container."  Right?
11     A.  Yes.
12     Q.  And it says, "While loading a yard truck with
13 a 20-foot container, the employee hit and damaged the
14 container."
15         Right?
16     A.  Yes.
17     Q.  That's not good, is it?
18     A.  No.  It's never good.
19     Q.  That's not a good behavior, is it?
20     A.  Never good when you hit anything.
21     Q.  Right.  Because if you hit something with a
22 forklift that big, it's obviously puncturing metal.
23 Right?
24     A.  Yes.
25     Q.  So we can imagine what it would do to a

EXHIBIT A

Page 229

1 person. Right?
2 MR. SEIPEL: Objection, form.
3 MR. NASH: Objection, form.
4 A. Yes.
5 Q. (By Mr. Haynes) It could do very serious harm
6 to a human. Right?
7 MR. SEIPEL: Objection, form.
8 A. Yes.
9 Q. (By Mr. Haynes) And he was not drug tested,
10 right?
11 A. It doesn't look like there was a drug test,
12 no.
13 Q. Do you know why?
14 A. No, I don't.
15 Q. Should he have been drug tested?
16 A. Drugs -- alcohol test says yes.
17 Q. I'm sorry. Strike that. He was.
18 A. He was drug tested, yes.
19 Q. I misread that. I'm sorry.
20 Go to the next page. And this is his
21 description of the incident. Okay?
22 He says (as read): "I was loading a
23 20-foot container -- loaded container onto a terminal,
24 40 foot chassis. While reversing I hit and punctured a
25 40-foot container."

Page 230

1 Do you see that?
2 A. Yes.
3 Q. So this was an incident that occurred when he
4 was reversing in the same kind of forklift, right, as
5 involved in this incident?
6 A. Yes.
7 Q. That's not good, is it?
8 A. No, it's not good.
9 Q. So that's at least one incident in the past
10 where he engaged in an unsafe behavior while reversing
11 in a forklift. Right?
12 A. Yes.
13 Q. And did you review this with Mr. White when
14 you were looking through this file at --
15 (Simultaneous speaking.)
16 A. It sound familiar.
17 Q. But this didn't cause you concern. Right?
18 A. No. Again, there was no -- this happened ten
19 years prior and, you know, these operators, they go out
20 there and they operate six, eight hours out of the day.
21 So one strike in ten years, it's a pretty decent record.
22 Q. Okay. And then it says, "Recommendations."
23 Okay? And it says, "We should have more space to work
24 around." Right?
25 A. Yes.

Page 231

1 Q. That's Mr. Silva making a recommendation,
2 right?
3 A. It looks like it, yes.
4 Q. And this goes back to what you were saying,
5 that you take what the employees say to you seriously
6 and you try to use it as far as it goes. Right?
7 A. Yes. As far as we can take it, yes.
8 Q. And he's saying, I need more space to work
9 around at this time back in 2012. Right?
10 A. Yes.
11 Q. Do you know what he means by that?
12 A. Well, it sounds like, you know, he would like
13 to have more space to work in his area. Now, I don't
14 know what type of work he was doing. I don't know if he
15 was just -- it sounds like here he was just loading the
16 container.
17 And I wouldn't know what the yard looked
18 like at that time. Again, the yard changes. It changes
19 by seasons, it changes by, you know, customer needs.
20 It changes by if there's a terminal in
21 one of our countries that's shut down because of
22 political arrest and they send all the containers over.
23 Now we got to, you know, store all the containers in one
24 area.
25 So our terminal changes, and I have no

Page 232

1 way of knowing what the terminal looked like at the
2 time.
3 Q. Okay. And just to be clear, this is the
4 Affective Employee Statement portion of this. Right?
5 A. Yes.
6 Q. That's why it's reciting what he said, right?
7 A. Yes, sir.
8 Q. And do you have any idea whether or not his
9 recommendation to have more space to work around,
10 anybody did anything with that?
11 A. I don't know.
12 Q. You can't recall?
13 A. No, I can't recall back then.
14 Q. I'm going to go to Exhibit No. 8.
15 MR. NASH: Kevin, is this in the same
16 line of question; or can we do a quick restroom break?
17 THE VIDEOGRAPHER: Off the record at
18 3:21.
19 (Recess taken at 3:21 p.m., resuming at
20 3:30 p.m.)
21 THE VIDEOGRAPHER: On the record at 3:30.
22 Q. (By Mr. Haynes) Mr. Contreras, are you ready
23 to keep going?
24 A. Yes, sir.
25 Q. Let me show you Exhibit 8.

# EXHIBIT A

Page 233

1       (Marked was Contreras Exhibit 8.)
2     Q. (By Mr. Haynes) This is another document that
3 we received from your attorneys in the case. Okay? And
4 it's about an incident involving Mr. Silva. Okay? You
5 can see his name right here. Right?
6     A. Yes.
7     Q. And you can see, Date of Incident, August 25,
8 2015. Right?
9     A. Yes.
10     Q. So this is about three years after the one
11 that we just saw, right, in 2012?
12     A. Right.
13     Q. And I think the easiest way to do it is to go
14 and show you the facts first because it's later in the
15 document. Okay?
16        So this is the incident form. Okay? And
17 the incident is on August 25, 2015, happening at 8:15 in
18 the morning. Right?
19     A. Yes.
20     Q. And it's happening -- it's obviously happening
21 at Jacintoport in Houston. Right?
22     A. Yes.
23     Q. And it's talking about the upper warehouse.
24 Right?
25     A. Yes.

Page 234

1     Q. Where is the upper warehouse?
2     A. Upper warehouse is the same area where this
3 incident took place with Delmy Recinos.
4     Q. And it says the foreman at that time was
5 Jorge Mendez. Right?
6     A. Yes.
7     Q. And it says that Jorge Mendez was actually
8 Mr. Silva's supervisor. Right?
9     A. Yes.
10     Q. But it also says that Mr. Silva himself is a
11 foreman. Right?
12     A. Yes.
13     Q. How does that work? How are they both
14 foremen?
15     A. That's a great question. I don't know.
16     Q. Okay. Let's look at the summary description.
17       Again, this is the incident form filled
18 out by Jacintoport. Okay? And this says, "Employee hit
19 and damaged a container while maneuvering in the
20 container yard."
21       Right?
22     A. Yes.
23     Q. So, again, he's operating -- it's a forklift
24 incident, is it not?
25     A. Yes.

Page 235

1     Q. And he's operating it in the yard and he hits
2 a container. Right?
3     A. Yes.
4     Q. And he damages it. Right?
5     A. Yes.
6     Q. That's not good, is it?
7     A. No.
8     Q. That's unsafe, isn't it?
9     A. Yes.
10     Q. And this is the second time we've seen him do
11 that. Right?
12     A. Yes.
13     Q. So it's not just one isolated incident. It's
14 another incident. True?
15     A. Yes.
16     Q. And it looks like the HSE supervisor,
17 Mr. Robledo, was aware of it because he reported it.
18 True?
19     A. Yes.
20     Q. And obviously Mr. Mendez knew about it.
21 Right?
22     A. Yes.
23     Q. And so we go, again, to the section where
24 Mr. Silva gives his statement, which is the Affected
25 Employee Statement.

Page 236

1       You can see that, right?
2     A. Yes.
3     Q. And it's translated. Can you see that?
4     A. Yes.
5     Q. Do you know why it would be translated?
6     A. Mr. Silva doesn't speak English.
7     Q. Okay. Do you speak Spanish?
8     A. Yes.
9     Q. So when you were interviewing Mr. Silva, you
10 interviewed him in Spanish?
11     A. Yes.
12     Q. Does Mr. White speak Spanish?
13     A. No.
14     Q. So he says, "With the 65,000-pound forklift."
15 Is that the same or different than the one he was
16 operating when --
17       (Simultaneous speaking.)
18     A. It's similar. It's just higher capacity.
19     Q. (By Mr. Haynes) So it can hold even more
20 weight?
21     A. Even more weight, correct.
22     Q. Is it larger physically?
23     A. About the same. It's just a heavier
24 counterweight in the back allows it to lift more.
25     Q. It's a big forklift?

1    A.  It's a big forklift, yes.

2    Q.  It says (as read): "With the 65," and he's

3  referencing a 65,000-pound forklift, "I was moving a 20

4  (foot) container and this area is confusing (congested).

5  This is the area I was loading the trucks to move them

6  (containers) loaded with cereal to the north yard. The

7  machine is too big for the path in this area."

8         Did I read that right?

9    A.  Yes.

10    Q.  So Mr. Silva is saying, again, that it's a

11  space issue, that the containers and the way it's

12  situated, according to him, the forklift is too big for

13  the area. Right?

14    A.  Yes.

15    Q.  And that's similar to what we saw in the first

16  incident. Right?

17    A.  He mentioned space.

18    Q.  He mentioned space.

19         So in other words, he's not saying that I

20  messed up, he's not taking, you know, what I'm going to

21  call full-throated responsibility.

22         He's trying to say, Look, it's too big to

23  operate in this space. Right?

24    A.  Yes.

25    Q.  And he said that two times in a row, didn't

1  he?

2    A.  Right, the space issue and now he saying the

3  machine is too big for the path. Again, when he says

4  "path," I don't know what path he's referring to and I

5  obviously don't remember what that area looked like at

6  that time.

7         So I don't know what path he's referring

8  to.

9    Q.  Right. But we don't have to interpret it too

10  much. He's just saying the machine is too big for

11  whatever path he's talking about. Right?

12    A.  Yes.

13    Q.  And this is another example, at least

14  according to him, of him having a problem operating the

15  machine due to its size relative to the environment.

16  Right?

17    A.  Yes.

18    Q.  All right. And one of the other things that

19  you look at as a safety professional when you are trying

20  to find out if someone is a safe operator is their

21  attitude. Right?

22    A.  Yes.

23    Q.  You don't want somebody behind the wheel of a

24  forklift that never takes responsibility for their

25  actions. Right?

1    A.  Yes.

2    Q.  You don't want somebody that's always, if they

3  get into incidents, that they are blaming somebody else

4  or saying, Well, it's not my fault; it's the way they

5  have the place set up.

6         Right?

7    A.  Yes.

8    Q.  And so now we have two incidents where

9  Mr. Silva is hitting objects, damaging them, in these

10  very large forklifts and he's not taking responsibility.

11  He's, basically, blaming it on the configuration of the

12  port. Right?

13    A.  Well, he's making a statement towards where

14  he's talking about the space. But I don't know if he

15  made other statements, you know, to the safety

16  specialist at that time.

17    Q.  Well, Mr. Contreras, if you see this as a

18  safety professional, you're looking at his record,

19  okay? --

20    A.  I agree.

21    Q.  -- you have to take it for its face value.

22    A.  For face value, yes.

23    Q.  And it doesn't say, I've made a mistake, I was

24  having a bad day. I was tired.

25         He just says, the machine is too big for

1  the area. Right?

2    A.  Yes.

3    Q.  That's not -- it at least doesn't indicate to

4  you that he's just taking full responsibility and

5  saying, I'll do better.

6        MR. SEIPEL: Objection, form.

7    Q.  (By Mr. Haynes) Right?

8    A.  No.

9    Q.  And that's not good, is it?

10        MR. SEIPEL: Objection, form.

11    Q.  (By Mr. Haynes) You would rather him say, I

12  take responsibility; I'll better next time.

13        MR. SEIPEL: Objection, form.

14        MR. NASH: Objection, form.

15    Q.  (By Mr. Haynes) As a safety professional.

16        MR. SEIPEL: Objection, form.

17    A.  No.

18    Q.  (By Mr. Haynes) No, you don't disagree with

19  that?

20    A.  I don't agree. I prefer to get some feedback

21  of how we can improve the area so the accident wouldn't

22  happen.

23    Q.  Do you have any evidence that this feedback

24  that he gave, such as it is, was used by Jacintoport or

25  Seaboard?

Page 241

1    A.  No.
2    Q.  Do you have any evidence that the feedback he
3  gave in the prior incident where he struck something in
4  a big forklift, whether that was taken into
5  consideration by Jacintoport or Seaboard?
6    A.  No.
7         MR. NASH:  Objection, form.
8    Q.  (By Mr. Haynes)  So while you want the
9  feedback, feedback is not useful unless something is
10  done about it.  Right?
11         MR. NASH:  Objection, form.
12    A.  Correct.
13    Q.  (By Mr. Haynes)  So at least as you sit here
14  right now, as the second in command of safety for
15  Seaboard, you don't know if his feedback was heeded, do
16  you?
17    A.  I can't remember whether something was done or
18  not.
19    Q.  I'm going to show you Exhibit No. 9.
20         (Marked was Contreras Exhibit 9.)
21    Q.  (By Mr. Haynes)  Can you see that?
22    A.  Yes.
23    Q.  This is another document that we received from
24  your attorneys.  Okay?  And it pertains to another
25  incident with Mr. Silva.  Okay?  And let me just show

Page 242

1  you the top here.  You can see it's from Jacintoport.
2  Right?
3    A.  Yes.
4    Q.  And it's referencing Mr. Silva and an incident
5  on July 22, 2016.  Right?
6    A.  Yes.
7    Q.  And that's a year after the one we just looked
8  at, give or take?
9    A.  Yes.
10    Q.  And the incident report says that this took
11  place at the upper warehouse again.  Right?
12    A.  Yes.
13    Q.  It happened at 11:30 in the morning.  Right?
14    A.  Yes.
15    Q.  There is Mr. Silva's name again.  Right?
16    A.  Yes.
17    Q.  And it says this time he's operating what I
18  believe is a Caterpillar forklift.  Right?
19    A.  Yes.
20    Q.  And it's a 6,000.  Right?  6,000 pound?
21    A.  Yes.  Small.
22    Q.  Smaller.  Right?
23    A.  Yes.
24    Q.  And the damage that he caused was to a golf
25  cart, the front left wheel.  Right?

Page 243

1    A.  Yes.
2    Q.  So this time there is a collision and it's not
3  involving a big forklift but a small forklift.  Right?
4    A.  Yes.
5    Q.  And can we agree that a large forklift like
6  the one he was driving on the day of is more complicated
7  and complex to drive than a small one?
8         MR. NASH:  Objection, form.
9    A.  It's different.
10    Q.  (By Mr. Haynes)  I mean, it requires more
11  skill and training and qualifications to drive a
12  65,000-capacity or 52,000-capacity forklift than a
13  smaller forklift?
14    A.  I can't speak to that because I've never
15  driven a forklift.  I've only driven small ones.
16         I know that the training for both, it's
17  the same, as far as the controls, back up, forward,
18  lift, drop.
19    Q.  Okay.
20    A.  I can't speak to that.
21    Q.  Can you speak to the fact that a larger
22  forklift has larger blind spots?
23    A.  Yes.
24    Q.  It weighs more?
25    A.  Yes.

Page 244

1    Q.  It's physically larger?
2    A.  Yes.
3    Q.  It requires more energy to stop and start?
4    A.  Yes.
5    Q.  It requires more sort of stopping distance,
6  meaning you have to stop in advance, right?
7    A.  Yes.
8    Q.  So in that sense it's more complex to drive,
9  isn't it?
10    A.  Yes.
11    Q.  It's the difference between driving a
12  passenger vehicle and a 18-wheeler, for example.  Those
13  are not the same.
14         MR. SEIPEL:  Objection, form.
15    A.  Yes.
16    Q.  (By Mr. Haynes)  And this is the summary,
17  again, by the company that provides a little more
18  information.
19         It says, "Forklift operator Diego Silva
20  was loading a 20-foot container in the 'container
21  staging area' of the upper warehouse where he backed
22  into a parked golf cart?"
23         Did I read that right?
24    A.  Yes.
25    Q.  So it's the same area where Ms. Recinos was

Page 245

1  killed.  Right?
2      A.  Yes.
3      Q.  And we have him backing again and hitting
4  something.  Right?
5      A.  Yes.
6      Q.  While he's trying to load a container.  Right?
7      A.  Yes.
8      Q.  And this time he's doing it in a smaller
9  forklift.  Right?
10      A.  Yes.
11      Q.  That has smaller blind spots.  Right?
12      A.  Yes.
13      Q.  That is not as complex to operate.  Right?
14      A.  Yes.
15      Q.  Where presumably it's easier to see objects
16  when you're reversing, right, due to the smaller blind
17  spots?
18      A.  Yes.
19      Q.  Okay.  And yet, he still hit a parked golf
20  cart.  Right?
21      A.  Yes.
22      Q.  That's not safe, is it?
23      A.  No.
24      Q.  This is not what you want to see in a forklift
25  operator at your company doing.  Right?

Page 246

1      A.  Correct.
2      Q.  And this is the third instance of it that
3  we've seen.  Right?
4      A.  Yes.
5      Q.  Is three enough for you to believe it's a
6  pattern?
7      A.  In a 24-year period, no.
8      Q.  Have you looked at 24 years of records of his
9  safety incidents?
10      A.  No.
11      Q.  Okay.  And this time we have the Affected
12  Statement, as you can see here.  Right?
13      A.  Yes.
14      Q.  And he just say says, "As I was backing up
15  from loading a container, I reversed into a parked golf
16  cart in the upper warehouse.  The golf cart belonged to
17  Gustavo Montez."  Right?
18      A.  Yes.
19      Q.  And there is no other explanation.  Right?
20      A.  Correct.
21      Q.  He doesn't make any recommendations at this
22  time, does he?
23      A.  No.
24      Q.  He doesn't try to blame the space, does he?
25      A.  No.

Page 247

1      Q.  It would be kind of hard to blame the space
2  for a forklift that big.  Right?
3          MR. SEIPEL:  Objection, form.
4          MR. NASH:  Objection, form.
5      A.  That big?  This is a small forklift.
6      Q.  (By Mr. Haynes)  Right.  For that size
7  forklift, it would be a little more difficult to say,
8  hey, there is not enough space.  Right?
9          MR. SEIPEL:  Objection, form.
10      A.  Yes.
11      Q.  (By Mr. Haynes)  And do you recall
12  specifically looking at these three incidents before you
13  issued your report or any time after this incident
14  happened?
15      A.  They look familiar now that I'm going over
16  them.
17      Q.  Okay.  Are you aware that there is more than
18  this?  There is more incidents than these three?
19      A.  I don't remember.
20      Q.  How many do we need to see, according to you,
21  the second in command at safety at Seaboard, for you to
22  determine that there was a pattern of unsafe driving
23  behaviors that would have at least called into question
24  Mr. Silva's ability to operate that forklift safely?
25      A.  So we --

Page 248

1          MR. SEIPEL:  Objection, form.
2      A.  Rephrase the question, please.
3      Q.  (By Mr. Haynes)  Sure.  I mean, at some
4  point -- I think you said that -- earlier didn't you
5  tell me a story or give me an example of a gentleman who
6  backed into things three times and he was fired?
7      A.  In a three-month period.  Yes.
8      Q.  I mean, is it just -- is it the philosophy of
9  Seaboard that, well, these things are just going to
10  happen, it's no big deal, as long as they're not
11  happening, you know, in three-month periods?  Or if a
12  man continues to back into things where he damages in
13  some cases large steel containers that are 10-, 20-feet
14  long, in other cases golf carts, is it just part of
15  what's expected to happen at the port?
16          MR. SEIPEL:  Objection, form.
17          MR. NASH:  Objection, form.
18      A.  So we look at incidents within a three-year
19  period, three-year blocks.  Right?  So we try to look at
20  incidents within the three-year block to establish if
21  there's an excessive amount of incidents that would
22  warrant, you know, some sort of additional disciplinary
23  action, or termination.
24          So when the incidents are spaced out so
25  far -- he had two incidents, you know, back to back,

Page 249

1   2015, 2016; but we try to look at incidents in
2   three-year blocks.
3          And then that would raise a flag that,
4   okay, this person is having, you know, incidents on a
5   yearly basis. And then we would look at those with a
6   closer eye to establish, see how we can, you know, make
7   some changes, either personnel or equipment as far as
8   what that person is operating, so we can minimize that
9   or completely eliminate those incidents.
10         MR. HAYNES: Let me object to the
11  responsiveness.
12     Q. (By Mr. Haynes) Where are you getting this
13  three-year period?
14     A. It's just something we agreed to between the
15  safety and HR teams as far as how they go about doing
16  their disciplinary action.
17         We look at a three-year block; and then,
18  you know, if somebody has multiple incidents within
19  three years and we're looking at that person more
20  closely and we have you on a short list of, hey, we've
21  got to keep an eye on this person. If he has one more,
22  we're going to seriously talk about how we're
23  going to move forward with this person.
24         As opposed to somebody who has been in
25  the company 20 years and he's had four or five accidents

Page 250

1   in 20 years, that's one accident every five years. When
2   you compute the amount of man-hours of that person and
3   all the moves he does on that forklift and when you put
4   all of that together, you know, we take that into
5   consideration as well.
6      Q. Did anyone look at his safety record in depth
7   before this incident?
8      A. Not that I recollect.
9      Q. And so if you have this three-year block
10  that's been agreed to internally at the
11  company -- that's what you said?
12     A. Yes.
13     Q. -- it's not based on any kind of OSHA standard
14  or DOT standard or anything like that, right?
15     A. No.
16     Q. So it's possible that someone could get into a
17  bunch of incidents, have a bunch of safety problems,
18  okay, in Year 1, and then for the next three years after
19  that they're clean, what do you make of all of those
20  safety incidents in Year 1? What do you with those?
21     A. So, again, using the example I used
22  previously, right, this gentleman that had, you know,
23  these three safety incidents within a three, four-month
24  period, you know, at that point we make a decision
25  either to take that person off that equipment, right,

Page 251

1   and retain him in a different capacity within the
2   company, where he's not operating that type of
3   equipment; or we say, Listen, you know, we cannot
4   accommodate that person, so we're going to terminate
5   this person based on too many incidents in this period
6   of time.
7      Q. Okay. Is this still the policy at the company
8   where you look at this three-year period?
9      A. It's not a written policy. It's something we
10  agreed to verbally a long time ago between the safety
11  and HR departments, how we handle progressive discipline
12  and make sure that, you know, we identified trends and
13  we don't have an employee that's had, you know, a number
14  of accidents and continues to have accidents.
15         So, you know, within a certain time limit
16  if you -- within that time limit, if you have too many
17  incidents, we're looking at you closely and, you know,
18  we've already met with you, we sat you down, hey, you've
19  had four incidents in the last -- you know, in
20  three -- in three years. You know, if you have one
21  more, we're going to take you off the machine or, you
22  know, you could possibly be terminated.
23     Q. I saw in the document somewhere that there is
24  a spreadsheet that lists your name as a mechanic. Do
25  you know what I'm talking about?

Page 252

1      A. So there is a mechanic named Omar Contreras
2   and, unfortunately, sometimes he gets my emails and I
3   get his. So his email is Omar.Contreras@Jacintoport.
4   Mine is Omar.Contreras@Seaboard. That's the only
5   difference. But otherwise, he has my same first name
6   and last name.
7      Q. So there are two Omar Contreras at the
8   company?
9      A. Yes.
10     Q. What are the odds of that?
11     A. What are the odds, yes, sir.
12     Q. So I'm not going to ask you about that now.
13  Or I'm not going to show it to you.
14         I will pull up the next exhibit. I don't
15  have my fancy software for this one, so I will have to
16  do this old school. This is going to be Exhibit 9.
17         Exhibit 9 was the 2016 Incident document.
18         Exhibit 10 is going to be this document,
19  which is a human resources document.
20         (Marked was Contreras Exhibit 10.)
21     Q. (By Mr. Haynes) And you can see here it's
22  Bates-stamped JPI. It's a document we got from your
23  lawyers. Okay? Are you with me?
24     A. Yes.
25     Q. It says it's a Human Resources Department

Page 253

1 Findings Report. Correct?
2    A.  Yes.
3    Q.  And it lists some folks here that are the
4 complainants, which I take to mean people who made a
5 complaint to HR.  Right?
6    A.  Okay.
7    Q.  And it says, Jorge Mendez.  You can see him,
8 right?
9    A.  Yes.
10   Q.  He was the supervisor of Mr. Silva, right?
11   A.  Yes.
12   Q.  Jose Balcazar?
13   A.  Yes, Balcazar.
14   Q.  Balcazar?  It says he's a supervisor over the
15 bag warehouse.
16       Does he still work at the company?
17   A.  I don't know.
18   Q.  And then it says, Randal Luis, a bag warehouse
19 and forklift operator.  Right?
20   A.  Yes.
21   Q.  And there was an Issue/Concern.  It says there
22 are various complaints reported by Diego Silva, Jose
23 Balcazar, Sergio Sanchez, and Delmy Recinos (the
24 receiving clerk) regarding individual incidents where
25 Mr. Luis yelled at them.  Right?

Page 254

1    A.  Yes.
2    Q.  And there are some issues here, but I don't
3 want to ask all of this.  I just want to point something
4 out about Mr. Silva in this.  Okay?  This is the
5 Findings section.
6       Can you see that?
7    A.  Yes.
8    Q.  This is according to HR, you know, what they
9 found based upon this incident where, basically, one
10 employee, a forklift operator named Mr. Luis, is
11 complaining about people and they're yelling back and
12 forth.  Okay?  Are you with me?
13   A.  Yes.
14   Q.  Section 2 under the Findings, it says,
15 "Witness testimonial corroborated that on April 7, 2022
16 Diego Silva was working the rail" --
17       MR. NASH:  2021.
18   Q.  I'm sorry.  "...2021 was working the railcar
19 area by the big door of the warehouse getting ready to
20 bring down a standing vertical container."
21       Right?  Do you see that?
22   A.  Yes.
23   Q.  (As read):  "And when this was happening,
24 Randal was instructing a rice truck to enter the same
25 area Diego was working in so that Randall continued

Page 255

1 offloading the rice truck.  When Diego advised Randal to
2 have the truck stop so his team could finish bringing
3 down the container horizontally, testimony will confirm
4 that Randal screamed at Diego and used profanity towards
5 Diego telling him" -- curse words.
6       "Human resources was unable to
7 corroborate that Diego had not been working for an
8 extended period.  Additionally, witness testimony will
9 corroborate that when Jorge Mendez went to look into the
10 matter and obtain feedback from Diego, Randal started to
11 yell at both Mendez and Diego."
12       Did I read all of that right?
13   A.  Yes.
14   Q.  "At that time Mendez advised Randal to stop
15 yelling at them and that the priority was for Diego to
16 continue his operations since the team was limited on
17 drivers and the containers needed to be ready when the
18 trucks come to retrieve the containers."
19       Did I read that right?
20   A.  Yes.
21   Q.  All right.  So what I want to ask you about
22 is, this is in 2021, the year before our incident.
23 Right?
24   A.  Yes.
25   Q.  And this is a finding made by the company.

Page 256

1 Right?
2    A.  Yes.
3    Q.  It is saying that, according to Jorge Mendez,
4 the priority was for Diego to continue his operations,
5 meaning his forklift operations, right?
6    A.  I don't know what he meant.
7    Q.  Well, it says, "the team was limited on
8 drivers."  Right?
9    A.  It sounded like the operation was bringing
10 down that container that was vertical.
11   Q.  Okay.  I mean --
12   A.  That's what it sounded from what you read
13 previously.
14   Q.  It says, "Diego Silva was working the railcar
15 area getting ready to bring down a standing vertical
16 container"?
17   A.  Right.  So we have these containers.  So
18 imagine these cargo containers you see on trucks.  They
19 stand them up with the doors open (indicating).  Right?
20 And then they put this machine that dumps the flour into
21 the container.
22   Q.  Okay.
23   A.  Then they close the doors and then they bring
24 it back down.  So I think that's what they are referring
25 to, bringing down that vertical container, bringing it

Page 257

1 back down.
2     Q. Okay. Are you sure about that?
3     A. That's what it sounds like. (As read): "Big
4 door of the warehouse getting ready to bring down a
5 standing vertical container and the merchandise was
6 being put into -- onto a downward horizontal."
7         So they bringing it down to a downward
8 horizontal position.
9     Q. What's the name of this machine? What do you
10 refer to it as?
11     A. Do you mean the --
12     Q. The one you're saying that he would be using
13 to move the equipment -- or the product, rather?
14     A. It's kind of -- you know, like in the farming
15 how they have these big machines that, you know, pick up
16 all the greens and then spit it out? So they feed
17 the bags into the bottom of the machine and then it kind
18 of has a chute that spits out the product and it dumps
19 the product into the container that's standing upright
20 with the doors open.
21     Q. Okay.
22     A. And then they close the container and then
23 they bring it down. So what it sounds like to me is
24 that they were in the process of bringing that container
25 down and Mr. Randal wanted to bring a truck in through

Page 258

1 there so he can work the truck.
2     Q. So it says (as read): "The priority was for
3 Diego to continue his operations since the team was
4 limited on drivers."
5         Right?
6     A. Yes.
7     Q. Your testimony is that's not a forklift
8 driver?
9         MR. SEIPEL: Objection, form.
10     A. I don't know what type of drivers they're
11 referring to.
12     Q. (By Mr. Haynes) Okay.
13     A. It could be forklift drivers. It could be,
14 you know, drivers of the container handlers because
15 sometimes, you know, they could get the container
16 handler with some straps and bring the container down.
17     Q. Okay.
18     A. I don't know how they were working that
19 operation at that time.
20     Q. Does the company have workers' compensation?
21     A. Yes.
22     Q. Does the company send its employees to doctors
23 if they need medical care?
24     A. Yes.
25     Q. And so, for example, if the employee has some

Page 259

1 kind of medical condition that they need help with, to
2 help them do their job, they have the ability to get
3 medical care through the company. Right?
4         MR. NASH: Objection, form.
5     A. So this is an HR function, workmens'
6 compensation. That's not my specialty.
7     Q. (By Mr. Haynes) Right.
8     A. But in order for an employee to be eligible
9 for workmen's compensation, they have to be injured in
10 the workplace.
11     Q. Okay.
12     A. So it's not like, you know, they can get
13 injured off site and then come in and get workmen's
14 comp.
15         Now, I kind of know the basics of it, but
16 HR handles all the workmen compensation and medical
17 benefits. And anything medical is handled by our human
18 resources department.
19     Q. So you are not receiving any medical
20 information for your employees?
21     A. No.
22     Q. You and the safety department?
23     A. No. All we get -- the most that we get is a
24 kind of breakdown of, okay, how many foot injuries, how
25 many hand injuries, so we can target or see if there is

Page 260

1 like a trend where, you know, employees are getting
2 injured in a certain part of that body or in a certain
3 way.
4         But I don't get information on each
5 employee's personal medical information.
6     Q. Okay. I mean, are you familiar that Mr. Silva
7 had requested a work restriction?
8     A. No, that wouldn't -- that wouldn't come
9 through us.
10     Q. Had you heard about that?
11     A. No.
12     Q. Did you know that he was having dizzy spells?
13         MR. SEIPEL: Objection, form.
14     A. No.
15     Q. (By Mr. Haynes) That's news to you?
16     A. Yeah, I didn't know that.
17     Q. If an employee who is responsible at least
18 sometimes for operating a large forklift is having dizzy
19 spells, that can be very dangerous, can't it?
20         MR. SEIPEL: Objection, form.
21     A. Potentially.
22     Q. (By Mr. Haynes) And you would want that
23 employee to get it controlled, wouldn't you?
24     A. I mean, again, we're talking about medical
25 information. I don't know. That's -- I don't know what

Page 261

1  the employee is suffering from. I don't know what is
2  causing the dizzy spells. I just don't know.
3      Q. Well, I mean, do you need to know what the
4  cause is to know that it's dangerous for somebody that's
5  having dizzy spells to operate a forklift?
6          MR. SEIPEL: Objection, form.
7      A. Yes, it is dangerous.
8      Q. (By Mr. Haynes) And so if this person is
9  telling his doctors that he wants to be work restricted,
10  that's information that you want to know about. Rights?
11         MR. SEIPEL: Objection, form.
12         MR. NASH: Same objection.
13     A. It depends on the work restriction. Again,
14  you know, the work restriction may have nothing to do
15  with safety. So if you're talking about forklift
16  operation, yes, it would probably be good for me to
17  know.
18     Q. (By Mr. Haynes) It would be critical for you
19  to know, right?
20     A. It would be nice for me to know.
21     Q. I mean, it's not just nice for you to know.
22  If someone is asking to be work restricted because they
23  don't feel safe to operate a forklift, that's
24  information that's critical for you to know. Right?
25         MR. SEIPEL: Objection, form.

Page 262

1          MR. NASH: Objection, form.
2      A. If that's exactly the statement that Mr. Silva
3  made, then yes.
4      Q. (By Mr. Haynes) Well, would it have to be
5  exactly? I mean, is that just enough in the realm for
6  you to be earned that, oh, well, my guy is telling
7  somebody, I want to be work restricted because I'm
8  having dizzy spells and that's -- does he need to say,
9  I'm not comfortable operating the forklift?
10         MR. SEIPEL: Objection, form.
11         MR. NASH: Objection, form.
12     Q. Isn't that a reasonable inference that that
13  would potentially an affect his ability to do it safely?
14         MR. SEIPEL: Objection, form.
15         MR. NASH: Objection, form.
16     A. I don't know.
17     Q. (By Mr. Haynes) You don't know, as the second
18  in command of safety at Seaboard Marine, that somebody
19  complaining of dizzy spells, that that could affect
20  their ability to operate a forklift safely?
21         MR. SEIPEL: Objection, form.
22         MR. NASH: Objection, form.
23     A. At the time that they were dizzy, yes.
24     Q. (By Mr. Haynes) Well, what if the dizzy
25  spells come out of nowhere and they just are

Page 263

1  uncontrolled, wouldn't that be a safety problem?
2          MR. SEIPEL: Objection, form.
3      A. That would be a concern.
4      Q. (By Mr. Haynes) I mean, anything that would
5  impair the operator's ability to see, perceive, be in
6  control of the forklift, that's something that the
7  company needs to know about. Right?
8          MR. NASH: Objection, form.
9      A. The company should know.
10     Q. (By Mr. Haynes) Okay. Because anything like
11  that, if it affects your ability to safely operate the
12  vehicle, people can get killed, can't they?
13         MR. SEIPEL: Objection, form.
14         MR. NASH: Objection, form.
15     A. Yes.
16     Q. That was a "yes"?
17         MR. NASH: Same objection.
18     A. Yes, it would be nice for the company to know.
19     Q. (By Mr. Haynes) I mean, if someone is having
20  dizzy spells and someone has very bad vision, okay, and
21  they step into one of those 52,000-pound forklifts,
22  that's not good, is it?
23         MR. SEIPEL: Objection, form.
24         MR. NASH: Objection, form.
25     A. It's not good.

Page 264

1      Q. (By Mr. Haynes) That's going to cause a
2  problem, isn't it?
3      A. Potentially.
4          MR. SEIPEL: Objection, form.
5          MR. NASH: Objection, form.
6      Q. (By Mr. Haynes) Only potentially, right?
7      A. Potentially.
8      Q. What if the person knows they are having dizzy
9  spells that are uncontrolled and they know they have bad
10  vision, it's not corrected? That's going to cause a
11  problem if they operate the forklift. Right?
12         MR. SEIPEL: Objection, form.
13         MR. NASH: Objection, form.
14     A. They shouldn't -- they shouldn't operate the
15  forklift.
16     Q. (By Mr. Haynes) They shouldn't. They should
17  say, This is not a good idea. I should not operate this
18  forklift?
19         MR. SEIPEL: Objection, form.
20     A. It's up to the person to -- if they know they
21  have a known condition, and we tell them all the time in
22  training, if you know you have a condition that's going
23  to impair you from operating the equipment, you
24  shouldn't be operating the equipment. This goes back to
25  the whole known versus not known.

Page 265

1  Q.  Right.
2  A.  Where if the company doesn't know, there is
3  nothing we can do about it.
4  Q.  Well, if the operator knows, they have control
5  over it.  Right?
6  A.  The operator at that point should take it upon
7  himself or herself to, you know, not operate the
8  equipment.
9  Q.  Right.  And if the operator knows they have
10 this condition, some kind of condition that impairs
11 their ability to operate it safely and, yet, they choose
12 to intentionally operate it anyway, that's unsafe, isn't
13 it?
14       MR. SEIPEL:  Objection, form.
15       MR. NASH:  Objection, form.
16 A.  Yes.
17 Q.  (By Mr. Haynes)  And that's likely to cause
18 some problems, isn't it?
19       MR. SEIPEL:  Objection, form.
20       MR. NASH:  Objection, form.
21 A.  Potentially.
22 Q.  (By Mr. Haynes)  Well, I mean, if you have
23 somebody you can't see and is having dizzy spells
24 operate a large forklift like that, it goes from more
25 than just potentially, right?  I mean, when you're

Page 266

1  talking about risk, the risk is significantly increased?
2  A.  If somebody can't see --
3       MR. SEIPEL:  Objection, form.
4       MR. NASH:  Objection, form.
5  A.  -- and they have dizzy spells, they should not
6  be operating the forklift.
7  Q.  (By Mr. Haynes)  Right, because it's likely
8  something bad is going to happen?
9       MR. SEIPEL:  Objection, form.
10 A.  Correct.
11 Q.  And that's not something that you want anyone
12 to do at the company.  Right?
13 A.  No.
14       MR. SEIPEL:  Objection, form.
15 Q.  (By Mr. Haynes)  And are you aware in your
16 investigation of any prior history that Mr. Silva had,
17 medically, where he was disqualified from operating a
18 forklift?
19 A.  No.
20 Q.  So you're not aware of any time -- I'm talking
21 about before 2022 -- where he had some kind of medical
22 issue that caused him not to be able to operate the
23 forklift.
24 A.  No, I was not aware.
25 Q.  Have you learned about that since?

Page 267

1  A.  Today and previously with the eye, vision,
2  that I learned about in 2023.
3  Q.  And if he's -- I mean, strike that.
4       If Mr. Silva had been disqualified
5  previously from operating a forklift because he had
6  seizures -- I'm talking about before 2022 -- he never
7  should have been operating the forklift the day of this
8  incident.  Right?
9       MR. SEIPEL:  Objection, form.
10       MR. NASH:  Objection, form.
11 A.  If?
12 Q.  (By Mr. Haynes)  Yes, sir.
13 A.  I'm sorry.  Rephrase the question.
14 Q.  Sure.  If he had been disqualified previously
15 because he had seizures, from operating the forklift, he
16 shouldn't have been operating one on the day of this
17 incident.  Right?
18       MR. SEIPEL:  Objection, form.
19       MR. NASH:  Objection, form.
20 A.  No.
21 Q.  Is that a correct, he should not have been?
22       MR. SEIPEL:  Objection, form.
23 A.  Yes.
24 Q.  (By Mr. Haynes)  Have you learned or
25 investigated whether or not that actually happened?

Page 268

1  A.  No, I was not aware.
2  Q.  Would that surprise you?
3  A.  Yes, it would.
4  Q.  Given that you know about his health condition
5  now, would it surprise you --
6       MR. SEIPEL:  Objection, form.
7  Q.  (By Mr. Haynes)  -- that he had seizures back
8  then that disqualified him?
9       MR. NASH:  Objection, form.
10 A.  It would surprise me, yes.
11       MR. SEIPEL:  Objection, form.
12 Q.  (By Mr. Haynes)  Did you know that at one
13 point he worked on the rail yard?
14 A.  No.
15 Q.  You didn't know that?
16 A.  No.  So I became involved with Jacintoport in
17 2018.  So prior to 2018, I had very little access and
18 very little interaction with Jacintoport.
19 Q.  Who was responsible for Jacintoport at your
20 company before 2018?
21 A.  My boss.  Daniel O'Neill.
22 Q.  So we need to talk to him to find out if he
23 knows about Mr. Silva?
24       MR. NASH:  Objection, form.
25 A.  So Stephen White has been there since 2015, I

1 think. I don't remember his date of hire. And previous
2 to that it was Daniel Robledo, which was on one of the
3 previous incident reports.
4     Q. (By Mr. Haynes) Okay.
5     A. So they both would have more knowledge than me
6 since they were there prior to me.
7     Q. Do you agree, based on your experience as a
8 safety professional, that workers have an incentive to
9 downplay their medical conditions that might limit their
10 ability to work?
11        MR. NASH: Objection, form.
12     A. Yes. I'm aware.
13     Q. (By Mr. Haynes) That's widely known,
14 especially on the DOT side, right?
15     A. Yes.
16     Q. You know, you've got these truck drivers who
17 they're asked to fill out questionnaires a lot about,
18 for example, sleep apnea; and most of the time they say
19 they don't snore because they have an incentive to not
20 be diagnosed with sleep apnea because it can create all
21 of these problems. Right?
22        MR. NASH: Objection, form.
23     A. Okay.
24     Q. (By Mr. Haynes) So given the fact that
25 workers have an incentive to downplay their medical

1 problems so they can keep their job or there is no
2 limitation on their job, what does Seaboard do to kind
3 of try to figure out whether they're being honest or
4 they are hiding information or they are not being
5 forthcoming about any medical problems they might have?
6     A. So we establish the medical policy that
7 we -- medical evaluation policy that we spoke about
8 earlier, where if you're an equipment operator or you
9 operate equipment in any capacity, you're going to be
10 tested to make sure you're physically capable to operate
11 the equipment.
12     Q. What was the company doing before this
13 incident happened?
14     A. You were only be tested at the date of hire.
15     Q. So there had been decades since he had been
16 tested?
17     A. For Mr. Silva specifically, yes.
18     Q. That's a blind spot, isn't it?
19        MR. NASH: Objection, form.
20     A. It was.
21     Q. (By Mr. Haynes) I mean, that's not safe, is
22 it?
23        MR. NASH: Objection, form.
24     A. No.
25     Q. (By Mr. Haynes) Don't you wish the company

1 would have had a policy in place, before this incident,
2 to have tested Mr. Silva to make sure that he hadn't
3 have some kind of medical condition that was
4 disqualifying?
5        MR. NASH: Objection, form.
6        MR. SEIPEL: Objection, form.
7     A. I'm sorry. Repeat the question.
8     Q. (By Mr. Haynes) Sure. Don't you wish the
9 company had some sort of policy in place, before this
10 incident, that would have insured that he was medically
11 qualified to operate the forklift?
12        MR. NASH: Objection, form.
13     A. It would have -- I'm not sure it would have
14 prevented the incident, but it's always good to have
15 additional measures in place.
16        MR. HAYNES: Let me object to the
17 responsiveness.
18     Q. (By Mr. Haynes) I'm simply asking, don't you
19 wish the company would have had that policy, the policy
20 of making sure he's medically qualified, before this
21 incident?
22     A. No.
23        MR. SEIPEL: Objection, form.
24     Q. (By Mr. Haynes) You don't wish the company
25 had that?

1        MR. SEIPEL: Same objection.
2     A. I don't see how it could make a difference to
3 the incident that took place. I'm not certain a hundred
4 percent it would have made a difference in the incident
5 that took place.
6     Q. (By Mr. Haynes) Do you need to be certain to
7 have that policy?
8     A. No. You asked me if I wish. I said no, I
9 don't wish.
10     Q. Well, I mean, you want to go above and beyond
11 when it comes to safety. Right?
12     A. Yes.
13     Q. Nothing is more important than safety. Right?
14        MR. NASH: Objection, form.
15     Q. These guys are working in a safety sensitive
16 industry, aren't they?
17     A. Yes.
18     Q. There are inherent dangers at the port.
19 Right?
20     A. Yes.
21     Q. People may not have gotten killed at the port,
22 you're saying, but certainly there have been injuries.
23 Right?
24     A. Yes.
25     Q. You're talking about heavy machinery. Right?

Page 273

1   A.  Yes.
2   Q.  You got 18-wheelers driving in there.  Right?
3   A.  Yes.
4   Q.  You've got huge containers.  Right?
5   A.  Yes.
6   Q.  It's a dangerous environment.
7       MR. NASH:  Objection, form.
8   A.  Potentially.
9   Q.  (By Mr. Haynes)  Okay.
10  A.  Depending where you're working, yes.
11  Q.  Well, is it hard to agree that the port is a
12  dangerous place?
13  A.  It's potentially dangerous.  If you're working
14  in the office, it's really not that dangerous.
15  Q.  Well, what I mean is the work that Mr. Silva
16  was doing out in the field.  That's dangerous work,
17  isn't it?
18  A.  Yes.  There are dangers in the field.
19  Q.  And you want to err on the side of caution,
20  don't you?
21  A.  Yes.
22  Q.  So you can guard against those dangers as best
23  you can.  Right?
24  A.  Yes.
25  Q.  So isn't it better to have the policy in place

Page 274

1   to make sure people operating heavy machinery are
2   medically qualified to do so?
3       MR. NASH:  Objection, form.
4   A.  There is very little proof that additional
5   procedures and additional policies prevents accidents.
6   Training is probably a better way to prevent accidents,
7   speaking to the employees, speaking to the personnel,
8   having that one on one connection.
9       You know, you could have all the policies
10  you want; but if the person, you know, doesn't want to
11  follow the policy or if the person doesn't want to, you
12  know, take measures or be safe in their job capacity,
13  you could have all the policies you want.
14      That's why I'm saying, you asked me do I
15  wish.  I said, no, because a lot of it comes down to the
16  user and the operator and the person conducting the
17  work.  Not necessarily just a company policy.
18  Q.  Well, but you mentioned training, right?
19  A.  Yes.
20  Q.  Training is done by the company?
21  A.  Yes.
22  Q.  People don't train themselves, do they,
23  usually?
24  A.  Correct.
25  Q.  So don't you wish the company would have

Page 275

1   trained Mr. Silva and others that it's important to
2   speak up and be honest about medical conditions that
3   might limit their ability to operate the forklift
4   safety -- safely?
5       MR. NASH:  Objection, form.
6   A.  So we did train Mr. Silva.  And, again,
7   anything that had to do with medical is handled by human
8   resources; and we really don't touch on the medical side
9   when it comes to the employees.
10      We're very -- we're told, you know,
11  again, there is HIPAA, the HIPAA laws; so we're told to
12  just stay away from the medical side and stick to the
13  practical classroom field work that's taking place in
14  the terminal.
15  Q.  Do you-all have like fatigue training?
16  A.  No.
17  Q.  There is no fatigue training at the company?
18  A.  What do you mean by "fatigue training"?
19  Q.  I mean fatigue, like how fatigue affects your
20  ability to operate a forklift safely or do any kind of
21  job safely.
22  A.  We talk about it during our general trainings,
23  yes.
24  Q.  Do you talk about the fact that certain
25  medical conditions might make fatigue a bigger problem?

Page 276

1   A.  No.  We don't address medical conditions in
2   our trainings.
3   Q.  You don't talk about the fact that if you got
4   diabetes or you got high blood pressure or anything like
5   that, that that makes fatigue a bigger problem?
6   A.  We touch on, you know, if you have a medical
7   condition, make sure that, you know, you're able to
8   operate the equipment, that your doctor says it's okay
9   to operate the equipment; but we don't go past that
10  statement.
11  Q.  Do you think that's a good policy, to just
12  kind of completely ignore the medical aspect of your
13  workers when it comes to safety?
14      MR. NASH:  Objection, form.
15  A.  It's not a bad policy.
16  Q.  (By Mr. Haynes)  Well, what if someone gets
17  into a serious incident and somebody gets hurt because
18  of a medical condition that you-all didn't figure out?
19      MR. SEIPEL:  Objection, form.
20  A.  Well, that's why we made the changes that we
21  made.
22  Q.  (By Mr. Haynes)  Well, if you already had a
23  good policy, then why did you change it?
24  A.  What policy are you referring to?
25  Q.  The policy of not looking into the medical

Page 277

1 from the safety department.
2        MR. SEIPEL:  Objection, form.
3    A.  But we didn't have a policy in place.
4    Q.  (By Mr. Haynes)  So you went from no policy to
5 having a policy?
6    A.  I'm confused as to the policy you're referring
7 to.
8    Q.  Well, I am too, frankly, because you're saying
9 you had a good policy and I don't even know what the
10 policy was.
11        It sounds like the safety department
12 didn't even inquire into the medical fitness of forklift
13 drivers.  Is that right?
14    A.  We've established that, yes.  So human
15 resources handles all the medical things for the
16 company.
17    Q.  And human resources doesn't inquire into their
18 medical fitness either.
19    A.  What human resources does and doesn't do, it's
20 really not my field of expertise.
21    Q.  Well, I'm not asking you to be an expert.  I'm
22 just asking you based operationally on the company and
23 your interactions with HR.
24        To your knowledge, human resources
25 doesn't inquire into their medical fitness.  Right?

Page 278

1    A.  At the time of the incident, the physical
2 fitness was only inquired upon hire.
3    Q.  So no one inquired into Mr. Silva's physical
4 medical fitness to operate that forklift within the ten
5 years prior to this incident?
6    A.  That I'm aware of, no.
7    Q.  You would have seen it by now, wouldn't you,
8 in his file, after reviewing all of this and going
9 through a lawsuit and doing a company investigation?
10        MR. NASH:  Objection, form.
11    A.  So I don't have access to his medical file.
12 I'm not given access to medical files.
13    Q.  What I mean is you would have seen whether or
14 not the company looked into that by now, in the ten
15 years before this incident?
16    A.  Most probably not.  The only reason I've
17 learned of, you know, the medical situation of Mr. Silva
18 is through this case.
19    Q.  But you don't have any information or evidence
20 that HR knew anything about it either?
21    A.  No, I don't.
22    Q.  You don't have any information or evidence
23 that HR looked into it?
24    A.  No, I don't.
25    Q.  Especially in the ten-year period before this

Page 279

1 incident?
2    A.  I do not.
3    Q.  Just to close the loop on this, if I can.
4        According to the company policy at the
5 time, Mr. Silva could have had a prejob or
6 beginning-of-job physical 20 years before the incident
7 and passed it, and that would have medically qualified
8 him to operate the 52,000-pound forklift at the time of
9 this incident?
10        MR. NASH:  Objection, form.
11    A.  Yes.
12    Q.  (By Mr. Haynes)  Do you think that's safe?
13        MR. NASH:  Objection, form.
14    A.  That's the policy that was in place at the
15 time.
16    Q.  My question is, do you think that's safe?
17        MR. NASH:  Objection, form.
18    A.  Yes.
19    Q.  (By Mr. Haynes)  We saw earlier in the
20 training documents you want to use common sense, you
21 expect the forklift operators to use common sense.
22 Right?
23    A.  Yes.
24    Q.  Do you think from a common sense standpoint
25 that it's safe to have a policy for someone to be able

Page 280

1 to have one physical in 20 years and still be considered
2 medically fit to drive a big forklift?
3        MR. NASH:  Objection, form.
4    A.  It's not uncommon.  It's kind of industry
5 practice, where you have the DOT physicals at the
6 beginning.  Not everybody does ongoing DOT physicals.
7 Again, there is more things involved in doing these DOT
8 physicals.
9        MR. HAYNES:  Let me object to the
10 responsiveness.
11    Q.  I didn't ask you about whether it's common.
12 I'm just asking:  Human to human, using your commonsense
13 hat, is it safe to have a policy where someone can get a
14 prejob or beginning-of-job physical, 20 years go by, and
15 they're still considered to be medically fit to operate
16 a large forklift?
17    A.  Yes.
18        MR. NASH:  Objection, form.
19    Q.  (By Mr. Haynes)  You think that's okay and
20 safe?
21        MR. NASH:  Objection, form.
22    A.  It's okay.
23    Q.  (By Mr. Haynes)  You see no problems with
24 that?
25        MR. NASH:  Objection, form.

Page 281

1    A.  I see problems; but you're asking me a direct
2  question.  You want a yes-or-no answer.  I'm saying yes
3  because it's involves a lot -- this policy that you're
4  referring to involves a large scope of employees.
5         You're focusing on operators.  I'm
6  looking at an entire company.  Right?  Where it has
7  operators, it has baggage handlers, it has office
8  employees.  It has -- so, you know, as a whole, if
9  you're asking me did the policy we have in place in the
10  time make sense, I would say yes.
11         You know, can it be done better?  Yes.
12  Which is what we did.  We did it better.  So now we have
13  this new policy in place for operators.  Right?  And
14  then they are getting medically evaluated periodically.
15    Q.  You did it better after you learned about a
16  medical condition in a lawsuit deposition that you
17  haven't read.  Right?
18         MR. NASH:  Objection, form.
19         MR. SEIPEL:  Objection, form.
20    A.  Correct.
21         (Marked was Contreras Exhibit 11.)
22    Q.  (By Mr. Haynes)  And let's go to Exhibit 11.
23         Mr. Contreras, this is a document that
24  was provided to us by your lawyers.  This is a text
25  message chain, and I believe you're on this chain.

Page 282

1  Okay?  Can you see that?
2    A.  Yes.
3    Q.  Have you seen this before?
4    A.  No, not in this format; but it looks like the
5  text with my group, my JPI group.
6    Q.  So you're referring to this chain as your JPI
7  group.  Right?
8    A.  Yes.  So this is a group text that we have
9  where we communicate anything happening in the terminal.
10    Q.  We have -- let's go through the list.  This is
11  Stephen White, I assume?
12    A.  Yes.
13    Q.  You have Mr. Betancourt?
14    A.  Yes.
15    Q.  That's you, "Omar Safety Super."  Right?
16    A.  Yes.
17    Q.  We have Xavier.  Who is Xavier?
18    A.  Xavier is a safety specialist that was with us
19  at that time, but he was not in the terminal at that
20  time.  He was off that day.
21    Q.  What's his last name?
22    A.  Lopez.
23    Q.  Does he still work at the company?
24    A.  No.
25    Q.  Do you know where he works --

Page 283

1    A.  Can I look at my phone real quick to
2  double-check his name?
3    Q.  Sure.
4    A.  (Reviewing)  no, he's no longer with the
5  company.  He resigned about a month ago.
6    Q.  Do you know where he's working now?
7    A.  No, I do not.
8         (Reviewing)  Yes, Lopez.
9    Q.  Okay, thank you.
10    A.  You're welcome.
11    Q.  And then Luis Figueroa?
12    A.  Yes.
13    Q.  And he's the safety specialist you mentioned
14  earlier.  Right?
15    A.  Yes.  He's no longer with the company also.
16    Q.  Did he resign also?
17    A.  Yes.
18    Q.  When did he resign?
19    A.  Last year.
20    Q.  Do you know where he is now?
21    A.  No.
22    Q.  Do you keep in touch with him or Xavier?
23    A.  No.
24    Q.  It says "owner."  Do you know what that means?
25    A.  I think that's who created the group chat.

Page 284

1    Q.  So this is dated -- the way I read this is the
2  first text message is sent on September 2, 2022 at
3  8:31 a.m.?
4    A.  That's correct.
5    Q.  And you send the first text message on this
6  chain.  Right?
7    A.  Yes.
8    Q.  And you say, "Witnesses are important, there
9  doesn't seem to be video footage."
10         Right?
11    A.  Correct.
12    Q.  Now, that, to me, reads like it's part of a
13  larger conversation.  It's not the first text message
14  sent.  Right?
15    A.  I don't know.  So that morning I got -- I was
16  notified, HR ran into my office notifying me there had
17  been a serious accident and there was a fatality.
18         And at that point I think I called one of
19  the guys.  I think Luis.  So Stephen White was off, and
20  Xavier Work was off.  So I think I called Luis, if I
21  remember correctly.
22         And then we had a conversation and I kind
23  of gave them some tips on what to do, you know, how to
24  control the area, don't move anything.  You know, I'm
25  assuming, right?  I can't remember verbatim.  But just

Page 285

1  give them guidance on how to handle the scene.
2          And then everything after that,
3  anything -- any text that I sent, which I don't remember
4  the texts I sent, obviously; I'm looking at them here
5  for the first time in a year and a half -- was just
6  guidance, I think, for the most part.
7      Q.  Okay.
8      A.  So there probably was a conversation before
9  that, a phone call.  I did make a phone call, if I
10  remember correctly; and I think it was to Luis.
11     Q.  Is this still your cell phone number right
12  here?
13     A.  Yes.
14     Q.  And is that a company phone?
15     A.  The actual phone is mine.  The line is
16  Seaboard's.
17     Q.  Does that mean they pay for it?
18     A.  They pay for the line, yes.  They gave me a
19  phone with a chip.  I don't like the phone.  I buy my
20  own phone, I put the chip in it.
21     Q.  Did all of these other guys have Seaboard
22  phones?
23     A.  Yes.  All of our phones were confiscated, yes.
24     Q.  Why were they confiscated?
25     A.  Well, just standard procedure in the company.

Page 286

1      Q.  Was anybody told not to take pictures?
2      A.  No.
3      Q.  I mean, you want pictures.  Correct?
4      A.  We want pictures.
5      Q.  In fact, you say, "Please send pics of scene
6  when you can."
7      A.  I'm looking at the camera, so at this point it
8  looks like I already had seen the camera footage.  So
9  there seems to be no video footage.
10         So I already had looked at the cameras by
11  this point, and I realized that one of the cameras was
12  pointed to the ocean, to the ship, and then -- so I'm
13  telling them, yeah, to send pictures of the scene.
14     Q.  All right.  Did they ever send you pictures?
15     A.  I don't remember if they did.
16     Q.  Okay.
17     A.  I don't think so.  I think -- possibly.  I
18  really don't remember.  I mean, I've seen pictures of
19  the scene and the area.  I can't remember if it was by
20  text or if they just showed it to me the following week
21  when I got there.  I think I saw them the next week when
22  I got there.
23     Q.  Then Wagner Betancourt says, "Ok," right?
24     A.  Yes.
25     Q.  And then you say, "Stephen, you need to call

Page 287

1  OSHA at some point today."  Right?
2      A.  Yes.
3      Q.  That's Stephen White you're talking to?
4      A.  Yes.
5      Q.  And obviously this is a recordable incident
6  and a reportable incident under OSHA?
7      A.  Correct.
8      Q.  And you have legal obligations to tell them?
9      A.  Correct.
10     Q.  And why did you say "at some point today"?
11     A.  Well, we have, I think, an eight-hour window,
12  if memory serves me right with OSHA, to whenever there
13  is a fatality or loss of an eye, I think it is, we have
14  to call OSHA within eight hours.
15         So I wanted to make sure that, you know,
16  we're obviously responding to this serious incident.  So
17  while we're responding, you know, there is no time for
18  us to be on the phone with OSHA answering 50 questions.
19         So we respond first.  That's kind of like
20  how we handle incidents.  We respond first, we attend to
21  the victim.  We attend to the scene; and then once we're
22  done with that, then we create a report, then we call
23  whoever we have to call.
24     Q.  Okay.  And he responds, "I will coordinate
25  with Riley and take care of the call once we have all

Page 288

1  the info."  Right?
2      A.  Correct.
3      Q.  Who is Riley?
4      A.  Riley is our workmen's comp -- workmen's comp
5  person in Jacintoport.
6      Q.  Why would Riley be involved?
7      A.  Well, Riley is the person who sends all the
8  workmen's comp information and reports to OSHA.  So as
9  soon as there is an injury or there is, obviously in
10  this case a serious incident with a fatality, Riley is
11  the person that would get that report, write up that
12  report, and send to OSHA.
13     Q.  Is Riley still with the company?
14     A.  Yes.
15     Q.  And then you say, "Luis, please remain with
16  the operator," meaning Mr. Silva, "and police until they
17  leave.  Wagner, stand by for support."
18         Right?
19     A.  Yes.
20     Q.  And then Stephen White says, "Police will not
21  allow Luis to cover the body."  Right?
22     A.  Yes.
23     Q.  So continuing on this text chain, all of these
24  texts that we've read, they are all within ten minutes
25  of the original texts we talked about.  Right?

# EXHIBIT A

Page 289

1    A.  Yes.
2    Q.  And the incident happened within 15, 20
3  minutes of this text chain, right?
4    A.  Approximately.
5    Q.  And then you say, "Ok we see that, we have
6  cameras on."  Right?
7    A.  Yes.
8    Q.  And that's you referring to the fact that
9  you're sitting in Miami looking at what's going on
10  in realtime in the aftermath.  Right?
11    A.  Yes.
12    Q.  And you can see that the police are preventing
13  him from covering the body.  Right?
14    A.  I can see that the body is there and that no
15  one is covering the body.  So my concern is, you know,
16  we have truck drivers in the area, we have -- I don't
17  want somebody coming and taking a picture
18  and just -- for the sake of being respectful to her.
19    Q.  Okay.  And then Wagner Betancourt says,
20  "Police don't want any one close to scene."
21        Right?  Right here.
22    A.  Yes.
23    Q.  And then you say (as read):  "There was a
24  second person hit, do we know who it was?  And what was
25  his condition?"

Page 290

1    A.  Yes.
2    Q.  So at this point you're getting information in
3  addition to what you're seeing on the camera.  Right?
4    A.  Yes.
5    Q.  Where would you have gotten the information at
6  8:45 a.m. that morning that a second person was hit?
7    A.  I don't remember.  I had a conversation with
8  Stephen and Luis.  There were phone calls made.  I don't
9  remember where I got the information, but...
10    Q.  And this is information that's happening very
11  quickly after the incident.  Correct?
12    A.  Yes.  There was a lot of information going
13  back and forth.
14    Q.  This is before lawyers get involved, right?
15    A.  Correct.
16    Q.  This is before anybody sits down at the
17  company and talks to people about what happened.  This
18  is like real-time information or almost real-time
19  information that's coming out.  Right?
20    A.  Correct.
21    Q.  And that information at that time was a second
22  person got hit.  Right?
23    A.  Yes.
24    Q.  And you're wanting to know what his condition
25  was.  Right?

Page 291

1    A.  Yes.
2    Q.  You obviously are concerned for his
3  well-being, I hope.  Right?
4    A.  Absolutely.
5    Q.  And then I think you're responding to the
6  police text and you say, "That's fine, let's make sure
7  one of the guys is talking to drivers that were in the
8  area, SSI, find out about the second person hit."
9        Right?
10    A.  Correct.
11    Q.  What is SSI?
12    A.  Seaboard Solutions.
13    Q.  Okay.  Why are you referencing them there?
14    A.  So in that upper warehouse area you have that
15  operation where Mr. Silva works, and then you have some
16  bay doors where we have Seaboard Solutions employees
17  working out of.
18    Q.  Okay.
19    A.  So those Seaboard Solutions employees, those
20  bay doors, have a direct line of sight to where the
21  incident took place; so I wanted to make sure that we
22  asked those folks if they saw anything.
23    Q.  Did you ever find anything that saw anything?
24    A.  No.  No one saw anything.
25    Q.  So when you're saying "drivers," you're

Page 292

1  talking about truck drivers --
2    A.  Yes.
3    Q.  -- that may have been in the areas?
4    A.  Truck drivers that may have been in the area,
5  yes.
6    Q.  And you're also talking about SSI employees?
7    A.  Yes.  I'm trying to make sure they cover every
8  single possibility of anyone that could have been in
9  that area.
10    Q.  And then Luis Figueroa responds.  Again, this
11  is at 8:46 a.m., all within about 20 minutes of the
12  original text.
13        It says, "It was a third-party driver.
14  I'm getting the info right now."
15        True?
16    A.  Yes.
17    Q.  And Stephen White says, "Details... everyone's
18  name to include police and anyone working at the scene."
19  Right?
20    A.  Yes.
21    Q.  And then you say, "Do we know the extent of
22  injuries of driver?"  I assume that means the
23  third-party driver.
24    A.  Yes.
25    Q.  So, again, you already know that one person

Page 293

1 has been critically injured because you can see her on
2 the ground. Right?
3    A. Correct.
4    Q. You want to know what the extent of the
5 injuries are to the other guy is?
6    A. Correct.
7    Q. And then Luis Figueroa says, (as read): "He
8 was injured but not in critical condition. He was taken
9 to LBJ," which is a hospital. Right?
10    A. Correct.
11    Q. He says, "Hospital," Mr. Figueroa does.
12       And then he sends you what looks like is
13 a photograph. Right?
14    A. It looks like it.
15    Q. Do you have this photograph still?
16    A. No.
17    Q. Do you know what happened to it?
18    A. No.
19    Q. Do you know if it's ever been provided to the
20 lawyers?
21    A. No.
22    Q. Do you know what it would have been of?
23    A. No. I don't remember.
24    Q. But Mr. Figueroa's phone was confiscated after
25 this incident. Right?

Page 294

1    A. Yes.
2    Q. And it was confiscated by Seaboard?
3    A. Yes.
4    Q. And it was confiscated according to protocol?
5    A. Yes.
6    Q. Normal protocol?
7       And the purpose is what exactly?
8    A. To preserve. Preserve information.
9    Q. Do you know if that was preserved?
10    A. I don't have personal knowledge, no.
11    Q. Who would have been responsible for preserving
12 it?
13    A. That's IT, our IT folks.
14    Q. Is that at Seaboard in Miami?
15    A. At Jacintoport.
16    Q. Okay?
17    A. And they were the ones that took the phones.
18    Q. Do you know -- do you have an individual or
19 individuals that are responsible for that?
20    A. No. HR would know about it. They were more
21 involved in that whole process --
22    Q. Okay.
23    A. -- specifically.
24    Q. I mean, you asked him to take pictures of the
25 scene. The presumption is that that's what he was

Page 295

1 taking a picture of. Right?
2    A. Yes.
3    Q. And then we have more text messages in this
4 chain. This is Exhibit 11 still. And this is
5 from -- again, 8:54. We're within 30 minutes of the
6 original text. Right?
7    A. Yes.
8    Q. Give or take. Right?
9       And you tell Stephen White, "Stephen,
10 when you get in and the scene is clear, let's all meet
11 and go over the details we are gathering. I was just
12 told that the two victims were checking containers,
13 forklift operator asked them to move."
14       Did I read that right?
15    A. Yes.
16    Q. So where did you get that information?
17    A. I don't remember.
18    Q. I mean, it wasn't somebody in Miami, right?
19    A. No, no, no. It obviously came from
20 Jacintoport. I just don't remember. And there were a
21 lot of phone calls. There was a lot of movement, and
22 things were developing rapidly. I don't remember who
23 gave me that information.
24    Q. Do you know -- did that come from Mr. Silva?
25    A. I don't know.

Page 296

1    Q. So you have no idea how you got that
2 information?
3    A. No. I don't remember.
4    Q. So you have no idea if it's accurate?
5    A. That's what I wrote at the time so that's what
6 somebody told me at the time; and at that time, at 8:56
7 a.m., that's all I knew.
8    Q. Do you know what it means when it says,
9 "forklift operator asked them to move"?
10    A. (Reading inaudibly.)
11       THE REPORTER: I'm sorry. What?
12       THE WITNESS: I'm sorry. I'm reading
13 that (indicating).
14       THE REPORTER: But I can't see that.
15 Just speak up, please.
16    Q. (By Mr. Haynes) Do you know what it means
17 when it says "forklift operator asked them to move"?
18    A. No.
19    Q. Then it says, "Message withheld." Right?
20    A. Yes.
21    Q. Do you know what this message is?
22    A. No.
23    Q. Do you know who it's from?
24    A. No.
25    Q. Not from a lawyer, is it?

Page 297

1   A.  I don't know.
2   Q.  I mean, there is no lawyer on this text chain.
3  Right?
4   A.  No.
5   Q.  Okay.  Do you have any understanding of why
6  this message would have been withheld?
7   A.  No.
8       MR. NASH:  I'm going to object and I'm
9  going to state this message, if it's the message I'm
10  thinking of, was withhold on the basis of
11  attorney-client privilege.
12      MR. HAYNES:  Okay.
13  Q.  (By Mr. Haynes)  SO I'm look at the document
14  that was given to me in this case.  Okay?  You don't
15  remember speaking with a lawyer on this text message, do
16  you?
17  A.  No.
18  Q.  Okay.  And there is no lawyer listed up here
19  on this document, is there?
20  A.  No.
21  Q.  Steve is not a lawyer?
22  A.  No.
23  Q.  Wagner is not a lawyer?
24  A.  No.
25  Q.  You're not a lawyer?

Page 298

1   A.  No.
2   Q.  Xavier is not a lawyer?
3   A.  No.
4   Q.  Luis is not a lawyer?
5   A.  No.
6   Q.  Nobody else is listed on this chain.  Right?
7   A.  No.
8   Q.  Okay.  Do you know if a lawyer just jumped on
9  this chain at some point?
10  A.  No.  Not possible.
11  Q.  Were you trying to keep this chain
12  confidential?
13  A.  No.
14  Q.  Do you have any idea why this message would be
15  withheld from us?
16  A.  No.
17  Q.  Do you have a problem with me seeing what this
18  message says?
19      MR. NASH:  Objection, form.
20  A.  No.
21  Q.  (By Mr. Haynes)  All right.  And then it says,
22  "I'm calling OSHA."  Right?
23  A.  Yes.
24  Q.  And that's you saying that.  Right?
25  A.  Yes.

Page 299

1   Q.  And so the message before that -- let's get
2  the context here.
3       The message before the message that was
4  withheld is 8:56 a.m.  Right?
5   A.  Yes.
6   Q.  And the next message after the message that
7  was withheld is 9:08 a.m.  Right?
8   A.  Yes.
9   Q.  And that's a span of about 12 minutes, give or
10  take.  Right?
11  A.  Yes.
12  Q.  And after the message that's withheld that
13  we're not allowed to see, you say, "I'm calling OSHA."
14  Right?
15  A.  Yes.
16  Q.  Whereas, before you told Stephen White, Hey,
17  call them at some point today.
18  A.  Yes.
19  Q.  Do you remember that?  And you were telling me
20  how there is an AR window and, you know, there's no
21  urgency in calling right now?
22  A.  Yes.
23  Q.  And then after this withhold message that
24  we're not allowed to see, you say, "I'm calling OSHA."
25  Right?

Page 300

1   A.  Yes.
2   Q.  So the plan changed from Stephen White calling
3  them at some point today to you saying, "I'm calling
4  OSHA."  Right?
5   A.  Yes.
6   Q.  Do you remember what changed?
7   A.  No.
8   Q.  Do you think that message in between might
9  tell us why it changed?
10      MR. NASH:  Objection, form.
11  A.  No.
12  Q.  (By Mr. Haynes)  But you don't even know what
13  it says.  Right?  You don't remember.
14      MR. NASH:  Objection, form.
15  A.  I don't think that has any bearing.  I think
16  it was more about Stephen was off.  He was en route,
17  rushing to the terminal.  He gets to the terminal, he
18  has, obviously, a large situation going on.  And I'm in
19  the office.  I'm better suited to calling OSHA and doing
20  the report myself.
21  Q.  You had not spoken to a lawyer at this point.
22  Right?
23  A.  No.
24  Q.  So it's not like, hey, I just talked to the
25  lawyer, he told me to say this.  That's not what that

Page 301

1  message says?
2          MR. NASH:  Objection, form.
3      A.  No.
4      Q.  (By Mr. Haynes)  You didn't pick up a legal
5  book and start giving advice on this chain, did you?
6          MR. NASH:  Objection, form.
7      A.  No.
8      Q.  (By Mr. Haynes)  Then, at 10:30, okay, this is
9  about an hour later, right? --
10     A.  Yes.
11     Q.  -- you say, "Juan Arriola was a witness?"
12  You're asking a question.  You're posing it to
13  Mr. Figueroa.  Right?
14     A.  I'm posing it to the group.
15     Q.  To the group, and Mr. Figueroa answers.
16  Right?
17     A.  Yes.
18     Q.  He says (as read):  "At the moment, yes, he
19  was part of the group, he was the first one who saw the
20  accident after it happened.  He was coming out of the
21  container when he heard the victim scream."  Right?
22     A.  Yes.
23     Q.  And so does that refresh your memory about
24  Mr. Arriola's role in that he came out, he heard a
25  screen and he came out of the container?

Page 302

1      A.  Yes.
2      Q.  And he's been deposed, and you haven't looked
3  at his depo.  We talked about that.  Right?
4      A.  Yes.
5      Q.  So he was the first one who saw the accident
6  after it happened.  Did you interview him?
7      A.  I don't remember, honestly.  I don't think I
8  did.  I think Stephen did.
9      Q.  Okay.
10     A.  I don't remember speaking to Arriola.
11     Q.  Did you review the interview notes from
12  Stephen?
13     A.  Yes, we discussed it.
14     Q.  What do you recall about that?
15     A.  Not much.  Now that I'm reading the
16  "screaming," I remember specifically I asked if he had
17  seen it; and I was told, no, he didn't see it.  He heard
18  a scream; and then when he walked out, he saw the scene.
19     Q.  Okay.  That's presumably Delmy Recino
20  screaming in pain.  Right?
21     A.  Presumably, yes.
22          MR. NASH:  Object to the form.
23     Q.  (By Mr. Haynes)  So she was at least conscious
24  for some of this.  Right?
25          MR. NASH:  Objection, form.

Page 303

1      A.  I don't know.
2      Q.  (By Mr. Haynes)  Well, I mean, you can't
3  scream in pain if you're unconscious, can you?
4          MR. SEIPEL:  Objection, form.
5          MR. NASH:  Objection, form.
6      A.  No.
7      Q.  (By Mr. Haynes)  And you respond, "Wow."
8      A.  Yes.
9      Q.  Why did you say "Wow" right there?
10     A.  It's just the more details you gather, the
11  more impactful and -- yeah, it's a terrible -- a
12  terrible incident.
13          So everybody is kind of, you know, taken
14  aback and, you know, you start imagining the whole scene
15  happening as more information gets provided to you and
16  it's -- it's overwhelming.
17     Q.  If it's overwhelming for you, it certainly was
18  overwhelming for the people involved.  Right?
19     A.  Yes.
20     Q.  And it's overwhelming for the family.  Right?
21     A.  Absolutely.
22     Q.  Okay.  And that's the last text chain that I
23  have from you from the day of this incident.  Okay?  Did
24  you text anybody else that day?
25     A.  Anything that I texted would have been

Page 304

1  provided to the legal group.
2      Q.  So do you recall?  I mean, there's no reason
3  for you to believe that the text messages just stopped
4  in their tracks at 10:33 a.m.  Right?
5      A.  I don't remember -- I didn't remember most of
6  these texts.
7      Q.  Okay.
8      A.  I knew there were texts that day, but I don't
9  remember specifically how many texts I sent.
10     Q.  I mean, you're continuing to talk to the team
11  in Houston, right, throughout the day?
12     A.  Yes.
13     Q.  And one of the ways you were communicating was
14  by text.  Right?
15     A.  Yes.
16     Q.  And I assume your investigation that day
17  specifically continued past 10:30 in the morning?
18     A.  Yes.
19     Q.  So you may not remember specifically sending a
20  text, but is it likely that you were continuing to text
21  after that time?
22     A.  I'm not sure, and probably not, for the simple
23  reason that after a couple of hours -- now we're talking
24  we're at 10:30, right, post-incident.
25          After a couple of hours the scene is

# EXHIBIT A

Page 305

1 under control, the body may have been removed already.
2 We've already spoken to the witnesses. You know,
3 initial. Right? We're still gathering information.
4 But I think the bulk of the communication
5 surrounded on making sure we cross our Ts and dot our
6 Is, make sure we speak to witnesses, make sure we speak
7 to drivers, make sure we speak to anybody in the area,
8 make sure we take pictures.
9 So once the body was removed, it kind of
10 scaled down; and at that point there wasn't a need for
11 constant messaging anymore.
12 Q. Let's look at Exhibit 12.
13 (Marked was Contreras Exhibit 12.)
14 Q. (By Mr. Haynes) This is another text chain.
15 Okay? Again, this was provided to us by your lawyers.
16 You can see the JPI Bates stamp on it. Right?
17 A. Yes.
18 Q. And on this thread we have someone named
19 Warfel?
20 A. I don't know who that is.
21 Q. Do you recognize that number right here
22 (indicating)?
23 A. No.
24 Q. This thread actually started before your
25 thread started. It started at 8:14 a.m. on September 2,

Page 306

1 right?
2 A. Yes.
3 Q. And somebody named Warfel -- and, again, this
4 is a document that I got from the lawyers when I
5 requested documents, including text messages. Okay?
6 I get a text -- or I see a text message
7 at 8:14 a.m. from Warfel to somebody else; and there is
8 a question mark, right, or three of them?
9 A. Yes.
10 Q. And then at 8:17 a.m. the person says, "I
11 think one person is dead." Right?
12 A. Yes.
13 Q. So they are clearly talking about the same
14 incident we're talking about. Right?
15 A. It looks like it, yes.
16 Q. And so as far as you can tell, by 8:17 a.m.
17 they were determining that they thought that Delmy was
18 passed away. Right?
19 A. That's what it looks like.
20 Q. And then Warfel asks, at 8:26, "What
21 happened?" Right?
22 A. Yes.
23 Q. And then, the answer at 8:27 is, "They got run
24 over." Right?
25 A. Yes.

Page 307

1 Q. And Warfel says again, "Both of them."
2 Right?
3 A. Yes.
4 Q. And the other person responds, within seconds,
5 within less than a minute, and says, "Yes." Right?
6 A. Yes.
7 Q. Again, all of those texts are before the 8:30
8 text that we saw in your chain. Right?
9 A. Yes.
10 Q. So these people must have more real- time
11 information than you-all's chain had. Right?
12 MR. NASH: Objection, form.
13 A. That's what it appears so.
14 Q. (By Mr. Haynes) And then Warfel says, "WTH,"
15 which I take to mean "what the hell." Right?
16 A. Correct.
17 Q. And he says, "That's insane." He says, "Do
18 you know them?"
19 Again, this is all at 8:28.
20 The texter says again (as read): "Yeah,
21 one of them body got cut off. Yes, I knew that person
22 who is dead." Right?
23 A. Yes.
24 Q. Is that the first time you've heard that
25 Delmy's body was cut in half or cut?

Page 308

1 A. No, no. I heard that they -- I heard
2 that -- I think when I was speaking to Luis, he told me
3 that the body had been cut in half.
4 Q. That's a horrible way to die, isn't it?
5 A. It's terrible.
6 Q. And Warfel says, "Like cut in half?"
7 And the owner says or the texter says,
8 "Yes." He says (as read): "It's probably will be in
9 the news." Right?
10 A. Yes.
11 Q. This was a big deal down at the port, wasn't
12 it?
13 MR. NASH: Objection, form.
14 A. Yes.
15 Q. (By Mr. Haynes) It's not everyday that
16 somebody gets split in half by a forklift. Right?
17 MR. NASH: Objection, form.
18 A. No.
19 Q. (By Mr. Haynes) Then Warfel says at 9:00
20 a.m., "That's awful."
21 "How did it happen?"
22 The answer is, "Knocked them down then
23 run" them over -- or "run over them." Right?
24 A. Yes.
25 Q. So according to this, you've got another piece

## Page 309

1 of information that not only was Delmy hit by the
2 forklift but the driver, Mr. Ramirez, was hit by the
3 forklift. Right?
4     MR. SEIPEL: Objection, form.
5   A. According to the text, yes.
6   Q. (By Mr. Haynes) Did you review this as part
7 of your investigation?
8   A. No. I didn't have access to other people's
9 phones.
10   Q. Well, clearly I got it. So, I mean, it's
11 available. Right?
12   A. Not to me.
13   Q. Well, it was given to me by Jacintoport. We
14 saw the Bates stamp, didn't we?
15   A. Yes.
16   Q. All right. So now you have your own statement
17 saying that Mr. Ramirez was knocked down and now you
18 have another statement from Jacinto's documents, at
19 least, that says he was also knocked down. Right?
20   A. Yes.
21   Q. And it's not disputed that Delmy was knocked
22 down by the forklift. Right?
23   A. Right.
24   Q. Then Warfel says, "OMG," meaning, oh, my God.
25 Right?

## Page 310

1   A. Yes.
2   Q. And then he says, "So the driver wasn't paying
3 attention." Right?
4   A. Yes.
5   Q. So his or her's reaction to this limited set
6 of information that's being exchanged is: The driver
7 must not have been paying attention. Right?
8     MR. SEIPEL: Objection, form.
9     MR. NASH: Objection, form.
10   A. Yes.
11   Q. (By Mr. Haynes) That's a pretty
12 commonsensical reaction when you hear that somebody got
13 split in half by a forklift. Right?
14     MR. NASH: Objection, form.
15   A. Yes.
16   Q. (By Mr. Haynes) It doesn't surprise you that
17 somebody would be like, well, the driver, forklift
18 driver, must not have been paying attention. Right?
19     MR. SEIPEL: Objection, form.
20     MR. NASH: Objection, form.
21   A. Yes, it doesn't surprise me.
22   Q. (By Mr. Haynes) And then this texter, the
23 owner of the chain, says, "No, he wasn't." Right?
24     MR. SEIPEL: Objection, form.
25   A. Right.

## Page 311

1   Q. (By Mr. Haynes) So you have another person
2 agreeing, saying, hey, no, he wasn't paying attention.
3 Right?
4   A. Yes.
5   Q. Are you saying that Silva was paying attention
6 that day?
7     MR. NASH: Objection, form.
8   A. No. I haven't said that.
9   Q. (By Mr. Haynes) Are you saying that he wasn't
10 paying attention?
11     MR. NASH: Objection, form.
12   A. I haven't said that.
13   Q. (By Mr. Haynes) Do you have any anything to
14 offer the jury in terms of your belief, as the second in
15 command of safety at Seaboard, whether or not Mr. Silva,
16 based on what you know, was actually paying attention
17 that day?
18     MR. NASH: Objection, form.
19   A. I -- I don't have knowledge whether he was or
20 wasn't paying attention.
21   Q. (By Mr. Haynes) And you don't -- you've
22 investigated the incident, you're a high-level safety
23 employee, and you're saying you know less than these
24 people that are texting each other within an hour of
25 this happening?

## Page 312

1     MR. NASH: Objection, form.
2     MR. SEIPEL: Objection, form.
3   A. They don't know anything.
4   Q. (By Mr. Haynes) Well, it doesn't take a lot,
5 does it, to realize that if a man backs into two people
6 and splits one of them in half, that he wasn't paying
7 attention, does it?
8     MR. SEIPEL: Objection, form.
9     MR. NASH: Objection, form.
10   A. That's not necessarily true. So this sounds
11 more like hearsay, just gossiping, of something that's
12 taking -- that's happening right now in the terminal and
13 everybody is trying to -- you know, what happened? What
14 happened?
15     And everybody is offering their own
16 conclusion as to what happened, but none of these people
17 witnessed the accident and none of them investigated the
18 accident.
19   Q. Well, you didn't even bother to look at this
20 hearsay, did you?
21     MR. NASH: Objection, form.
22   A. My investigation is not based on hearsay.
23 It's based on facts.
24   Q. (By Mr. Haynes) You didn't bother to review
25 two sworn depositions of people who were actually there,

Page 313

1 did you?
2          MR. NASH: Objection, form.
3     A. They weren't made available to me.
4     Q. (By Mr. Haynes) Are they under lock and key?
5          MR. NASH: Objection, form.
6     A. They are not available to me.
7     Q. (By Mr. Haynes) I'll email it to you right
8 now.
9          MR. NASH: Objection, form.
10    Q. (By Mr. Haynes) Do you want me to email it to
11 you?
12    A. That would be great.
13          MR. NASH: Objection, form.
14    A. If my attorneys agree.
15    Q. What's your email? I will email it directly
16 to you. I'll copy these guys.
17          MR. NASH: Objection, form.
18          If you would like to speak -- or send
19 something to the witness, you know it has to go through
20 counsel.
21    Q. (By Mr. Haynes) So I'm going to send it to
22 Andy, your lawyer, and I want him to forward it to you.
23          Do you have a problem with --
24          MR. NASH: Objection, form.
25    Q. (By Mr. Haynes) -- receiving these

Page 314

1 depositions?
2     A. That's up to my attorneys, whether they want
3 to -- if they feel it's --
4          (Simultaneous speaking.)
5     Q. Well, you keep saying it's "not made available
6 to you," and I just think that's a very convenient thing
7 for you to say. So I'm making it available to you right
8 now.
9          Do you understand what I'm saying?
10          MR. NASH: Objection, form.
11    A. I appreciate that.
12          MR. NASH: Objection, sidebar.
13    Q. (By Mr. Haynes) If I had a print- -- I'm not
14 in my law office; I'm at your lawyer's office.
15          If I was in my law office, I would print
16 it for you and give you a hard copy to take home on the
17 plane. Because you're flying back to Miami, aren't you?
18    A. I'm going --
19          MR. NASH: Objection, form.
20    A. -- to stay around for a couple of days.
21    Q. (By Mr. Haynes) Okay. Can I email it to
22 somebody at Jacintoport? They've got a printer down
23 there, don't they?
24          MR. NASH: Objection, form.
25    A. You can email it to my attorneys.

Page 315

1     Q. (By Mr. Haynes) You're going to print it and
2 read it on the plane?
3          MR. NASH: Objection, form.
4     A. That's up to my attorneys' guidance.
5     Q. (By Mr. Haynes) Well, I'm telling you right
6 now, if this case goes to trial, I'm going to ask you
7 about it at trial. Okay?
8     A. I understand.
9          MR. NASH: Objection, form.
10    Q. (By Mr. Haynes) And I'm asking you, as a
11 favor to me and the family -- because you care about
12 what happened, right?
13    A. Absolutely.
14          MR. NASH: Objection, form.
15    Q. (By Mr. Haynes) You want to get to the bottom
16 of it?
17          MR. NASH: Objection, form.
18    A. Yes.
19    Q. (By Mr. Haynes) You don't want to rely on
20 hearsay?
21          MR. NASH: Objection, form.
22    A. Correct.
23    Q. (By Mr. Haynes) You didn't put Mr. Silva
24 under oath, did you?
25          MR. NASH: Objection. Asked and

Page 316

1 answered.
2     A. No.
3     Q. (By Mr. Haynes) You understand that when
4 somebody is under oath and subject to the penalty of
5 perjury, that is different if you're just asking him
6 questions after an incident. Right?
7          MR. NASH: Objection, form.
8     A. Yes.
9     Q. (By Mr. Haynes) They are not going to jail if
10 they lie to you, are they?
11          MR. NASH: Objection, form.
12    A. No.
13    Q. (By Mr. Haynes) All right. So you understand
14 why it's important to look at sworn testimony. Right?
15          MR. NASH: Objection, form.
16    A. Yes.
17    Q. (By Mr. Haynes) And you're going to do that
18 before trial, aren't you?
19          MR. NASH: Objection, form.
20    A. On my counsel's advice. I will do whatever my
21 counsel advises.
22    Q. (By Mr. Haynes) Well, they haven't advised
23 you to read it in the time since the incident, have
24 they?
25          MR. NASH: Objection, form.

Page 317

1  Q. (By Mr. Haynes) Right?
2       MR. NASH: You don't have to comment on
3  advice of counsel.
4  Q. (By Mr. Haynes) Let me ask you this way: Has
5  anybody told you to read the depositions?
6       MR. NASH: Objection, form.
7  A. Do I have to answer?
8  Q. (By Mr. Haynes) Yeah.
9  A. No.
10      (Marked was Contreras Exhibit 13.)
11  Q. (By Mr. Haynes) Did you talk to OSHA at any
12  time?
13  A. Yes.
14  Q. So this is what's called an OSHA Violation
15  Worksheet. Can you see that?
16  A. Yes.
17  Q. And it was prepared on the 17th of February,
18  2023. Can you see that?
19  A. Yes.
20  Q. And that's five months after the incident.
21  Right?
22  A. Yes.
23  Q. It's also Michael Jordan's birthday. Did you
24  know that?
25      MR. NASH: Objection, form.

Page 318

1  A. No.
2  Q. (By Mr. Haynes) It is.
3       And it's talking about -- it's talking
4  about an inspection number.
5       Do you see that?
6  A. Yes.
7  Q. And you're familiar with the fact that OSHA
8  will conduct inspections and they assign numbers to
9  those inspections. Right?
10  A. Yes.
11  Q. And they call them "establishments," right,
12  and this establishment is Jacintoport International.
13  True?
14  A. Yes.
15  Q. And relative to that inspection, they found a
16  serious violation. Right?
17  A. Yes.
18  Q. You couldn't remember that earlier, could you?
19  A. I couldn't remember that.
20  Q. So this refreshes your memory. Right?
21  A. I don't remember seeing this report.
22  Q. Do you recall -- if you didn't see it in this
23  format, did you ever get a copy of the citation?
24  A. Yes. We got a copy -- well, we got a copy of
25  what OSHA requests for us to post at the scene in the

Page 319

1  area where the incident took place.
2  Q. Okay.
3  A. But that was immediately following the
4  incident. This was five months later, so I don't
5  remember seeing this one.
6  Q. Well, did you follow up with OSHA to determine
7  what their findings were?
8       MR. NASH: Objection, form.
9  A. I don't remember.
10  Q. (By Mr. Haynes) I mean, a serious violation
11  of OSHA, as a safety professional that's second in
12  command at Seaboard Marine, I mean, that's something
13  that sticks out in your mind. Right?
14  A. Okay. So I remember seeing this but not in
15  this format, so maybe it was sent to me on a
16  different -- maybe it was shown to me in a different
17  format.
18  Q. Okay.
19  A. I remember the recommended abatement actions.
20  Q. Well, earlier you told me that you-all didn't
21  change anything about the traffic and put in barriers,
22  right? Didn't you tell me that earlier?
23  A. Following the incident we did. We removed the
24  containers. I said that earlier. We moved the
25  containers away from that area, which removed the truck

Page 320

1  traffic which allowed us to create forklift and
2  pedestrian lanes.
3  Q. So are containers used there now?
4  A. No. So before, that was a container yard; and
5  then the work that Recinos and Silva were involved in
6  was being done adjacent to the warehouse; and in that
7  area sometimes the trucks that are coming to pick up or
8  deliver cargo, they would transit near that area.
9       Now all of those containers are removed,
10  so we don't have that truck traffic there anymore. And
11  now we've set up the area where so that the containers
12  can be laid down for them to do their stuffing.
13      And then it has a forklift lane, and it
14  separates the forklift from the pedestrians that are
15  doing the work.
16  Q. Okay. Do you agree that the company committed
17  the violation that's described right here?
18      MR. NASH: Objection, form.
19  A. That was OSHA's findings.
20  Q. (By Mr. Haynes) Do you agree that was a
21  violation?
22      MR. NASH: Objection, form.
23  A. I agree that was OSHA's findings, yes.
24  Q. (By Mr. Haynes) I'm talking about you
25  independently, as second in command of safety for

Page 321

1  Seaboard Marine.  Do you agree that these facts happened
2  and they are a violation?
3          MR. NASH:  Objection, form.
4      A.  I don't necessarily agree.  OSHA uses this
5  5(a) OSHA act as a catch-all whenever something happens
6  and they don't have a specific regulation that addresses
7  it.
8          So, again, saying that "Clerks working in
9  proximity to forklift operators were exposed, struck by
10  hazards..."
11     Q.  (By Mr. Haynes)  So you don't agree?
12     A.  I don't agree with the violation issued by
13  OSHA.
14     Q.  One of the findings that OSHA makes is in
15  question format, and this is -- the question on the
16  screen is:  "Is there an effective means of discovering
17  violations of the work rule?"
18         Okay?  Do you see that?
19     A.  Yes.
20     Q.  And the work rule is what you describe as the
21  catch-all.  Right?
22     A.  Yes.
23     Q.  And the answer is what?
24     A.  It says here, "No."
25     Q.  It says, "Jorge Mendez, warehouse

Page 322

1  superintendent, stated there are multiple blind spots on
2  the large forklifts and they are heavily dependent on
3  the backup alarms to alert pedestrians.  He stated that
4  the receiving clerks are instructed to be aware of their
5  surroundings."
6          Right?
7      A.  Yes.
8      Q.  So that's kind of like what you said earlier.
9  You-all rely completely, almost completely, on backup
10  alarms.  Right?
11     A.  No.
12     Q.  All right.  The record will say what it says.
13         Do you agree that there are multiple
14  blind spots on these large forklifts?
15     A.  Yes, there are some blinds spots.
16     Q.  Do you agree that the operators are heavily
17  dependent upon the backup alarms?
18     A.  I disagree.
19     Q.  Okay.  So you disagree with Mr. Mendez?
20     A.  Yes.
21     Q.  And he was the supervisor of Mr. Silva?
22     A.  Yes.
23     Q.  This is the first time you're seeing what
24  Mr. Mendez said?
25     A.  Yes.

Page 323

1      Q.  So are you going to call him up and say, Hey,
2  Jorge, I think we need to talk about this because I
3  disagree with what you told OSHA?
4          MR. NASH:  Objection, form.
5      A.  I'm not going to -- I cannot approach
6  Mr. Mendez regarding a statement he provided to OSHA.
7      Q.  (By Mr. Haynes)  Okay.
8      A.  But I will -- I can have a conversation in a
9  different way.
10     Q.  How are you going to do that?
11     A.  Well, I need to make sure that operators
12  understand that, you know, there are other ways
13  to -- you know, to alert pedestrians other than backup
14  alarms.  You know, there's communication.  There's the
15  horn we were talking about earlier.
16     Q.  Mr. Contreras, I thought you said that they're
17  not supposed to use the horn.
18     A.  I never said that.
19     Q.  I'm very confused.  I thought we had a lot of
20  discussion about how you think it's unnecessary to use
21  the horn and I showed you the documents, as always, and
22  you quibbled with me about that.
23         So can we just figure out whether they
24  are supposed to use the horn or not?
25         MR. SEIPEL:  Objection, form.

Page 324

1      A.  Again, your statement prior was that they
2  should always use the horn.  What I'm saying is there's
3  different ways to address, you know, a pedestrian when
4  you're using a forklift.
5          There's communication.  There's backup
6  alarms.  There's horns.  Okay?  So there's different
7  ways that you can address a pedestrian when, you know,
8  you're operating a forklift.
9      Q.  Okay.  The next question that OSHA poses as
10  part of their finding is, No. 4, and it says (as read):
11  "Is there effective enforcement of the rule when
12  violations occur?" meaning the general safety rule.
13  Right?
14     A.  Yes.
15     Q.  What's the answer?
16     A.  No.
17     Q.  And again, it says (as read):  "Jorge Mendez,
18  warehouse superintendent, stated there are multiple
19  blind spots on the large forklifts and they are heavily
20  dependent on the backup alarms to alert pedestrians.  He
21  stated that the receiving clerks are instructed to be
22  aware of their surroundings.  The disciplinary records
23  provided that involve equipment operation are from
24  incidents involving damage to property or personal
25  injury.  There are no disciplinary records for forklift

# EXHIBIT A

Page 325

1  operation violations observed by supervisors."
2  Right?
3  A. That's what it says.
4  Q. And what that means is, going back to the memo
5  I showed you earlier, the only disciplinary records for
6  Mr. Silva that we have involve situations where he
7  struck other objects or hurt other people. Right?
8  MR. SEIPEL: Objection, form.
9  MR. NASH: Objection, form.
10  A. Yes.
11  Q. (By Mr. Haynes) There's no record that we've
12  been provided or that was provided to OSHA where a
13  supervisor observes unsafe behavior by Mr. Silva.
14  Right?
15  A. Not that I'm aware of.
16  Q. And that was a specific memo that we looked at
17  in 2017, where the head employee at the port in Houston
18  was saying, we need more of these because there's been a
19  lot of incidents that are basically not being
20  documented. Right?
21  MR. NASH: Objection, form.
22  A. Yes.
23  Q. (By Mr. Haynes) And this is a 2023 document.
24  It looks like it's still going on. Right?
25  MR. NASH: Objection, form.

Page 326

1  A. It's a 2023 document, yes.
2  Q. (By Mr. Haynes) Well, according to OSHA, it's
3  still going on. Right?
4  MR. NASH: Objection, form.
5  A. Correct.
6  Q. (By Mr. Haynes) All right. And there is no
7  doubt the company knew this was a problem as early as
8  2017. Right?
9  MR. NASH: Objection, form.
10  A. Yes.
11  Q. (By Mr. Haynes) Okay. So can you assure the
12  jury that all the potential unsafe behaviors that
13  Mr. Silva were exhibiting between 2017 and when he
14  killed Ms. Recinos were being captured appropriately and
15  recorded?
16  MR. SEIPEL: Objection, form.
17  MR. NASH: Objection, form.
18  A. I'm sorry. Rephrase the question.
19  Q. (By Mr. Haynes) Sure. Can you assure the
20  jury that any unsafe behaviors that Mr. Silva was
21  exhibiting in a forklift were being appropriately
22  captured and recorded?
23  MR. SEIPEL: Objection, form.
24  MR. NASH: Objection, form.
25  A. I cannot make that assurance, no.

Page 327

1  Q. (By Mr. Haynes) Okay. That's not good, is
2  it?
3  MR. NASH: Objection, form.
4  A. I wasn't there, so...
5  Q. (By Mr. Haynes) Well, the buck stops with
6  you. Right? You're second in command of safety.
7  MR. SEIPEL: Objection, form.
8  MR. NASH: Objection, form.
9  A. I wasn't there present to witness, you know,
10  12-, 14-hour days of Mr. Silva operating equipment; so I
11  can't speak to that.
12  Q. (By Mr. Haynes) Well, this is saying -- I
13  think you understand this is saying there's a problem
14  that supervisors are not documenting safety violations.
15  Right?
16  MR. NASH: Objection, form.
17  A. That's what that first memo in 2017 said.
18  Q. (By Mr. Haynes) And that's what this is
19  saying, too. Right?
20  MR. NASH: Objection, form.
21  A. This is saying (as read): "There's no
22  disciplinary records for forklift operation violations
23  observed by supervisors."
24  Q. Yeah. And it's saying that's a problem about
25  effective enforcement. Right?

Page 328

1  MR. NASH: Objection, form.
2  A. Well, I don't know what timeline, you know,
3  this inspector requested documents for.
4  Q. (By Mr. Haynes) There's always an explanation
5  that helps the company. Right?
6  MR. NASH: Objection, form.
7  Q. (By Mr. Haynes) Always.
8  MR. NASH: Objection, form.
9  Q. (By Mr. Haynes) Did you know that Mr. Silva
10  testified that Jacintoport is cheap?
11  MR. SEIPEL: Objection, form.
12  MR. NASH: Objection, form.
13  A. No, I didn't know.
14  Q. (By Mr. Haynes) Do you agree with that?
15  MR. SEIPEL: Objection, form.
16  MR. NASH: Objection, form.
17  A. No comment.
18  Q. (By Mr. Haynes) No comment?
19  A. No. I tend to disagree.
20  Q. Well, why did you say "no comment"?
21  A. I don't want to comment on my employer's
22  financial behavior.
23  Q. Well, don't you think that's relevant to
24  safety?
25  MR. SEIPEL: Objection, form.

# EXHIBIT A

## Page 329

1      MR. NASH: Objection, form.
2  A. Well, Mr. Silva is incorrect.
3  Q. (By Mr. Haynes) I mean, Mr. Silva was not
4 assigned to operate the forklift that day as a forklift
5 operator. Is that fair? Meaning there was a forklift
6 operator on duty that day.
7      MR. SEIPEL: Objection, form.
8  A. I don't know how many forklift operators were
9 on duty that day.
10  Q. (By Mr. Haynes) Did you look into that?
11  A. We have forklift operators all over the
12 terminal.
13  Q. So there surely would have been another
14 forklift operator that could have operated that
15 forklift.
16  A. I don't know if that person would have been
17 available at that time.
18  Q. What about Mr. Arriola?
19  A. I don't know what he was doing at the time of
20 the incident.
21  Q. You know he's a forklift operator. Right?
22  A. No, I didn't know.
23  Q. You didn't know that Mr. Arriola, the witness
24 that came to the scene after it happened and heard the
25 scream, you didn't know that he was a forklift operator?

## Page 330

1  A. I didn't, no.
2  Q. Did you know that he testified that he has
3 operated that same forklift?
4  A. No.
5  Q. You're learning this for the first time in
6 this deposition?
7  A. I can't remember 600 employees, whether
8 they're forklift operators or not.
9  Q. You've got too many employees to oversee,
10 don't you?
11      MR. NASH: Objection, form.
12  Q. (By Mr. Haynes) Right?
13      MR. NASH: Objection, form.
14  A. There's a lot of employees.
15  Q. (By Mr. Haynes) I mean, do you need a bigger
16 staff to help you out?
17      MR. NASH: Objection, form.
18  A. No.
19  Q. (By Mr. Haynes) Do you think the company
20 would give you a bigger staff if you asked for one?
21      MR. NASH: Objection, form.
22  A. Yes.
23  Q. (By Mr. Haynes) Have you asked?
24  A. No. It's not needed.
25  Q. Okay. Mr. Arriola was a forklift operator,

## Page 331

1 and he had used that very forklift. Okay? I'm
2 representing that to you. I don't think that's
3 disputed. Okay?
4      Any reason why he couldn't have been
5 operating that forklift?
6  A. I don't know. It depends on operational needs
7 on that day.
8  Q. The decision was made to use the guy who had
9 been in at least three prior incidents that we saw.
10 Right?
11      MR. NASH: Objection, form.
12  A. Yes.
13  Q. (By Mr. Haynes) Right?
14      And God knows how many other incidents
15 that were not recorded.
16      MR. SEIPEL: Objection, form.
17      MR. NASH: Objection, form.
18  A. Okay.
19  Q. (By Mr. Haynes) Right?
20      MR. NASH: Objection, form.
21      MR. SEIPEL: Objection, form.
22  A. Okay.
23  Q. (By Mr. Haynes) I mean, can you at least
24 acknowledge the possibility that he got to other -- or
25 that he committed other safety violations in the

## Page 332

1 forklift that were not captured, based on what you see
2 from that memo in the OSHA report?
3      MR. SEIPEL: Objection, form.
4      MR. NASH: Objection, form.
5  A. No, I cannot say that.
6  Q. (By Mr. Haynes) So that's not possible?
7      MR. NASH: Objection, form.
8  A. I cannot say that.
9  Q. (By Mr. Haynes) Right. It's impossible
10 because that would hurt the company, wouldn't it?
11      MR. SEIPEL: Objection, form.
12      MR. NASH: Objection, form.
13  A. I cannot say that.
14  Q. (By Mr. Haynes) All right. Is it fair of me
15 to say that you-all had an obligation to preserve all
16 evidence relevant to this incident?
17  A. Yes.
18      MR. NASH: Objection, form.
19  Q. (By Mr. Haynes) And there would be no excuse
20 for not preserving the evidence. Right?
21      MR. NASH: Objection, form.
22  A. That's correct.
23  Q. (By Mr. Haynes) Did you know that I was not
24 allowed to conduct an inspection of the port without
25 filing a temporary restraining order after this

Page 333

1 incident?
2     MR. NASH: Objection, form.
3   A. I wasn't aware.
4   Q. (By Mr. Haynes) Do you think that's fair? Do
5 you think it's fair that I had to go to court to file a
6 restraining order to permit people from my team and my
7 experts to go in there and look at the scene?
8     MR. NASH: Objection, form.
9   A. I -- I'm not a lawyer, so I don't know whether
10 it's fair or not.
11   Q. (By Mr. Haynes) Okay. What kind of phone do
12 you have?
13   A. An iPhone.
14   Q. Do you have any apps on your phone that
15 are -- that you do your job with?
16   A. Yes.
17   Q. Like a Seaboard app?
18   A. Yes.
19   Q. What's it called?
20   A. I have a Seaboard app. It's a company portal
21 app.
22   Q. Okay.
23   A. I have a Seaforge app. That's the database
24 that we use to intake incident information.
25   Q. Did you have those back in 2022?

Page 334

1   A. Yes.
2   Q. Did you use those?
3   A. On that day? No.
4   Q. Why not?
5   A. I didn't draft the report. So on that day I
6 did not use those apps.
7   Q. Okay. Who drafted the report?
8   A. Stephen White.
9   Q. Did Mr. Silva receive any discipline for this
10 incident?
11   A. Not that I'm aware of.
12   Q. Was he docked in pay?
13   A. I don't know. That's the nature of our
14 question.
15   Q. Was he demoted?
16   A. I don't think so. I think he's still a
17 foreman.
18   Q. So he still has the same exact position that
19 he had the day of this incident. Right?
20   A. I think so.
21   Q. And so as far as it pertains to Mr. Silva's
22 life and his work with Jacintoport or Seaboard or a
23 combination thereof, it's like this incident didn't even
24 happen. Right?
25     MR. NASH: Objection, form.

Page 335

1     MR. SEIPEL: Objection, form.
2   A. That's incorrect.
3   Q. (By Mr. Haynes) Can you share with the jury
4 any consequences to his employment from this incident --
5     MR. NASH: Objection, form.
6   Q. (By Mr. Haynes) -- that were given out by the
7 company?
8     MR. NASH: Objection, form.
9   A. He's no longer operating a forklift.
10   Q. (By Mr. Haynes) And I think we've talked
11 about earlier how you don't even know if that's a
12 requirement or not.
13   A. Correct. But it's a fact.
14   Q. So other than that, can you share with the
15 jury any consequences that have been given to him from
16 the company work-wise as a result of this incident?
17   A. I'm not aware of any.
18   Q. Is that acceptable to you --
19     MR. NASH: Objection, form.
20   Q. (By Mr. Haynes) -- as the second in command
21 of safety?
22     MR. NASH: Objection, form.
23   A. There may be. I'm just not aware of any.
24   Q. (By Mr. Haynes) Well, who else would know,
25 other than the second in command of safety?

Page 336

1   A. HR.
2   Q. Does HR -- they're responsible for
3 safety-based discipline?
4     MR. NASH: Objection, form.
5   A. Yes.
6   Q. (By Mr. Haynes) They're responsible for
7 deciding whether someone needs retraining?
8   A. No.
9   Q. Who is responsible for that?
10   A. Retraining is safety, the safety team.
11   Q. Has anybody on your team said he needs more
12 training?
13   A. Not that I recollect.
14   Q. Okay. Do you know on personal knowledge that
15 Mr. Silva had any refresher training on that forklift in
16 the five years before this incident?
17   A. Yes.
18   Q. How do you know that?
19   A. I saw his training records.
20   Q. Where did you see his training records?
21   A. We have a database that houses all the
22 training records for all the employees in the company.
23   Q. And that database is based upon input data
24 from the guys in Houston. Right?
25   A. Right.

Page 337

1  Q. You don't have any independent knowledge of
2  that, right?
3  A. I didn't witness the training myself, no.
4  Q. Right. You just looked at a report in a
5  database that's inputted by people in Houston.
6  Right?
7  A. Yes.
8  Q. Did you see any training -- you said you
9  thought you saw that he got some in 2022.
10  Right?
11  A. Yes.
12  Q. Did you see any before that?
13  A. Yes.
14  Q. When?
15  A. He has many, many trainings.
16  Q. On that forklift?
17  A. On the forklift, yes.
18  Q. And you're not aware -- as the second in
19  command of safety for Seaboard Marine, you're not aware
20  of him ever being disqualified for any reason from
21  driving a forklift for the company prior to September of
22  2022. Right?
23  A. No, I'm not aware.
24  MR. HAYNES: Pass the witness.
25  (Following commenced at 5:20 p.m.)

Page 338

1  EXAMINATION
2  BY MR. SEIPEL:
3  Q. Mr. Contreras, my name is Collin Seipel; and I
4  do have a few follow-up questions. I represent
5  Mr. Silva.
6  A. Okay.
7  Q. I know it's been a long day, so I'm going to
8  be brief. You're not a physician. Is that correct?
9  A. No, I am not.
10  Q. You have no medical training. Is that
11  correct?
12  A. No, I do not.
13  Q. Not an eye doctor?
14  A. No.
15  Q. You're not offering opinions today on the
16  level of impairment to Mr. Silva's eye, if any?
17  A. No.
18  Q. You're not offering any opinions today as to
19  whether Mr. Silva had any impairment that affected his
20  ability to drive?
21  A. No.
22  Q. You're not offering any opinions on whether
23  Mr. Silva has the requisite vision to obtain a license
24  through the DOT?
25  A. No.

Page 339

1  MR. HAYNES: Leading and form.
2  Q. (By Mr. Seipel) You're not offering any
3  opinions as to whether Mr. Silva has had a seizure on
4  the job?
5  A. No.
6  Q. Are you aware of that from any factual
7  standpoint? You've never been given that information?
8  MR. HAYNES: Leading.
9  A. No.
10  Q. (By Mr. Seipel) Did you interview Mr. Silva
11  as part of this investigation?
12  A. Yes.
13  Q. During that investigation did you have any
14  reason to believe that his statements were inaccurate?
15  MR. HAYNES: Form.
16  A. No.
17  Q. Anything that you have personal knowledge
18  subsequent to that that would suggest his statements
19  were inaccurate?
20  MR. HAYNES: Form and leading.
21  A. No.
22  MR. SEIPEL: Thank you.
23  I will pass the witness.
24  MR. NASH: Okay. We will reserve our
25  questions.

Page 340

1  THE VIDEOGRAPHER: Off the record at
2  5:21.
3  (Proceedings concluded at 5:21 p.m.)
4  * * *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 341

CHANGES AND CORRECTIONS

WITNESS NAME: OMAR CONTRERAS

DATE: FEBRUARY 27, 2024

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE/LINE   CHANGE        REASON CODE

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

        OMAR CONTRERAS

## Page 342

I, OMAR CONTRERAS, have read the foregoing deposition and hereby affix my signature that the same is true and correct, except as noted on the previous page.

_____

        OMAR CONTRERAS

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day personally appeared OMAR CONTRERAS, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they have executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2024.

_____

        NOTARY PUBLIC IN AND FOR

        THE STATE OF _____

COMMISSION EXPIRES: _____

## Page 343

CAUSE NO. 2022-63980

JIMMY RECINOS,              : IN THE DISTRICT COURT
INDIVIDUALLY AND AS         :
REPRESENTATIVE OF ESTATE    :
OF DELMY RECINOS,           :
DECEASED, JIMMY A.          :
RECINOS, MARK A. BUESO      :
SANDOVAL,                   :
        Plaintiffs,         :
                            : HARRIS COUNTY, TEXAS
VS.                         :
                            :
JACINTOPORT INTERNATIONAL,  :
LLC, SEABOARD CORPORATION,  :
AND DIEGO LOPEZ SILVA,      :
        Defendants.         : 215TH JUDICIAL DISTRICT

*********************************************

REPORTER'S CERTIFICATION TO THE
ORAL and VIDEOTAPED DEPOSITION OF
OMAR CONTRERAS
FEBRUARY 27, 2024

*********************************************

I, Pat English-Arredondo, CSR, RMR, CRR, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

that the witness, OMAR CONTRERAS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

that the deposition transcript was submitted on _____ to MR. ANDREW NASH to forward to the Witness, OMAR CONTRERAS, for review, examination, and return to SB COMPANY by _____;

that pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record and the amount of time used by each party at the deposition:

Mr. Kevin Haynes - ^ Minutes
Mr. Collin Seipel - 0 Hours, ^ Minutes

## Page 344

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 10th day of March, 2024.

_____

        Pat English-Arredondo, Texas CSR 3828
        CSR Expiration: 04/30/2026

Independent Affiliate Reporter for:
Local Affiliate Reporter for:
SB Company
Texas Firm No. #11077
1980 Post Oak Blvd, Suite 100
Houston, Texas 77056
(713) 331 9955
www.shaunabeach.com

Job No.: 6455

# EXHIBIT A

Page 345

1    FURTHER CERTIFICATION UNDER RULE 203 TRCP
2        The original deposition of OMAR CONTRERAS was/was
not returned to the deposition officer on or before
3    _____. If returned after the stipulated
date, the original deposition was returned on
4    _____;
5        If returned, the attached "Changes and Corrections"
page contains any changes and the reasons therefor;
6
        If returned, the original deposition was delivered
7    to MR. KEVIN HAYNES, Custodial Attorney;
8        That $_____ is the deposition officer's
charges to MR. KEVIN HAYNES, attorney for Plaintiffs,
9    for preparing the original deposition transcript and
any copies of exhibits;
10
        That the deposition was delivered in accordance
11   with Rule 203.3, and that a copy of this certificate
was served on all parties shown herein and filed with
12   the Clerk.
13       Certified to by me this _____ day of _____,
2024.
14
15
16   _____
        Pat English-Arredondo, Texas CSR 3828
17      CSR Expiration: 04/30/2026
18   Independent Affiliate Reporter for:
     Local Affiliate Reporter for:
19   SB Company
     Texas Firm No. #11077
20   1980 Post Oak Blvd, Suite 100
     Houston, Texas 77056
21   (713) 331 9955
     www.shaunabeach.com
22
23
24
25   Job No.: 6455

| A |
|---|

**aback** 303:14

**abatement** 319:19

**ability** 122:10 218:7, 247:24 259:2, 262:13 262:20, 263:5 263:11, 265:11 269:10, 275:3 275:20, 338:20

**able** 11:7, 17:9 76:8, 77:15 88:5, 88:12 92:1, 104:11 194:21, 195:8 195:12, 195:21 203:2, 266:22 276:7, 279:25

**above-styled** 1:16

**absent** 72:6

**absolutely** 14:10 37:13, 40:7 84:16, 107:9 125:23, 126:2 197:13, 212:6 291:4, 303:21 315:13

**acceptable** 126:3, 126:5 182:12, 335:18

**access** 39:1 80:18, 163:10 202:22, 204:9 223:2, 268:17 278:11, 278:12 309:8

**accident** 7:3 16:16, 17:4 18:8, 30:12 34:17, 46:2 47:4, 47:25 48:9, 48:14 48:15, 49:14

49:20, 125:11 126:23, 128:10 129:24, 148:25 153:23, 192:14 199:25, 200:7 208:4, 208:20 219:25, 240:21 250:1, 284:17 301:20, 302:5 312:17, 312:18

**accidents** 125:6 125:6, 144:6 207:10, 207:14 207:15, 207:21 209:23, 210:22 211:15, 212:2 215:9, 249:25 251:14, 251:14 274:5, 274:6

**accommodate** 203:25, 251:4

**account** 108:11

**accountable** 93:5, 93:6

**accurate** 55:2 55:13, 224:11 296:4

**accurately** 50:23

**achieving** 73:23

**acknowledge** 331:24

**acknowledged** 342:16

**Acknowledgme...** 132:11

**acquired** 18:22 48:10, 49:17

**acquiring** 48:5

**act** 33:7, 321:5

**action** 83:19 83:23, 90:24 134:11, 202:24 216:2, 219:19 219:20, 220:4 223:3, 248:23

249:16, 344:2 344:3

**actions** 160:25 219:2, 225:10 238:25, 319:19

**active** 194:5

**actively** 137:8 137:24

**actual** 176:24 216:7, 217:6 285:15

**add** 46:4 140:11, 147:4 176:19

**addition** 62:6 74:9, 290:3

**additional** 19:3 42:16, 51:16 147:3, 147:5 147:9, 172:19 248:22, 271:15 274:4, 274:5

**Additionally** 255:8

**address** 74:12 74:21, 135:21 218:1, 276:1 324:3, 324:7

**addressed** 103:4 131:18, 223:17 224:6

**addresses** 321:6

**addressing** 137:8

**adequate** 14:18

**adherence** 54:20, 54:22

**adjacent** 320:6

**adjustments** 103:7, 176:25

**administered** 8:5, 57:10

**Administration** 72:21

**admit** 206:17

**adopted** 102:11

111:14

**adopts** 72:18

**advance** 10:8 244:6

**advice** 301:5 316:20, 317:3

**advise** 178:16

**advised** 104:22 112:13, 133:8 255:1, 255:14 316:22

**advises** 316:21

**Aeropia** 57:5 62:16, 150:8

**afar** 34:21 45:22, 45:23

**affect** 189:7 262:13, 262:19

**Affective** 232:4

**affiliate** 65:17 344:10, 344:11 345:18, 345:18

**affix** 342:2

**aftermath** 289:10

**agency** 20:17 20:22

**ago** 9:17, 21:14 100:12, 105:11 199:10, 205:23 227:7, 251:10 283:5

**agree** 18:21 24:5, 28:20 30:14, 37:4 37:14, 40:13 43:19, 49:3 49:24, 50:6 50:11, 90:3 94:1, 94:7 124:22, 128:20 137:21, 141:6 142:5, 178:5 183:22, 184:3 188:23, 191:15 207:18, 212:23

216:4, 239:20 240:20, 243:5 269:7, 273:11 313:14, 320:16 320:20, 320:23 321:1, 321:4 321:11, 321:12 322:13, 322:16 328:14

**agreed** 249:14 250:10, 251:10

**agreeing** 200:8 311:2

**ahead** 8:4, 84:16 103:7, 217:10

**ahold** 25:17 25:21, 30:10

**aids** 73:2 196:18

**ailment** 91:7 115:1, 117:11 117:12, 118:15 123:20, 123:22 124:3, 124:4 124:9, 124:11

**aisles** 210:10

**alarm** 127:2 127:14, 127:18 127:20, 128:3 128:16, 129:21 141:15, 141:24 142:2, 142:4 142:16, 142:23 143:5, 143:24 144:22, 145:4 146:1, 184:10 184:23, 185:2 186:7, 186:9 186:13, 186:17 186:25, 188:19 188:23, 189:8 189:11, 191:6 191:10, 191:17 191:24, 192:2 192:5, 192:12 192:16, 192:19

192:22, 193:1
193:5, 193:10
194:22, 195:5
195:8, 195:13
195:21, 196:3
196:4, 196:12
198:18, 199:13
199:15
**alarms** 29:20
141:13, 144:5
144:9, 145:21
188:4, 189:16
204:17, 322:3
322:10, 322:17
323:14, 324:6
324:20
**alcohol** 229:16
**alert** 170:24
322:3, 323:13
324:20
**alerts** 186:9
**allegedly** 186:20
195:20
**allow** 35:24
167:10, 288:21
**allowed** 87:15
100:17, 115:19
115:24, 120:8
120:10, 120:17
164:16, 164:17
299:13, 299:24
320:1, 332:24
**allows** 236:24
**Amazon** 63:17
**ambiance** 191:8
**ambient** 188:8
189:6, 189:23
**amend** 176:20
**amended** 27:22
**America** 55:22
95:24
**amount** 79:24
134:12, 181:17
248:21, 250:2
343:23
**analysis** 41:9

**and/or** 107:6
**Andrew** 2:12
343:19
**Andy** 313:22
**Andy.nash@ph...**
2:17
**angle** 45:23
49:11
**anguish** 37:12
46:17
**ANSI** 168:4
168:6, 168:7
168:13
**answer** 9:20
9:25, 10:2
10:13, 10:20
11:3, 13:15
38:10, 91:24
96:16, 106:17
165:18, 281:2
306:23, 308:22
317:7, 321:23
324:15
**answered**
183:20, 316:1
**answering**
195:10, 287:18
**answers** 187:23
301:15
**anybody** 53:1
76:19, 83:17
88:24, 113:21
116:23, 140:15
176:2, 177:10
186:10, 198:15
204:13, 215:21
216:12, 219:24
232:10, 286:1
290:16, 303:24
305:7, 317:5
336:11
**anymore** 57:4
89:21, 162:6
162:11, 162:12
305:11, 320:10
**anyway** 265:12

**apnea** 269:18
269:20
**apologize** 10:8
52:7
**apologized** 52:3
52:5
**app** 333:17
333:20, 333:21
333:23
**apparently**
195:20
**appeared**
342:12
**appears** 307:13
**applicable**
73:13, 128:14
210:16
**application**
74:14, 76:10
**applied** 101:25
**applies** 67:25
73:7
**apply** 59:17
59:20, 59:23
59:25, 60:18
60:19
**applying** 190:24
**appreciate**
314:11
**approach** 323:5
**approaches**
33:18
**appropriate**
69:11, 69:16
**appropriately**
326:14, 326:21
**approve** 84:10
**approved** 65:25
167:9, 167:12
167:13, 168:12
178:7, 183:23
188:1, 189:2
199:24, 202:4
209:4
**approximately**
11:24, 12:14

289:4
**apps** 333:14
334:6
**April** 254:15
**AR** 299:20
**area** 34:19
34:21, 34:25
35:3, 35:4
35:17, 45:18
45:19, 46:2
50:10, 62:8
76:22, 77:11
85:25, 86:9
86:9, 111:15
111:24, 135:22
136:16, 141:18
145:1, 158:15
158:18, 158:19
158:23, 160:12
161:11, 172:3
172:11, 174:17
174:21, 175:6
178:16, 190:2
190:8, 190:18
190:22, 191:6
191:9, 200:11
201:10, 201:10
201:12, 201:17
201:24, 202:11
202:19, 203:1
203:2, 203:8
204:7, 205:2
208:16, 214:6
214:7, 227:4
227:11, 231:13
231:24, 234:2
237:4, 237:5
237:7, 237:13
238:5, 240:1
240:21, 244:21
244:25, 254:19
254:25, 256:15
284:24, 286:19
289:16, 291:8
291:14, 292:4
292:9, 305:7

319:1, 319:25
320:7, 320:8
320:11
**areas** 36:1
55:10, 58:17
58:18, 59:1
77:8, 154:1
158:7, 158:12
158:13, 158:18
171:20, 204:14
212:8, 213:23
292:3
**argue** 219:6
**arising** 8:19
11:11
**arm** 99:20
**arrange** 52:13
**arrest** 231:22
**Arriola** 26:11
27:17, 27:21
27:25, 180:5
301:11, 302:10
329:18, 329:23
330:25
**Arriola's** 28:24
301:24
**arrived** 68:21
195:6
**arrows** 206:22
**ascertain**
101:18
**aside** 21:18
39:22, 58:13
**asked** 25:23
78:9, 85:25
116:4, 133:9
163:25, 163:25
183:19, 269:17
272:8, 274:14
291:22, 294:24
295:13, 296:9
296:17, 302:16
315:25, 330:20
330:23
**asking** 38:4
38:10, 39:15

39:16, 108:18
110:10, 110:11
146:5, 146:9
146:24, 146:25
192:21, 261:22
271:18, 277:21
277:22, 280:12
281:1, 281:9
301:12, 315:10
316:5
**asks** 306:20
**aspect** 276:12
**assets** 68:11
68:15
**assign** 18:7
149:5, 149:9
149:16, 318:8
**assigned** 329:4
**assist** 149:10
**associated** 32:13
**assume** 10:14
15:18, 37:4
38:4, 90:3
203:14, 282:11
292:22, 304:16
**assuming**
112:17, 160:9
165:8, 284:25
**assumption**
196:24, 203:16
**assurance**
326:25
**assure** 326:11
326:19
**at-fault** 220:3
**attached** 345:5
**attempting**
174:12
**attempts** 26:2
**attend** 287:20
287:21
**attention** 88:17
113:4, 113:7
135:8, 189:18
189:20, 310:3
310:7, 310:18

311:2, 311:5
311:10, 311:16
311:20, 312:7
**attitude** 197:17
197:21, 238:21
**attorney** 345:7
345:8
**attorney-client**
297:11
**attorneys** 13:2
18:25, 21:3
39:19, 39:20
39:22, 108:16
110:3, 110:20
180:9, 222:10
233:3, 241:24
313:14, 314:2
314:25, 315:4
344:2
**audibility**
142:17
**audible** 141:12
142:2, 145:7
186:9, 188:1
191:6
**audit** 117:2
**August** 233:7
233:17
**automated**
35:21, 35:25
**available** 17:20
22:1, 22:5, 22:6
22:8, 22:9
43:25, 44:3
104:19, 116:5
117:10, 117:15
117:18, 120:4
120:25, 140:11
151:23, 309:11
313:3, 313:6
314:5, 314:7
329:17
**Avenue** 2:6
**avoid** 44:18
44:20, 148:25
205:6, 205:8

**aware** 17:13
19:21, 19:21
20:16, 21:7
24:14, 25:3
26:22, 27:1
27:2, 28:2
29:18, 29:19
29:20, 31:17
32:22, 37:21
41:21, 42:2
42:5, 42:8
43:25, 44:2
45:5, 48:22
87:23, 88:3
88:7, 89:4, 89:7
91:20, 92:7
92:15, 97:14
100:5, 102:6
144:20, 156:14
159:24, 159:25
162:22, 172:17
173:1, 214:20
235:17, 247:17
266:15, 266:20
266:24, 268:1
269:12, 278:6
322:4, 324:22
325:15, 333:3
334:11, 335:17
335:23, 337:18
337:19, 337:23
339:6
**awareness**
61:14
**awful** 308:20

---

# B

**B-R-E-C-H-E-I...**
64:18
**back** 8:20, 12:11
23:24, 24:2
25:24, 25:25
29:7, 30:25
35:17, 38:23
43:20, 61:24

82:9, 82:17
97:19, 97:20
98:10, 104:25
112:4, 116:7
127:1, 127:8
132:18, 137:2
141:17, 163:11
167:5, 177:13
177:14, 184:2
193:7, 199:17
202:19, 205:12
213:12, 215:15
217:18, 227:4
231:4, 231:9
232:13, 236:24
243:17, 248:12
248:25, 248:25
254:11, 256:24
257:1, 264:24
268:7, 290:13
314:17, 325:4
333:25
**backed** 215:12
217:14, 217:14
217:15, 244:21
248:6
**background**
142:8, 206:13
218:22
**backing** 30:25
76:13, 141:25
144:7, 145:18
178:13, 245:3
246:14
**Backovers** 5:18
155:13
**backs** 312:5
**backtrack** 90:17
**backup** 29:20
127:2, 127:14
127:18, 127:20
128:3, 128:16
129:21, 141:13
141:15, 141:24
142:3, 142:16
142:23, 143:5

143:23, 144:5
144:9, 145:4
145:6, 145:21
145:25, 184:10
184:23, 185:2
186:7, 186:13
186:17, 186:25
188:23, 189:8
189:11, 192:16
192:19, 192:22
193:1, 193:5
193:10, 194:21
195:21, 198:18
199:12, 199:15
204:17, 217:14
322:3, 322:9
322:17, 323:13
324:5, 324:20
**backwards**
138:17
**bad** 10:7, 95:17
96:19, 118:10
154:6, 154:11
197:17, 215:6
215:14, 215:20
217:17, 217:24
239:24, 263:20
264:9, 266:8
276:15
**bag** 253:15
253:18
**baggage** 281:7
**bags** 86:1
257:17
**balance** 122:23
**Balcazar** 253:12
253:13, 253:14
253:23
**banned** 174:17
**bare** 89:25
**barricades**
158:11
**barriers** 33:4
158:3, 158:6
158:16, 159:1
159:4, 319:21

**based** 23:11
27:11, 29:24
30:4, 30:11
38:22, 41:12
45:16, 47:19
54:7, 54:16
64:6, 69:23
71:8, 72:12
95:21, 98:1
128:22, 134:11
163:12, 186:23
211:8, 250:13
251:5, 254:9
269:7, 277:22
311:16, 312:22
312:23, 332:1
336:23
**baseline** 59:1
73:23, 74:2
74:20
**basic** 30:11
148:9
**basically** 29:16
77:9, 102:22
123:9, 169:15
201:14, 211:16
219:19, 239:11
254:9, 325:19
**basics** 259:15
**basing** 99:8
148:4
**basis** 82:2
163:9, 249:5
297:10
**Bates** 5:10, 5:14
5:22, 7:3
132:25, 167:3
305:16, 309:14
**Bates-stamped**
252:22
**bay** 291:16
291:20
**bays** 175:17
175:22
**Bear** 66:14
**bearing** 300:15

**bears** 16:18
**beginning** 133:6
192:1, 280:6
**beginning-of-job**
279:6, 280:14
**behalf** 108:19
125:8
**behavior** 71:24
71:25, 72:5
126:15, 216:7
216:8, 216:25
228:19, 230:10
325:13, 328:22
**behaviors** 134:2
134:16, 216:11
216:18, 217:6
247:23, 326:12
326:20
**belief** 86:25
165:2, 311:14
**believe** 29:10
29:13, 30:18
34:23, 68:18
73:22, 77:6
87:4, 105:9
118:14, 118:19
124:14, 128:5
140:7, 163:22
164:1, 164:3
192:15, 193:1
221:2, 221:14
224:11, 242:18
246:5, 281:25
304:3, 339:14
**believes** 68:15
72:11
**belonged** 246:16
**benefits** 259:17
**Benitez** 131:24
132:1, 135:14
137:14
**best** 23:22
30:11, 67:21
165:9, 165:12
178:15, 204:13
204:21, 212:5

212:6, 273:22
**Betancourt** 6:23
137:1, 137:4
282:13, 286:23
289:19
**better** 38:20
41:17, 41:17
84:14, 118:7
131:10, 133:24
135:11, 135:16
160:11, 177:1
213:11, 240:5
240:12, 273:25
274:6, 281:11
281:12, 281:15
300:19
**beyond** 50:3
50:4, 59:2
73:18, 74:20
147:7, 151:15
272:10
**big** 14:24, 15:2
18:9, 56:5
58:22, 60:3
89:10, 111:9
121:25, 139:25
149:8, 182:19
182:21, 199:13
228:8, 228:22
236:25, 237:1
237:7, 237:12
237:22, 238:3
238:10, 239:25
241:4, 243:3
247:2, 247:5
248:10, 254:19
257:3, 257:15
280:2, 308:11
**big-picture**
208:3
**bigger** 138:2
275:25, 276:5
330:15, 330:20
**bike** 213:13
213:18
**binding** 101:1

**bird's-eye** 34:3
36:7
**birthday** 317:23
**bit** 114:7
176:14, 203:21
203:23, 224:13
**blame** 177:5
246:24, 247:1
**blaming** 239:3
239:11
**blank** 190:23
**blind** 94:25
141:19, 141:20
145:1, 145:2
243:22, 245:11
245:16, 270:18
322:1, 322:14
324:19
**blindfold** 95:1
**blinds** 322:15
**block** 248:20
249:17, 250:9
**blocking** 204:9
**blocks** 248:19
249:2
**blood** 276:4
**blow** 53:15
131:9, 148:24
**blurry** 96:11
**Blvd** 344:12
345:20
**body** 43:22
45:1, 45:4, 45:9
45:20, 45:25
46:4, 47:2
48:18, 49:3
49:5, 49:6, 49:7
49:10, 49:18
49:25, 260:2
288:21, 289:13
289:14, 289:15
305:1, 305:9
307:21, 307:25
308:3
**book** 69:23
70:1, 183:2

301:5
**booking** 63:12
**bookings** 63:14
**booklet** 133:20
**booklets** 133:11
**books** 61:20
**boss** 64:2, 64:15
268:21
**bother** 312:19
312:24
**bothered** 22:7
**bottom** 18:13
18:19, 132:10
134:14, 257:17
315:15
**bought** 52:11
**box** 81:18, 173:2
**boxes** 26:24
**braking** 71:18
**brand-new** 16:4
16:6
**break** 66:2
66:10, 71:22
130:22, 203:6
232:16
**breakbulk**
63:15, 64:13
**breakdown**
125:21, 200:19
259:24
**breaks** 11:2
**breathe** 101:8
**Brecheisen**
64:16
**brief** 66:10
338:8
**bring** 97:19
97:19, 98:10
104:2, 254:20
256:15, 256:23
257:4, 257:23
257:25, 258:16
**bringing** 255:2
256:9, 256:25
256:25, 257:7
257:24

broaden 70:18
broker 67:23
brought 8:19
88:17, 113:4
113:7
BROWN 3:4
Bruce 64:16
buck 327:5
BUESO 1:4
343:4
build 70:4
building 39:2
158:9, 175:1
bulk 63:2, 305:4
bunch 250:17
250:17
business 149:18
154:5, 203:7
204:11, 204:12
212:9, 212:13
212:14, 212:15
212:25
busy 77:17
buy 63:17
285:19

## C

Cabezas 223:6
call 25:17, 25:23
25:25, 36:1
60:20, 63:13
76:23, 82:19
84:19, 212:14
237:21, 285:9
285:9, 286:25
287:14, 287:22
287:23, 287:25
299:17, 318:11
323:1
called 8:7, 25:19
41:7, 54:10
67:11, 78:12
131:11, 155:13
168:15, 168:19
168:20, 170:5

188:1, 221:3
247:23, 284:18
284:20, 317:14
333:19
calling 221:21
224:16, 298:22
299:13, 299:21
299:24, 300:2
300:3, 300:19
calls 290:8
295:21
camera 34:16
34:22, 34:23
35:3, 35:13
35:23, 36:2
49:6, 49:11
286:7, 286:8
290:3
cameras 34:4
34:10, 34:17
34:19, 35:1
35:7, 35:9
35:10, 35:10
35:24, 36:7
36:10, 36:16
36:19, 36:21
45:19, 45:21
286:10, 286:11
289:6
capability 15:16
capable 270:10
capacity 56:23
169:2, 169:7
227:20, 227:22
228:7, 236:18
251:1, 270:9
274:12
capture 34:16
34:17, 34:19
177:1
captured 34:22
326:14, 326:22
332:1
car 153:24
card 342:14
care 108:6

258:23, 259:3
287:25, 315:11
cargo 35:17
36:23, 36:24
56:3, 56:4
63:16, 64:12
64:13, 67:18
67:19, 67:21
67:22, 203:22
204:10, 204:10
256:18, 320:8
Caribbean
55:23
cars 213:19
cart 242:25
244:22, 245:20
246:16, 246:16
carts 248:14
case 8:18, 17:14
21:17, 21:19
37:5, 38:11
44:12, 77:3
92:15, 104:24
105:7, 109:2
109:6, 110:15
132:25, 153:12
156:14, 179:9
208:21, 233:3
278:18, 288:10
297:14, 315:6
cases 31:6, 59:6
147:6, 248:13
248:14
cash 24:17
catastrophe
102:25
catastrophes
102:23
catastrophic
39:23, 40:20
41:2
catch-all 321:5
321:21
Caterpillar
242:18

caught 215:18
cause 1:1, 1:17
16:12, 19:4
27:21, 41:9
138:2, 230:17
261:4, 264:1
264:10, 265:17
343:1
caused 8:20
48:21, 51:11
51:13, 123:21
124:4, 174:8
218:23, 223:23
228:9, 242:24
266:22
causes 225:6
225:16
causing 16:21
261:2
caution 143:18
145:25, 273:19
caveat 178:20
cell 285:11
center 62:22
Central 55:22
cereal 237:6
certain 17:3
17:4, 62:23
74:21, 86:9
93:12, 104:15
104:16, 105:4
129:15, 134:21
147:6, 158:7
158:12, 158:12
251:15, 260:2
260:2, 272:3
272:6, 275:24
certainly 27:19
59:25, 118:19
124:13, 152:6
171:24, 196:20
217:5, 272:22
303:17
certainty 106:21
202:14
certificate

345:11
certificates
81:17
certification
4:10, 47:11
47:22, 86:14
343:11, 344:4
345:1
certifications
14:15, 47:12
56:25, 71:14
certified 3:13
47:4, 56:15
86:10, 87:9
87:16, 87:18
87:19, 87:20
89:24, 98:20
343:14, 344:4
344:6, 345:13
certify 343:15
344:1
chain 7:2
281:25, 281:25
282:6, 284:6
288:23, 289:3
295:4, 297:2
298:6, 298:9
298:11, 301:5
303:22, 305:14
307:8, 307:11
310:23
chance 193:17
196:8
change 28:21
33:20, 33:20
33:22, 33:23
51:24, 65:25
65:25, 92:12
98:15, 111:9
113:18, 114:12
114:22, 117:7
117:13, 117:21
119:2, 119:11
123:10, 123:17
123:25, 138:13
138:14, 176:10

176:13, 176:15
176:21, 187:13
191:19, 191:22
192:7, 203:18
203:25, 276:23
319:21, 341:6
**changed** 116:14
300:2, 300:6
300:9
**changes** 41:4
84:11, 110:25
111:5, 111:14
111:21, 111:23
160:6, 160:19
176:23, 191:25
192:8, 192:14
193:12, 204:23
231:18, 231:18
231:19, 231:20
231:25, 249:7
276:20, 341:1
345:5, 345:5
**changing**
186:23, 187:2
**chapters** 168:17
**charges** 345:8
**Charmaine**
220:8, 220:10
**chartered** 61:6
**chassis** 229:24
**chat** 283:25
**cheap** 328:10
**check** 169:20
169:22, 221:4
**checked** 114:17
**checking** 81:17
295:12
**checks** 63:25
**chemical** 62:16
**chemicals** 62:20
62:21, 62:21
62:23
**chief** 84:4
**chip** 285:19
285:20
**choice** 45:14

187:2
**choose** 265:11
**chute** 257:18
**circles** 158:8
**circumstance**
141:23, 188:25
**circumstances**
151:14, 181:21
189:1
**citation** 159:14
159:16, 160:15
318:23
**citations** 159:11
**cite** 159:3, 159:6
**cited** 135:5
135:7
**Civil** 1:23
**claiming** 168:12
**claims** 23:14
**clarify** 93:10
101:7, 186:24
341:4
**class** 79:21
79:22
**classroom** 76:4
76:6, 79:5
79:16, 79:23
80:12, 99:25
221:8, 221:14
221:18, 275:13
**clean** 250:19
**clear** 9:23, 11:7
17:8, 17:11
29:9, 32:21
69:16, 69:25
70:20, 77:19
99:21, 112:19
125:20, 135:8
140:21, 177:22
194:4, 196:4
200:4, 201:25
202:8, 210:3
217:10, 232:3
295:10
**clearer** 125:24
**clearly** 70:10

191:6, 191:9
306:13, 309:10
**clerk** 15:22
253:24, 345:12
**clerks** 321:8
322:4, 324:21
**close** 60:13
175:1, 175:17
175:21, 256:23
257:22, 279:3
289:20
**closed** 23:8
23:9, 23:12
24:3, 27:3
28:16, 28:19
119:16, 195:14
**closely** 249:20
251:17
**closer** 249:6
**closeup** 46:3
**CLR** 1:19, 3:15
**CODE** 341:6
**Codes** 341:4
**coincide** 199:24
200:22, 201:6
202:3, 202:5
**coincidence**
216:16
**coincidentally**
86:16
**Collin** 3:3
338:3, 343:25
**collision** 205:6
243:2
**color** 61:15
61:16
**combination**
334:23
**come** 57:17
58:7, 70:2, 78:9
82:25, 111:16
151:16, 153:16
158:21, 159:16
255:18, 259:13
260:8, 262:25
295:24

**comes** 32:14
33:9, 42:16
56:1, 60:25
72:3, 104:10
107:17, 137:22
138:12, 147:6
150:14, 153:18
171:12, 171:13
191:14, 216:4
272:11, 274:15
275:9, 276:13
**comfortable**
58:10, 100:20
162:15, 162:19
201:20, 262:9
**coming** 24:18
127:3, 141:20
144:25, 153:24
178:15, 178:17
289:17, 290:19
301:20, 320:7
**command** 181:9
182:5, 186:12
189:14, 192:23
241:14, 247:21
262:18, 311:15
319:12, 320:25
327:6, 335:20
335:25, 337:19
**commenced** 8:1
337:25
**comment** 317:2
328:17, 328:18
328:20, 328:21
**COMMISSION**
342:23
**commit** 69:10
**commitment**
133:9
**committed**
320:16, 331:25
**committing**
133:23, 136:4
**common** 41:6
147:25, 150:13
171:1, 175:3

175:4, 175:10
279:20, 279:21
279:24, 280:11
**commonly**
138:5, 152:12
**commonsense**
280:12
**commonsensical**
310:12
**communicate**
147:22, 282:9
**communicated**
163:13, 184:18
**communicating**
304:13
**communication**
17:9, 17:10
17:11, 83:14
125:7, 125:20
125:21, 125:24
200:19, 200:19
305:4, 323:14
324:5
**communications**
16:25, 17:7
18:6
**comp** 259:14
288:4, 288:4
288:8
**companies** 68:1
109:11, 149:1
150:24
**company** 3:11
3:16, 14:22
20:14, 23:10
27:6, 28:9
28:16, 36:6
38:11, 38:17
38:19, 39:19
42:14, 53:2
54:13, 55:5
55:18, 61:4
61:5, 61:8
64:21, 65:4
65:12, 65:15
67:1, 67:11

67:14, 67:21
68:4, 68:10
69:9, 70:19
72:18, 73:17
74:9, 75:4, 75:4
75:7, 75:10
78:23, 87:7
97:18, 98:11
100:14, 100:16
104:15, 104:24
105:4, 105:11
105:21, 108:24
110:21, 110:22
112:10, 112:20
113:17, 116:14
116:23, 117:2
119:20, 120:22
121:10, 122:3
122:15, 122:17
134:22, 135:18
144:21, 154:11
160:6, 160:19
161:7, 163:3
165:10, 171:4
177:5, 178:7
182:8, 183:6
183:12, 183:23
185:24, 187:9
187:17, 188:1
189:2, 199:23
202:4, 209:17
209:18, 211:18
214:21, 214:25
219:7, 219:13
225:11, 244:17
245:25, 249:25
250:11, 251:2
251:7, 252:8
253:16, 255:25
258:20, 258:22
259:3, 263:7
263:9, 263:18
265:2, 266:12
268:20, 270:12
270:25, 271:9
271:19, 271:24

274:17, 274:20
274:25, 275:17
277:16, 277:22
278:9, 278:14
279:4, 281:6
282:23, 283:5
283:15, 285:14
285:25, 288:13
290:17, 320:16
326:7, 328:5
330:19, 332:10
333:20, 335:7
335:16, 336:22
337:21, 343:20
344:11, 345:19
**company's** 24:2
32:24, 33:24
122:16, 133:10
137:7
**compensation**
110:7, 258:20
259:6, 259:9
259:16
**complain** 33:12
**complainants**
253:4
**complaining**
58:9, 254:11
262:19
**complaint** 253:5
**complaints**
253:22
**complete** 23:13
23:15, 23:17
23:21
**completed**
23:24, 24:2
119:8
**completely** 35:5
249:9, 276:12
322:9, 322:9
**complex** 243:7
244:8, 245:13
**compliance** 5:14
54:1, 54:20
55:5, 55:17

64:9, 131:16
**complicated**
243:6
**comply** 168:12
204:25, 219:7
**component** 70:7
104:7
**comprehensively**
74:12
**compute** 250:2
**computer** 15:18
**concepts** 71:17
**concern** 171:16
218:15, 218:23
230:17, 263:3
289:15
**concerned**
23:15, 28:15
28:16, 90:11
150:2, 291:2
**concerning**
135:9, 218:7
225:21
**concluded** 17:1
17:24, 29:25
42:12, 112:3
340:3
**conclusion**
50:24, 51:5
51:6, 51:8
51:14, 312:16
**condition** 68:21
69:6, 94:17
95:16, 103:6
120:24, 196:17
259:1, 264:21
264:22, 265:10
265:10, 268:4
271:3, 276:7
276:18, 281:16
289:25, 290:24
293:8
**conditions**
103:17, 115:18
115:25, 120:18
269:9, 275:2

275:25, 276:1
**conduct** 77:17
117:2, 212:12
224:22, 224:24
318:8, 332:24
**conducted**
74:14, 87:25
198:5
**conducting**
40:19, 274:16
**conductor**
153:22
**conducts** 76:21
**Conex** 26:24
**confidential**
22:2, 32:7
298:12
**configuration**
239:11
**confirm** 221:17
255:3
**confirmed** 31:2
**confiscated**
285:23, 285:24
293:24, 294:2
294:4
**conform** 341:4
**confused** 277:6
323:19
**confusing** 237:4
**congested** 237:4
**connection** 9:12
11:11, 21:19
274:8
**conscious**
302:23
**consequences**
335:4, 335:5
**conservation**
58:17, 58:19
**consider** 187:6
187:7, 188:6
188:18, 189:4
189:9, 189:15
189:15, 191:1
209:12, 211:11

**consideration**
241:5, 250:5
342:17
**considered**
135:23, 148:9
190:16, 209:11
209:15, 280:1
280:15
**consistent** 98:11
100:21, 100:23
137:17
**constant** 204:23
305:11
**construction**
157:6
**consult** 29:4
**consultants**
13:13
**consulting** 29:4
**contact** 29:21
30:24, 190:4
190:7, 190:7
205:14
**container** 61:13
63:19, 63:20
63:21, 158:18
158:18, 158:20
158:21, 158:22
158:25, 172:19
173:5, 173:16
173:19, 173:19
173:24, 173:25
174:4, 174:10
174:13, 201:13
201:14, 201:14
201:16, 204:9
205:23, 216:22
217:23, 228:10
228:13, 228:14
229:23, 229:23
229:25, 231:16
234:19, 234:20
235:2, 237:4
244:20, 244:20
245:6, 246:15
254:20, 255:3

256:10, 256:16
256:21, 256:25
257:5, 257:19
257:22, 257:24
258:14, 258:15
258:16, 301:21
301:25, 320:4
**containers**
61:22, 202:23
202:23, 202:25
203:1, 203:8
203:23, 231:22
231:23, 237:6
237:11, 248:13
255:17, 255:18
256:17, 256:18
273:4, 295:12
319:24, 319:25
320:3, 320:9
320:11
**contains** 345:5
**contents** 144:17
**context** 46:4
299:2
**continually**
71:22, 72:4
75:8
**continue** 105:24
213:16, 255:16
256:4, 258:3
**continued**
215:15, 254:25
304:17
**continues**
248:12, 251:14
**continuing**
288:23, 304:10
304:20
**Contreras** 1:11
1:14, 4:2, 5:6
6:23, 8:6, 8:16
8:17, 37:4
43:19, 53:11
53:20, 66:9
66:13, 97:17
109:1, 118:14

124:23, 129:5
130:21, 131:1
154:22, 154:24
166:3, 206:9
222:8, 232:22
233:1, 239:17
241:20, 252:1
252:7, 252:20
281:21, 281:23
305:13, 317:10
323:16, 338:3
341:2, 341:24
342:1, 342:8
342:12, 343:12
343:16, 343:20
345:2
**contributing**
225:6, 225:17
**control** 33:4
36:6, 62:17
125:18, 157:22
157:25, 263:6
265:4, 284:24
305:1
**controlled**
260:23
**controls** 58:4
76:13, 176:17
243:17
**convenient**
314:6
**conversation**
13:3, 19:11
19:14, 19:17
85:7, 162:17
189:22, 284:13
284:22, 285:8
290:7, 323:8
**conversations**
16:14, 25:21
**coordinate**
287:24
**copied** 131:21
**copies** 39:9
166:23, 345:9
**copy** 12:20

19:24, 39:16
53:18, 136:6
166:24, 206:3
206:5, 313:16
314:16, 318:23
318:24, 318:24
345:11
**corner** 34:18
148:23, 149:3
**corporate** 33:13
63:7, 64:13
133:8
**Corporation** 1:8
65:18, 343:8
**correct** 14:4
16:6, 19:16
19:20, 20:1
23:20, 24:4
31:8, 31:11
31:12, 31:16
35:12, 38:24
41:1, 43:24
46:14, 46:20
47:3, 48:6, 49:1
50:4, 50:20
51:14, 54:4
57:12, 57:19
57:22, 59:5
59:8, 62:1, 62:5
62:11, 65:8
65:11, 71:9
71:12, 71:15
71:19, 71:23
72:9, 73:1, 73:5
73:10, 73:15
73:20, 74:1
75:1, 75:6
75:11, 77:23
78:16, 80:9
81:12, 81:19
86:15, 86:19
90:2, 91:19
93:6, 97:1, 98:4
98:5, 98:14
101:2, 103:18
105:18, 112:5

112:9, 113:13
115:2, 116:6
116:12, 126:17
134:19, 134:23
138:1, 138:23
140:1, 140:20
147:8, 155:23
165:5, 169:5
172:13, 172:16
172:21, 173:6
173:19, 174:9
174:15, 174:19
175:16, 186:4
208:16, 210:12
210:15, 210:18
217:1, 218:9
236:21, 241:12
246:1, 246:20
253:1, 266:10
267:21, 274:24
281:20, 284:4
284:11, 286:3
287:7, 287:9
288:2, 290:11
290:15, 290:20
291:10, 293:3
293:6, 293:10
307:16, 315:22
326:5, 332:22
335:13, 338:8
338:11, 341:4
342:3
**correctable**
88:12, 89:19
90:13, 90:15
91:3
**corrected** 89:22
94:9, 94:18
95:12, 96:1
96:20, 264:10
**Corrections**
341:1, 345:5
**corrective** 91:21
160:25, 202:24
**correctly** 186:6
284:21, 285:10

**corroborate**
255:7, 255:9
**corroborated**
254:15
**cost** 150:19
150:21, 152:17
**costly** 111:9
**costs** 183:6
**counsel** 118:2
118:5, 122:24
313:20, 316:21
317:3, 343:22
344:1
**counsel's** 316:20
**count** 60:12
**counterweight**
236:24
**countless**
192:25
**countries** 55:22
203:24, 231:21
**COUNTY** 1:6
342:10, 343:6
**couple** 12:7
304:23, 304:25
314:20
**course** 75:17
75:19, 135:15
**courses** 80:10
87:11
**court** 1:2, 9:22
109:15, 333:5
343:2
**cover** 74:24
75:7, 107:7
288:21, 292:7
**covered** 49:8
62:9
**covering** 289:13
289:15
**crane** 149:7
149:8, 149:10
149:10, 149:11
149:11, 151:11
153:14, 153:18
191:2

**crash** 8:20
14:11, 48:17
48:25, 51:11
118:15, 193:2
**create** 202:21
203:2, 269:20
287:22, 320:1
**created** 50:14
92:18, 140:4
140:8, 168:11
203:15, 204:2
204:3, 204:4
283:25
**crew** 61:4, 77:10
**crews** 61:6
**critical** 149:7
151:19, 153:14
153:15, 261:18
261:24, 293:8
**critically** 293:1
**cross** 207:22
208:8, 208:14
210:10, 305:5
**cross-references**
73:13
**crossing** 211:17
212:4, 213:2
**CRR** 1:19, 3:15
343:14
**crucial** 30:21
**Cseipel@brow...**
3:7
**CSR** 343:14
344:9, 344:9
345:16, 345:17
**CSR(TX** 1:19
3:15
**culture** 68:19
69:23, 71:5
72:12, 98:6
98:11, 119:3
119:4, 137:10
137:15, 209:17
**current** 71:11
91:1
**currently** 162:5

163:1, 163:1
**curse** 255:5
**Custodial** 345:7
**customer** 67:19
67:22, 231:19
**customers** 63:16
63:20, 67:17
**cut** 307:21
307:25, 307:25
308:3, 308:6
**cute** 180:10

## D

**daily** 169:20
**damage** 49:24
217:16, 228:9
242:24, 324:24
**damaged**
228:13, 234:19
**damages** 235:4
248:12
**damaging** 239:9
**Dan** 66:1
**danger** 74:22
**dangerous**
32:12, 32:20
94:4, 94:10
94:20, 95:2
95:6, 95:6
95:10, 95:13
96:3, 96:6
96:14, 96:15
96:15, 96:15
97:7, 97:11
260:19, 261:4
261:7, 273:6
273:12, 273:13
273:14, 273:16
**dangers** 29:15
32:9, 32:13
32:17, 32:17
272:18, 273:18
273:22
**Daniel** 64:3
226:5, 226:11

226:12, 268:21
269:2
**data** 31:13, 47:1
48:9, 49:17
80:18, 138:11
211:8, 336:23
**database** 75:16
80:17, 80:18
84:8, 84:11
333:23, 336:21
336:23, 337:5
**date** 5:10, 7:7
22:12, 79:11
83:6, 87:12
104:25, 112:17
214:13, 223:10
233:7, 269:1
270:14, 341:3
345:3
**dated** 5:13, 6:5
6:11, 6:15, 6:22
7:2, 131:14
222:15, 284:1
**dates** 80:5
87:14, 87:22
**day** 1:17, 26:12
34:7, 34:7, 44:4
44:6, 69:7, 76:1
79:20, 79:22
80:2, 80:3, 80:4
85:20, 94:16
99:25, 100:1
108:6, 111:16
137:4, 169:23
170:10, 172:12
184:24, 189:19
191:12, 191:13
191:15, 192:1
227:23, 230:20
239:24, 243:6
267:7, 267:16
282:20, 303:23
303:24, 304:8
304:11, 304:16
311:6, 311:17
329:4, 329:6

329:9, 331:7
334:3, 334:5
334:19, 338:7
342:11, 342:20
344:6, 345:13
**day-to-day**
151:25
**days** 44:6
162:21, 191:8
314:20, 327:10
**dead** 306:11
307:22
**deal** 58:4, 58:12
61:7, 164:8
182:19, 182:21
199:13, 248:10
308:11
**death** 8:20
11:12, 16:10
16:19, 16:22
18:5, 19:11
29:13, 39:23
40:20, 48:21
51:3, 51:13
51:18, 155:22
192:17
**debunk** 106:20
**decade** 226:19
**decades** 270:15
**DECEASED**
1:4, 343:4
**December** 133:7
214:10
**decent** 230:21
**decide** 33:3
112:10
**decided** 124:6
**decides** 59:6
113:17
**deciding** 57:21
140:2, 336:7
**deciphering**
194:8
**decision** 23:12
110:9, 110:11
121:10, 121:11

153:2, 161:15
161:18, 164:18
164:20, 164:23
164:25, 165:1
165:4, 165:7
165:7, 187:15
204:11, 204:12
212:10, 212:13
212:14, 212:25
218:22, 250:24
331:8
**decisions** 108:25
163:12, 163:13
**dedicated** 77:12
77:14, 78:2
171:7
**dedication**
133:8
**deed** 69:12
69:21
**deeds** 71:4
72:13
**deems** 78:10
**defend** 130:6
183:5, 187:17
**DEFENDANT**
2:11, 3:1
**Defendants** 1:9
343:9
**defense** 38:11
**definitely** 33:21
**degree** 203:17
**delay** 223:15
223:23, 224:7
**deliver** 204:10
320:8
**delivered** 345:6
345:10
**Delmy** 1:3, 8:18
11:12, 15:5
18:4, 18:11
29:13, 51:3
91:15, 126:6
126:24, 128:21
152:6, 172:3
172:11, 192:17

194:20, 202:11
205:6, 213:3
234:3, 253:23
302:19, 306:17
309:1, 309:21
343:3
**Delmy's** 37:21
307:25
**demoted** 334:15
**denote** 7:14
**Dented** 228:9
**department**
6:18, 28:18
28:19, 60:23
104:20, 121:5
121:5, 121:7
121:15, 121:15
121:22, 135:22
136:17, 165:4
165:6, 165:7
165:20, 165:20
165:24, 165:24
219:20, 252:25
259:18, 259:22
277:1, 277:11
**department's**
121:8
**departments**
121:19, 251:11
**dependency**
188:14, 189:7
190:20
**dependent**
141:23, 322:2
322:17, 324:20
**depending**
75:19, 76:21
79:21, 188:25
273:10
**depends** 85:17
97:9, 190:22
215:25, 261:13
331:6
**depo** 113:9
113:10, 185:5
302:3

**deposed** 8:25
9:16, 17:13
19:22, 21:9
21:14, 22:11
22:13, 22:16
22:23, 24:14
24:17, 24:20
25:4, 28:2
28:10, 98:23
107:3, 116:10
119:10, 120:2
302:2
**deposing** 116:18
**deposition** 1:11
1:14, 11:11
11:18, 12:2
12:9, 12:13
17:16, 17:17
21:5, 21:11
21:15, 21:19
28:4, 28:13
42:7, 92:10
106:19, 107:4
108:20, 112:16
112:17, 112:25
113:12, 114:11
114:23, 115:3
116:3, 117:15
117:16, 117:18
123:1, 156:23
180:5, 183:10
187:21, 199:8
209:19, 281:16
330:6, 342:2
343:11, 343:17
343:19, 343:22
343:23, 345:2
345:2, 345:3
345:6, 345:8
345:9, 345:10
**depositions** 9:12
24:8, 24:11
39:16, 42:5
312:25, 314:1
317:5
**depth** 250:6

**describe** 321:20
**described** 44:13
44:13, 44:14
114:24, 135:18
320:17
**description** 5:3
49:5, 229:21
234:16, 342:14
**design** 54:19
176:18, 207:21
208:6, 211:16
212:3, 213:1
213:22
**designed** 124:8
208:13, 213:11
**designing** 55:16
**designs** 211:22
**detail** 29:10
29:12, 54:11
86:7, 105:3
105:8, 114:1
199:9, 224:15
**details** 27:25
44:14, 75:17
160:16, 160:23
173:11, 218:12
219:22, 292:17
295:11, 303:10
**deteriorate**
105:5
**deteriorated**
105:12
**Determination**
6:5, 222:12
**determine** 48:10
51:3, 80:15
99:3, 194:16
215:8, 219:10
247:22, 319:6
**determined**
225:25
**determining**
188:18, 216:5
306:17
**develop** 74:10
**developing** 55:8

295:22
**Devices** 188:2
**diabetes** 91:8
99:22, 104:4
105:6, 276:4
**diagnosed**
269:20
**die** 179:23
308:4
**died** 130:6
181:1
**Diego** 1:8, 3:1
3:2, 14:12
16:15, 16:15
17:1, 17:3, 18:6
78:17, 84:24
85:3, 86:13
132:13, 161:6
214:9, 222:17
244:19, 253:22
254:16, 254:25
255:1, 255:4
255:5, 255:7
255:10, 255:11
255:15, 256:4
256:14, 258:3
343:8
**differ** 100:6
100:9
**difference** 129:5
152:18, 244:11
252:5, 272:2
272:4
**different** 35:2
35:2, 35:25
48:8, 55:22
76:23, 77:8
77:9, 84:12
148:6, 148:7
153:17, 154:1
164:6, 191:8
191:8, 191:8
203:24, 221:3
227:11, 227:25
228:2, 236:15
243:9, 251:1

316:5, 319:16
319:16, 323:9
324:3, 324:6
**differently**
227:4
**difficult** 101:18
247:7
**diligence** 105:22
111:2, 111:18
112:20, 112:24
113:10, 114:15
114:19
**ding** 216:21
**direct** 54:19
281:1, 291:20
**directed** 158:4
**directing** 55:16
153:22, 153:22
**direction** 17:3
17:4, 140:19
177:20, 200:4
202:8, 205:10
207:2, 210:3
**directions** 219:5
**directly** 61:7
136:4, 313:15
**director** 64:9
132:3
**disagree** 240:18
322:18, 322:19
323:3, 328:19
**disciplinary**
134:11, 219:1
219:19, 219:20
220:4, 248:22
249:16, 324:22
324:25, 325:5
327:22
**discipline**
219:13, 251:11
334:9, 336:3
**discovering**
321:16
**discuss** 81:4
**discussed**
112:12, 302:13

**discussion** 84:21 175:21, 225:24 323:20
**discussions** 173:23, 218:25
**dismiss** 109:22
**dismissed** 179:9
**dispatcher** 25:19, 25:20 25:21, 26:2 26:3
**dispute** 156:9 211:7
**disputed** 174:2 309:21, 331:3
**disqualified** 162:24, 266:17 267:4, 267:14 268:8, 337:20
**disqualifying** 271:4
**disrespectful** 197:12, 197:15 197:20, 197:24 198:1
**distance** 34:22 49:8, 244:5
**distinct** 65:12 65:15
**distinction** 129:4
**distribution** 62:22, 62:22
**distributor** 62:17
**DISTRICT** 1:2 1:9, 343:2 343:9
**disturbing** 46:10
**divide** 212:5 213:20, 213:21
**division** 23:14 64:11
**divisions** 64:11
**divulge** 115:11

**dizzy** 260:12 260:18, 261:2 261:5, 262:8 262:19, 262:23 262:24, 263:20 264:8, 265:23 266:5
**dock** 149:14 191:1, 227:12
**docked** 334:12
**doctor** 276:8 338:13
**doctors** 258:22 261:9
**document** 5:17 6:19, 6:22, 7:15 132:21, 132:24 167:7, 168:11 176:18, 178:18 183:23, 189:2 203:14, 204:2 204:4, 222:9 222:11, 224:20 226:21, 233:2 233:15, 241:23 251:23, 252:17 252:18, 252:19 252:22, 281:23 297:13, 297:19 306:4, 325:23 326:1, 342:14
**documentation** 12:15, 12:19 61:18, 183:15 222:25
**documented** 325:20
**documenting** 137:8, 327:14
**documents** 10:16, 19:2 39:10, 71:8 107:10, 159:21 167:18, 174:3 220:17, 279:20 306:5, 309:18

323:21, 328:3
**doing** 19:6 33:17, 40:1 53:6, 72:6 76:19, 84:17 93:21, 93:23 105:22, 111:7 111:18, 114:10 114:18, 114:19 130:2, 133:20 134:7, 147:23 154:4, 204:22 204:23, 216:2 218:19, 231:14 245:8, 245:25 249:15, 270:12 273:16, 278:9 280:7, 300:19 320:15, 329:19
**domestically** 56:2
**door** 254:19 257:4
**doors** 175:18 256:19, 256:23 257:20, 291:16 291:20
**dot** 54:21, 55:5 60:22, 62:10 104:1, 104:2 113:20, 120:11 250:14, 269:14 280:5, 280:6 280:7, 305:5 338:24
**double-check** 283:2
**doubt** 68:14 326:7
**downplay** 269:9 269:25
**downtown** 11:14, 39:2
**downward** 257:6, 257:7
**draft** 334:5

**drafted** 334:7
**drawing** 206:20 207:2
**drive** 85:20 98:20, 151:7 151:8, 162:5 206:25, 243:7 243:11, 244:8 280:2, 338:20
**driven** 243:15 243:15
**driver** 24:21 24:23, 25:1 25:2, 25:3 25:12, 26:7 30:10, 30:10 61:1, 108:10 172:14, 196:9 258:8, 292:13 292:22, 292:23 309:2, 310:2 310:6, 310:17 310:18
**driver's** 151:6
**drivers** 24:19 24:20, 61:3 122:5, 158:21 255:17, 256:8 258:4, 258:10 258:13, 258:14 269:16, 277:13 289:16, 291:7 291:25, 292:1 292:4, 305:7
**driveway** 151:4 151:8
**driving** 98:21 142:11, 148:23 166:17, 182:1 183:16, 206:14 216:6, 227:23 243:6, 244:11 247:22, 273:2 337:21
**drop** 158:22 158:24, 243:18

**drove** 17:3
**drowned** 145:5
**drug** 229:9 229:11, 229:15 229:18
**Drugs** 229:16
**due** 80:21, 80:21 80:23, 105:22 111:2, 111:18 112:20, 112:24 114:10, 114:14 114:19, 223:15 224:6, 238:15 245:16
**duly** 1:16, 8:7 343:16
**dumps** 256:20 257:18
**Dunbar** 1:21 2:14, 12:23
**duties** 32:16 77:9
**duty** 226:2 329:6, 329:9
**dynamic** 78:6

## E

**e-mailed** 84:23
**earlier** 73:6 73:16, 79:13 80:14, 85:10 87:2, 97:17 99:2, 150:23 167:17, 192:18 200:17, 200:22 221:5, 248:4 270:8, 279:19 283:14, 318:18 319:20, 319:22 319:24, 322:8 323:15, 325:5 335:11
**early** 326:7
**earned** 262:6
**easier** 245:15

**easiest** 233:13
**easy** 111:15
**educate** 34:1
70:5, 198:25
**educated** 139:10
199:5, 199:6
**education** 95:21
**effect** 99:7
187:13
**effective** 54:20
69:17, 69:25
70:20, 93:1
136:2, 188:19
189:8, 321:16
324:11, 327:25
**effort** 143:12
143:12, 143:16
145:12, 147:10
**eight** 57:5
230:20, 287:14
**eight-hour**
287:11
**either** 125:6
165:6, 193:19
196:24, 224:1
224:5, 249:7
250:25, 277:18
278:20
**either/or** 224:12
**elaborate** 99:11
**eligible** 259:8
**eliminate** 249:9
**Elizabeth** 223:6
**email** 63:4
83:24, 83:25
84:7, 84:17
84:18, 85:3
85:6, 117:20
117:24, 117:25
252:3, 313:7
313:10, 313:15
313:15, 314:21
314:25
**emails** 83:12
85:2, 252:2
**employed** 344:1

**employee** 16:5
16:6, 16:7, 16:8
21:17, 26:23
33:1, 33:18
65:4, 65:6
78:15, 80:15
84:4, 85:4
90:21, 94:2
99:3, 99:17
100:14, 100:18
108:24, 111:12
115:24, 133:20
133:22, 134:8
134:9, 136:12
137:13, 153:10
183:12, 204:20
215:11, 215:13
215:15, 216:2
217:13, 217:18
217:20, 217:22
219:4, 220:4
220:8, 228:13
232:4, 234:18
235:25, 251:13
254:10, 258:25
259:8, 260:17
260:23, 261:1
311:23, 325:17
**employee's**
120:24, 136:7
260:5
**employees**
21:12, 21:16
29:16, 32:22
33:3, 33:11
33:15, 34:1
34:13, 41:13
41:17, 54:23
55:9, 57:13
57:16, 58:18
58:21, 59:3
60:8, 60:16
60:16, 60:19
60:19, 60:20
61:3, 61:3, 61:4
61:8, 61:10

70:25, 71:8
75:13, 78:4
81:10, 85:7
86:20, 92:21
93:19, 95:23
104:6, 120:1
120:8, 120:17
121:23, 126:13
134:1, 134:7
134:21, 136:4
142:13, 155:17
156:11, 160:7
163:11, 172:9
184:19, 189:17
222:23, 231:5
258:22, 259:20
260:1, 274:7
275:9, 281:4
281:8, 291:16
291:19, 292:6
330:7, 330:9
330:14, 336:22
**employer** 90:20
90:23, 99:18
201:3, 202:15
**employer's**
328:21
**employment**
9:13, 38:2
335:4
**en** 300:16
**encompasses**
58:16, 59:14
**ended** 162:17
**energy** 244:3
**enforce** 69:18
133:10, 184:18
201:3, 202:16
203:11
**enforced** 71:17
**enforcement**
324:11, 327:25
**enforces** 219:20
**enforcing**
101:14, 155:10
**engage** 37:17

126:15, 216:10
**engaged** 230:10
**engages** 72:5
**engaging** 216:7
216:25
**English** 77:7
139:16, 236:6
**English-Arred...**
1:19, 3:14
343:14, 344:9
345:16
**ensure** 69:11
120:15, 202:17
**ensured** 69:12
**ensuring** 40:17
92:21
**entailed** 19:15
19:18
**enter** 75:18
254:24
**entire** 9:24, 9:24
46:1, 62:8
171:7, 178:11
281:6
**entities** 13:25
**entitled** 110:6
**entity** 93:11
**enviroment**
212:6
**environment**
32:14, 33:16
207:21, 208:7
212:3, 212:11
213:1, 213:22
238:15, 273:6
**environments**
171:20, 211:23
**envision** 151:25
**epilepsy** 91:8
99:4, 99:23
100:4, 104:3
**equally** 149:4
**equipment**
29:19, 58:12
76:9, 77:2, 77:4
77:15, 78:5

79:3, 79:6
86:11, 86:20
86:23, 86:24
87:8, 88:12
90:20, 91:2
99:10, 99:15
100:4, 104:13
121:3, 123:20
125:9, 127:1
127:21, 141:2
141:3, 141:13
141:15, 144:9
144:12, 151:12
151:16, 154:12
162:15, 162:16
163:15, 163:22
164:2, 164:13
168:8, 168:8
172:6, 175:7
175:8, 175:11
175:12, 175:13
183:17, 190:18
192:13, 198:8
198:9, 208:25
227:17, 249:7
250:25, 251:3
257:13, 264:23
264:24, 265:8
270:8, 270:9
270:11, 276:8
276:9, 324:23
327:10
**ergonomically**
207:21, 208:6
208:13, 211:22
213:22
**ergonomics**
60:18
**err** 273:19
**error** 341:5
**escalate** 83:22
**especially**
269:14, 278:25
**essentially**
73:12, 77:22
147:20, 226:22

**establish** 201:3 201:23, 202:16 203:11, 226:1 248:20, 249:6 270:6
**established** 277:14
**establishment** 318:12
**establishments** 318:11
**ESTATE** 1:3 343:3
**estimate** 9:6 79:12
**evaluate** 77:2 77:3
**evaluated** 86:21 86:23, 281:14
**evaluation** 76:8 79:6, 80:12 100:1, 134:17 221:2, 221:5 221:15, 221:19 221:20, 270:7
**evaluations** 135:23
**evaluator** 76:25 77:2, 221:15
**evaluators** 76:23, 76:23
**event** 26:15 39:23, 40:20 136:5
**events** 41:3
**everybody** 32:15, 37:1 90:14, 204:21 204:22, 280:6 303:13, 312:13 312:15
**everyday** 308:15
**everyone's** 292:17
**evidence** 107:12

198:4, 198:11 240:23, 241:2 278:19, 278:22 332:16, 332:20
**exact** 7:14, 17:8 60:12, 79:11 83:6, 87:11 123:8, 132:2 208:20, 210:20 214:13, 334:18
**exactly** 9:5 18:13, 30:1 30:2, 30:7 31:23, 48:10 69:20, 79:3 87:22, 112:18 126:24, 262:2 262:5, 294:7
**examination** 4:1 4:4, 4:5, 8:11 338:1, 343:20
**example** 33:3 58:17, 61:9 61:11, 61:12 67:18, 72:4 75:20, 77:3 89:20, 91:8 91:8, 94:18 141:18, 149:6 153:20, 176:21 191:1, 203:20 215:10, 215:16 217:1, 217:12 217:23, 238:13 244:12, 248:5 250:21, 258:25 269:18
**excerpt** 5:9 5:17
**excessive** 248:21
**exchanged** 310:6
**excuse** 144:22 195:10, 332:19
**executed** 342:17
**executive** 65:1

65:2
**exercise** 108:6
**exhibit** 5:5, 5:8 5:12, 5:16, 5:20 6:1, 6:4, 6:9 6:13, 6:17, 6:21 7:1, 7:6, 53:10 53:11, 66:12 66:13, 66:16 70:13, 72:15 74:8, 130:24 131:1, 154:23 154:24, 166:1 166:2, 166:3 177:13, 177:14 206:8, 206:9 206:19, 222:7 222:8, 232:14 232:25, 233:1 241:19, 241:20 252:14, 252:16 252:17, 252:18 252:20, 281:21 281:22, 295:4 305:12, 305:13 317:10
**exhibiting** 326:13, 326:21
**exhibits** 5:1 7:12, 345:9
**exist** 28:21 67:14
**existence** 226:1
**existing** 162:7
**exists** 41:22 42:3
**expect** 89:6 107:21, 126:13 171:3, 279:21
**expectation** 78:14, 133:25
**expected** 77:15 248:15
**expense** 150:19
**expensive** 149:5 149:23, 150:3

**experience** 54:10, 86:17 95:22, 211:9 269:7
**experienced** 87:6
**experiencing** 37:12
**expert** 19:1 277:21
**expertise** 50:3 50:5, 50:10 277:20
**experts** 18:18 29:4, 29:5 37:18, 49:14 333:7
**Expiration** 344:9, 345:17
**EXPIRES** 342:23
**explain** 16:24 115:18, 126:25 183:11, 193:15 193:18, 341:5
**explained** 111:6
**explanation** 246:19, 328:4
**exploring** 69:10
**exposed** 321:9
**expound** 30:17
**expressed** 225:25, 342:18
**extended** 255:8
**extent** 145:4 292:21, 293:4
**extra** 50:19 77:16, 143:20 145:6, 146:12 147:19, 147:21 150:11, 203:23 204:1
**extremely** 94:4 94:10, 94:20 95:2, 95:6 95:13, 96:3

96:6, 96:15 97:5
**eye** 29:21, 30:23 88:8, 88:16 88:19, 88:25 90:25, 94:17 97:18, 99:4 190:4, 190:7 205:14, 249:6 249:21, 267:1 287:13, 338:13 338:16
**eyeball** 26:14
**eyes** 88:9 112:14, 147:21
**eyesight** 89:10 89:16, 89:18 89:19, 91:2 91:18, 94:9 94:17, 95:11 95:17, 96:1 96:10, 96:19 96:19, 104:3 104:19, 105:12 123:3, 127:3
**eyewitness** 30:2 31:10, 108:11
**eyewitnesses** 25:7

**F**

**fabricated** 107:10
**face** 239:21 239:22
**facilities** 54:24 55:15, 62:25 74:15
**facility** 63:8 63:9, 63:15 111:12, 153:21 172:9, 181:7
**fact** 26:16, 34:3 68:3, 100:2 102:11, 117:6

142:13, 161:22
164:14, 172:17
194:8, 195:7
195:12, 211:11
243:21, 269:24
275:24, 276:3
286:5, 289:8
318:7, 335:13
**factor** 195:23
217:5
**factors** 96:7
129:7, 188:6
188:18, 189:4
189:9, 189:15
189:16, 190:17
190:25, 196:19
225:7, 225:17
**facts** 18:22
18:24, 23:11
225:24, 233:14
312:23, 321:1
341:4
**factual** 50:13
339:6
**fail** 204:19
**failed** 121:1
200:11, 201:3
202:7, 202:11
202:15
**failing** 216:2
**fails** 125:7
200:4, 205:9
**failure** 125:7
125:8, 135:23
198:18, 203:10
**fair** 10:11, 10:14
51:1, 51:17
68:7, 70:21
77:25, 78:11
108:5, 112:3
145:3, 203:16
203:17, 225:4
329:5, 332:14
333:4, 333:5
333:10
**faith** 208:23

**fall** 58:20, 58:21
80:2, 217:24
217:25
**familiar** 9:15
33:16, 59:9
131:8, 138:8
139:1, 139:5
140:23, 144:3
203:15, 207:7
222:24, 223:1
230:16, 247:15
260:6, 318:7
**families** 40:11
40:14
**family** 8:18
37:11, 37:14
46:17, 52:3
52:4, 52:13
108:19, 110:6
152:7, 303:20
315:11
**fancy** 252:15
**far** 22:2, 23:14
25:6, 28:15
28:18, 29:11
39:24, 51:10
56:4, 58:12
63:2, 65:7, 65:8
90:11, 129:17
150:2, 162:3
163:19, 172:8
176:18, 219:1
231:6, 231:7
243:17, 248:25
249:7, 249:15
306:16, 334:21
**farming** 257:14
**farther** 35:18
**fast-forward**
42:2
**fatal** 217:25
**fatality** 42:25
159:15, 181:11
181:15, 284:17
287:13, 288:10
**fatally** 46:8

51:23
**fatigue** 188:16
189:7, 190:21
275:15, 275:17
275:18, 275:19
275:19, 275:25
276:5
**fault** 239:4
**favor** 108:13
194:25, 315:11
**feasible** 213:24
214:1
**feature** 170:14
**features** 169:11
**February** 1:12
1:18, 8:2, 22:18
75:23, 162:23
317:17, 341:3
343:12
**feed** 257:16
**feedback** 133:11
133:15, 240:20
240:23, 241:2
241:9, 241:9
241:15, 255:10
**feel** 43:12, 44:15
46:3, 48:24
261:23, 314:3
**feeling** 46:17
**feet** 151:21
**felt** 215:4
**field** 41:6, 47:8
138:6, 138:20
216:14, 273:16
273:18, 275:13
277:20
**fifth** 188:16
**fight** 179:7
**Figueroa** 6:24
221:10, 221:13
283:11, 292:10
293:7, 293:11
301:13, 301:15
**Figueroa's**
222:4, 293:24
**figure** 270:3

276:18, 323:23
**file** 37:17, 206:5
218:6, 230:14
278:8, 278:11
333:5
**filed** 109:21
114:11, 116:9
116:13, 345:11
**files** 278:12
**filing** 18:17
332:25
**fill** 134:3
169:25, 269:17
**filled** 225:3
234:17
**filling** 81:17
177:4
**filtering** 188:12
189:6, 190:20
**final** 26:6
**finalizing**
223:16, 223:23
224:7
**financial** 328:22
**financially**
344:2
**find** 27:7, 37:19
40:4, 41:11
67:21, 75:9
118:25, 172:18
174:9, 174:13
215:2, 215:4
238:20, 268:22
291:8, 291:23
**finding** 116:19
175:21, 192:10
255:25, 324:10
**findings** 6:18
253:1, 254:5
254:14, 319:7
320:19, 320:23
321:14
**fine** 182:15
183:1, 291:6
**finish** 9:23, 9:24
165:14, 255:2

**finished** 38:23
**fired** 248:6
**Firm** 344:12
345:19
**firm's** 68:11
**firmly** 218:2
**first** 22:10
112:25, 153:17
164:10, 174:5
181:11, 181:15
188:4, 188:8
206:17, 208:6
208:10, 210:2
211:15, 212:2
233:14, 237:15
252:5, 284:2
284:5, 284:13
285:5, 287:19
287:20, 301:19
302:5, 307:24
322:23, 327:17
330:5
**fit** 87:24, 111:8
112:1, 112:2
115:15, 120:15
280:2, 280:15
**fitness** 277:12
277:18, 277:25
278:2, 278:4
**five** 168:23
249:25, 250:1
317:20, 319:4
336:16
**fix** 118:7
**flag** 219:11
249:3
**flammable**
61:16
**flat** 107:18
**flight** 44:9
**floor** 3:5, 39:5
207:4
**Florida** 47:21
54:7, 54:17
**flour** 256:20
**flow** 158:4

158:13, 204:10
**flowing** 37:1
**flown** 52:12
**flying** 314:17
**focus** 111:3
154:16, 199:19
199:20
**focused** 26:18
**focusing** 281:5
**foggy** 173:12
**folks** 51:21
194:10, 253:3
291:22, 294:13
**follow** 26:2
26:4, 71:1, 73:9
108:23, 122:16
122:17, 166:20
170:17, 170:21
186:2, 207:23
209:24, 220:2
220:3, 274:11
319:6
**follow-up** 338:4
**followed** 69:19
**following** 8:1
44:8, 46:2
102:22, 103:5
103:5, 127:24
161:21, 162:2
219:4, 219:5
220:17, 286:20
319:3, 319:23
337:25, 343:15
343:22
**follows** 8:8
68:25
**foot** 155:17
156:11, 229:24
237:4, 259:24
**footage** 15:13
29:25, 30:8
35:8, 284:9
286:8, 286:9
**forcing** 101:13
**foregoing** 342:1
342:15

**foreman** 77:6
77:7, 77:8, 77:9
77:12, 78:20
79:1, 86:3, 86:4
86:9, 86:12
132:16, 161:10
214:15, 234:4
234:11, 334:17
**foreman's** 77:19
**foremen** 77:14
85:10, 85:16
86:6, 214:17
234:14
**foremost** 212:2
**forensic** 31:13
46:25
**forget** 44:17
204:20
**forklift** 6:2, 8:20
14:12, 14:15
14:21, 26:25
30:6, 46:1, 49:9
56:11, 56:15
56:17, 56:19
57:11, 59:25
72:4, 72:5
75:24, 75:25
76:13, 77:12
77:20, 78:2
78:7, 78:7, 78:8
78:9, 78:12
78:22, 79:1
79:10, 85:19
85:20, 85:21
85:23, 85:24
86:5, 86:13
87:1, 87:15
87:17, 87:24
88:6, 89:10
89:12, 89:16
89:23, 92:2
94:2, 94:8
94:15, 95:1
95:8, 95:25
96:2, 96:20
98:20, 102:8

102:9, 104:21
105:14, 113:21
113:22, 120:14
120:16, 123:12
123:16, 126:6
126:8, 128:1
138:24, 138:25
139:4, 139:7
140:13, 141:7
141:8, 141:16
142:2, 142:24
143:5, 143:10
143:14, 143:19
143:21, 144:15
144:16, 144:20
144:23, 145:8
147:14, 147:22
148:1, 148:9
148:9, 149:13
149:16, 150:6
150:9, 150:12
150:14, 150:18
151:11, 151:17
154:3, 154:4
154:7, 154:19
156:16, 156:21
162:1, 162:6
162:11, 162:24
165:3, 166:13
166:16, 167:21
169:22, 171:4
171:16, 174:24
175:4, 175:23
177:15, 177:19
178:2, 178:6
178:12, 179:5
181:24, 182:1
182:7, 183:14
183:23, 185:9
185:25, 186:11
188:19, 191:5
191:25, 192:25
193:24, 194:12
194:17, 194:19
194:20, 195:5
198:6, 199:12

200:3, 200:11
201:11, 201:23
202:11, 202:22
203:2, 203:11
205:15, 205:22
205:24, 206:3
207:10, 208:2
208:18, 210:20
216:5, 216:20
218:8, 219:15
219:18, 220:23
221:23, 227:18
228:2, 228:8
228:22, 230:4
230:11, 234:23
236:14, 236:25
237:1, 237:3
237:12, 238:24
241:4, 242:18
243:3, 243:3
243:5, 243:12
243:13, 243:15
243:22, 244:19
245:9, 245:24
247:2, 247:5
247:7, 247:24
250:3, 253:19
254:10, 256:5
258:7, 258:13
260:18, 261:5
261:15, 261:23
262:9, 262:20
263:6, 264:11
264:15, 264:18
265:24, 266:6
266:18, 266:23
267:5, 267:7
267:15, 271:11
275:3, 275:20
277:12, 278:4
279:8, 279:21
280:2, 280:16
295:13, 296:9
296:17, 308:16
309:2, 309:3
309:22, 310:13

310:17, 320:1
320:13, 320:14
321:9, 324:4
324:8, 324:25
326:21, 327:22
329:4, 329:4
329:5, 329:8
329:11, 329:14
329:15, 329:21
329:25, 330:3
330:8, 330:25
331:1, 331:5
332:1, 335:9
336:15, 337:16
337:17, 337:21
**forklift/pedestr...**
201:4, 202:16
**forklifts** 56:22
56:23, 57:7
57:9, 57:14
57:24, 58:13
86:7, 87:1
92:15, 121:24
126:4, 126:15
140:15, 149:15
151:18, 152:1
152:12, 154:2
161:12, 161:24
171:12, 171:14
171:19, 189:25
191:4, 207:22
208:7, 208:14
211:17, 212:4
213:2, 239:10
263:21, 322:2
322:14, 324:19
**form** 38:6
38:14, 43:3
46:22, 49:19
50:9, 51:4
51:12, 51:19
52:8, 52:18
53:4, 72:1
72:10, 89:17
90:6, 91:23
92:3, 92:4

92:11, 94:6
94:11, 94:12
94:21, 94:22
95:3, 95:4, 95:7
95:14, 95:15
96:4, 96:5
96:23, 96:24
97:2, 97:3, 97:8
98:7, 98:13
98:17, 106:7
106:16, 107:1
107:2, 107:19
108:3, 108:7
108:8, 108:15
108:21, 109:8
109:12, 109:16
109:19, 109:23
110:1, 110:8
110:12, 110:24
113:2, 113:3
113:6, 114:6
114:13, 116:16
116:21, 116:25
117:4, 117:9
118:12, 118:16
118:20, 119:7
119:13, 119:18
121:17, 122:1
122:11, 123:7
124:19, 126:10
126:19, 129:10
129:11, 129:22
130:8, 130:9
141:10, 142:20
143:7, 143:15
145:10, 145:16
146:2, 146:11
146:20, 146:21
147:2, 147:11
148:2, 148:5
148:19, 150:7
150:20, 152:9
152:20, 153:6
154:9, 154:10
154:20, 156:17
157:5, 157:11

157:13, 157:19
157:20, 162:13
165:22, 171:22
172:20, 172:24
172:25, 173:4
173:10, 173:20
174:7, 176:4
177:1, 177:7
179:11, 179:12
179:15, 179:16
179:21, 179:24
179:25, 180:2
180:7, 180:8
180:12, 180:13
180:16, 180:17
180:20, 180:23
181:2, 181:19
182:9, 182:13
182:17, 182:22
183:3, 183:7
183:8, 184:16
185:7, 185:10
185:14, 185:19
187:1, 187:10
187:18, 187:19
191:21, 193:7
193:25, 195:1
195:16, 195:17
197:16, 197:19
197:23, 198:2
198:14, 199:3
199:14, 208:15
209:14, 209:20
211:20, 212:18
212:21, 213:4
221:4, 221:5
221:19, 225:3
226:22, 229:2
229:3, 229:7
233:16, 234:17
240:6, 240:10
240:13, 240:14
240:16, 241:7
241:11, 243:8
244:14, 247:3
247:4, 247:9

248:1, 248:16
248:17, 258:9
259:4, 260:13
260:20, 261:6
261:11, 261:25
262:1, 262:10
262:11, 262:14
262:15, 262:21
262:22, 263:2
263:8, 263:13
263:14, 263:23
263:24, 264:4
264:5, 264:12
264:13, 264:19
265:14, 265:15
265:19, 265:20
266:3, 266:4
266:9, 266:14
267:9, 267:10
267:18, 267:19
267:22, 268:6
268:9, 268:11
268:24, 269:11
269:22, 270:19
270:23, 271:5
271:6, 271:12
271:23, 272:14
273:7, 274:3
275:5, 276:14
276:19, 277:2
278:10, 279:10
279:13, 279:17
280:3, 280:18
280:21, 280:25
281:18, 281:19
298:19, 300:10
300:14, 301:2
301:6, 302:22
302:25, 303:4
303:5, 307:12
308:13, 308:17
309:4, 310:8
310:9, 310:14
310:19, 310:20
310:24, 311:7
311:11, 311:18

312:1, 312:2
312:8, 312:9
312:21, 313:2
313:5, 313:9
313:13, 313:17
313:24, 314:10
314:19, 314:24
315:3, 315:9
315:14, 315:17
315:21, 316:7
316:11, 316:15
316:19, 316:25
317:6, 317:25
319:8, 320:18
320:22, 321:3
323:4, 323:25
325:8, 325:9
325:21, 325:25
326:4, 326:9
326:16, 326:17
326:23, 326:24
327:3, 327:7
327:8, 327:16
327:20, 328:1
328:6, 328:8
328:11, 328:12
328:15, 328:16
328:25, 329:1
329:7, 330:11
330:13, 330:17
330:21, 331:11
331:16, 331:17
331:20, 331:21
332:3, 332:4
332:7, 332:11
332:12, 332:18
332:21, 333:2
333:8, 334:25
335:1, 335:5
335:8, 335:19
335:22, 336:4
339:1, 339:15
339:20
**format** 176:13
176:24, 282:4
318:23, 319:15

319:17, 321:15
**forms** 70:2
176:11, 176:13
**Fort** 47:21
**forth** 48:4
76:15, 111:13
139:17, 254:12
290:13
**forthcoming**
270:5
**forward** 112:1
141:18, 178:13
210:14, 243:17
249:23, 313:22
343:19
**forwarder**
67:24
**forwarding**
76:14
**found** 197:13
254:9, 318:15
**four** 26:5
205:23, 249:25
251:19
**four-month**
250:23
**fourth** 188:14
**frankly** 277:8
**free-flowing**
158:19
**freely** 158:22
**freight** 76:14
76:15
**frequently**
114:2
**Friday** 44:9
**frivolous** 109:6
109:11
**front** 10:17
86:8, 190:4
242:25
**full** 44:7, 63:19
165:17, 165:17
240:4
**full-throated**
237:21

**fully** 87:21
**function** 85:24
86:2, 259:5
**functional**
127:20, 184:10
184:23, 185:2
186:7
**functioning**
128:4, 128:9
145:4, 170:9
191:18
**functions** 55:9
**funny** 180:11
180:11, 180:15
180:18, 180:19
**further** 68:18
83:22, 101:17
344:1, 344:2
344:4, 345:1
**future** 41:4
41:18, 71:24
124:9, 138:22
225:18

**G**

**GARCIA** 2:5
**gather** 25:24
303:10
**gathered** 43:13
44:6
**gathering** 48:3
220:16, 295:11
305:3
**GEICO** 151:2
151:2
**general** 34:21
59:12, 61:14
61:17, 73:2
78:14, 141:6
204:5, 275:22
324:12
**generally** 33:15
161:3, 214:16
**generated** 23:18
176:11, 176:12

**gentleman**
24:16, 26:11
28:10, 221:2
248:5, 250:22
**getting** 76:13
110:3, 120:20
121:23, 153:7
162:12, 249:12
254:19, 256:15
257:4, 260:1
281:14, 290:2
292:14
**Gilma** 164:9
**give** 10:19, 11:7
32:2, 32:5
52:20, 61:9
79:21, 79:22
80:20, 81:20
84:13, 99:24
100:1, 106:14
134:3, 145:23
146:9, 151:2
157:2, 179:7
184:3, 203:19
217:23, 223:13
242:8, 248:5
285:1, 295:8
299:9, 314:16
330:20
**given** 135:9
135:11, 177:15
186:20, 209:18
268:4, 269:24
278:12, 297:14
309:13, 335:6
335:15, 339:7
342:19, 343:17
343:21
**gives** 235:24
**giving** 301:5
**glasses** 89:22
92:8, 94:19
94:20
**global** 55:18
**globally** 56:4
**go** 8:4, 9:18

34:10, 35:8
40:14, 41:24
42:10, 58:5
59:1, 59:6, 69:6
73:18, 74:20
80:15, 84:16
85:25, 103:7
118:8, 129:18
139:22, 143:3
151:14, 158:9
164:10, 166:5
167:5, 168:18
177:13, 199:17
213:12, 214:16
217:10, 229:20
230:19, 232:14
233:13, 235:23
249:15, 272:10
276:9, 280:14
281:22, 282:10
295:11, 313:19
333:5, 333:7
**goals** 73:24
**God** 107:14
175:25, 309:24
331:14
**goes** 91:7
102:24, 134:10
137:6, 167:4
176:17, 231:4
231:6, 264:24
265:24, 315:6
**going** 10:7
10:13, 10:16
15:19, 24:6
32:18, 34:7
34:14, 36:8
41:18, 41:24
42:10, 44:19
53:9, 61:23
61:24, 65:24
66:10, 66:16
72:6, 73:8, 79:4
79:6, 81:14
82:9, 82:11
90:3, 92:12

93:15, 94:2
94:8, 96:25
97:7, 97:19
98:3, 98:10
98:25, 100:2
100:2, 105:4
109:2, 109:5
113:14, 113:22
116:3, 118:10
119:2, 121:12
130:22, 130:24
133:4, 140:15
141:5, 141:7
142:8, 143:19
147:7, 148:24
149:1, 149:6
149:7, 150:24
151:2, 153:16
158:24, 163:6
163:11, 178:13
180:11, 184:2
184:3, 184:14
186:23, 187:4
187:8, 187:13
188:20, 191:19
194:14, 199:9
203:25, 206:8
209:8, 209:12
214:7, 214:19
232:14, 232:23
237:20, 241:19
247:15, 248:9
249:22, 249:23
251:4, 251:21
252:12, 252:13
252:16, 252:18
264:1, 264:10
264:22, 266:8
270:9, 278:8
289:9, 290:12
297:8, 297:9
300:18, 313:21
314:18, 315:1
315:6, 316:9
316:17, 323:1
323:5, 323:10

325:4, 325:24
326:3, 338:7
**golf** 242:24
244:22, 245:19
246:15, 246:16
248:14
**good** 8:13, 8:14
33:19, 33:25
64:19, 68:21
70:7, 89:10
89:16, 89:18
94:9, 94:16
95:11, 96:1
96:19, 98:6
102:6, 102:10
106:6, 119:3
143:17, 145:14
145:19, 145:21
145:23, 146:10
146:18, 146:25
149:17, 149:18
154:5, 170:8
196:22, 209:16
217:19, 228:17
228:18, 228:19
228:20, 230:7
230:8, 235:6
240:9, 261:16
263:22, 263:25
264:17, 271:14
276:11, 276:23
277:9, 327:1
**gossiping**
312:11
**gotten** 272:21
290:5
**govern** 56:11
62:4
**governing** 54:21
**government**
13:25, 20:17
20:22, 102:24
**governs** 56:2
**great** 35:4, 91:8
148:25, 234:15
313:12

**greater** 74:13
**greens** 257:16
**gross** 106:21
**grossly** 108:2
**ground** 9:18
45:18, 206:24
293:2
**group** 6:23
77:10, 282:5
282:5, 282:7
282:8, 283:25
301:14, 301:15
301:19, 304:1
**group/departm...**
135:7
**guarantee** 69:3
**guard** 273:22
**guess** 64:19
105:11
**guidance** 63:5
74:11, 93:8
100:5, 100:21
100:24, 101:6
102:2, 108:16
155:7, 157:7
285:1, 285:6
315:4
**guide** 147:21
**guided** 21:3
**guidelines** 54:23
56:10
**Gustavo** 246:17
**guy** 262:6, 293:5
331:8
**guys** 118:3
272:15, 284:19
285:21, 291:7
313:16, 336:24

**H**

**habitual** 219:11
**habitually**
216:11
**habituation**
188:10, 189:6

189:24, 190:20
**half** 42:20, 43:1
135:16, 179:18
199:10, 215:4
285:5, 307:25
308:3, 308:6
308:16, 310:13
312:6
**hand** 8:5
259:25, 342:19
**handle** 63:11
159:8, 251:11
285:1, 287:20
**handled** 62:13
259:17, 275:7
**handler** 205:23
258:16
**handlers** 258:14
281:7
**handles** 104:15
104:16, 120:21
259:16, 277:15
**handling** 61:10
61:23, 62:20
**hands** 183:15
**happen** 10:24
69:5, 103:8
111:19, 112:21
112:23, 140:11
144:6, 201:9
201:18, 201:21
202:6, 202:25
204:23, 213:10
240:22, 248:10
248:15, 266:8
308:21, 334:24
**happened** 18:14
19:19, 20:6
27:7, 34:20
35:6, 35:19
37:15, 37:19
38:17, 40:4
41:11, 41:13
42:4, 42:23
43:11, 45:7
48:11, 48:18

82:7, 87:3
92:12, 98:2
114:5, 119:2
128:11, 137:3
162:6, 177:8
192:6, 199:10
200:7, 200:8
200:14, 200:23
201:21, 208:21
226:24, 230:18
242:13, 247:14
267:25, 270:13
289:2, 290:17
293:17, 301:20
302:6, 306:21
312:13, 312:14
312:16, 315:12
321:1, 329:24
**happening** 81:4
83:18, 83:22
111:2, 125:11
126:23, 129:25
213:7, 233:17
233:20, 233:20
248:11, 254:23
282:9, 290:10
303:15, 311:25
312:12
**happens** 38:13
39:23, 321:5
**hard** 125:17
185:3, 185:3
247:1, 273:11
314:16
**harder** 10:3
**harm** 229:5
**HARRIS** 1:6
343:6
**hat** 280:13
**Haynes** 2:3, 4:4
8:12, 8:17
32:18, 38:9
38:16, 39:16
43:5, 43:17
43:19, 44:22
44:24, 46:24

49:21, 50:11
51:7, 51:13
51:25, 52:11
52:20, 53:1
53:5, 53:9
53:12, 66:9
66:14, 72:3
72:11, 79:7
79:9, 88:13
88:15, 89:13
89:15, 90:9
91:9, 91:11
91:24, 92:9
92:13, 94:7
94:14, 94:24
95:5, 95:9
95:18, 96:17
97:4, 97:10
98:9, 98:15
98:19, 106:1
106:3, 106:9
106:18, 107:5
107:23, 108:5
108:18, 109:1
109:10, 109:14
109:18, 109:21
109:25, 110:4
110:10, 110:14
113:5, 113:8
114:14, 115:7
115:9, 115:21
115:22, 116:18
116:23, 117:1
117:6, 117:14
118:13, 118:18
118:22, 119:10
119:16, 119:20
121:12, 121:14
121:21, 122:4
122:13, 123:10
124:20, 125:12
125:14, 126:13
126:24, 128:6
128:8, 129:2
129:13, 130:1
130:11, 130:12

130:14, 130:21
131:2, 131:4
131:5, 141:14
142:23, 143:1
143:3, 143:9
143:17, 145:11
145:19, 146:5
146:7, 146:9
146:23, 147:5
147:13, 148:4
148:11, 148:21
149:20, 149:22
150:15, 150:17
152:2, 152:4
152:13, 152:15
153:9, 154:13
154:15, 154:22
154:25, 156:19
157:9, 157:14
157:16, 157:21
162:8, 162:10
162:18, 165:19
165:23, 166:5
171:24, 172:22
173:2, 173:8
173:13, 173:21
174:8, 176:6
177:8, 179:13
179:18, 179:22
180:1, 180:4
180:10, 180:15
180:18, 180:21
180:25, 181:4
181:23, 182:11
182:15, 182:19
182:21, 182:24
183:5, 183:9
183:22, 184:17
185:8, 185:12
185:17, 185:21
187:4, 187:12
187:24, 191:23
194:1, 195:3
195:19, 197:17
197:21, 197:25
198:4, 198:15

199:4, 199:17
201:9, 202:1
202:2, 203:4
203:6, 206:12
208:17, 209:16
209:22, 211:25
212:19, 212:23
213:6, 213:14
213:16, 222:9
227:13, 229:5
229:9, 232:22
233:2, 236:19
240:7, 240:11
240:15, 240:18
241:8, 241:13
241:21, 243:10
244:16, 247:6
247:11, 248:3
249:10, 249:12
252:21, 258:12
259:7, 260:15
260:22, 261:8
261:18, 262:4
262:17, 262:24
263:4, 263:10
263:19, 264:1
264:6, 264:16
265:17, 265:22
266:7, 266:15
267:12, 267:24
268:7, 268:12
269:4, 269:13
269:24, 270:21
270:25, 271:8
271:16, 271:18
271:24, 272:6
273:9, 276:16
276:22, 277:4
279:12, 279:19
280:9, 280:19
280:23, 281:22
296:16, 297:12
297:13, 298:21
300:12, 301:4
301:8, 302:23
303:2, 303:7

305:14, 307:14
308:15, 308:19
309:6, 310:11
310:16, 310:22
311:1, 311:9
311:13, 311:21
312:4, 312:24
313:4, 313:7
313:10, 313:21
313:25, 314:13
314:21, 315:1
315:5, 315:10
315:15, 315:19
315:23, 316:3
316:9, 316:13
316:17, 316:22
317:1, 317:4
317:8, 317:11
318:2, 319:10
320:20, 320:24
321:11, 323:7
325:11, 325:23
326:2, 326:6
326:11, 326:19
327:1, 327:5
327:12, 327:18
328:4, 328:7
328:9, 328:14
328:18, 329:3
329:10, 330:12
330:15, 330:19
330:23, 331:13
331:19, 331:23
332:6, 332:9
332:14, 332:19
332:23, 333:4
333:11, 335:3
335:6, 335:10
335:20, 335:24
336:6, 337:24
339:1, 339:8
339:15, 339:20
343:24, 345:7
345:8
**hazard** 103:3
**hazardous**

53:25, 54:22
56:3, 56:4
60:24, 61:10
61:13, 61:15
62:3, 62:8
63:13, 64:12
**hazards** 321:10
**hazmat** 61:14
61:21
**he/she** 68:21
**head** 10:3, 29:16
111:22, 127:6
214:22, 214:23
325:17
**headquarters**
63:7
**heads-up** 84:13
**health** 72:19
72:20, 74:12
100:15, 100:16
268:4
**hear** 127:2
189:19, 191:7
191:9, 193:10
193:16, 195:8
195:9, 195:12
195:21, 196:11
196:15, 196:19
196:23, 196:24
310:12
**heard** 15:1
22:15, 24:19
26:15, 26:24
127:14, 133:15
173:5, 193:6
193:14, 194:11
196:3, 199:16
260:10, 301:21
301:24, 302:17
307:24, 308:1
308:1, 329:24
**hearing** 58:17
58:18, 105:6
114:17, 142:13
189:18, 189:24
196:18

**hears** 145:7
**hearsay** 194:8
312:11, 312:20
312:22, 315:20
**heavier** 236:23
**heavily** 322:2
322:16, 324:19
**heavy** 272:25
274:1
**heeded** 241:15
**heights** 58:21
**held** 138:5
**hell** 307:15
**help** 37:19
38:10, 49:25
86:1, 101:7
107:14, 115:18
147:21, 148:22
154:7, 154:19
159:8, 175:25
225:9, 259:1
259:2, 330:16
**helped** 13:14
148:18, 152:5
152:11, 152:16
159:10
**helps** 138:22
328:5
**hey** 23:3, 33:19
39:15, 84:7
84:14, 93:14
118:7, 144:12
247:8, 249:20
251:18, 299:16
300:24, 311:2
323:1
**hiding** 270:4
**high** 58:17, 90:7
90:7, 90:7
137:14, 215:21
217:23, 276:4
**high-level**
311:22
**higher** 236:18
**highest** 65:3
65:5, 65:6

95:22, 100:14
153:10, 183:12
**highly** 90:8
**hindsight**
106:10, 106:10
152:10
**HIPAA** 275:11
275:11
**hire** 19:1, 37:18
104:25, 105:23
117:1, 150:11
269:1, 270:14
278:2
**hired** 226:10
226:18
**hiring** 18:18
18:18
**histories** 120:15
**history** 115:25
122:6, 266:16
**hit** 145:12
145:15, 145:17
145:24, 151:4
215:12, 228:13
228:20, 228:21
229:24, 234:18
245:19, 289:24
290:6, 290:22
291:8, 309:1
309:2
**hits** 235:1
**hitting** 171:17
239:9, 245:3
**hold** 48:24
85:18, 93:4
93:5, 236:19
**holds** 172:14
**home** 40:14
68:20, 69:6
314:16
**Homeland**
36:12
**Honduras** 63:18
63:21
**honest** 47:20
52:10, 270:3

275:2
**honestly** 110:19
159:13, 302:7
**hop** 77:17
**hope** 39:12
64:18, 87:19
291:3
**horizontal**
257:6, 257:8
**horizontally**
255:3
**horn** 140:25
141:8, 141:11
141:16, 141:21
141:25, 142:1
142:25, 143:10
143:13, 143:18
143:22, 144:16
144:18, 144:22
144:25, 145:5
145:12, 145:15
145:17, 145:25
177:25, 178:3
178:6, 178:11
178:12, 178:14
178:15, 178:25
179:6, 183:24
184:11, 185:9
185:13, 185:15
185:17, 185:22
186:8, 186:9
186:14, 186:25
210:10, 323:15
323:17, 323:21
323:24, 324:2
**horns** 324:6
**horrible** 179:14
179:17, 308:4
**hospital** 293:9
293:11
**host** 62:3
**hour** 11:25, 12:8
301:9, 311:24
**hours** 12:13
127:25, 230:20
287:14, 304:23

304:25, 343:24
343:25
**house** 80:17
**houses** 75:16
336:21
**Houston** 1:22
2:7, 2:16, 3:6
11:14, 15:11
15:14, 27:11
34:4, 34:11
39:3, 52:12
55:20, 60:11
63:6, 71:1
78:12, 81:10
81:14, 81:18
82:24, 93:5
233:21, 304:11
325:17, 336:24
337:5, 344:13
345:20
**HR** 44:10, 104:7
104:10, 104:15
121:4, 121:7
121:15, 121:22
134:10, 163:4
163:5, 163:8
163:10, 164:4
164:5, 164:8
164:9, 164:22
165:7, 165:23
218:25, 218:25
219:20, 220:1
220:5, 220:10
222:24, 223:7
223:17, 224:2
224:8, 224:20
224:22, 224:24
225:1, 225:1
249:15, 251:11
253:5, 254:8
259:5, 259:16
277:23, 278:20
278:23, 284:16
294:20, 336:1
336:2
**HR's** 122:2

**HSE** 235:16
**Hudson** 137:1
**huge** 273:4
**human** 6:5, 6:18
120:21, 120:21
222:11, 229:6
252:19, 252:25
255:6, 259:17
275:7, 277:14
277:17, 277:19
277:24, 280:12
280:12
**hundred** 40:15
87:14, 149:15
272:3
**hurt** 138:2
193:22, 193:23
216:12, 216:17
216:21, 276:17
325:7, 332:10
**husband** 37:21
**hypothetical**
96:10
**hypothetically**
95:20, 96:13

## I

**I-R-I-C-K** 13:7
**idea** 33:19, 98:1
112:6, 127:8
127:11, 127:14
128:23, 232:8
264:17, 296:1
296:4, 298:14
**ideas** 209:18
**identified**
251:12
**identify** 32:16
135:21, 137:25
225:6
**identity** 342:14
**ignore** 190:1
276:12
**imagine** 46:15
46:17, 46:18

59:15, 228:25
256:18
**imagining**
303:14
**immediately**
136:3, 162:1
319:3
**imp** 117:12
**impactful**
303:11
**impair** 263:5
264:23
**impairment**
103:9, 119:15
338:16, 338:19
**impairments**
103:2
**impairs** 265:10
**impede** 175:13
**impediment**
90:23, 92:5
99:13, 99:14
99:18, 99:21
**impeding**
202:22
**impersonal**
52:10
**implement** 41:3
54:20, 73:17
112:10, 113:17
123:24
**implemented**
117:7, 123:15
123:17, 123:19
124:1
**implementing**
55:17, 58:15
60:9, 102:17
114:12, 208:19
**important** 9:22
10:2, 32:21
68:11, 68:15
68:24, 70:7
70:19, 90:10
122:20, 122:21
137:21, 171:12

194:16, 195:22
196:20, 196:22
209:10, 212:20
213:3, 213:6
216:6, 216:22
217:4, 272:13
275:1, 284:8
316:14
**impossible**
332:9
**improve** 134:21
137:10, 137:15
240:21
**in-depth** 61:18
61:19
**in-house** 12:25
118:5, 122:24
124:16
**inaccurate**
339:14, 339:19
**inaudibly**
296:10
**incentive** 269:8
269:19, 269:25
**incident** 6:6
6:10, 6:14
19:18, 20:12
25:8, 26:19
34:20, 34:24
34:25, 35:6
42:18, 44:8
44:8, 45:1, 45:3
47:12, 47:23
48:2, 48:3, 48:6
79:10, 83:2
83:4, 85:1, 87:2
89:12, 91:13
91:14, 91:17
92:6, 94:16
98:2, 98:3
102:12, 102:17
103:1, 103:5
104:6, 104:18
106:11, 107:7
111:24, 112:21
115:18, 123:13

123:18, 123:21
123:25, 124:4
124:10, 124:12
124:22, 124:24
125:14, 127:24
128:22, 137:3
137:5, 152:16
157:23, 159:15
161:21, 162:2
162:6, 163:14
164:12, 172:12
176:10, 176:11
176:24, 177:3
199:10, 199:21
200:23, 204:8
208:12, 216:1
217:4, 220:3
220:9, 220:14
220:17, 222:20
223:17, 223:24
224:15, 224:16
225:2, 225:7
225:21, 226:22
227:5, 229:21
230:3, 230:5
230:9, 233:4
233:7, 233:16
233:17, 234:3
234:17, 234:24
235:13, 235:14
237:16, 241:3
241:25, 242:4
242:10, 247:13
250:7, 252:17
254:9, 255:22
267:8, 267:17
269:3, 270:13
271:1, 271:10
271:14, 271:21
272:3, 272:4
276:17, 278:1
278:5, 278:15
279:1, 279:6
279:9, 287:5
287:6, 287:16
288:10, 289:2

290:11, 291:21
293:25, 303:12
303:23, 306:14
311:22, 316:6
316:23, 317:20
319:1, 319:4
319:23, 329:20
332:16, 333:1
333:24, 334:10
334:19, 334:23
335:4, 335:16
336:16
**incidents** 13:24
14:1, 31:10
124:8, 130:4
134:20, 140:11
201:6, 202:6
213:7, 216:20
217:13, 218:10
225:10, 239:3
239:8, 246:9
247:12, 247:18
248:18, 248:20
248:21, 248:24
248:25, 249:1
249:4, 249:9
249:18, 250:17
250:20, 250:23
251:5, 251:17
251:19, 253:24
287:20, 324:24
325:19, 331:9
331:14
**include** 28:24
104:18, 160:14
166:16, 292:18
**includes** 112:24
143:5, 143:9
166:13, 206:10
225:24, 343:22
**including** 35:17
45:1, 142:23
142:25, 160:15
306:5
**inconclusive**
51:10

**incorporate**
139:18, 141:13
**incorrect**
114:16, 115:4
173:7, 329:2
335:2
**INCORRECT...**
3:1
**increased** 266:1
**independent**
81:13, 81:15
337:1, 344:10
345:18
**independently**
320:25
**INDEX** 4:1
**indicate** 240:3
**indicated** 215:5
**indicating** 118:3
185:18, 256:19
296:13, 305:22
**indicator** 135:8
**indicators** 138:9
138:11, 138:16
138:21
**individual**
253:24, 294:18
**INDIVIDUAL...**
1:2, 343:2
**individuals**
294:19
**industrial** 5:21
76:4, 76:6, 79:5
85:11, 139:15
140:7, 151:10
166:8, 166:9
166:12, 221:7
**industries**
149:25, 150:1
213:23
**industry** 73:3
75:5, 157:6
272:16, 280:4
**inference**
262:12
**info** 288:1

292:14
**infor** 196:22
**information**
18:22, 18:24
19:3, 20:5, 20:9
21:4, 25:24
27:16, 27:20
27:24, 28:21
30:4, 30:9
30:20, 38:25
39:20, 39:20
40:3, 40:21
41:12, 41:21
41:25, 42:3
42:6, 42:16
43:13, 44:5
48:3, 48:5
48:17, 49:3
50:19, 50:21
51:2, 51:16
61:20, 81:20
98:2, 103:6
104:19, 115:12
117:10, 117:17
117:17, 119:14
120:3, 120:6
120:9, 120:12
120:20, 120:24
121:23, 139:13
140:10, 140:10
160:18, 177:1
191:14, 196:20
211:12, 219:1
220:1, 225:1
244:18, 259:20
260:4, 260:5
260:25, 261:10
261:24, 270:4
278:19, 278:22
288:8, 290:2
290:5, 290:9
290:10, 290:12
290:18, 290:19
290:21, 294:8
295:16, 295:23
296:2, 303:15

305:3, 307:11
309:1, 310:6
333:24, 339:7
343:21
**informed**
114:23
**infraction**
133:11, 133:23
136:5
**infractions**
135:22, 137:9
137:18, 137:25
219:16
**inherent** 29:15
32:9, 74:22
272:18
**inherently**
32:12, 32:20
**initial** 160:11
305:3
**injured** 44:19
44:21, 48:18
259:9, 259:13
260:2, 293:1
293:8
**injuries** 49:18
217:16, 259:24
259:25, 272:22
292:22, 293:5
**injury** 49:25
155:22, 288:9
324:25
**input** 336:23
**inputted** 337:5
**inquire** 103:19
103:23, 277:12
277:17, 277:25
**inquired** 278:2
278:3
**insane** 307:17
**inside** 57:23
**inspect** 37:18
**inspected** 192:1
**inspection**
169:25, 170:6
184:23, 198:5

198:8, 198:9
198:11, 198:17
199:11, 318:4
318:15, 332:24
**inspections**
224:22, 318:8
318:9
**inspector** 328:3
**install** 144:5
**instance** 1:15
246:2
**instantly** 179:23
**institution**
168:7
**instructed** 136:3
322:4, 324:21
**instructing**
254:24
**instructions**
219:5
**instrument**
342:16
**insufficient**
135:8
**insurance** 109:5
109:11, 149:1
150:23
**insured** 151:1
271:10
**intake** 333:24
**intended** 226:1
**intentional**
106:21
**intentionally**
44:25, 265:12
**interact** 220:12
**interaction**
268:18
**interactions**
277:23
**interested** 344:3
**internal** 5:13
55:8, 131:11
157:22, 157:25
**internally** 140:5
250:10

**international**
1:7, 2:11, 54:21
55:21, 65:10
318:12, 343:7
**internationally**
56:3
**interpret** 189:12
189:13, 238:9
**interpretation**
100:7, 103:15
178:8, 178:10
**interpretations**
100:6, 100:8
100:21, 101:7
101:14, 101:15
101:24, 102:3
**intervention**
72:7
**interview** 25:10
25:18, 27:4
27:6, 31:19
115:3, 115:5
302:6, 302:11
339:10
**interviewed**
27:9, 236:10
**interviewing**
25:15, 48:4
236:9
**intricacies**
149:9
**intricate** 148:8
**investigate**
100:16, 103:10
103:11, 103:20
103:22, 119:6
130:4, 181:17
225:16
**investigated**
119:8, 220:9
220:14, 267:25
311:22, 312:17
**investigates**
159:16
**investigating**
31:9, 44:12

**investigation**
6:6, 6:10, 6:14
15:7, 16:13
17:2, 17:24
17:25, 18:1
18:23, 20:23
23:5, 23:7
23:15, 23:16
23:19, 24:3
27:3, 28:16
28:19, 29:6
29:25, 31:20
38:22, 40:1
40:19, 42:12
42:15, 44:20
46:5, 88:1
112:4, 117:2
119:9, 119:17
159:9, 173:9
175:20, 175:24
176:5, 192:11
194:6, 194:14
195:13, 195:25
196:1, 196:7
197:5, 218:15
219:25, 220:1
220:15, 223:16
223:24, 224:4
224:7, 224:16
225:2, 225:21
266:16, 278:9
304:16, 309:7
312:22, 339:11
339:13
**investigations**
224:24
**investigator**
19:10
**investigators**
225:25
**involve** 324:23
325:6
**involved** 14:11
24:16, 42:25
50:8, 149:9
219:24, 220:16

224:3, 230:5
268:16, 280:7
288:6, 290:14
294:21, 303:18
320:5
**involves** 281:3
281:4
**involving** 21:17
223:24, 233:4
243:3, 324:24
**iPhone** 333:13
**Irick** 13:5
124:21
**irrelevant** 195:8
195:13
**isolated** 235:13
**issue** 27:22, 63:3
90:25, 91:18
97:18, 99:4
101:6, 104:21
104:23, 112:13
113:1, 114:10
114:24, 115:10
122:25, 123:2
136:3, 151:15
237:11, 238:2
266:22
**Issue/Concern**
253:21
**issued** 48:23
100:22, 159:12
247:13, 321:12
**issues** 10:23
36:13, 74:13
88:4, 88:7
100:15, 100:17
103:23, 104:2
104:4, 115:6
116:20, 138:1
160:11, 171:8
171:11, 177:16
178:22, 187:25
214:18, 219:4
254:2
**issuing** 26:6
**items** 83:19

## J

**Jacintoport** 1:7
2:11, 5:9, 5:13
6:10, 6:14, 8:19
12:25, 15:23
15:25, 16:3
16:8, 18:2, 65:9
65:21, 67:7
70:25, 75:2
78:6, 80:21
81:1, 81:4, 81:9
81:23, 82:14
82:16, 84:5
85:12, 88:24
89:3, 89:4, 89:6
90:13, 93:7
93:9, 93:11
93:18, 93:19
93:20, 107:6
132:6, 132:7
132:24, 133:7
159:3, 159:12
164:7, 166:20
166:22, 167:7
167:13, 168:11
174:17, 176:10
181:1, 181:8
202:15, 203:15
204:24, 208:19
220:11, 220:19
222:11, 225:14
225:21, 226:2
226:11, 233:21
234:18, 240:24
241:5, 242:1
268:16, 268:18
268:19, 288:5
294:15, 295:20
309:13, 314:22
318:12, 328:10
334:22, 343:7
**Jacintoport's**
5:21, 131:12
166:9, 309:18
**jail** 316:9

**JIMMY** 1:2, 1:4
343:2, 343:4
**job** 33:17, 40:6
40:16, 46:9
55:9, 56:5, 57:8
60:3, 62:12
62:15, 62:19
64:8, 64:10
64:25, 77:5
77:19, 78:5
78:10, 78:11
84:2, 85:24
86:2, 92:24
110:3, 122:10
122:18, 122:19
122:22, 135:11
135:16, 147:23
151:5, 172:18
174:13, 179:8
183:6, 219:23
222:1, 222:2
222:4, 259:2
270:1, 270:2
274:12, 275:21
333:15, 339:4
344:25, 345:25
**jobs** 77:22
**jointly** 218:21
**Jordan's** 317:23
**Jorge** 221:3
221:15, 234:5
234:7, 253:7
255:9, 256:3
321:25, 323:2
324:17
**Jose** 253:12
253:22
**JPI** 6:22, 252:22
282:5, 282:6
305:16
**JPI000045-46**
5:10
**JPI000300** 5:22
**JPI001384** 5:14
**JPI001631** 7:3
**JPI300** 167:4

**JPI304** 167:4
**Juan** 131:24
132:1, 301:11
**JUDICIAL** 1:9
343:9
**July** 242:5
**jump** 86:4
**jumped** 298:8
**June** 5:10
131:14, 132:21
222:15, 225:22
**jury** 13:13
91:16, 96:18
100:13, 109:2
111:21, 114:9
145:23, 146:10
178:9, 179:2
181:4, 183:11
186:5, 192:5
202:17, 211:25
311:14, 326:12
326:20, 335:3
335:15
**Justify** 127:6

## K

**keep** 51:15
66:10, 72:6
83:17, 83:19
91:11, 106:22
122:19, 122:22
127:3, 130:22
140:21, 156:4
177:22, 179:8
190:4, 190:7
200:4, 200:11
202:8, 202:11
210:3, 222:23
232:23, 249:21
270:1, 283:22
298:11, 314:5
**kept** 83:10
**Kevin** 2:3, 8:17
232:15, 343:24
345:7, 345:8

**key** 99:16
106:11, 313:4
**khaynes@kher...**
2:8
**KHERKHER**
2:5
**kill** 216:20
**killed** 15:4
102:13, 153:5
158:16, 181:13
211:19, 245:1
263:12, 272:21
326:14
**kind** 13:23, 22:7
56:22, 67:24
68:3, 72:7, 76:1
80:1, 83:14
105:2, 105:8
122:25, 123:1
130:5, 133:5
133:23, 139:15
141:24, 158:8
161:20, 162:17
167:5, 187:16
194:24, 201:16
206:13, 208:20
215:5, 215:23
218:21, 219:9
219:12, 222:22
224:14, 230:4
247:1, 250:13
257:14, 257:17
259:1, 259:15
259:24, 265:10
266:21, 270:2
271:3, 275:20
276:12, 280:4
284:22, 287:19
303:13, 305:9
322:8, 333:11
**kinds** 58:14
213:7
**knew** 22:23
88:24, 89:3
154:11, 211:21
211:21, 212:1

212:1, 235:20
278:20, 296:7
304:8, 307:21
326:7
**knocked** 308:22
309:17, 309:19
309:21
**know** 10:10
10:25, 11:24
14:11, 14:25
15:4, 15:24
16:2, 16:4
16:13, 19:14
20:19, 21:9
22:3, 22:4
24:16, 25:6
27:15, 28:1
29:24, 29:24
30:4, 30:7
30:11, 30:22
30:23, 30:24
30:25, 31:1
33:21, 34:13
35:1, 36:4
36:25, 37:2
37:15, 37:24
37:25, 38:2
39:11, 42:6
42:11, 43:1
43:14, 43:14
44:14, 44:16
49:8, 49:16
49:21, 50:2
51:21, 51:23
52:10, 53:3
53:8, 58:3, 58:6
58:6, 58:8, 58:9
58:10, 58:20
58:25, 60:12
60:17, 61:12
61:19, 62:2
62:19, 63:4
63:4, 64:15
74:4, 75:18
77:1, 77:18
78:22, 79:2

79:9, 79:20
79:22, 80:1
80:10, 80:20
81:5, 81:10
83:20, 84:10
84:14, 85:3
85:4, 85:18
85:22, 86:1
86:1, 87:6, 87:9
88:3, 88:24
89:2, 89:4, 89:4
89:8, 90:23
90:24, 90:25
91:3, 91:4, 91:6
91:7, 91:17
91:22, 91:25
92:1, 92:5, 92:6
92:7, 92:8, 93:7
93:11, 93:12
93:16, 93:19
95:16, 96:9
96:11, 96:12
96:16, 98:19
98:23, 99:18
99:19, 100:2
102:21, 102:23
103:2, 103:8
103:8, 103:17
104:15, 105:3
105:5, 105:6
105:21, 105:22
106:12, 106:23
106:23, 106:23
106:24, 107:20
108:9, 108:23
109:18, 109:22
111:1, 111:6
111:9, 111:11
111:14, 111:15
111:23, 112:1
112:16, 116:17
117:12, 118:17
118:18, 118:21
118:23, 118:24
120:5, 120:7
120:23, 120:24

122:4, 122:6
122:14, 124:11
124:13, 124:15
125:5, 125:5
125:8, 125:8
125:18, 125:22
125:24, 127:10
127:13, 127:16
128:3, 128:8
128:14, 128:16
128:20, 129:8
129:13, 129:15
129:16, 130:1
130:2, 132:2
133:21, 133:22
133:22, 136:22
139:10, 139:16
142:21, 144:6
144:10, 148:11
148:14, 149:2
149:5, 149:8
149:11, 149:15
151:1, 151:2
151:6, 151:16
151:19, 151:21
153:16, 154:4
156:22, 157:18
157:25, 160:10
160:11, 160:22
161:25, 162:3
162:4, 162:7
162:14, 162:25
163:1, 163:3
163:4, 163:5
163:7, 163:8
163:15, 163:16
163:17, 163:18
163:19, 165:8
168:25, 169:2
169:9, 169:11
169:13, 169:17
170:20, 173:3
175:7, 175:9
175:13, 178:17
180:3, 180:25
181:23, 182:2

182:4, 182:6
183:13, 185:4
185:15, 187:5
187:14, 189:16
189:17, 189:21
189:23, 190:3
190:8, 190:9
190:11, 190:24
191:7, 191:11
192:3, 192:4
193:20, 193:22
193:23, 193:23
194:7, 194:9
194:11, 194:13
194:20, 195:2
195:9, 196:5
196:5, 196:17
196:18, 196:18
196:21, 196:22
196:25, 197:3
198:13, 198:23
200:7, 200:17
200:18, 200:21
203:17, 203:19
203:22, 204:3
204:5, 204:12
204:16, 204:18
205:5, 205:7
205:11, 205:14
205:15, 205:22
206:6, 207:2
209:9, 211:4
211:21, 212:12
213:13, 213:18
213:20, 214:6
214:17, 215:6
215:9, 215:11
215:13, 215:19
216:1, 217:18
217:22, 218:2
218:3, 219:1
219:5, 219:6
219:7, 219:22
220:2, 220:14
220:16, 221:17
222:1, 222:4

223:6, 223:20
226:3, 226:7
226:14, 228:5
229:13, 230:19
231:11, 231:12
231:14, 231:14
231:17, 231:19
231:23, 232:11
234:15, 236:5
237:20, 238:4
238:7, 239:14
239:15, 241:15
243:16, 248:11
248:22, 248:25
249:4, 249:6
249:18, 250:4
250:22, 250:24
251:3, 251:12
251:13, 251:15
251:17, 251:19
251:20, 251:22
251:25, 253:17
254:8, 256:6
257:14, 257:15
258:10, 258:14
258:15, 258:18
259:12, 259:15
260:1, 260:12
260:16, 260:25
260:25, 261:1
261:2, 261:3
261:4, 261:10
261:14, 261:17
261:19, 261:20
261:21, 261:24
262:16, 262:17
263:7, 263:9
263:18, 264:9
264:20, 264:22
265:2, 265:7
268:4, 268:12
268:15, 269:16
274:9, 274:10
274:12, 275:10
276:6, 276:7
277:9, 278:17

281:8, 281:11
282:25, 283:6
283:20, 283:24
284:15, 284:23
284:24, 287:15
287:17, 289:15
289:24, 290:24
292:21, 292:25
293:4, 293:17
293:19, 293:22
294:9, 294:18
294:20, 295:24
295:25, 296:8
296:16, 296:21
296:23, 297:1
298:8, 299:20
300:12, 303:1
303:13, 303:14
305:2, 305:20
307:18, 311:16
311:23, 312:3
312:13, 313:19
317:24, 323:12
323:13, 323:14
324:3, 324:7
327:9, 328:2
328:2, 328:9
328:13, 329:8
329:16, 329:19
329:21, 329:22
329:23, 329:25
330:2, 331:6
332:23, 333:9
334:13, 335:11
335:24, 336:14
336:18, 338:7
**knowing** 101:12
101:13, 155:8
232:1
**knowledge**
23:22, 47:7
81:13, 81:15
90:21, 106:11
123:19, 128:9
128:13, 148:6
165:9, 165:12

175:10, 269:5
277:24, 294:10
311:19, 336:14
337:1, 339:17
**known** 14:24
14:25, 90:21
97:18, 99:13
99:16, 100:15
102:1, 103:3
103:16, 114:25
117:11, 119:14
124:2, 153:1
171:19, 175:10
211:18, 214:14
214:14, 214:14
216:14, 264:21
264:25, 264:25
269:13, 342:12
**knows** 86:19
264:8, 265:4
265:9, 268:23
331:14

### L

**labor** 147:19
149:4, 149:22
150:2
**lack** 133:24
160:11
**lagging** 138:8
138:16
**laid** 46:2, 49:5
49:6, 49:9
158:8, 201:12
202:20, 202:23
320:12
**lane** 202:21
202:22, 320:13
**lanes** 201:4
201:11, 201:11
201:23, 202:16
203:3, 203:9
203:11, 320:2
**large** 14:12
14:18, 58:11

63:8, 63:15
126:14, 155:25
239:10, 243:5
248:13, 260:18
265:24, 280:16
281:4, 300:18
322:2, 322:14
324:19
**larger** 236:22
243:21, 243:22
244:1, 284:13
**largest** 169:8
**Lauderdale**
47:21
**law** 1:21, 226:2
314:14, 314:15
**laws** 101:1
101:7, 275:11
**lawsuit** 11:11
18:18, 32:2
32:5, 37:18
88:18, 109:6
109:11, 109:22
113:14, 114:11
116:9, 116:13
116:19, 117:8
119:11, 120:2
174:2, 209:13
214:25, 222:10
278:9, 281:16
**lawsuits** 186:23
**lawyer** 13:4
124:16, 209:19
296:25, 297:2
297:15, 297:18
297:21, 297:23
297:25, 298:2
298:4, 298:8
300:21, 300:25
313:22, 333:9
**lawyer's** 11:15
39:7, 124:20
314:14
**lawyers** 11:20
12:22, 12:25
18:18, 32:2

32:5, 37:17
39:9, 39:22
117:1, 199:6
252:23, 281:24
290:14, 293:20
305:15, 306:4
**lay** 43:22
**layer** 145:6
**layout** 201:16
203:24
**LBJ** 293:9
**lead** 18:1, 19:9
55:5, 86:4
87:13, 125:11
**leader** 77:10
78:1
**leaders** 135:7
**leading** 138:8
138:11, 138:21
164:3, 339:1
339:8, 339:20
**learn** 22:10
22:13, 41:2
48:16, 88:15
101:16, 115:10
139:23, 153:4
**learned** 19:17
28:8, 41:7
88:18, 89:1
89:2, 113:11
161:4, 214:24
266:25, 267:2
267:24, 278:17
281:15
**learning** 98:2
112:24, 114:10
330:5
**leave** 39:15
40:24, 151:3
288:17
**leaving** 26:1
96:7, 96:8
**led** 163:21
164:1, 176:5
**left** 129:21
242:25

**legal** 23:14, 32:6
88:17, 118:2
118:5, 164:24
165:6, 165:19
287:8, 301:4
304:1
**length** 44:5
**lenses** 91:21
**Les** 3:10
**lessons** 41:7
**letting** 9:23
133:22
**level** 338:16
**license** 151:6
338:23
**lie** 50:7, 316:10
**Lieber** 164:9
**lies** 63:5
**life** 37:7, 37:8
101:8, 122:23
146:16, 152:24
153:3, 194:11
213:3, 334:22
**lifesaving** 153:4
153:7
**lift** 86:1, 149:6
149:7, 153:14
169:4, 169:6
236:24, 243:18
**lifting** 151:20
**light** 19:4, 38:12
42:3, 44:20
50:7, 72:17
148:24, 191:14
**limit** 251:15
251:16, 269:9
275:3
**limitation** 270:2
**limited** 144:8
181:17, 181:20
255:16, 256:7
258:4, 310:5
**line** 43:9, 58:2
176:19, 176:20
232:16, 285:15
285:18, 291:20

**lines** 158:6
158:12
**LinkedIn** 5:6
53:18, 57:6
**list** 211:16
249:20, 282:10
**listed** 297:18
298:6
**Listen** 189:17
251:3
**listing** 128:12
**lists** 207:24
251:24, 253:3
**literally** 15:19
26:14, 34:6
34:14, 57:20
209:2
**litigation** 21:12
24:5, 24:9
**little** 60:13
60:14, 114:7
119:17, 131:9
131:10, 143:16
147:9, 176:14
203:21, 203:22
218:2, 224:13
224:14, 244:17
247:7, 268:17
268:18, 274:4
**LLC** 1:8, 2:11
343:8
**LLP** 2:5, 2:14
**load** 210:13
210:17, 245:6
**loaded** 173:2
173:5, 173:15
174:4, 229:23
237:6
**loading** 173:24
228:12, 229:22
231:15, 237:5
244:20, 246:15
**local** 27:10
220:19, 344:11
345:18
**located** 200:11

**location** 154:4
211:16
**locations** 54:24
55:16, 55:25
63:1, 210:10
211:24
**lock** 313:4
**log** 15:18
**logic** 186:5
**logo** 67:4
131:12
**long** 11:24, 12:8
16:2, 21:9, 74:7
78:24, 82:11
87:7, 87:8
89:20, 96:11
104:24, 105:10
105:11, 133:3
151:20, 151:21
160:3, 186:13
189:19, 206:16
226:18, 226:20
227:7, 248:10
248:14, 251:10
338:7
**long-term** 38:1
**longer** 35:18
163:22, 203:1
226:12, 283:4
283:15, 335:9
**Longshoring**
72:25
**look** 10:20
15:19, 30:25
34:14, 35:17
35:25, 36:24
43:12, 44:15
44:25, 45:4
46:6, 46:12
46:15, 49:2
58:7, 61:20
75:8, 101:3
101:23, 104:20
118:10, 131:8
133:2, 138:12
140:18, 158:21

167:6, 177:19
185:5, 195:4
200:4, 202:8
205:9, 205:25
210:2, 216:6
216:17, 216:22
219:3, 219:9
229:11, 234:16
237:22, 238:19
247:15, 248:18
248:19, 249:1
249:5, 249:17
250:6, 251:8
255:9, 283:1
297:13, 305:12
312:19, 316:14
329:10, 333:7
**looked** 45:3
72:17, 100:10
100:11, 102:10
127:20, 156:20
193:6, 205:12
205:17, 205:22
207:5, 215:1
231:17, 232:1
238:5, 242:7
246:8, 278:14
278:23, 286:10
302:2, 325:16
337:4
**looking** 33:13
35:14, 42:15
44:18, 44:20
45:23, 47:1
48:18, 72:15
127:11, 134:1
138:17, 138:17
173:18, 190:3
216:24, 217:5
218:16, 230:14
239:18, 247:12
249:19, 251:17
276:25, 281:6
285:4, 286:7
289:9
**lookout** 200:12

202:12
**looks** 206:13
222:24, 223:10
224:25, 231:3
235:16, 282:4
286:8, 293:12
293:14, 306:15
306:19, 325:24
**loop** 3:5, 279:3
**loose** 221:21
**loosely** 134:17
140:14
**Lopez** 1:8, 3:1
3:2, 282:22
283:8, 343:8
**lose** 119:5
**loses** 37:7, 37:8
**loss** 287:13
**lost** 110:7
110:18
**lot** 21:4, 30:19
37:12, 51:2
58:5, 58:6
58:22, 58:24
58:24, 60:6
96:7, 145:12
152:10, 157:12
194:4, 194:6
208:23, 208:25
269:17, 274:15
281:3, 290:12
295:21, 295:21
312:4, 323:19
325:19, 330:14
**lots** 70:10, 149:8
**loud** 142:5
179:3, 201:2
**Louisiana** 1:21
2:15
**low** 145:1
**lower** 227:12
**lucky** 216:11
**Luis** 221:10
221:13, 253:18
253:25, 254:10
283:11, 284:19

284:20, 285:10
288:15, 288:21
290:8, 292:10
293:7, 298:4
308:2
**lunch** 130:13
130:18, 130:22
**lying** 107:18
196:16

## M

**machine** 1:20
58:8, 77:17
168:25, 169:2
169:6, 169:9
169:20, 169:23
170:6, 170:8
237:7, 238:3
238:10, 238:15
239:25, 251:21
256:20, 257:9
257:17
**machinery**
149:8, 191:3
272:25, 274:1
**machines** 142:8
169:8, 257:15
**main** 90:19
127:7, 132:5
158:8, 158:9
171:16, 210:24
211:1, 221:14
221:15
**maintenance**
204:17
**major** 103:3
214:18
**making** 23:12
41:22, 76:16
80:22, 151:19
153:2, 176:25
191:2, 191:3
196:24, 212:15
212:19, 231:1
239:13, 271:20

305:5, 314:7
**malfunctioning**
192:13
**man** 27:10
163:5, 182:6
248:12, 312:5
**man-hours**
250:2
**manage** 48:2
48:6
**managed** 150:8
**management**
47:12, 47:23
**manager** 44:10
54:1, 54:6
62:17, 62:18
164:9, 220:10
223:7
**managers** 36:23
135:21
**maneuvering**
149:11, 234:19
**manlift** 151:11
**manner** 7:13
224:3
**manual** 5:9, 6:2
35:23, 35:24
36:3, 139:2
139:6, 139:10
139:19, 139:24
139:25, 140:3
141:3, 205:18
206:4, 206:16
211:8
**manually** 35:22
**manuals** 209:3
**manufactured**
14:21
**manufacturer**
139:6, 139:14
167:20, 208:1
208:18, 210:20
228:3, 228:5
**manufacturer's**
139:2, 139:6
139:19

**manufacturers**
62:23
**Marc** 2:13
**Marc.matthew...**
2:18
**March** 22:20
344:6
**marine** 8:19, 9:9
9:13, 13:1, 13:9
29:14, 32:10
53:22, 54:1
56:7, 59:18
59:21, 59:23
59:25, 63:22
64:5, 68:7
68:14, 68:25
70:10, 70:23
72:11, 72:24
73:7, 73:8
73:11, 75:12
76:12, 88:21
90:4, 90:14
92:18, 92:20
93:22, 97:25
99:2, 104:5
107:6, 108:22
113:20, 121:4
121:14, 121:18
121:19, 121:20
147:14, 149:4
149:22, 150:3
153:10, 166:19
186:13, 189:14
192:24, 262:18
319:12, 321:1
337:19
**Marine's** 67:4
92:24
**Marines** 72:16
**mark** 1:4, 2:4
306:8, 343:4
**marked** 53:11
66:13, 131:1
154:24, 166:3
206:9, 207:3
207:3, 207:4

222:8, 233:1
241:20, 252:20
281:21, 305:13
317:10
**markings** 158:4
158:16, 159:1
159:4
**marks** 49:10
49:12
**material** 60:24
85:8
**materials** 54:1
54:22, 61:10
62:3, 62:9
62:13, 70:14
70:17, 70:20
**matter** 110:2
215:14, 255:10
**matters** 110:18
110:19, 110:21
**Matthews** 2:13
**Mcarter@kher...**
2:9
**mean** 16:12
22:6, 31:14
38:9, 45:5
50:22, 69:21
74:18, 80:6
81:15, 85:2
85:19, 89:9
94:24, 97:11
125:10, 136:23
140:14, 141:6
143:20, 143:24
150:25, 151:1
151:5, 159:15
160:17, 167:10
172:10, 175:3
175:3, 178:14
179:13, 189:18
189:25, 191:7
197:1, 198:25
205:21, 206:12
209:16, 213:18
243:10, 248:3
248:8, 253:4

256:11, 257:11
260:6, 260:24
261:3, 261:21
262:5, 263:4
263:19, 265:22
265:25, 267:3
270:21, 272:10
273:15, 275:18
275:19, 278:13
285:17, 286:3
286:18, 294:24
295:18, 297:2
303:2, 304:2
304:10, 307:15
309:10, 319:10
319:12, 329:3
330:15, 331:23
**meaning** 68:4
71:17, 74:2
74:13, 88:21
93:6, 139:6
151:1, 202:7
202:15, 244:6
256:5, 288:16
309:24, 324:12
329:5
**means** 61:15
61:16, 71:7
90:13, 102:4
114:10, 150:10
169:4, 189:10
200:3, 221:23
226:3, 231:11
283:24, 292:22
296:8, 296:16
321:16, 325:4
**meant** 167:1
217:9, 256:6
**measurements**
31:14
**measures** 69:11
117:13, 271:15
274:12
**mechanic**
251:24, 252:1
**mechanically**

170:9
**media** 13:19
13:21
**medical** 88:4
88:7, 99:4
103:17, 103:23
115:12, 115:17
115:25, 120:3
120:6, 120:9
120:9, 120:12
120:15, 120:18
120:22, 121:23
122:5, 122:25
123:2, 163:11
258:23, 259:1
259:3, 259:16
259:17, 259:19
260:5, 260:24
266:21, 269:9
269:25, 270:5
270:6, 270:7
271:3, 275:2
275:7, 275:8
275:12, 275:25
276:1, 276:6
276:12, 276:18
276:25, 277:12
277:15, 277:18
277:25, 278:4
278:11, 278:12
278:17, 281:16
338:10
**medically** 102:9
120:15, 266:17
271:10, 271:20
274:2, 279:7
280:2, 280:15
281:14
**medications**
11:6
**meet** 13:12, 55:8
80:25, 81:23
81:25, 82:4
214:9, 214:12
295:10
**meeting** 12:8

12:9, 12:11
52:13, 82:11
**meetings** 12:1
13:12, 45:16
81:3, 81:5, 83:9
83:18, 84:22
**members** 82:5
**memo** 5:13
131:11, 325:4
325:16, 327:17
332:2
**memorializing**
135:17
**memory** 79:14
87:4, 104:22
105:10, 141:5
144:24, 287:12
301:23, 318:20
**Mendez** 221:3
221:15, 234:5
234:7, 235:20
253:7, 255:9
255:11, 255:14
256:3, 321:25
322:19, 322:24
323:6, 324:17
**Mendez's** 222:1
**mentioned**
49:13, 73:16
74:23, 85:10
167:17, 237:17
237:18, 274:18
283:13
**merchandise**
257:5
**merits** 33:22
**message** 26:1
135:10, 281:25
284:2, 284:5
284:13, 296:19
296:21, 297:6
297:9, 297:9
297:15, 298:14
298:18, 299:1
299:3, 299:3
299:6, 299:6

299:12, 299:23
300:8, 301:1
306:6
**messages** 194:1
295:3, 304:3
306:5
**messaging**
305:11
**messed** 237:20
**met** 13:17, 44:4
44:12, 49:4
162:14, 251:18
**metal** 228:22
**method** 155:16
156:10
**Miami** 13:10
15:10, 15:12
15:14, 15:20
44:10, 54:7
54:16, 55:20
60:15, 63:6
63:8, 64:6
80:15, 164:9
204:24, 220:18
223:7, 223:8
289:9, 294:14
295:18, 314:17
**Michael** 317:23
**Microsoft** 81:24
82:17
**middle** 175:5
**mind** 18:9
51:15, 68:14
153:18, 187:5
215:7, 319:13
**mine** 110:5
252:4, 285:15
**minimize** 249:8
**minimum** 28:24
59:4, 70:3
73:18, 74:2
74:3, 74:20
90:12
**minimums**
89:25
**minor** 176:23

217:13, 217:16
217:16
**minute** 307:5
**minutes** 288:24
289:3, 292:11
295:5, 299:9
343:24, 343:25
**mirrors** 156:15
156:15
**misread** 229:19
**missed** 49:17
**missing** 99:20
**mistake** 172:23
239:23
**mode** 36:3
**model** 206:10
**modifications**
177:2
**module** 168:19
168:20, 171:7
177:16, 187:24
187:25
**modules** 57:18
92:13, 168:15
168:16
**mom** 52:24
**moment** 34:14
301:18
**Monday** 111:16
127:23, 128:17
195:6
**money** 212:16
212:19
**monitor** 71:19
**monitoring**
134:15, 137:24
**Montez** 246:17
**month** 135:16
283:5
**months** 22:22
100:12, 134:25
205:23, 317:20
319:4
**morning** 8:13
8:14, 128:17
192:2, 192:3

195:6, 233:18
242:13, 284:15
290:6, 304:17
**motion** 109:21
**move** 119:6
141:7, 143:13
143:19, 144:23
149:7, 151:19
153:15, 185:9
194:24, 237:5
249:23, 257:13
284:24, 295:13
296:9, 296:17
**moved** 34:25
35:2, 35:22
45:9, 45:18
178:6, 319:24
**movement**
141:12, 295:21
**moves** 61:12
144:16, 250:3
**moving** 29:19
37:2, 111:25
127:1, 141:16
141:17, 141:18
142:2, 143:21
144:12, 145:8
149:10, 151:16
153:19, 153:20
172:6, 186:11
237:3
**multiple** 54:23
55:15, 77:22
215:9, 215:19
249:18, 322:1
322:13, 324:18

**N**

**N-O-V-A** 47:17
47:18
**name** 8:15, 8:17
13:6, 24:18
24:25, 25:2
47:14, 53:20
124:20, 132:14

142:9, 176:21
176:22, 176:22
221:5, 233:5
242:15, 251:24
252:5, 252:6
257:9, 282:21
283:2, 292:18
338:3, 341:2
342:15
**named** 3:1
14:22, 220:8
227:4, 252:1
254:10, 305:18
306:3
**names** 136:25
**Nash** 2:12, 38:6
38:14, 46:22
49:19, 51:4
51:19, 52:8
52:18, 52:22
53:4, 53:7, 66:2
89:17, 90:6
92:4, 92:11
94:6, 94:11
94:22, 95:4
95:15, 96:4
96:23, 97:2
98:7, 98:13
98:17, 106:16
107:1, 108:3
108:8, 108:15
108:21, 109:8
109:12, 109:16
109:19, 109:23
110:1, 110:8
110:24, 113:2
113:6, 114:6
114:13, 116:16
116:21, 116:25
117:4, 117:9
118:12, 118:16
119:7, 119:13
119:18, 121:17
122:1, 122:11
123:7, 124:19
126:19, 129:10

130:9, 130:12
145:16, 146:2
146:11, 146:21
148:2, 148:5
150:7, 150:20
152:9, 152:20
152:25, 153:6
154:10, 156:17
157:5, 157:11
157:15, 157:20
162:13, 165:17
165:22, 171:22
172:20, 172:24
173:10, 176:4
177:7, 179:12
179:16, 179:25
180:7, 180:13
180:17, 180:20
180:23, 181:2
181:19, 182:10
182:13, 182:17
182:20, 182:22
183:3, 183:8
184:16, 185:7
185:10, 187:1
187:10, 187:18
191:21, 195:1
195:17, 197:16
197:19, 197:23
198:2, 199:3
199:14, 208:15
209:14, 209:20
211:20, 212:18
212:21, 213:4
229:3, 232:15
240:14, 241:7
241:11, 243:8
247:4, 248:17
254:17, 259:4
261:12, 262:1
262:11, 262:15
262:22, 263:8
263:14, 263:17
263:24, 264:5
264:13, 265:15
265:20, 266:4

267:10, 267:19
268:9, 268:24
269:11, 269:22
270:19, 270:23
271:5, 271:12
272:14, 273:7
274:3, 275:5
276:14, 278:10
279:10, 279:13
279:17, 280:3
280:18, 280:21
280:25, 281:18
297:8, 298:19
300:10, 300:14
301:2, 301:6
302:22, 302:25
303:5, 307:12
308:13, 308:17
310:9, 310:14
310:20, 311:7
311:11, 311:18
312:1, 312:9
312:21, 313:2
313:5, 313:9
313:13, 313:17
313:24, 314:10
314:12, 314:19
314:24, 315:3
315:9, 315:14
315:17, 315:21
315:25, 316:7
316:11, 316:15
316:19, 316:25
317:2, 317:6
317:25, 319:8
320:18, 320:22
321:3, 323:4
325:9, 325:21
325:25, 326:4
326:9, 326:17
326:24, 327:3
327:8, 327:16
327:20, 328:1
328:6, 328:8
328:12, 328:16
329:1, 330:11

330:13, 330:17
330:21, 331:11
331:17, 331:20
332:4, 332:7
332:12, 332:18
332:21, 333:2
333:8, 334:25
335:5, 335:8
335:19, 335:22
336:4, 339:24
343:19
**nature** 52:24
334:13
**near** 320:8
**nearby** 136:6
**nearly** 135:6
**necessarily** 7:14
70:6, 70:9, 75:3
85:18, 215:25
274:17, 312:10
321:4
**necessary** 73:23
78:10, 215:7
**need** 10:9, 14:18
43:12, 44:15
51:2, 71:14
83:22, 86:4
93:15, 111:3
114:17, 117:21
133:3, 135:11
135:16, 137:15
138:13, 139:1
139:5, 139:22
141:8, 141:15
141:25, 143:22
143:23, 144:21
144:22, 151:13
154:15, 176:17
178:16, 186:8
220:5, 231:8
247:20, 258:23
259:1, 261:3
262:8, 268:22
272:6, 286:25
305:10, 323:2
323:11, 325:18

330:15
**needed** 46:3
79:18, 103:4
255:17, 330:24
**needle** 194:24
**needs** 65:25
69:2, 83:20
144:15, 149:12
231:19, 263:7
331:6, 336:7
336:11
**negate** 100:2
**negates** 141:24
**negligence**
106:21
**negligent** 108:2
**neither** 344:1
**never** 17:20
19:24, 20:8
25:25, 43:5
43:11, 43:21
52:4, 52:5
96:25, 115:5
116:4, 116:9
116:10, 116:13
116:14, 117:18
128:25, 151:17
175:23, 177:8
185:16, 193:21
197:9, 207:5
220:20, 228:18
228:20, 238:24
243:14, 267:6
323:18, 339:7
**new** 26:10
43:20, 85:8
119:24, 123:15
140:10, 140:10
154:16, 165:1
281:13
**news** 260:15
308:9
**nice** 261:20
261:21, 263:18
**night** 40:14
**nod** 10:3

**noise** 58:18
142:18, 145:5
188:8, 189:6
189:23, 191:3
191:3
**nonnegotiable**
210:21
**nonresponsive**
115:8, 115:21
121:13, 154:14
202:1, 203:5
213:15
**nonresponsive...**
152:3
**normal** 42:17
42:18, 294:6
**normally** 42:20
79:22, 80:3
84:13, 85:6
125:6, 148:7
151:25, 153:20
164:10, 175:6
**north** 237:6
**NOTARY**
342:22
**note** 7:12
133:21
**noted** 342:3
**notes** 83:17
83:19, 302:11
**notice** 133:11
133:20, 134:3
134:6, 134:10
134:10, 203:19
**notices** 133:16
134:11, 136:4
**notified** 89:2
176:9, 284:16
**notifying** 284:16
**Notwithstanding**
186:19
**Nova** 47:11
47:16
**nub** 139:15
**number** 16:1
25:20, 200:8

206:10, 251:13
285:11, 305:21
318:4
**numbered** 1:17
101:3
**numbers** 318:8
**numerous** 135:5
135:15, 192:25

**O**

**O'Neill** 64:3
65:3, 66:1
268:21
**Oak** 344:12
345:20
**oath** 8:5, 14:5
14:7, 14:9
14:10, 17:14
19:22, 20:15
20:18, 23:4
24:11, 28:10
107:14, 128:21
148:12, 148:15
174:3, 175:25
196:12, 315:24
316:4, 342:13
**object** 32:18
38:6, 43:3
43:17, 44:22
46:22, 79:7
88:13, 89:13
91:9, 106:1
115:7, 121:12
125:12, 128:6
141:10, 143:1
146:7, 149:20
150:15, 152:2
152:13, 154:13
162:8, 203:4
213:14, 249:10
271:16, 280:9
297:8, 302:22
**objection** 38:14
49:19, 50:9
51:4, 51:12

51:19, 52:8
52:18, 52:22
53:4, 53:7, 72:1
72:10, 89:17
90:6, 91:23
92:3, 92:4
92:11, 94:6
94:11, 94:12
94:21, 94:22
95:3, 95:4, 95:7
95:14, 95:15
96:4, 96:5
96:23, 96:24
97:2, 97:3, 97:8
98:7, 98:13
98:17, 106:7
106:16, 107:1
107:2, 107:19
108:3, 108:7
108:8, 108:15
108:21, 109:8
109:12, 109:16
109:19, 109:23
110:1, 110:8
110:12, 110:24
113:2, 113:3
113:6, 114:6
114:13, 115:21
116:16, 116:21
116:25, 117:4
117:9, 118:12
118:16, 118:20
119:7, 119:13
119:18, 121:17
122:1, 122:11
123:7, 124:19
126:10, 126:19
129:10, 129:11
129:22, 130:8
130:9, 142:20
143:7, 143:15
145:10, 145:16
146:2, 146:11
146:20, 146:21
147:2, 147:11
148:2, 148:5

| | | | | |
|---|---|---|---|---|
| 148:19, 150:7 | 240:14, 240:16 | 308:17, 309:4 | 335:19, 335:22 | 73:24, 74:12 |
| 150:20, 152:9 | 241:7, 241:11 | 310:8, 310:9 | 336:4 | **occur** 199:25 |
| 152:20, 152:25 | 243:8, 244:14 | 310:14, 310:19 | **objects** 239:9 | 201:6, 201:7 |
| 153:6, 154:9 | 247:3, 247:4 | 310:20, 310:24 | 245:15, 325:7 | 324:12 |
| 154:10, 154:20 | 247:9, 248:1 | 311:7, 311:11 | **obligate** 102:7 | **occurred** 20:8 |
| 156:17, 157:5 | 248:16, 248:17 | 311:18, 312:1 | **obligation** 32:24 | 230:3, 344:5 |
| 157:11, 157:13 | 258:9, 259:4 | 312:2, 312:8 | 75:8, 99:3 | **ocean** 286:12 |
| 157:15, 157:19 | 260:13, 260:20 | 312:9, 312:21 | 100:16, 103:19 | **October** 12:10 |
| 157:20, 162:13 | 261:6, 261:11 | 313:2, 313:5 | 332:15 | **odd** 151:22 |
| 165:22, 171:22 | 261:12, 261:25 | 313:9, 313:13 | **obligations** | **odds** 252:10 |
| 172:20, 172:24 | 262:1, 262:10 | 313:17, 313:24 | 287:8 | 252:11 |
| 172:25, 173:4 | 262:11, 262:14 | 314:10, 314:12 | **observed** 133:12 | **offer** 67:17 |
| 173:10, 173:20 | 262:15, 262:21 | 314:19, 314:24 | 137:18, 325:1 | 311:14 |
| 174:7, 176:4 | 262:22, 263:2 | 315:3, 315:9 | 327:23 | **offering** 312:15 |
| 177:7, 179:11 | 263:8, 263:13 | 315:14, 315:17 | **observes** 325:13 | 338:15, 338:18 |
| 179:12, 179:15 | 263:14, 263:17 | 315:21, 315:25 | **observing** 134:2 | 338:22, 339:2 |
| 179:16, 179:21 | 263:23, 263:24 | 316:7, 316:11 | 134:15 | **office** 11:15 |
| 179:24, 179:25 | 264:4, 264:5 | 316:15, 316:19 | **obstructed** | 15:20, 39:7 |
| 180:2, 180:7 | 264:12, 264:13 | 316:25, 317:6 | 155:18, 156:11 | 60:17, 60:18 |
| 180:8, 180:12 | 264:19, 265:14 | 317:25, 319:8 | 210:11, 210:14 | 63:3, 64:14 |
| 180:13, 180:16 | 265:15, 265:19 | 320:18, 320:22 | **obtain** 41:12 | 158:9, 175:22 |
| 180:17, 180:20 | 265:20, 266:3 | 321:3, 323:4 | 48:17, 120:13 | 273:14, 281:7 |
| 180:23, 181:2 | 266:4, 266:9 | 323:25, 325:8 | 255:10, 338:23 | 284:16, 300:19 |
| 181:19, 182:9 | 266:14, 267:9 | 325:9, 325:21 | **obtained** 27:16 | 314:14, 314:14 |
| 182:10, 182:13 | 267:10, 267:18 | 325:25, 326:4 | 27:21, 27:24 | 314:15, 342:19 |
| 182:17, 182:20 | 267:19, 267:22 | 326:9, 326:16 | 47:1, 206:4 | **officer** 95:22 |
| 182:22, 183:3 | 268:6, 268:9 | 326:17, 326:23 | **obviously** 9:20 | 343:17, 343:22 |
| 183:7, 183:8 | 268:11, 268:24 | 326:24, 327:3 | 36:12, 64:10 | 345:2 |
| 183:19, 184:16 | 269:11, 269:22 | 327:7, 327:8 | 66:24, 76:12 | **officer's** 345:8 |
| 185:7, 185:10 | 270:19, 270:23 | 327:16, 327:20 | 79:23, 81:1 | **offices** 1:21 |
| 185:14, 185:19 | 271:5, 271:6 | 328:1, 328:6 | 99:19, 100:25 | 55:18, 55:21 |
| 187:1, 187:10 | 271:12, 271:23 | 328:8, 328:11 | 116:10, 120:10 | 63:13 |
| 187:18, 187:19 | 272:1, 272:14 | 328:12, 328:15 | 141:24, 144:6 | **official** 54:5 |
| 191:21, 193:25 | 273:7, 274:3 | 328:16, 328:25 | 191:24, 215:14 | 163:16 |
| 195:1, 195:16 | 275:5, 276:14 | 329:1, 329:7 | 218:25, 221:18 | **offloading** 255:1 |
| 195:17, 197:16 | 276:19, 277:2 | 330:11, 330:13 | 228:22, 233:20 | **oftentimes** 31:9 |
| 197:19, 197:23 | 278:10, 279:10 | 330:17, 330:21 | 235:20, 238:5 | **oh** 131:4, 179:4 |
| 198:2, 198:14 | 279:13, 279:17 | 331:11, 331:16 | 285:4, 287:5 | 262:6, 309:24 |
| 199:3, 199:14 | 280:3, 280:18 | 331:17, 331:20 | 287:16, 288:9 | **Ok** 286:23 |
| 202:1, 208:15 | 280:21, 280:25 | 331:21, 332:3 | 291:2, 295:19 | 289:5 |
| 209:14, 209:20 | 281:18, 281:19 | 332:4, 332:7 | 300:18 | **okay** 9:4, 9:9 |
| 211:20, 212:18 | 298:19, 300:10 | 332:11, 332:12 | **occasion** 21:15 | 9:25, 10:21 |
| 212:21, 213:4 | 300:14, 301:2 | 332:18, 332:21 | **occasions** | 10:22, 10:25 |
| 229:2, 229:3 | 301:6, 302:25 | 333:2, 333:8 | 135:10 | 11:1, 11:4, 11:5 |
| 229:7, 240:6 | 303:4, 303:5 | 334:25, 335:1 | **occupational** | 12:12, 12:22 |
| 240:10, 240:13 | 307:12, 308:13 | 335:5, 335:8 | 72:19, 72:20 | 14:3, 19:6 |

23:18, 24:23
26:20, 27:10
38:4, 38:7, 38:9
38:13, 38:15
38:16, 39:22
39:23, 39:24
47:10, 47:19
53:1, 53:15
58:13, 59:19
67:16, 74:8
77:5, 77:19
78:11, 82:15
83:2, 84:20
85:8, 87:9
88:10, 89:25
92:13, 96:3
97:17, 99:11
99:17, 105:3
106:14, 108:5
110:4, 114:2
114:8, 115:20
122:13, 122:24
128:2, 129:20
130:11, 130:21
132:4, 136:15
136:18, 139:4
139:9, 140:16
141:4, 141:22
144:13, 145:3
147:13, 147:20
149:19, 150:23
154:16, 156:25
159:24, 161:1
161:6, 161:19
167:9, 168:15
172:7, 173:8
174:5, 174:6
174:10, 174:11
177:15, 178:18
179:4, 182:24
192:12, 192:25
193:6, 195:7
195:11, 196:13
199:6, 199:21
200:10, 205:17
208:2, 211:3

211:14, 212:15
214:5, 214:9
214:18, 214:20
218:3, 218:5
219:12, 220:12
223:3, 223:4
225:4, 226:9
227:13, 229:21
230:22, 230:23
232:3, 233:3
233:4, 233:15
233:16, 234:16
234:18, 236:7
239:19, 241:24
241:25, 243:19
245:19, 246:11
247:17, 249:4
250:18, 251:7
252:23, 253:6
254:4, 254:12
256:11, 256:22
257:2, 257:21
258:12, 258:17
259:11, 259:24
260:6, 263:10
263:20, 269:4
269:23, 273:9
276:8, 280:19
280:22, 282:1
283:9, 285:7
286:16, 287:24
289:19, 291:13
291:18, 294:16
294:22, 297:5
297:12, 297:14
297:18, 298:8
301:8, 302:9
302:19, 303:22
303:23, 304:7
305:15, 306:5
314:21, 315:7
319:2, 319:14
319:18, 320:16
321:18, 322:19
323:7, 324:6
324:9, 326:11

327:1, 330:25
331:1, 331:3
331:18, 331:22
333:11, 333:22
334:7, 336:14
338:6, 339:24
**old** 252:16
**Omar** 1:11, 1:14
4:2, 5:6, 6:24
8:6, 8:16, 53:20
252:1, 252:7
282:15, 341:2
341:24, 342:1
342:8, 342:12
343:12, 343:16
343:20, 345:2
**Omar.Contrer...**
252:3
**Omar.Contrer...**
252:4
**OMG** 309:24
**once** 23:13
41:11, 49:22
49:23, 50:1
50:6, 81:1
81:22, 82:25
114:2, 119:5
215:11, 287:21
287:25, 305:9
**ones** 33:17
127:7, 134:6
243:15, 294:17
**ongoing** 23:5
280:6
**open** 51:15
51:20, 175:18
178:8, 178:9
183:2, 201:10
256:19, 257:20
**openly** 137:7
**operate** 14:16
14:19, 57:2
57:4, 57:14
76:9, 77:15
78:5, 79:3
85:24, 86:7

86:18, 86:20
86:23, 87:15
87:24, 88:5
88:12, 89:23
91:2, 92:2, 94:2
94:8, 96:20
104:13, 120:16
121:2, 121:3
121:24, 140:15
144:15, 151:12
158:22, 161:16
162:11, 162:16
163:19, 164:16
164:17, 169:15
171:19, 185:25
218:8, 221:24
230:20, 237:23
245:13, 247:24
261:5, 261:23
262:20, 263:11
264:11, 264:14
264:17, 265:7
265:11, 265:12
265:24, 266:22
270:9, 270:10
271:11, 275:3
275:20, 276:8
276:9, 278:4
279:8, 280:15
329:4
**operated** 56:17
56:19, 56:22
57:3, 57:7, 57:8
57:11, 89:11
162:2, 163:15
164:11, 164:14
329:14, 330:3
**operates** 90:20
**operating** 14:12
56:20, 76:1
78:7, 86:13
86:14, 87:8
87:17, 89:9
89:15, 94:3
94:14, 94:15
95:1, 95:8

95:12, 95:25
96:2, 96:13
99:10, 99:14
100:4, 102:8
113:22, 126:14
138:25, 151:7
151:11, 154:7
154:12, 154:19
161:12, 161:23
162:15, 162:24
163:1, 163:2
163:22, 164:1
164:13, 169:13
170:17, 170:21
170:22, 181:24
182:7, 183:14
186:3, 201:24
208:2, 234:23
235:1, 236:16
238:14, 242:17
249:8, 251:2
260:18, 262:9
264:23, 264:24
266:6, 266:17
267:5, 267:7
267:15, 267:16
274:1, 324:8
327:10, 331:5
335:9
**operation** 77:18
78:6, 148:10
149:12, 150:14
151:25, 169:9
169:17, 175:14
212:12, 214:7
256:9, 258:19
261:16, 291:15
324:23, 325:1
327:22
**operational**
60:16, 60:19
60:20, 86:9
156:16, 156:18
199:12, 331:6
**operationally**
277:22

**operations**
36:23, 75:8
131:19, 137:24
147:15, 148:1
148:8, 150:6
150:18, 153:14
216:5, 255:16
256:4, 256:5
258:3
**operator** 29:22
30:22, 56:15
58:8, 58:9
77:13, 78:8
78:8, 78:12
78:22, 79:1
85:19, 85:23
87:6, 94:1, 94:8
104:1, 104:3
104:21, 117:11
123:20, 124:2
124:2, 127:3
127:4, 139:5
140:18, 141:7
144:10, 146:12
147:22, 149:10
150:10, 150:12
168:22, 171:4
190:6, 199:25
200:3, 200:4
202:7, 205:9
205:14, 215:6
238:20, 244:19
245:25, 253:19
254:10, 265:4
265:6, 265:9
270:8, 274:16
288:16, 295:13
296:9, 296:17
329:5, 329:6
329:14, 329:21
329:25, 330:25
**operator's** 58:2
58:3, 263:5
**operators** 78:3
92:25, 102:8
111:7, 111:8

112:1, 113:21
120:14, 123:12
123:16, 138:25
140:14, 145:15
145:17, 150:9
154:3, 154:5
169:22, 177:15
177:19, 178:2
179:5, 183:24
190:5, 192:25
207:23, 209:24
219:16, 219:18
230:19, 279:21
281:5, 281:7
281:13, 321:9
322:16, 323:11
329:8, 329:11
330:8
**opinion** 191:22
192:8
**opinions** 191:19
192:7, 338:15
338:18, 338:22
339:3
**opportunity**
10:19, 44:18
52:21
**opposed** 216:8
249:24
**oral** 1:11, 1:14
343:11, 343:17
**order** 170:9
259:8, 332:25
333:6
**organization**
107:22
**organization's**
68:19
**original** 288:25
292:12, 295:6
345:2, 345:3
345:6, 345:9
**OSHA** 5:17, 7:7
14:3, 14:4
54:22, 55:5
56:2, 56:10

58:14, 58:16
58:25, 59:2
59:4, 59:10
59:12, 62:6
63:9, 72:21
73:13, 74:23
74:23, 74:24
75:3, 88:11
89:18, 90:18
91:1, 99:9
100:22, 100:25
101:6, 147:6
155:6, 156:9
157:7, 159:3
159:6, 159:8
159:15, 159:21
159:24, 160:11
160:19, 160:23
161:3, 166:13
167:24, 168:13
206:4, 206:4
207:23, 209:24
250:13, 287:1
287:6, 287:12
287:14, 287:18
288:8, 288:12
298:22, 299:13
299:24, 300:4
300:19, 317:11
317:14, 318:7
318:25, 319:6
319:11, 321:4
321:5, 321:13
321:14, 323:3
323:6, 324:9
325:12, 326:2
332:2
**OSHA's** 74:20
100:23, 155:3
320:19, 320:23
**outcome** 344:3
**outlining** 6:6
**outside** 117:1
219:7
**outstrip** 121:8
**overall** 219:21

**overlap** 104:14
**oversee** 65:21
330:9
**overseeing**
95:23
**oversees** 64:11
64:12, 64:13
**oversight** 93:8
192:24
**overtake** 121:8
121:15
**overtaken** 143:4
**overview** 133:5
**overwhelming**
303:16, 303:17
303:18, 303:20
**owe** 40:8, 40:11
**owner** 7:2
283:24, 308:7
310:23

**P**

**p.m** 1:18
130:18, 130:19
232:19, 232:20
337:25, 340:3
**pad** 83:20
**page** 4:3, 5:3
5:6, 5:6, 9:19
10:11, 53:18
71:3, 166:6
167:4, 206:19
207:9, 229:20
342:4, 345:5
**PAGE/LINE**
341:6
**pages** 5:18, 6:2
6:7, 6:11, 6:15
6:19, 6:24, 7:8
**paid** 110:3
110:5, 152:7
**pain** 302:20
303:3
**paint** 158:3
158:16, 159:1

159:4, 206:24
**painted** 158:6
158:12
**pamphlets**
157:8
**paper** 69:17
70:1, 190:23
**paperwork**
222:22
**park** 174:24
175:1, 175:4
175:6, 175:8
175:11, 175:12
175:13
**parked** 175:17
175:19, 175:21
244:22, 245:19
246:15
**parking** 175:23
**part** 13:3, 15:7
16:11, 16:11
16:16, 18:8
23:5, 23:10
23:18, 29:5
29:15, 31:19
31:25, 39:19
48:25, 56:10
56:13, 61:7
62:19, 72:24
93:21, 96:12
104:8, 114:14
119:3, 126:21
135:24, 138:24
183:10, 201:5
209:6, 209:8
219:23, 220:15
221:2, 221:18
226:2, 226:21
248:14, 260:2
284:12, 285:6
301:19, 309:6
324:10, 339:11
**partially** 18:5
**particular** 21:23
28:7, 35:13
73:12, 102:19

104:21, 166:21
204:7
**particularly**
37:8, 73:3
**parties** 126:21
126:22, 343:22
344:1, 345:11
**parts** 59:20
96:18
**party** 343:23
**pass** 337:24
339:23
**passed** 46:16
52:24, 279:7
306:18
**passenger**
244:12
**Pat** 1:19, 3:14
343:14, 344:9
345:16
**Pate** 3:10
**path** 140:22
177:22, 200:5
202:8, 210:3
237:7, 238:3
238:4, 238:4
238:7, 238:11
**paths** 207:22
208:8, 208:14
211:17, 212:4
213:2
**pattern** 216:6
217:5, 246:6
247:22
**pay** 63:18, 109:5
111:10, 111:11
149:2, 150:24
189:18, 189:20
285:17, 285:18
334:12
**paying** 310:2
310:7, 310:18
311:2, 311:5
311:10, 311:16
311:20, 312:6
**pedestrian**

30:24, 144:11
155:24, 171:17
186:10, 188:21
190:3, 199:21
199:25, 200:10
201:11, 201:23
202:6, 202:21
203:3, 203:11
207:10, 208:4
320:2, 324:3
324:7
**pedestrian-rela...**
171:8, 171:11
177:16, 178:22
187:25
**Pedestrian/For...**
207:13
**pedestrians**
171:20, 172:3
172:5, 190:7
190:9, 207:22
208:7, 208:13
211:17, 212:3
213:2, 320:14
322:3, 323:13
324:20
**penalty** 316:4
**people** 35:2
42:20, 50:8
50:23, 70:5
81:18, 89:6
90:14, 93:5
102:8, 104:10
149:2, 150:24
153:5, 160:20
164:6, 180:25
194:21, 195:7
195:12, 195:20
203:15, 206:25
216:10, 253:4
254:11, 263:12
272:21, 274:1
274:22, 290:17
303:18, 307:10
311:24, 312:5
312:16, 312:25

325:7, 333:6
337:5
**people's** 309:8
**perceive** 263:5
**percent** 40:15
87:14, 272:4
**perfectly** 182:15
183:1
**perform** 78:10
219:25, 220:1
**Performance**
133:11, 133:15
**performed**
198:11, 198:17
**period** 23:2
41:22, 79:20
105:12, 246:7
248:7, 248:19
249:13, 250:24
251:5, 251:8
255:8, 278:25
**periodic** 76:1
**periodically**
81:22, 281:14
**periods** 248:11
**perjury** 316:5
**permanent**
161:17
**permission**
120:14
**permit** 333:6
**person** 13:17
44:21, 52:9
61:18, 76:21
90:22, 94:16
99:14, 121:1
130:6, 132:5
140:5, 154:11
212:24, 217:6
220:24, 229:1
249:4, 249:8
249:19, 249:21
249:23, 250:2
250:25, 251:4
251:5, 261:8
264:8, 264:20

274:10, 274:11
274:16, 288:5
288:7, 288:11
289:24, 290:6
290:22, 291:8
292:25, 306:10
306:11, 307:4
307:21, 311:1
329:16, 342:15
**person's** 96:9
176:22
**personal** 52:23
115:12, 128:8
148:6, 260:5
294:10, 324:24
336:14, 339:17
**personally** 27:5
44:16, 62:12
101:23, 101:23
199:15, 220:21
220:23, 342:12
**personnel** 45:17
78:4, 133:8
134:5, 135:9
148:1, 249:7
274:7
**persons** 150:11
**perspective**
105:21
**pertaining** 99:9
**pertains** 222:17
241:24, 334:21
**Phelps** 1:21
2:14, 12:23
**philosophy** 98:5
98:8, 248:8
**phone** 25:20
82:19, 84:19
283:1, 285:9
285:9, 285:11
285:14, 285:15
285:19, 285:19
285:20, 287:18
290:8, 293:24
295:21, 333:11
333:14

**phones** 285:22
285:23, 294:17
309:9
**photograph**
46:6, 46:16
293:13, 293:15
**photographs**
31:14, 44:1
44:25, 49:2
**photography**
43:22
**photos** 44:2
**phrase** 221:21
**physical** 68:21
90:22, 92:5
99:13, 99:20
103:2, 103:9
104:1, 104:2
104:25, 105:5
105:17, 106:4
112:7, 113:1
114:24, 115:1
115:10, 115:25
116:20, 117:11
118:14, 119:15
120:4, 121:2
123:20, 123:22
124:3, 124:9
124:11, 166:24
196:17, 278:1
278:3, 279:6
280:1, 280:14
**physically** 105:9
111:8, 112:1
112:2, 115:6
115:15, 236:22
244:1, 270:10
**physicals** 104:6
104:10, 104:17
104:23, 105:22
105:24, 111:7
111:11, 112:11
113:21, 114:20
116:15, 119:24
120:11, 120:23
123:11, 123:16

280:5, 280:6
280:8
**physician** 338:8
**pick** 158:24
204:10, 257:15
301:4, 320:7
**picking** 76:14
**pics** 286:5
**picture** 44:18
289:17, 295:1
**pictures** 12:19
43:2, 43:4, 43:6
43:7, 43:8
43:12, 44:15
45:3, 45:4, 45:6
45:12, 45:15
286:1, 286:3
286:4, 286:13
286:14, 286:18
294:24, 305:8
**piece** 149:8
151:21, 308:25
**PIT** 5:21
221:12
**placard** 61:15
**place** 17:5, 30:1
30:3, 32:12
32:20, 34:25
35:24, 43:14
43:14, 48:7
103:25, 104:25
111:24, 111:25
125:19, 162:21
163:15, 164:12
200:18, 227:5
227:9, 234:3
239:5, 242:11
271:1, 271:9
271:15, 272:3
272:5, 273:12
273:25, 275:13
277:3, 279:14
281:9, 281:13
291:21, 319:1
**placed** 36:7
45:19, 122:14

**plain** 77:7
139:16
**Plaintiffs** 1:5
1:15, 2:2, 343:5
345:8
**plan** 37:2
157:22, 158:1
198:25, 199:4
300:2
**plane** 52:12
314:17, 315:2
**planning** 116:18
**plans** 21:1
28:12
**play** 74:6, 129:8
129:14, 129:16
**played** 29:13
30:12, 30:14
30:18, 48:25
51:3, 51:17
192:17
**plays** 200:21
**please** 8:15
10:10, 10:18
11:3, 12:5
12:18, 16:24
47:10, 47:15
55:17, 94:13
99:11, 108:13
108:19, 126:25
132:20, 165:14
178:9, 183:11
186:6, 189:14
201:1, 248:2
286:5, 288:15
296:15, 341:5
**plenty** 173:11
**plus** 114:7
**point** 12:10
13:2, 61:13
61:13, 61:24
86:5, 87:2
90:19, 90:23
105:25, 106:13
116:19, 117:12
125:21, 130:13

143:24, 161:16
161:17, 163:16
248:4, 250:24
254:3, 265:6
268:13, 284:18
286:7, 286:11
287:1, 287:10
290:2, 298:9
299:17, 300:3
300:21, 305:10
**pointed** 34:23
286:12
**pointing** 35:3
35:5, 36:19
36:21, 207:2
**points** 106:15
138:11, 154:16
157:3, 157:9
157:12, 179:8
184:3
**police** 159:16
288:16, 288:20
289:12, 289:20
291:6, 292:18
**policies** 33:25
57:18, 69:17
69:18, 70:1
70:2, 70:11
70:20, 71:16
73:17, 133:10
137:7, 186:23
274:5, 274:9
274:13
**policy** 12:20
23:10, 66:22
66:24, 67:25
68:3, 68:8
70:12, 72:16
72:18, 73:12
73:14, 74:4
74:11, 103:25
111:25, 112:11
113:18, 114:1
114:12, 116:14
117:7, 117:13
117:22, 119:11

119:24, 123:10
123:15, 123:17
123:25, 184:14
219:7, 219:13
219:21, 219:22
225:13, 251:7
251:9, 270:6
270:7, 271:1
271:9, 271:19
271:19, 272:7
273:25, 274:11
274:17, 276:11
276:15, 276:23
276:24, 276:25
277:3, 277:4
277:5, 277:6
277:9, 277:10
279:4, 279:14
279:25, 280:13
281:3, 281:9
281:13
**political** 231:22
**poor** 154:18
197:20
**port** 15:2, 15:14
15:19, 20:23
26:12, 26:23
31:10, 33:4
34:4, 36:12
37:22, 38:2
39:24, 42:21
54:16, 60:11
78:3, 78:12
82:23, 83:3
95:9, 95:13
126:14, 157:21
208:12, 208:19
239:12, 248:15
272:18, 272:21
273:11, 308:11
325:17, 332:24
**portal** 333:20
**portion** 189:22
221:16, 221:16
225:3, 232:4
**portions** 209:3

**ports** 57:14
60:10, 62:24
63:2, 63:6
75:13, 95:23
139:1, 140:14
142:6, 171:4
171:25
**poses** 324:9
**posing** 301:12
301:14
**position** 50:17
257:8, 334:18
**positive** 38:12
**possibility** 292:8
331:24
**possible** 101:16
142:16, 145:3
181:13, 182:5
183:11, 183:18
202:18, 204:8
204:25, 205:3
205:4, 205:5
205:7, 211:23
212:8, 212:9
212:11, 213:1
213:20, 213:21
214:2, 214:4
250:16, 298:10
332:6
**possibly** 20:4
251:22, 286:17
**post** 160:12
318:25, 344:12
345:20
**post-incident**
304:24
**posting** 160:12
**potential** 138:1
200:9, 200:16
202:7, 202:9
202:10, 326:12
**potentially** 20:7
36:13, 41:3
94:23, 94:25
95:5, 100:3
126:22, 134:1

143:10, 155:22
194:23, 200:15
201:21, 202:13
205:8, 205:9
260:21, 262:13
264:3, 264:6
264:7, 265:21
265:25, 273:8
273:13
**pound** 242:20
**pounds** 169:6
**pouring** 62:21
**Powered** 5:21
76:4, 76:6, 79:5
85:11, 139:14
140:7, 166:8
166:9, 166:12
221:7
**practical** 76:7
76:10, 79:6
79:25, 80:11
86:17, 221:16
221:20, 275:13
**practice** 42:17
106:6, 150:14
178:15, 280:5
**practices** 30:12
73:17, 102:7
102:10, 102:20
**pre** 170:3
**pre-COVID**
82:20
**predict** 138:12
**predicts** 71:24
**prefer** 52:9
110:13, 240:20
**preference**
138:20
**prejob** 104:6
104:10, 104:17
279:5, 280:14
**premises** 203:16
**preparation**
12:13, 13:12
**prepare** 11:20
11:22

**prepared** 11:17
12:2, 12:22
24:1, 157:14
157:16, 317:17
**preparing** 345:9
**present** 13:1
224:3, 327:9
**preserve** 294:8
294:8, 332:15
**preserved** 294:9
**preserving**
294:11, 332:20
**preshift** 198:5
**president** 64:20
108:24, 121:20
**press** 13:24
14:1
**pressure** 276:4
**presumably**
245:15, 302:19
302:21
**presumption**
294:25
**pretrip** 169:25
170:5
**pretty** 36:8
59:14, 87:20
111:22, 146:14
146:15, 181:7
181:9, 194:15
199:13, 209:10
230:21, 310:11
**prevent** 41:4
41:18, 102:25
111:1, 124:8
126:23, 129:24
138:22, 152:16
207:20, 208:4
208:20, 209:23
210:22, 211:15
212:2, 212:3
213:1, 225:9
225:17, 274:6
**preventable**
124:23, 124:24
**prevented** 25:14

106:3, 124:25
125:4, 125:15
125:23, 125:25
126:2, 126:18
126:20, 126:25
128:22, 129:3
271:14
**preventing** 5:17
42:14, 52:16
53:5, 102:16
105:19, 155:13
213:7, 289:12
**preventive**
225:10
**prevents** 274:5
**previous** 57:4
57:8, 57:8
62:18, 140:5
140:8, 269:1
269:3, 342:3
**previously**
74:19, 99:12
250:22, 256:13
267:1, 267:5
267:14
**price** 46:21
**primary** 78:15
85:24
**principle** 68:24
138:5
**principles**
139:19
**print** 7:7
314:13, 314:15
315:1
**printed** 132:13
**printer** 314:22
**prior** 12:1, 12:8
12:9, 17:17
26:6, 41:23
83:2, 83:4
102:17, 162:21
218:12, 218:14
230:19, 241:3
266:16, 268:17
269:6, 278:5

324:1, 331:9
337:21
**priority** 90:5
255:15, 256:4
258:2
**privilege** 297:11
**proactive** 33:8
137:22
**probably** 10:7
22:25, 31:2
92:9, 109:2
221:10, 261:16
274:6, 278:16
285:8, 304:22
308:8
**problem** 18:17
88:8, 88:16
88:19, 88:25
89:22, 97:4
99:5, 100:3
112:7, 121:21
121:25, 138:2
238:14, 263:1
264:2, 264:11
275:25, 276:5
298:17, 313:23
326:7, 327:13
327:24
**problems** 123:9
250:17, 265:18
269:21, 270:1
270:5, 280:23
281:1
**procedure** 1:23
285:25
**procedures**
32:21, 34:1
74:11, 169:13
169:17, 170:17
170:21, 170:22
274:5
**proceeding**
344:2
**Proceedings**
340:3
**process** 9:15

30:5, 144:11
161:4, 257:24
294:21
**Produced** 1:15
**product** 211:5
211:6, 225:20
257:13, 257:18
257:19
**production**
36:25
**profanity** 255:4
**professional**
238:19, 239:18
240:15, 269:8
319:11
**professionals**
13:14
**proficient** 77:1
**program** 56:2
56:3, 58:6
58:19, 60:10
65:22, 70:8
93:8, 98:1, 98:1
**programs** 54:20
55:8, 55:17
57:15, 58:15
60:25, 70:4
**progressive**
219:12, 219:19
251:11
**prohibit** 211:17
**prohibited**
161:23, 161:25
177:3, 181:24
182:7, 183:13
183:16
**prohibition**
162:4, 162:7
163:17, 163:23
**promote** 71:4
98:6, 98:12
**prompt** 75:22
**prompted** 80:10
**promulgated**
72:20
**proof** 205:12

205:13, 205:15
274:4
**propensity**
217:18
**properly** 58:8
76:8, 94:3
**property** 324:24
**protected**
204:14, 204:21
**protecting**
155:17, 156:10
**protection**
58:20, 58:22
142:14, 145:7
217:24
**protocol** 294:4
294:6
**proved** 342:13
**proven** 155:16
156:10
**provide** 19:3
27:25, 29:15
39:20, 44:3
63:4, 73:23
93:7, 158:13
187:22, 188:20
**provided** 18:24
32:1, 32:4, 32:6
50:21, 70:13
75:13, 92:14
136:6, 139:13
140:13, 144:14
152:18, 160:19
183:21, 217:1
222:9, 225:1
281:24, 293:19
303:15, 304:1
305:15, 323:6
324:23, 325:12
325:12
**provides** 54:11
244:17
**provisions** 1:23
**proximity** 321:9
**psychologists**
13:13

**PUBLIC** 342:22
**pull** 66:23
194:1, 252:14
**punctured**
228:10, 229:24
**puncturing**
228:22
**purpose** 36:21
101:18, 141:11
142:1, 170:3
170:7, 184:11
186:9, 187:21
225:5, 225:9
294:7
**purposes** 342:17
**pursuant** 1:22
343:21, 344:4
**pushed** 194:10
**put** 20:15, 28:21
33:4, 38:11
46:21, 51:8
63:19, 86:12
89:21, 94:18
94:25, 99:25
118:13, 132:16
139:14, 140:3
157:8, 208:23
209:2, 209:6
209:8, 250:3
256:20, 257:6
285:20, 315:23
319:21
**putting** 76:14
177:4

**Q**

**qualification**
88:5
**qualifications**
14:19, 243:11
**qualified** 48:13
48:15, 49:14
87:24, 92:25
102:9, 271:11
271:20, 274:2

279:7
**quality** 62:17
**quarter** 82:25
**quarterback**
111:16
**question** 9:20
9:24, 10:9
10:13, 11:3
14:6, 18:9
26:10, 32:3
38:8, 43:20
85:4, 85:9, 86:8
94:13, 101:24
103:13, 123:14
125:3, 146:24
154:17, 157:2
165:1, 165:15
165:17, 196:2
196:2, 216:9
232:16, 234:15
247:23, 248:2
267:13, 271:7
279:16, 281:2
301:12, 306:8
321:15, 321:15
324:9, 326:18
334:14
**questionnaires**
269:17
**questions** 10:7
10:20, 13:15
20:15, 20:18
20:24, 38:5
38:10, 154:16
182:25, 187:22
195:10, 199:2
287:18, 316:6
338:4, 339:25
**quibbled** 323:22
**quick** 90:17
177:13, 232:16
283:1
**quickly** 290:11
**quite** 15:23
34:13
**quotations** 7:12

**quote** 7:14

**R**

**rail** 153:19
158:8, 254:16
268:13
**railcar** 254:18
256:14
**raise** 8:5, 249:3
**Ramirez** 24:17
25:4, 25:7
25:10, 25:22
25:23, 26:8
172:15, 174:9
193:18, 193:20
193:21, 194:12
194:15, 309:2
309:17
**Ramirez's** 29:2
173:3, 174:5
**ran** 26:15, 26:25
126:6, 284:16
**Randal** 253:18
254:24, 255:1
255:4, 255:10
255:14, 257:25
**Randall** 254:25
**range** 115:17
**rank** 65:8
**ranking** 65:3
65:5, 95:22
100:14
**rapidly** 295:22
**rare** 221:13
**rarely** 80:2
**re-education**
217:7
**reach** 67:20
84:12
**react** 193:15
193:17, 193:19
**reacted** 193:7
193:20
**reaction** 148:18
310:5, 310:12

**reactive** 33:9
137:22
**read** 7:13, 53:14
68:12, 69:13
74:8, 74:16
92:10, 98:25
108:13, 108:19
112:25, 113:8
113:10, 113:12
115:3, 117:18
133:3, 133:6
134:24, 135:4
135:12, 135:20
136:2, 136:8
137:6, 139:22
139:24, 160:1
160:2, 160:4
160:9, 179:2
179:3, 180:4
201:1, 207:16
229:22, 237:2
237:8, 244:23
254:23, 255:12
255:19, 256:12
257:3, 258:2
281:17, 284:1
288:24, 289:23
293:7, 295:14
301:18, 307:20
308:8, 315:2
316:23, 317:5
324:10, 324:17
327:21, 342:1
**reading** 190:23
296:10, 296:12
302:15
**reads** 284:12
**ready** 66:10
130:22, 185:6
232:22, 254:19
255:17, 256:15
257:4
**real** 90:17
118:10, 177:13
221:24, 283:1
307:10

**real-time** 290:18, 290:18
**realize** 105:3 312:5
**realized** 286:11
**really** 49:16 50:17, 56:11 75:4, 88:5, 91:6 92:8, 102:4 143:17, 145:11 145:14, 149:5 151:20, 151:20 154:6, 181:6 191:23, 207:5 217:24, 217:24 273:14, 275:8 277:20, 286:18
**realm** 262:5
**realtime** 289:10
**rearview** 156:15
**reason** 11:7 21:23, 28:7 46:12, 84:15 84:24, 87:23 92:10, 102:19 114:22, 128:5 143:18, 145:14 145:20, 145:22 145:23, 146:10 146:18, 146:25 147:10, 150:5 156:9, 164:15 173:18, 211:7 224:11, 278:16 304:2, 304:23 331:4, 337:20 339:14, 341:4 341:6
**reasonable** 69:10, 108:6 262:12
**reasoning** 211:8
**reasons** 35:2 36:15, 36:18 150:17, 150:21 162:25, 192:16

345:5
**recall** 232:12 232:13, 247:11 302:14, 304:2 318:22
**receive** 85:11 334:9
**received** 233:3 241:23
**receiving** 253:24, 259:19 313:25, 322:4 324:21
**recess** 66:5 130:13, 130:18 232:19
**Recino** 302:19
**Recinos** 1:2, 1:3 1:4, 8:18, 11:12 15:5, 15:22 18:11, 20:3 21:6, 24:22 29:13, 30:5 42:23, 43:11 45:20, 46:16 48:24, 51:13 51:23, 69:5 102:13, 108:11 123:18, 125:19 152:7, 158:15 172:3, 172:11 174:8, 193:6 194:10, 196:10 202:11, 205:6 205:13, 211:19 234:3, 244:25 253:23, 320:5 326:14, 343:2 343:3, 343:4
**Recinos's** 43:22 45:1, 46:4, 49:7 83:4, 103:1 213:3
**reciting** 232:6
**reckless** 197:21
**recognize** 53:16

66:19, 68:19 166:7, 179:14 305:21
**recognized** 147:25
**recognizing** 137:15
**recollect** 160:24 181:14, 250:8 336:13
**recollection** 173:22
**recommend** 33:5, 33:12
**recommendation** 33:21, 231:1 232:9
**recommendati...** 33:6, 230:22 246:21
**recommended** 160:5, 319:19
**recommends** 211:22
**reconstruction** 48:1, 48:9 48:14, 48:15 49:14, 49:20
**reconstructionist** 47:5
**record** 1:24 7:14, 8:3, 9:23 66:3, 66:7 130:16, 130:20 167:3, 214:20 214:24, 230:21 232:17, 232:21 239:18, 250:6 322:12, 325:11 340:1, 341:4 343:17, 343:23
**recordable** 287:5
**recorded** 326:15 326:22, 331:15
**recording**

135:17
**records** 83:10 246:8, 324:22 324:25, 325:5 327:22, 336:19 336:20, 336:22
**red** 14:24, 15:2 148:24
**redundancies** 144:3
**redundancy** 144:1, 145:6
**refer** 15:1 141:2, 257:10
**reference** 223:22
**referencing** 160:10, 167:16 167:17, 227:15 237:3, 242:4 291:13
**referring** 192:8 238:4, 238:7 256:24, 258:11 276:24, 277:6 281:4, 282:6 289:8
**refers** 68:4
**reflected** 7:13
**refresh** 173:21 301:23
**refresher** 80:7 105:13, 336:15
**refreshes** 318:20
**regard** 29:23 107:7
**regarding** 6:15 7:3, 17:10, 58:9 85:7, 111:7 120:3, 120:8 120:18, 173:23 253:24, 323:6
**regardless** 101:21
**regards** 5:18

49:20
**regularly** 57:10 80:24, 83:24
**regulates** 168:7
**regulation** 74:23, 90:18 90:19, 99:9 99:12, 100:15 101:19, 102:2 102:25, 103:15 321:6
**regulations** 58:14, 60:24 61:20, 62:4 62:9, 72:19 73:13, 73:22 74:24, 75:3 100:24, 101:1 102:22, 122:2 147:6, 155:7
**relate** 47:25
**related** 65:24 344:1
**relates** 65:20
**relation** 46:1 49:9
**relationship** 104:9
**relative** 149:25 238:15, 318:15
**release** 120:5
**relevant** 73:3 110:15, 195:19 195:22, 328:23 332:16
**reliable** 207:20 208:3, 208:20 210:25, 211:2 211:11, 211:14 212:1
**rely** 31:10 31:13, 100:17 138:21, 186:16 189:10, 216:16 315:19, 322:9
**relying** 81:9

81:18, 100:17
188:23
**remain** 288:15
**remember** 9:5
22:12, 24:18
24:19, 24:25
25:2, 26:17
27:18, 31:23
47:20, 64:24
74:5, 78:23
79:11, 79:17
80:4, 83:6
87:11, 87:21
87:22, 97:23
98:22, 100:10
113:25, 113:25
123:8, 136:23
144:17, 144:18
146:13, 156:20
158:17, 159:7
159:13, 159:17
159:18, 160:2
160:15, 160:15
160:16, 160:23
161:20, 169:7
173:6, 173:8
173:11, 173:13
173:22, 173:24
175:19, 181:11
181:12, 181:16
194:3, 198:7
198:8, 198:16
198:24, 199:1
199:9, 208:11
214:13, 218:11
218:12, 218:13
222:2, 226:17
238:5, 241:17
247:19, 269:1
284:21, 284:25
285:3, 285:10
286:15, 286:18
286:19, 290:7
290:9, 293:23
295:17, 295:20
295:22, 296:3

297:15, 299:19
300:6, 300:13
302:7, 302:10
302:16, 304:5
304:5, 304:9
304:19, 318:18
318:19, 318:21
319:5, 319:9
319:14, 319:19
330:7
**removed** 202:25
305:1, 305:9
319:23, 319:25
320:9
**renewal** 80:7
**reopening** 42:15
**repeat** 10:10
14:6, 32:3
65:14, 94:13
148:13, 271:7
**repeating**
106:22
**rephrase** 10:10
123:14, 217:11
248:2, 267:13
326:18
**report** 6:7, 6:11
6:14, 13:24
23:13, 23:16
23:18, 24:1
26:6, 27:22
27:23, 28:22
31:25, 32:1
32:4, 32:6
38:23, 41:23
41:23, 42:10
48:23, 50:12
50:13, 50:14
51:8, 51:10
80:19, 80:20
159:24, 159:25
160:9, 160:10
160:24, 160:25
161:2, 170:6
176:18, 177:4
224:16, 225:6

225:20, 226:1
242:10, 247:13
253:1, 287:22
288:11, 288:12
300:20, 318:21
332:2, 334:5
334:7, 337:4
**reportable**
287:6
**reported** 1:20
235:17, 253:22
**reporter** 3:13
8:4, 8:10, 9:22
129:1, 165:14
296:11, 296:14
343:15, 344:10
344:11, 345:18
345:18
**REPORTER'S**
4:10, 7:12
343:11
**reporting** 14:1
137:18, 176:11
**reports** 65:22
80:24, 83:17
170:1, 269:3
288:8
**represent** 8:18
8:23, 18:10
338:4
**REPRESENT...**
1:3, 343:3
**representing**
174:1, 206:24
331:2
**request** 81:6
**requested** 4:8
19:24, 260:7
306:5, 328:3
**requests** 318:25
**require** 56:24
70:25, 79:2
90:14, 114:20
120:10, 123:16
145:15, 145:17
145:22, 145:24

146:10, 146:18
147:1, 147:5
147:14, 151:14
152:1, 153:16
157:21
**required** 69:16
76:2, 90:15
91:4, 91:4
101:19, 101:22
104:17, 105:13
105:16, 137:17
138:24, 155:7
204:1
**requirement**
59:4, 104:5
139:9, 146:3
146:4, 146:6
146:22, 146:24
335:12
**requirements**
102:6, 157:7
344:4
**requires** 14:15
58:25, 59:2
77:18, 90:12
104:1, 113:20
147:18, 166:20
243:10, 244:3
244:5
**requiring**
105:20, 106:4
111:7, 112:11
123:11
**requisite** 338:23
**research** 211:9
**reserve** 339:24
**reserved** 148:8
**resign** 283:16
283:18
**resigned** 283:5
**resolves** 201:15
**resources** 6:5
6:18, 120:21
120:21, 222:11
252:19, 252:25
255:6, 259:18

275:8, 277:15
277:17, 277:19
277:24
**respectful**
289:18
**respective** 32:16
50:7
**respond** 194:21
287:19, 287:20
303:7
**responding**
217:7, 287:16
287:17, 291:5
**responds** 287:24
292:10, 307:4
**response** 48:3
160:5
**responsibilities**
30:23, 50:8
62:7, 62:8
65:19, 121:9
135:24
**responsibility**
16:18, 18:7
33:25, 38:17
55:24, 56:1
59:22, 60:6
62:25, 63:3
63:5, 93:12
93:16, 93:20
93:23, 168:2
237:21, 238:24
239:10, 240:4
240:12
**responsible** 18:5
40:17, 48:24
56:13, 57:13
57:15, 58:14
60:9, 60:25
61:2, 61:7, 63:9
76:16, 82:13
82:16, 92:21
101:12, 104:8
140:2, 155:8
260:17, 268:19
294:11, 294:19

336:2, 336:6
336:9
**responsiveness**
32:19, 43:18
44:23, 79:8
88:14, 89:14
91:10, 106:2
125:13, 128:7
143:2, 146:8
149:21, 150:16
152:14, 162:9
249:11, 271:17
280:10
**rest** 12:20
43:23, 45:2
45:6
**restraining**
332:25, 333:6
**restricted** 165:2
261:9, 261:22
262:7
**restricting**
121:22
**restriction**
172:2, 174:23
260:7, 261:13
261:14
**restrictions**
172:8
**restrictive** 122:9
**restroom** 66:2
232:16
**result** 17:4
51:22, 117:8
151:16, 165:3
165:6, 192:11
335:16
**results** 216:8
223:16, 224:7
**resuming** 66:5
130:19, 232:19
**retain** 251:1
**retraining** 72:7
217:7, 336:7
336:10
**retrieve** 255:18

**return** 68:20
132:20, 343:20
**returned** 345:2
345:3, 345:3
345:5, 345:6
**reveal** 20:2
20:5, 51:16
175:20
**reverse** 142:3
**reversed** 246:15
**reversing**
229:24, 230:4
230:10, 245:16
**review** 12:15
17:16, 21:1
21:15, 21:18
22:7, 23:5
23:11, 28:12
33:6, 33:22
51:2, 51:16
116:3, 159:21
223:10, 230:13
302:11, 309:6
312:24, 343:20
**reviewed** 12:17
21:11, 28:4
102:2, 218:6
**reviewing** 15:13
49:18, 49:24
278:8, 283:4
283:8
**rewrite** 184:14
186:24
**rice** 254:24
255:1
**Richmond** 2:6
**ride** 213:13
213:18
**right** 8:5, 11:12
11:15, 11:18
12:23, 14:13
14:16, 14:22
14:24, 15:5
15:8, 15:16
15:23, 16:5
16:7, 17:14

17:17, 18:6
18:10, 18:11
18:19, 18:23
19:4, 19:12
19:15, 19:19
19:22, 19:25
20:3, 20:6, 20:9
21:21, 22:3
22:18, 22:20
22:23, 22:25
23:5, 23:21
23:24, 24:6
24:9, 24:12
25:4, 25:8
26:12, 26:16
27:23, 28:10
28:17, 28:18
28:22, 28:25
29:2, 29:17
31:4, 31:15
32:10, 32:22
32:24, 33:4
33:9, 33:14
34:1, 34:4
34:15, 34:20
35:7, 35:9
35:19, 36:8
36:10, 36:13
37:9, 37:12
37:14, 37:15
37:17, 37:19
37:22, 38:5
38:23, 39:7
39:12, 39:13
39:17, 40:1
40:4, 40:11
40:14, 40:14
40:22, 40:25
41:4, 41:7, 41:9
41:14, 41:19
42:4, 42:11
44:1, 45:2, 45:6
45:7, 45:10
45:16, 45:23
46:13, 47:2
48:11, 48:25

49:3, 50:18
50:19, 50:25
53:20, 54:2
54:8, 54:11
54:14, 54:17
55:6, 57:18
59:4, 59:7
59:16, 59:17
60:1, 60:4
61:14, 61:25
62:4, 62:10
63:23, 64:10
65:10, 65:13
65:16, 65:20
66:24, 67:2
67:5, 67:7, 68:1
68:5, 68:12
68:16, 68:20
68:25, 69:3
69:11, 69:13
69:19, 69:22
69:23, 70:1
70:5, 70:11
71:1, 71:5, 71:8
71:11, 71:14
71:19, 72:8
72:13, 72:21
72:25, 73:4
73:9, 73:14
73:19, 73:25
74:2, 74:16
74:25, 75:5
75:10, 76:11
76:17, 77:13
77:20, 77:22
78:3, 78:12
78:15, 78:18
78:25, 79:15
80:8, 81:11
81:20, 81:24
82:21, 85:17
85:23, 86:3
87:5, 88:22
89:10, 89:11
89:16, 90:1
90:5, 90:16

90:22, 91:21
92:2, 92:10
92:18, 92:22
93:2, 93:22
93:24, 95:2
96:25, 98:3
98:12, 98:22
99:15, 100:22
101:1, 101:4
101:10, 101:14
102:13, 102:23
104:22, 105:10
105:14, 105:20
105:23, 106:13
106:25, 107:8
107:10, 107:12
107:15, 107:18
107:25, 110:23
111:9, 112:4
112:8, 112:21
112:22, 113:1
113:9, 113:15
113:18, 113:22
114:3, 114:5
114:8, 114:12
114:20, 114:24
115:10, 116:5
116:11, 116:15
118:15, 118:19
119:12, 119:24
120:6, 120:11
121:5, 121:9
122:6, 122:22
124:14, 125:15
125:19, 126:9
126:16, 128:2
129:9, 129:13
129:18, 129:21
130:11, 130:14
131:12, 131:14
131:19, 132:11
132:16, 132:18
132:22, 133:13
133:14, 133:24
133:25, 134:18
134:22, 135:12

| | | | | |
|---|---|---|---|---|
| 135:18, 135:25 | 172:10, 172:19 | 212:10, 212:16 | 242:2, 242:5 | 288:1, 288:18 |
| 136:8, 136:12 | 174:13, 174:18 | 212:20, 213:8 | 242:11, 242:13 | 288:21, 288:25 |
| 136:18, 136:24 | 174:21, 174:24 | 213:10, 213:19 | 242:15, 242:18 | 289:3, 289:6 |
| 137:11, 137:15 | 175:2, 175:15 | 213:25, 215:16 | 242:20, 242:22 | 289:10, 289:13 |
| 137:19, 138:3 | 175:18, 176:7 | 216:8, 216:12 | 242:25, 243:3 | 289:21, 289:21 |
| 138:6, 138:14 | 176:8, 177:5 | 216:14, 216:25 | 244:6, 244:23 | 290:3, 290:14 |
| 138:15, 138:18 | 177:8, 177:17 | 217:8, 217:13 | 245:1, 245:4 | 290:19, 290:22 |
| 139:2, 139:16 | 177:20, 177:23 | 217:20, 217:25 | 245:6, 245:9 | 290:25, 291:3 |
| 140:17, 140:19 | 177:25, 178:25 | 218:24, 219:4 | 245:11, 245:13 | 291:9, 292:14 |
| 140:22, 140:25 | 181:20, 182:3 | 220:20, 222:6 | 245:16, 245:20 | 292:19, 293:2 |
| 141:6, 141:9 | 182:19, 182:21 | 222:13, 222:15 | 245:25, 246:3 | 293:9, 293:13 |
| 141:17, 141:23 | 182:25, 183:6 | 222:17, 222:23 | 246:12, 246:17 | 293:25, 295:1 |
| 142:6, 142:9 | 183:25, 184:7 | 223:11, 223:18 | 246:19, 247:2 | 295:6, 295:8 |
| 143:6, 143:10 | 185:21, 185:22 | 223:25, 224:8 | 247:6, 247:8 | 295:14, 295:18 |
| 143:14, 143:25 | 185:25, 186:14 | 224:17, 224:20 | 248:19, 250:14 | 296:19, 297:3 |
| 144:1, 144:7 | 186:17, 188:2 | 225:7, 225:11 | 250:22, 250:25 | 298:6, 298:21 |
| 145:8, 145:12 | 188:4, 188:10 | 225:14, 225:18 | 253:5, 253:8 | 298:22, 298:24 |
| 145:15, 145:20 | 188:12, 188:14 | 225:22, 226:21 | 253:10, 253:19 | 299:4, 299:7 |
| 146:19, 147:7 | 188:16, 188:21 | 226:22, 226:25 | 253:25, 254:21 | 299:10, 299:14 |
| 147:23, 148:1 | 189:2, 189:2 | 227:15, 227:18 | 255:12, 255:19 | 299:21, 299:25 |
| 148:22, 149:8 | 189:10, 189:11 | 227:20, 228:4 | 255:21, 255:23 | 300:4, 300:13 |
| 149:23, 150:3 | 189:23, 190:1 | 228:10, 228:15 | 256:1, 256:5 | 300:22, 301:9 |
| 151:6, 151:15 | 190:23, 191:16 | 228:21, 228:23 | 256:8, 256:17 | 301:13, 301:16 |
| 152:8, 152:19 | 191:20, 193:8 | 229:1, 229:6 | 256:19, 258:5 | 301:21, 302:3 |
| 153:11, 153:20 | 194:17, 194:22 | 229:10, 230:4 | 259:3, 259:7 | 302:20, 302:24 |
| 153:25, 154:19 | 196:21, 197:9 | 230:11, 230:17 | 261:19, 261:24 | 303:9, 303:18 |
| 155:8, 155:10 | 197:14, 200:5 | 230:24, 231:2 | 263:7, 264:6 | 303:20, 304:4 |
| 155:19, 155:22 | 200:12, 200:17 | 231:6, 231:9 | 264:11, 265:1 | 304:11, 304:14 |
| 156:1, 156:5 | 200:24, 200:25 | 232:4, 232:6 | 265:5, 265:9 | 304:24, 305:3 |
| 158:19, 159:18 | 201:6, 202:8 | 233:5, 233:5 | 265:25, 266:7 | 305:16, 305:21 |
| 160:18, 165:4 | 203:12, 203:16 | 233:8, 233:11 | 266:12, 267:8 | 306:1, 306:8 |
| 166:10, 166:14 | 203:19, 203:21 | 233:12, 233:18 | 267:17, 269:14 | 306:11, 306:14 |
| 166:20, 167:1 | 203:21, 204:6 | 233:21, 233:24 | 269:21, 272:11 | 306:18, 306:21 |
| 167:1, 167:18 | 204:14, 205:1 | 234:5, 234:8 | 272:13, 272:19 | 306:24, 307:2 |
| 167:24, 168:2 | 205:9, 205:12 | 234:11, 234:21 | 272:23, 272:25 | 307:5, 307:8 |
| 168:4, 168:13 | 206:14, 206:25 | 235:2, 235:4 | 273:2, 273:4 | 307:11, 307:15 |
| 168:20, 168:23 | 207:11, 207:16 | 235:11, 235:21 | 273:23, 274:18 | 307:22, 308:9 |
| 169:2, 169:4 | 207:24, 208:4 | 236:1, 237:8 | 277:13, 277:25 | 308:16, 308:23 |
| 169:9, 169:11 | 208:8, 208:14 | 237:13, 237:16 | 279:22, 281:6 | 309:3, 309:11 |
| 169:13, 169:18 | 209:4, 209:13 | 237:23, 238:2 | 281:13, 281:17 | 309:16, 309:19 |
| 169:20, 170:12 | 209:19, 209:25 | 238:9, 238:11 | 282:7, 282:15 | 309:22, 309:23 |
| 170:15, 170:18 | 210:4, 210:7 | 238:16, 238:18 | 283:14, 284:6 | 309:25, 310:3 |
| 170:22, 171:1 | 210:11, 210:14 | 238:21, 238:25 | 284:10, 284:14 | 310:7, 310:13 |
| 171:5, 171:12 | 210:17, 210:22 | 239:6, 239:12 | 284:25, 285:11 | 310:18, 310:23 |
| 171:17, 171:21 | 211:2, 211:9 | 240:1, 240:7 | 286:14, 286:23 | 310:25, 311:3 |
| 171:25, 172:4 | 211:19, 212:4 | 241:10, 241:14 | 287:1, 287:12 | 312:12, 313:7 |

314:7, 315:5
315:12, 316:6
316:13, 316:14
317:1, 317:21
318:9, 318:11
318:16, 318:20
319:13, 319:22
320:17, 321:21
322:6, 322:10
322:12, 324:13
325:2, 325:7
325:14, 325:20
325:24, 326:3
326:6, 326:8
327:6, 327:15
327:19, 327:25
328:5, 329:21
330:12, 331:10
331:13, 331:19
332:9, 332:14
332:20, 334:19
334:24, 336:24
336:25, 337:2
337:4, 337:6
337:10, 337:22
**Rights** 261:10
**Riley** 287:25
288:3, 288:4
288:6, 288:7
288:10, 288:13
**risk** 155:22
266:1, 266:1
**RMR** 1:19, 3:15
343:14
**road** 76:10
76:11, 148:23
221:21
**roads** 151:9
**roadway** 175:5
175:11
**Robledo** 226:5
226:11, 235:17
269:2
**role** 16:21
16:23, 16:24
19:10, 29:13

30:12, 30:15
30:18, 39:19
48:25, 51:3
51:17, 74:6
77:24, 78:15
192:17, 194:7
301:24
**root** 41:9, 225:6
225:16
**route** 300:16
**row** 215:13
237:25
**rule** 59:12, 91:1
100:6, 100:8
122:6, 122:8
141:7, 174:16
174:21, 185:18
185:22, 186:2
321:17, 321:20
324:11, 324:12
344:4, 345:1
345:11
**rules** 1:23, 9:18
32:21, 33:1
54:21, 56:10
58:14, 71:18
71:22, 72:24
72:25, 73:2
101:13, 105:24
122:2, 122:14
122:16, 122:17
166:13, 184:18
207:23, 209:24
**run** 12:17, 97:25
121:5, 126:3
165:20, 165:24
306:23, 308:23
308:23
**running** 77:20
193:10
**runover** 207:10
207:13
**rushing** 300:17

## S

**safe** 33:25, 59:3
96:21, 96:25
97:11, 147:23
156:4, 169:13
169:17, 170:17
170:21, 170:21
238:20, 245:22
261:23, 270:21
274:12, 279:12
279:16, 279:25
280:13, 280:20
**safely** 14:19
86:18, 90:7
169:16, 185:25
186:3, 247:24
262:13, 262:20
263:11, 265:11
275:4, 275:20
275:21
**safer** 75:10
111:15, 117:3
135:18, 187:9
209:19
**safety** 5:9, 5:14
6:2, 6:6, 6:10
12:20, 27:10
30:11, 33:9
40:16, 41:6
53:25, 56:2
56:11, 58:6
59:12, 59:15
64:10, 64:12
64:25, 65:3
65:6, 65:21
65:24, 66:22
66:24, 68:19
69:17, 69:22
69:25, 70:8
70:11, 70:12
70:14, 70:17
70:20, 71:5
71:16, 71:18
71:22, 72:4
72:12, 72:16

72:19, 72:20
74:12, 81:1
81:23, 84:3
84:4, 90:4, 90:7
90:10, 92:2
93:5, 93:8
93:18, 95:22
97:25, 98:5
98:6, 98:11
100:14, 104:9
104:15, 104:20
106:6, 117:20
119:3, 119:4
121:5, 121:8
121:15, 121:24
131:16, 133:9
133:10, 134:20
134:21, 135:5
135:6, 135:6
135:10, 135:15
135:22, 136:3
136:4, 136:6
136:12, 136:13
136:18, 136:24
137:7, 137:8
137:10, 137:15
137:18, 137:22
137:25, 138:1
138:6, 138:12
138:13, 138:20
139:13, 144:3
153:10, 163:5
164:20, 165:3
165:20, 165:24
169:11, 170:14
171:16, 181:10
182:6, 183:12
186:13, 187:13
189:14, 192:23
198:18, 204:16
206:3, 209:3
209:17, 212:20
214:20, 214:24
216:14, 219:2
219:8, 222:5
222:6, 224:16

224:19, 224:22
224:24, 226:8
238:19, 239:15
239:18, 240:15
241:14, 246:9
247:21, 249:15
250:6, 250:17
250:20, 250:23
251:10, 259:22
261:15, 262:18
263:1, 269:8
272:11, 272:13
272:15, 275:4
276:13, 277:1
277:11, 282:15
282:18, 283:13
311:15, 311:22
319:11, 320:25
324:12, 327:6
327:14, 328:24
331:25, 335:21
335:25, 336:10
336:10, 337:19
**safety-based**
336:3
**safety-first**
212:24
**safety-related**
73:24
**safety/hazmat**
54:6
**sake** 289:18
**Sanchez** 253:23
**SANDOVAL**
1:5, 343:5
**sat** 57:23
251:18
**save** 146:16
183:6
**saved** 152:24
153:3, 194:11
**saw** 12:19
44:13, 49:5
195:14, 199:15
233:11, 237:15
251:23, 279:19

286:21, 291:22
291:23, 291:24
301:19, 302:5
302:18, 307:8
309:14, 331:9
336:19, 337:9
**saying** 34:12
42:8, 48:23
52:16, 52:25
69:15, 81:23
91:11, 93:14
97:23, 100:20
103:22, 106:22
106:22, 112:19
123:21, 124:7
129:6, 132:20
135:14, 136:10
139:4, 139:18
139:22, 141:14
156:10, 163:9
164:15, 167:23
178:2, 192:15
192:15, 194:10
194:22, 198:22
199:12, 200:14
201:20, 211:14
213:24, 224:19
231:4, 231:8
237:10, 237:19
238:2, 238:10
239:4, 240:5
256:3, 257:12
272:22, 274:14
277:8, 281:2
291:25, 298:24
300:3, 309:17
311:2, 311:5
311:9, 311:23
314:5, 314:9
321:8, 324:2
325:18, 327:12
327:13, 327:19
327:21, 327:24
**says** 33:19
53:22, 53:25
54:7, 54:13

54:19, 55:4
56:7, 67:1
68:10, 68:18
69:9, 72:17
72:23, 73:21
73:22, 74:8
100:15, 107:17
133:6, 134:24
135:4, 135:20
136:2, 136:18
140:18, 144:21
155:16, 155:21
168:22, 169:20
170:14, 175:8
176:2, 176:6
177:10, 177:19
178:4, 178:25
183:23, 184:4
184:5, 184:8
184:12, 184:13
185:8, 186:20
186:24, 199:24
203:10, 203:13
207:13, 209:22
210:2, 210:7
210:9, 210:13
210:25, 211:1
222:11, 223:15
223:25, 224:6
224:10, 224:15
224:19, 225:9
225:20, 228:9
228:12, 229:16
229:22, 230:22
230:23, 234:4
234:7, 234:10
234:18, 236:14
237:2, 238:3
239:25, 242:10
242:17, 244:19
246:14, 252:25
253:7, 253:14
253:18, 253:21
254:14, 256:7
256:14, 258:2
276:8, 283:24

286:23, 288:20
289:19, 292:13
292:17, 293:7
293:11, 296:8
296:17, 296:19
298:18, 298:21
300:13, 301:1
301:18, 306:10
307:1, 307:5
307:14, 307:17
307:17, 307:20
308:6, 308:7
308:7, 308:8
308:19, 309:19
309:24, 310:2
310:23, 321:24
321:25, 322:12
324:10, 324:17
325:3
**SB** 3:11, 3:16
343:20, 344:11
345:19
**scaled** 305:10
**scenario** 43:10
105:9, 126:21
218:1
**scenarios**
151:24, 153:17
215:10, 217:21
**scene** 26:16
37:18, 44:13
128:10, 285:1
286:5, 286:13
286:19, 287:21
289:20, 292:18
294:25, 295:10
302:18, 303:14
304:25, 318:25
329:24, 333:7
**schedule** 37:3
**scheduled** 12:10
80:1
**school** 252:16
**scope** 58:11
135:24, 281:4
**scream** 26:24

301:21, 302:18
303:3, 329:25
**screamed** 255:4
**screaming**
26:15, 302:16
302:20
**screen** 10:17
53:13, 66:17
155:1, 166:2
167:6, 206:1
301:25, 321:16
**scroll** 166:24
**se** 17:10, 44:15
45:4
**Seaboard** 1:8
5:9, 8:19, 9:9
9:13, 13:1, 13:9
53:22, 54:1
54:5, 56:7, 57:4
59:6, 63:13
63:22, 64:5
65:12, 65:15
65:18, 67:4
67:11, 67:20
67:20, 68:7
68:14, 68:25
70:10, 70:23
72:11, 72:16
73:8, 73:11
75:12, 76:16
76:19, 80:15
88:21, 90:4
90:14, 92:18
92:20, 92:24
93:22, 97:25
99:2, 102:7
102:16, 104:5
104:18, 105:19
106:3, 107:6
108:22, 113:20
121:4, 121:14
121:18, 121:19
121:20, 147:14
150:5, 150:18
152:7, 152:18
153:10, 157:21

164:7, 166:19
167:8, 167:9
167:13, 168:12
174:16, 186:13
189:14, 192:24
202:15, 208:18
210:6, 212:10
225:13, 240:25
241:5, 241:15
247:21, 248:9
262:18, 270:2
285:21, 291:12
291:16, 291:19
294:2, 294:14
311:15, 319:12
321:7, 333:17
333:20, 334:22
337:19, 343:8
**Seaboard's**
73:14, 285:16
**Seaforge** 333:23
**seal** 342:19
**seasons** 231:19
**seat** 58:10
**second** 65:6
66:14, 95:22
100:13, 153:10
181:9, 182:5
183:12, 186:12
188:10, 189:13
192:23, 200:10
235:10, 241:14
247:21, 262:17
289:24, 290:6
290:21, 291:8
311:14, 319:11
320:25, 327:6
335:20, 335:25
337:18
**seconds** 307:4
**section** 54:10
59:9, 72:23
132:11, 155:13
168:19, 168:20
199:20, 206:18
207:9, 235:23

254:5, 254:14
**sections** 59:23
155:12, 168:1
**security** 36:13
64:12
**see** 10:18, 15:19
19:24, 26:7
30:21, 36:25
43:7, 43:8
45:15, 45:20
45:25, 46:1
46:8, 49:7
49:10, 49:11
51:20, 52:24
53:12, 53:20
66:17, 66:23
66:24, 80:20
81:6, 99:19
99:20, 99:23
104:9, 104:20
121:21, 127:2
131:2, 131:5
131:9, 131:21
131:24, 132:10
132:13, 132:18
132:25, 134:2
134:16, 148:20
148:21, 154:25
155:3, 155:14
166:1, 167:6
171:9, 179:4
190:15, 199:19
205:11, 205:25
206:12, 206:17
206:20, 207:1
215:20, 218:7
218:10, 222:13
223:4, 230:1
233:5, 233:7
236:1, 236:3
239:17, 241:21
242:1, 245:15
245:24, 246:12
247:20, 249:6
252:21, 253:7
254:6, 254:21

256:18, 259:25
263:5, 265:23
266:2, 272:2
280:23, 281:1
282:1, 289:5
289:12, 289:14
293:1, 296:14
299:13, 299:24
302:17, 305:16
306:6, 317:15
317:18, 318:5
318:22, 321:18
332:1, 336:20
337:8, 337:12
**seeing** 208:11
290:3, 298:17
318:21, 319:5
319:14, 322:23
**seen** 20:22, 43:2
43:4, 43:5
43:22, 45:12
131:7, 151:17
208:10, 222:25
235:10, 246:3
278:7, 278:13
282:3, 286:8
286:18, 302:17
**sees** 127:4
**Seipel** 3:3, 4:5
43:3, 50:9
51:12, 72:1
72:10, 91:23
92:3, 94:12
94:21, 95:3
95:7, 95:14
96:5, 96:24
97:3, 97:8
106:7, 107:2
107:19, 108:7
110:12, 113:3
118:20, 126:10
129:11, 129:22
130:8, 141:10
142:20, 143:7
143:15, 145:10
146:20, 147:2

147:11, 148:19
154:9, 154:20
157:13, 157:19
172:25, 173:4
173:20, 174:7
179:11, 179:15
179:21, 179:24
180:2, 180:8
180:12, 180:16
182:9, 183:7
183:19, 185:14
185:19, 187:19
193:25, 195:16
198:14, 229:2
229:7, 240:6
240:10, 240:13
240:16, 244:14
247:3, 247:9
248:1, 248:16
258:9, 260:13
260:20, 261:6
261:11, 261:25
262:10, 262:14
262:21, 263:2
263:13, 263:23
264:4, 264:12
264:19, 265:14
265:19, 266:3
266:9, 266:14
267:9, 267:18
267:22, 268:6
268:11, 271:6
271:23, 272:1
276:19, 277:2
281:19, 303:4
309:4, 310:8
310:19, 310:24
312:2, 312:8
323:25, 325:8
326:16, 326:23
327:7, 328:11
328:15, 328:25
329:7, 331:16
331:21, 332:3
332:11, 335:1
338:2, 338:3

339:2, 339:10
339:22, 343:25
**seizure** 339:3
**seizures** 267:6
267:15, 268:7
**send** 63:16
63:21, 67:19
220:1, 231:22
258:22, 284:5
286:5, 286:13
286:14, 288:12
313:18, 313:21
**sending** 304:19
**sends** 288:7
293:12
**senior** 64:20
64:22
**sense** 123:24
171:1, 175:4
175:4, 244:8
279:20, 279:21
279:24, 281:10
**sensitive** 272:15
**sent** 83:12
117:24, 225:1
284:2, 284:14
285:3, 285:4
304:9, 319:15
**sentence** 73:21
**separate** 80:4
80:9, 221:1
**separates**
320:14
**September** 8:21
19:18, 22:17
42:13, 119:9
284:2, 305:25
337:21
**Sergio** 253:23
**serious** 37:5
37:8, 180:21
229:5, 276:17
284:17, 287:16
288:10, 318:16
319:10
**seriously** 14:5

14:7, 14:8, 14:9
216:21, 231:5
249:22
**serve** 55:4
106:19, 107:4
**served** 184:10
345:11
**serves** 79:15
87:5, 104:22
105:10, 287:12
**services** 67:17
**sessions** 12:2
**set** 30:22, 75:19
147:21, 151:14
168:8, 239:5
310:5, 320:11
**sets** 59:4
**setting** 21:18
39:22, 58:13
**severity** 215:25
216:1, 217:3
**share** 110:13
111:21, 335:3
335:14
**shared** 29:11
161:19
**shed** 19:3, 42:3
44:19
**sheds** 50:7
**sheet** 190:23
221:9, 221:18
**Shell** 39:2
**ship** 63:18
67:18, 67:22
191:2, 286:12
**shipment** 63:19
**shirt** 56:7
**shop** 204:17
**short** 96:10
224:2, 249:20
**short-service**
16:7
**shortage** 77:16
223:16, 223:22
224:8
**shorthand** 1:20

343:15
**shortly** 112:12
112:12, 112:16
**shot** 35:4
**show** 30:1, 53:9
66:12, 66:16
72:6, 83:17
130:24, 137:7
154:22, 155:12
166:1, 166:6
222:7, 232:25
233:14, 241:19
241:25, 252:13
**showed** 217:17
221:5, 286:20
323:21, 325:5
**showing** 10:16
138:18
**shown** 74:13
319:16, 345:11
**shows** 197:17
**shut** 231:21
**side** 33:13
36:24, 142:3
182:6, 269:14
273:19, 275:8
275:12
**sidebar** 157:15
314:12
**sideview** 156:15
**sight** 58:3
291:20
**sign** 141:12
**sign-in** 221:8
221:18
**signage** 158:11
**signal** 144:11
**signature** 4:8
221:19, 342:2
**signed** 226:5
**significant**
111:23, 119:11
215:5
**significantly**
266:1
**signifying** 142:2

**silence** 10:25
**Silva** 1:8, 3:1
3:2, 6:15, 14:12
15:4, 17:10
17:13, 18:6
19:12, 19:22
20:11, 20:15
22:10, 22:23
23:3, 24:22
25:6, 30:14
31:19, 56:20
61:11, 61:12
61:23, 65:9
65:20, 67:9
75:25, 77:3
77:3, 78:17
84:24, 85:3
86:13, 87:1
89:11, 90:25
94:3, 94:15
95:13, 95:19
96:2, 96:21
98:20, 108:6
108:12, 112:7
113:1, 114:5
114:25, 116:7
116:10, 125:19
126:6, 132:13
144:14, 148:11
148:14, 152:4
152:15, 156:22
157:12, 161:6
166:16, 172:23
173:15, 174:24
178:5, 183:13
184:6, 185:12
186:20, 190:10
198:5, 202:7
205:12, 208:2
214:9, 220:20
221:6, 222:17
223:24, 227:15
231:1, 233:4
234:10, 235:24
236:6, 236:9
237:10, 239:9

241:25, 242:4
244:19, 253:10
253:22, 254:4
254:16, 256:14
260:6, 262:2
266:16, 267:4
268:23, 270:17
271:2, 273:15
275:1, 275:6
278:17, 279:5
288:16, 291:15
295:24, 311:5
311:15, 315:23
320:5, 322:21
325:6, 325:13
326:13, 326:20
327:10, 328:9
329:2, 329:3
334:9, 336:15
338:5, 338:19
338:23, 339:3
339:10, 343:8
**Silva's** 21:5
77:5, 103:6
104:23, 105:9
108:14, 112:13
114:23, 123:1
218:6, 234:8
242:15, 247:24
278:3, 334:21
338:16
**similar** 30:22
170:20, 210:6
215:10, 225:10
236:18, 237:15
**simple** 146:14
146:15, 304:22
**simply** 271:18
**SIMS** 3:4
**Simultaneous**
126:12, 128:24
144:4, 165:11
184:25, 201:8
227:10, 230:15
236:17, 314:4
**single** 34:17

199:9, 292:8
**sir** 8:4, 8:10
8:14, 8:24, 9:1
24:24, 25:1
53:13, 56:9
60:5, 60:7
102:14, 107:3
107:9, 118:6
119:22, 119:25
122:19, 130:10
130:23, 131:2
149:24, 155:1
183:4, 221:25
232:7, 232:24
252:11, 267:12
**sit** 79:23, 85:19
85:20, 128:21
162:22, 198:10
241:13
**site** 48:2, 151:10
259:13
**sites** 148:7
**sits** 290:16
**sitting** 15:14
58:3, 289:9
**situated** 237:12
**situation** 152:11
163:11, 163:12
190:24, 215:24
278:17, 300:18
**situations**
199:24, 202:3
202:5, 325:6
**six** 100:12
134:25, 135:1
135:5, 150:9
150:11, 230:20
**size** 168:25
238:15, 247:6
**skill** 243:11
**sleep** 269:18
269:20
**slide** 218:3
**slightly** 96:14
**slow** 140:24
177:25, 179:5

183:24, 203:21
210:9
**slowed** 203:22
**small** 56:23
63:17, 242:21
243:3, 243:7
243:15, 247:5
**smaller** 242:22
243:13, 245:8
245:11, 245:16
**smiling** 180:14
**smirk** 180:11
187:17
**smirking** 187:20
**snore** 269:19
**software** 176:16
252:15
**solely** 100:17
186:16
**solutions** 67:12
67:17, 67:20
291:12, 291:16
291:19
**somebody** 44:19
46:8, 52:25
60:20, 71:18
71:21, 72:4
76:25, 89:9
103:9, 117:20
117:21, 138:2
145:7, 147:20
148:24, 181:13
194:3, 196:3
215:17, 216:17
216:19, 216:21
216:21, 220:5
221:3, 221:11
238:23, 239:2
239:3, 249:18
249:24, 261:4
262:7, 262:18
265:23, 266:2
276:17, 289:17
295:18, 296:6
306:3, 306:7
308:16, 310:12

310:17, 314:22
316:4
**somebody's**
153:3
**sons** 18:11
**soon** 39:14
119:17, 158:9
288:9
**sorry** 13:20
14:6, 32:3
52:14, 52:17
52:25, 53:2
65:14, 103:13
123:14, 135:2
145:2, 148:13
165:16, 167:2
170:4, 171:13
206:11, 229:17
229:19, 254:18
267:13, 271:7
296:11, 296:12
326:18
**sort** 29:9, 60:18
62:22, 77:12
86:10, 91:5
99:3, 107:21
112:7, 113:1
114:24, 133:19
134:13, 138:2
149:6, 151:18
168:17, 218:16
219:10, 222:19
244:5, 248:22
271:9
**sorts** 33:13
137:14
**sound** 140:24
141:8, 141:15
141:21, 141:25
142:17, 142:19
142:21, 142:22
143:4, 143:5
143:10, 143:13
143:18, 143:22
144:16, 144:21
144:22, 177:25

178:3, 178:11
178:12, 178:14
178:15, 178:25
179:6, 183:24
186:8, 186:24
210:9, 211:8
230:16
**sounded** 178:6
256:9, 256:12
**sounding**
144:25
**sounds** 129:21
140:23, 231:12
231:15, 257:3
257:23, 277:11
312:10
**source** 211:12
**sources** 28:20
40:21
**South** 3:5, 55:22
**Southeastern**
47:16
**space** 204:1
230:23, 231:8
231:13, 232:9
237:11, 237:17
237:18, 237:23
238:2, 239:14
246:24, 247:1
247:8
**spaced** 248:24
**span** 299:9
**Spanish** 92:14
236:7, 236:10
236:12
**spar** 187:16
**sparring** 187:20
**speak** 17:9, 51:6
88:5, 101:10
108:10, 108:10
122:2, 150:1
190:16, 193:21
196:9, 236:6
236:7, 236:12
243:14, 243:20
243:21, 275:2

296:15, 305:6
305:6, 305:7
313:18, 327:11
**speaking** 95:21
126:12, 128:24
144:4, 165:11
184:25, 201:8
204:5, 227:10
230:15, 236:17
274:7, 274:7
297:15, 302:10
308:2, 314:4
**special** 14:15
56:24
**specialist** 222:5
222:6, 239:16
282:18, 283:13
**specialists**
136:24
**specialized** 47:7
55:10
**specialty** 259:6
**specific** 55:9
64:22, 75:4
75:4, 75:5, 77:1
85:18, 90:18
99:9, 141:2
151:13, 163:24
164:6, 176:21
205:2, 219:18
321:6, 325:16
**specifically**
26:17, 72:23
74:22, 144:18
169:7, 219:15
247:12, 270:17
294:23, 302:16
304:9, 304:17
304:19
**specifics** 198:7
198:8
**specify** 29:9
29:12, 30:17
123:4
**speculate** 163:7
**spell** 13:6, 36:4

47:14, 64:17
**spells** 260:12
260:19, 261:2
261:5, 262:8
262:19, 262:25
263:20, 264:9
265:23, 266:5
**spent** 44:11
57:5
**spit** 257:16
**spits** 257:18
**split** 42:20, 43:1
179:18, 308:16
310:13
**splits** 312:6
**spoke** 270:7
**spoken** 52:4
164:10, 300:21
305:2
**spoliated** 107:12
**spot** 141:19
141:20, 145:2
145:2, 270:18
**spots** 243:22
245:11, 245:17
322:1, 322:14
322:15, 324:19
**spotter** 147:13
147:20, 148:17
148:23, 149:1
149:9, 149:16
150:10, 151:3
151:3, 151:13
151:23, 152:8
152:15, 152:3
153:7, 153:21
154:7, 154:19
**spotters** 5:18
147:14, 147:25
148:7, 148:12
148:15, 148:22
149:2, 149:5
150:6, 150:18
150:25, 151:18
152:1, 152:11
153:14, 154:1

154:3, 155:16
155:21, 156:4
156:10
**spotting** 150:12
154:4
**spreadsheet**
251:24
**SSI** 291:8
291:11, 292:6
**stacks** 158:20
201:15, 201:16
204:9
**staff** 45:17
77:16, 223:17
223:23, 224:8
330:16, 330:20
**staffed** 224:2
**staging** 244:21
**stamp** 132:25
305:16, 309:14
**stand** 129:23
256:19, 288:17
**standard** 168:13
168:13, 176:25
250:13, 250:14
285:25
**standards** 168:8
**standing** 30:7
254:20, 256:15
257:5, 257:19
**standpoint**
10:24, 24:2
63:10, 279:24
339:7
**start** 135:2
244:3, 301:5
303:14
**started** 57:3
209:13, 214:25
255:10, 305:24
305:25, 305:25
**starts** 167:3
207:9
**state** 1:20, 8:15
160:17, 297:9
342:9, 342:22

343:15
**stated** 1:23
100:9, 115:5
322:1, 322:3
324:18, 324:21
**statement** 26:17
42:9, 42:10
96:8, 129:23
209:17, 232:4
235:24, 235:25
239:13, 246:12
262:2, 276:10
309:16, 309:18
323:6, 324:1
**statements** 26:7
239:15, 339:14
339:18
**States** 55:19
95:24, 149:3
**stationary** 35:11
35:12
**status** 81:11
120:4
**stay** 32:17
172:5, 190:8
275:12, 314:20
**stayed** 161:20
205:15
**steel** 248:13
**STENOGRAP...**
3:13
**step** 143:3
143:3, 143:20
146:12, 146:14
146:15, 147:3
147:9, 263:21
**Stephen** 27:8
27:10, 80:18
81:25, 82:1
82:4, 83:20
131:21, 136:13
136:19, 136:20
197:7, 218:20
218:21, 218:24
221:12, 221:13
226:8, 226:10

226:18, 226:19
268:25, 282:11
284:19, 286:25
287:3, 288:20
290:8, 292:17
295:9, 295:9
299:16, 300:2
300:16, 302:8
302:12, 334:8
**steps** 147:6
**Steve** 13:5
124:21, 297:21
**Stevedoring**
131:18
**stick** 275:12
**sticks** 319:13
**stipulated** 345:3
**stone** 40:24
**stop** 148:25
244:3, 244:6
255:2, 255:14
**stopped** 192:3
304:3
**stopping** 39:14
130:13, 172:10
244:5
**stops** 327:5
**storage** 62:20
62:21, 203:24
204:1
**store** 231:23
**story** 248:5
**straps** 258:16
**street** 1:22, 2:15
213:19
**strike** 17:12
17:25, 22:17
26:10, 27:19
31:18, 60:22
75:2, 81:8, 84:1
85:8, 102:15
107:24, 116:7
124:6, 159:20
161:22, 165:1
168:19, 170:4
173:13, 224:23

229:17, 230:21
267:3
**strikes** 215:23
**struck** 15:4
49:22, 49:23
50:1, 50:6
51:23, 126:8
193:24, 194:12
194:16, 194:19
194:20, 241:3
**stuff** 85:21
**stuffing** 226:24
227:3, 227:7
227:14, 320:12
**subject** 131:16
316:4
**subjective** 89:18
181:20
**submitted**
343:19
**subscribed**
342:15
**subsection**
188:4
**subsections**
59:14
**subsequent**
339:18
**substance** 17:6
21:5, 133:2
**substantial**
106:20
**suffer** 10:25
**suffering** 261:1
**sufficient**
188:20
**suggest** 339:18
**suggesting**
194:25
**suggestions** 33:5
33:6
**suggests** 129:7
**suicidal** 197:1
197:5
**suite** 1:22, 2:6

2:15, 117:21
344:12, 345:20
367:1, 59:2
**suited** 300:19
**sum** 12:12
**summary**
234:16, 244:16
**Sunday** 44:10
**super** 223:1
282:15
**superintendent**
322:1, 324:18
**supervision**
219:6
**supervisor**
77:10, 84:3
132:21, 134:4
136:5, 136:7
136:11, 136:16
136:17, 137:13
226:8, 234:8
235:16, 253:10
253:14, 322:21
325:13
**supervisors**
131:19, 134:14
135:21, 137:19
325:1, 327:14
327:23
**supervisory**
77:24, 133:7
134:5, 135:9
**supplemental**
27:22, 74:10
**support** 102:3
133:9, 137:7
225:10, 288:17
**supposed** 33:8
33:11, 53:14
93:24, 124:7
134:1, 134:15
141:20, 204:22
207:3, 323:17
323:24
**sure** 9:19, 10:11
10:18, 29:9
29:21, 30:23

30:24, 32:15
37:1, 59:2
69:18, 71:10
71:13, 71:16
76:8, 76:16
80:21, 80:22
81:6, 83:8
83:23, 87:10
87:14, 87:20
92:25, 93:1
93:12, 93:17
93:21, 93:23
101:25, 102:7
104:7, 111:8
111:19, 111:25
112:19, 112:21
112:23, 121:24
126:1, 127:4
130:14, 141:1
144:5, 145:7
147:18, 147:22
151:4, 151:5
153:23, 159:11
161:15, 161:17
164:24, 164:24
166:22, 170:8
181:6, 181:7
181:9, 184:22
190:8, 200:16
204:4, 204:13
204:15, 204:21
214:17, 214:18
216:10, 224:1
227:6, 227:6
227:14, 248:3
251:12, 257:2
267:14, 270:10
271:2, 271:8
271:13, 271:20
274:1, 276:7
283:3, 287:15
291:6, 291:21
292:7, 304:22
305:5, 305:6
305:6, 305:7
305:8, 323:11

326:19
surely 329:13
surprise 20:20
48:16, 268:2
268:5, 268:10
310:16, 310:21
surprised 37:11
surrounded
305:5
surroundings
29:19, 322:5
324:22
swear 20:11
20:14, 20:17
20:23
swivel 29:17
35:15, 35:21
35:25
sworn 1:16, 8:7
23:4, 312:25
316:14, 343:16
system 35:24
75:18, 75:18
80:9, 105:25

**T**

T-O-U-R 36:5
table 11:4
take 10:4, 11:2
11:2, 11:17
14:5, 14:7, 14:8
33:21, 48:9
63:13, 63:19
66:2, 76:5, 79:4
90:7, 90:24
101:16, 129:20
130:13, 130:14
133:3, 139:13
140:2, 145:12
160:25, 176:20
183:10, 194:7
223:13, 231:5
231:7, 239:21
240:12, 242:8
250:4, 250:25

251:21, 253:4
265:6, 274:12
286:1, 287:25
294:24, 295:8
299:10, 305:8
307:15, 312:4
314:16
taken 1:16, 9:21
24:8, 44:1, 66:5
79:19, 114:11
130:18, 142:22
160:6, 162:1
162:21, 223:3
232:19, 241:4
293:8, 303:13
343:22, 344:2
takes 48:7
143:12, 147:9
238:24
talk 13:24, 14:1
29:8, 51:24
52:12, 75:24
115:2, 115:9
122:5, 144:25
184:22, 196:8
206:18, 214:17
217:3, 220:5
249:22, 268:22
275:22, 275:24
276:3, 304:10
317:11, 323:2
talked 20:12
44:4, 115:4
115:11, 288:25
300:24, 302:3
335:10
talking 35:7
35:9, 50:24
69:22, 73:6
91:12, 92:16
95:18, 95:19
95:20, 106:13
106:14, 114:15
122:8, 123:11
154:15, 157:3
157:9, 157:12

161:3, 177:16
178:22, 179:8
184:3, 187:25
189:16, 207:10
219:15, 222:19
223:20, 225:5
233:23, 238:11
239:14, 251:25
260:24, 261:15
266:1, 266:20
267:6, 272:25
287:3, 291:7
292:1, 292:6
304:23, 306:13
306:14, 318:3
318:3, 320:24
323:15
talks 67:1, 99:13
188:6, 227:17
290:17
tampered 45:18
tape 156:19
target 259:25
taste 197:20
tat 212:1
Taylor 6:2
14:22, 167:17
167:20, 205:17
206:3, 208:17
208:22, 208:23
211:3, 211:4
211:22
teach 41:13
team 15:7, 44:4
44:12, 49:4
49:13, 77:10
78:1, 80:10
80:22, 81:1
81:23, 82:5
86:4, 93:18
135:6, 136:3
136:13, 136:14
136:18, 136:20
137:9, 255:2
255:16, 256:7
258:3, 304:10

333:6, 336:10
336:11
teams 81:2
81:24, 82:17
249:15
Technically
65:9
technique 153:4
153:8
technology
10:23
tell 12:5, 22:7
30:2, 31:22
47:10, 55:15
62:24, 81:10
84:13, 84:16
99:23, 100:18
106:13, 123:1
124:16, 173:15
178:9, 179:2
181:4, 186:5
192:21, 195:19
196:11, 206:25
248:5, 264:21
287:8, 295:9
300:9, 306:16
319:22
telling 117:21
120:19, 129:8
148:24, 153:13
192:5, 211:25
255:5, 261:9
262:6, 286:13
299:19, 315:5
tells 61:14
83:21, 183:16
192:13
temporary
332:25
ten 9:7, 181:1
189:25, 191:4
230:18, 230:21
278:4, 278:14
288:24
ten-year 278:25
tend 328:19

tends 72:5
Tenth 3:5
term 166:12
terminal 29:14
32:10, 34:18
44:8, 59:18
60:21, 74:22
76:12, 76:22
76:24, 78:10
85:25, 93:20
96:12, 96:18
131:19, 132:5
132:7, 133:7
134:5, 135:9
135:20, 136:11
137:14, 137:25
142:21, 149:4
149:14, 149:17
154:2, 158:5
158:7, 158:10
158:14, 193:9
201:13, 201:14
203:25, 209:1
214:17, 215:18
215:21, 225:22
229:23, 231:20
231:25, 232:1
275:14, 282:9
282:19, 300:17
300:17, 312:12
329:12
terminals 55:20
59:21, 59:23
60:1, 72:24
73:8, 148:6
149:23, 150:3
203:18, 204:24
terminate 251:4
terminated
215:13, 217:19
216:16, 251:22
termination
248:23
terms 49:17
59:15, 60:9
60:22, 60:23

63:1, 218:7
311:14
**terrible** 192:14
303:11, 303:12
308:5
**test** 76:10, 76:11
76:12, 91:4
104:1, 104:2
221:21, 229:11
229:16
**tested** 105:10
111:12, 191:7
229:9, 229:15
229:18, 270:10
270:14, 270:16
271:2
**testified** 8:8
112:6, 148:12
148:14, 148:17
180:5, 202:2
328:10, 330:2
**testify** 85:15
**testimonial**
254:15
**testimony** 11:8
18:4, 19:9, 23:4
24:11, 28:25
29:2, 31:11
43:21, 44:24
46:24, 91:16
96:17, 98:16
100:13, 102:1
114:9, 120:13
194:15, 199:8
218:5, 255:3
255:8, 258:7
316:14, 343:17
343:22
**Texas** 1:6, 1:20
1:22, 1:23, 2:7
2:16, 3:6, 343:6
343:15, 344:9
344:12, 344:13
345:16, 345:19
345:20
**text** 6:22, 7:2

53:14, 194:1
281:24, 282:5
282:8, 284:2
284:5, 284:13
285:3, 286:20
288:23, 289:3
291:6, 292:12
295:3, 295:6
297:2, 297:15
303:22, 303:24
304:3, 304:14
304:20, 304:20
305:14, 306:5
306:6, 306:6
307:8, 309:5
**texted** 303:25
**texter** 307:20
308:7, 310:22
**texting** 311:24
**texts** 285:4
288:24, 288:25
304:6, 304:8
304:9, 307:7
**thank** 8:10
283:9, 339:22
**therefor** 345:5
**thereof** 334:23
**thing** 73:11
82:20, 86:3
129:21, 133:3
151:10, 163:16
163:17, 164:13
179:3, 190:6
193:12, 209:12
211:15, 216:22
217:4, 218:17
314:6
**things** 10:3
13:25, 31:3
31:14, 33:14
37:18, 44:17
44:17, 50:23
58:5, 58:7
58:24, 60:18
63:17, 72:7
74:21, 81:4

84:8, 85:6
93:12, 93:17
98:9, 104:15
104:16, 105:4
105:5, 118:25
125:10, 126:22
128:12, 128:19
129:18, 129:24
130:5, 138:16
138:17, 138:18
138:22, 152:10
155:8, 168:15
168:23, 171:3
181:12, 181:17
189:7, 190:25
191:25, 194:4
194:6, 200:22
204:19, 207:24
210:19, 215:16
217:19, 219:16
225:17, 238:18
248:6, 248:9
248:12, 277:15
280:7, 295:22
**think** 9:6, 12:9
12:12, 16:9
16:18, 16:21
27:8, 29:7
33:19, 34:22
35:14, 38:16
38:19, 41:11
43:13, 44:3
44:8, 44:16
46:25, 47:21
51:22, 52:10
52:23, 60:11
60:12, 64:18
74:7, 79:13
79:13, 80:13
83:7, 88:8, 89:1
98:22, 103:14
105:1, 109:6
109:11, 109:25
110:6, 110:11
110:16, 111:2
118:22, 118:24

119:16, 122:9
124:9, 126:20
130:25, 132:3
144:24, 152:10
157:16, 159:17
161:10, 163:6
163:8, 163:21
164:15, 164:17
164:22, 166:21
174:2, 180:6
180:9, 180:10
180:11, 182:11
184:17, 185:16
187:8, 192:17
196:16, 196:23
197:1, 198:3
198:12, 202:19
206:12, 218:11
218:14, 220:10
226:19, 226:19
227:3, 227:25
228:1, 233:13
248:4, 256:24
269:1, 276:11
279:12, 279:16
279:24, 280:19
283:25, 284:18
284:19, 284:20
285:6, 285:10
286:17, 286:17
286:21, 287:11
287:13, 291:5
300:8, 300:15
300:15, 302:7
302:8, 305:4
306:11, 308:2
314:6, 323:2
323:20, 327:13
328:23, 330:19
331:2, 333:4
333:5, 334:16
334:16, 334:20
335:10
**thinking** 35:14
133:19, 297:10
**thinks** 90:4

**third** 188:12
201:1, 201:5
246:2
**third-party**
292:13, 292:23
**thorough** 69:16
**thought** 114:18
117:14, 124:17
144:11, 162:10
164:12, 217:10
306:17, 323:16
323:19, 337:9
**thoughts** 110:2
110:13
**thread** 305:18
305:24, 305:25
**three** 9:17
21:14, 26:5
26:5, 75:21
75:22, 76:3
199:24, 202:3
202:4, 215:12
215:19, 215:23
217:13, 217:23
233:10, 246:5
247:12, 247:18
248:6, 249:19
250:18, 250:23
250:23, 251:20
251:20, 306:8
331:9
**three-month**
248:7, 248:11
**three-year**
248:18, 248:19
248:20, 249:2
249:13, 249:17
250:9, 251:8
**throw** 130:5
**thrown** 109:15
**ticket** 52:12
133:24, 134:9
134:17
**time** 9:16, 10:19
10:24, 10:24
12:13, 15:23

15:24, 17:11
21:16, 21:24
23:22, 26:21
26:22, 27:4
28:1, 30:2, 30:8
30:20, 31:17
31:24, 34:10
34:10, 34:15
34:24, 35:23
36:2, 36:8, 37:7
41:23, 43:15
44:2, 50:13
50:21, 62:18
74:7, 74:9, 74:9
74:10, 74:10
77:16, 78:9
78:24, 79:24
80:25, 80:25
81:5, 81:5, 82:5
82:5, 83:3
83:25, 83:25
84:24, 87:7
87:8, 87:10
87:25, 90:24
91:3, 91:12
91:12, 91:14
91:17, 92:6
100:10, 100:11
101:6, 101:6
103:1, 105:23
106:10, 112:25
128:4, 128:9
129:1, 134:12
137:13, 144:18
153:1, 157:22
158:17, 159:19
160:3, 161:16
172:2, 178:11
181:22, 189:24
190:19, 193:9
194:14, 196:1
196:7, 201:11
201:17, 202:20
202:21, 204:2
204:3, 204:7
205:2, 205:20

208:10, 208:12
210:17, 213:25
214:3, 214:4
214:8, 221:10
221:12, 221:13
224:4, 226:18
226:20, 227:7
231:9, 231:18
232:2, 234:4
235:10, 238:6
239:16, 240:12
242:17, 243:2
245:8, 246:11
246:22, 247:13
251:6, 251:10
251:15, 251:16
255:14, 258:19
262:23, 264:21
266:20, 269:18
278:1, 279:5
279:8, 279:15
281:10, 282:19
282:20, 285:5
287:17, 290:21
296:5, 296:6
296:6, 304:21
307:10, 307:24
316:23, 317:12
322:23, 329:17
329:19, 330:5
343:22, 343:23
**timeline** 328:2
**timely** 224:3
**times** 9:2, 9:3
9:5, 26:4, 26:5
33:18, 49:22
215:12, 215:19
237:25, 248:6
**tips** 284:23
**tire** 49:10, 49:12
**tired** 239:24
**title** 54:4, 54:5
64:8, 64:22
77:5, 78:8
78:11, 79:2
84:2, 85:17

132:2, 132:16
161:10, 222:1
222:3, 222:4
**titled** 5:17
66:24
**today** 8:2, 10:8
10:17, 11:8
11:18, 12:3
17:17, 19:22
22:17, 22:18
35:3, 38:5
39:15, 50:18
51:24, 52:7
52:17, 56:7
75:17, 120:23
132:8, 159:22
162:22, 181:24
186:22, 195:10
198:10, 198:25
267:1, 287:1
287:10, 299:17
300:3, 338:15
338:18
**told** 22:6, 22:9
23:3, 28:9
50:23, 108:23
117:14, 118:1
120:7, 121:1
122:24, 162:15
275:10, 275:11
286:1, 295:12
296:6, 299:16
300:25, 302:17
308:2, 317:5
319:20, 323:3
**tomorrow** 35:4
98:23, 163:20
**tone** 13:14
**tool** 168:19
**tools** 168:8
168:9
**top** 111:22
127:6, 131:12
134:14, 214:22
214:22, 242:1
**tort** 106:21

**total** 12:12
**totally** 177:10
177:12
**touch** 275:8
276:6, 283:22
**touched** 128:1
**tough** 38:5, 38:8
182:25, 199:2
**tour** 36:1, 36:1
36:4
**tower** 109:5
**toxic** 61:16
**track** 75:12
134:20
**tracks** 304:4
**traffic** 33:4
153:22, 157:22
157:25, 158:4
158:13, 201:15
319:21, 320:1
320:10
**tragic** 51:25
207:14, 208:12
**tragically** 130:6
**trailing** 210:13
**train** 71:7
86:19, 153:20
153:22, 153:23
160:7, 160:20
274:22, 275:6
**trained** 32:15
32:22, 57:1
57:21, 76:3
79:10, 86:21
86:22, 86:25
87:1, 94:3
98:20, 139:10
151:6, 151:7
151:12, 220:20
220:22, 220:24
221:6, 275:1
**trainer** 55:5
221:10, 221:14
**training** 5:22
13:19, 13:21
13:23, 14:16

14:19, 29:15
32:14, 55:8
56:25, 57:13
57:15, 57:18
57:18, 57:20
58:15, 58:22
60:9, 60:25
61:2, 61:17
61:19, 62:6
62:7, 63:1
65:20, 70:4
70:14, 70:17
70:20, 71:10
71:17, 72:7
75:12, 75:16
75:17, 75:23
75:24, 76:1
76:5, 76:6
76:17, 76:20
78:25, 79:3
79:5, 79:14
79:16, 80:6
80:7, 80:7, 80:8
80:11, 80:12
80:14, 80:17
80:22, 81:6
81:7, 81:11
81:14, 84:8
84:12, 85:11
85:16, 86:14
87:4, 87:5
87:14, 89:24
92:13, 93:1
95:21, 98:1
99:24, 99:25
100:1, 105:13
138:24, 139:15
139:20, 140:3
140:4, 140:7
140:13, 144:14
144:17, 144:20
144:24, 147:4
166:8, 166:10
166:19, 166:21
167:8, 167:10
168:11, 177:15

178:7, 184:22
186:19, 187:25
189:22, 192:24
199:18, 199:23
202:4, 209:3
210:6, 215:15
221:8, 221:9
243:11, 243:16
264:22, 274:6
274:18, 274:20
275:15, 275:17
275:18, 279:20
336:12, 336:15
336:19, 336:20
336:22, 337:3
337:8, 338:10
**trainings** 75:20
75:21, 87:12
92:21, 221:1
221:12, 275:22
276:2, 337:15
**transcript** 17:16
19:25, 20:2
21:1, 23:3, 28:5
98:25, 108:14
343:17, 343:19
345:9
**transcription**
341:4
**transcripts**
21:11, 21:15
21:19, 21:25
22:2, 38:24
117:19
**transit** 320:8
**translated** 236:3
236:5
**transport** 56:4
62:3, 67:21
**transportation**
54:21, 60:24
111:11
**traumatized**
162:20
**travel** 140:19
140:22, 177:20

177:22, 200:5
**TRCP** 344:4
345:1
**trend** 215:5
215:8, 215:14
215:16, 215:20
219:10, 260:1
**trends** 251:12
**trial** 21:2
108:14, 108:20
109:2, 118:8
315:6, 315:7
316:18
**tried** 25:19
52:12, 110:25
**Troy** 137:1
**truck** 5:21, 25:1
25:2, 25:3
25:12, 26:7
30:9, 30:10
61:1, 61:3, 76:4
76:6, 79:5
85:11, 108:10
139:15, 158:21
166:8, 166:10
166:12, 172:14
173:3, 174:5
196:8, 204:9
217:14, 221:7
228:12, 254:24
255:1, 255:2
257:25, 258:1
269:16, 289:16
292:1, 292:4
319:25, 320:10
**trucks** 142:11
175:12, 191:9
201:24, 237:5
255:18, 256:18
320:7
**true** 14:19
15:20, 16:1
53:23, 54:25
55:11, 68:22
78:20, 81:14

103:21, 113:12
128:15, 129:2
131:16, 131:22
138:22, 142:11
142:18, 149:25
161:24, 168:25
169:16, 170:24
171:24, 172:14
188:8, 189:8
196:6, 198:22
200:21, 204:4
222:20, 235:14
235:18, 292:15
312:10, 318:13
342:3, 343:17
**try** 18:18, 25:17
25:18, 41:2
41:6, 41:24
41:25, 48:10
66:15, 89:6
106:20, 110:23
111:1, 117:2
118:25, 134:21
145:6, 174:9
187:17, 204:15
231:6, 246:24
248:19, 249:1
270:3
**trying** 25:21
29:7, 98:12
109:14, 172:17
172:18, 174:13
179:7, 202:19
207:1, 212:12
237:22, 238:19
245:6, 292:7
298:11, 312:13
**Ts** 305:5
**Tuesday** 1:17
**tumoring** 55:19
**turn** 23:13
23:16, 35:9
127:1, 127:2
134:17
**turned** 127:8
170:12

**twice** 49:22
50:7
**two** 12:13, 22:22
25:7, 61:9
79:17, 87:10
95:23, 136:24
165:13, 173:12
194:20, 195:7
195:12, 195:20
208:3, 210:19
210:23, 210:25
221:1, 237:25
239:8, 248:25
252:7, 295:12
312:5, 312:25
**two-month** 23:2
**type** 75:25
84:12, 90:22
147:25, 228:2
228:3, 231:14
251:2, 258:10
**types** 80:8
**typical** 178:14
222:22

**U**

**U.S.-based**
54:23
**Uh-huh** 155:15
156:6
**ultimate** 50:24
51:5, 51:6, 51:7
**ultimately** 33:24
48:19, 51:1
92:24, 161:18
**umbrella** 65:18
**unable** 255:6
**unacceptable**
107:25, 108:1
108:4, 126:9
126:15, 191:16
191:17, 197:11
197:14
**unbalanced**
151:22

**uncommon**
280:4
**unconscious**
303:3
**uncontrolled**
263:1, 264:9
**uncover** 19:2
**undergo** 104:1
104:6
**underneath**
136:21
**understand**
8:22, 10:5, 10:9
11:10, 18:10
18:12, 18:15
19:1, 19:5, 48:8
48:12, 49:25
58:2, 74:21
100:25, 101:17
103:13, 109:3
109:4, 109:7
109:10, 109:15
146:23, 152:5
172:22, 179:19
179:22, 180:1
221:20, 314:9
315:8, 316:3
316:13, 323:12
327:13
**understanding**
16:13, 49:23
162:5, 216:9
297:5
**understands**
68:10
**understood**
10:14
**undo** 98:3
**unfortunately**
16:17, 30:13
31:3, 51:22
108:9, 159:18
196:9, 252:2
**unimaginable**
46:19, 46:23
**union** 85:22

**United** 55:19 95:24, 149:3
**university** 47:11 47:14, 47:16
**unknowns** 30:19
**unnecessarily** 122:10
**unnecessary** 323:20
**unsafe** 72:5 134:2, 134:7 134:15, 175:15 175:16, 216:6 216:10, 216:25 230:10, 235:8 247:22, 265:12 325:13, 326:12 326:20
**untrue** 129:2
**unturned** 40:24
**up-to-date** 80:22, 81:7
**update** 82:7 83:21, 140:10
**updated** 5:10 71:11, 105:16 106:4, 140:6 140:9, 199:7
**updates** 84:8 176:25
**upper** 233:23 234:1, 234:2 242:11, 244:21 246:16, 291:14
**upright** 257:19
**upsetting** 46:6 46:8
**urge** 137:6
**urged** 172:5
**urgency** 299:21
**use** 61:11 112:20, 148:9 148:9, 153:13 170:14, 171:1 185:8, 185:12

185:17, 185:21 186:14, 209:2 231:6, 279:20 279:21, 323:17 323:20, 323:24 324:2, 331:8 333:24, 334:2 334:6
**useful** 241:9
**user** 274:16
**uses** 92:7, 321:4
**usually** 274:23

**V**

**vague** 101:18
**valuable** 48:17 49:3
**value** 46:25 239:21, 239:22
**various** 253:22
**vehicle** 151:7 151:8, 151:8 156:2, 244:12 263:12
**vehicles** 155:17 156:11
**vendor** 84:13
**verbal** 12:21 135:10, 223:4
**verbally** 10:2 223:17, 224:6 251:10
**verbatim** 284:25
**verbiage** 176:20
**versus** 264:25
**vertical** 254:20 256:10, 256:15 256:25, 257:5
**vessel** 35:5, 61:1
**vessels** 34:24 36:19, 36:22 36:24, 61:4 63:14, 142:9
**vest** 204:16

204:20, 215:18 215:19, 215:22
**vice** 64:20
**vice-president** 64:20, 64:23
**vicinity** 24:22 30:6, 143:21 186:10
**victim** 287:21 301:21
**victims** 295:12
**video** 15:13 29:25, 30:8 30:20, 30:21 31:2, 31:4, 31:5 31:7, 52:25 284:9, 286:9
**Videographer** 3:9, 3:10, 8:2 66:3, 66:7 130:16, 130:20 131:3, 232:17 232:21, 340:1
**VIDEOTAPED** 1:11, 1:14 343:11
**view** 34:3, 35:18 35:18, 36:8 102:3, 140:21 155:18, 156:12 177:22, 200:5 210:3, 210:14
**views** 225:25
**violated** 185:18 185:22
**violation** 7:7 317:14, 318:16 319:10, 320:17 320:21, 321:2 321:12
**violations** 135:5 135:6, 135:15 321:17, 324:12 325:1, 327:14 327:22, 331:25
**virtually** 143:12

**visibility** 144:8 145:1, 215:22
**visible** 188:2 204:16
**vision** 89:21 90:13, 90:15 96:11, 96:11 96:11, 105:6 123:9, 154:6 154:12, 154:18 210:10, 263:20 264:10, 267:1 338:23
**visit** 82:23
**VS** 1:6, 343:6

**W**

**Wagner** 137:1 137:4, 286:23 288:17, 289:19 297:23
**wait** 33:11
**walk** 172:9 174:21, 184:2 193:9
**walked** 13:2 17:3, 30:5 302:18
**walking** 30:6 30:24, 172:3 172:4, 172:11 172:11, 174:17 190:9, 193:16 215:17, 215:21
**wall** 130:5
**want** 10:19 10:25, 11:3 18:13, 34:15 40:3, 40:20 43:7, 43:8 45:15, 46:12 46:15, 52:24 63:17, 63:18 66:12, 71:21 83:21, 84:14

89:9, 89:15 93:10, 98:15 121:4, 122:22 133:5, 151:22 155:12, 157:2 162:5, 162:11 165:19, 165:23 166:6, 168:18 176:19, 176:19 176:20, 176:21 179:8, 187:3 194:2, 199:19 206:18, 215:20 216:16, 216:17 225:16, 238:23 239:2, 241:8 245:24, 254:3 254:3, 255:21 260:22, 261:10 262:7, 266:11 272:10, 273:19 274:10, 274:10 274:11, 274:13 279:20, 281:2 286:3, 286:4 289:17, 289:20 293:4, 313:10 313:22, 314:2 315:15, 315:19 328:21
**wanted** 103:4 147:18, 175:2 257:25, 287:15 291:21
**wanting** 290:24
**wants** 67:19 67:22, 84:12 121:19, 261:9
**warehouse** 62:18, 63:11 63:15, 141:19 149:14, 150:9 227:12, 233:23 234:1, 234:2 242:11, 244:21 246:16, 253:15

253:18, 254:19
257:4, 291:14
320:6, 321:25
324:18
**warehousing**
63:8
**Warfel** 7:3
305:19, 306:3
306:7, 306:20
307:1, 307:14
308:6, 308:19
309:24
**warning** 136:4
136:6, 145:8
188:2, 188:20
223:4
**warrant** 27:19
248:22
**was/was** 345:2
**watch** 34:6
140:12, 140:12
**watching** 81:16
**water** 35:15
**way** 16:15
16:16, 17:2
34:16, 39:21
58:7, 83:15
86:12, 118:13
135:17, 144:13
157:1, 158:7
160:17, 160:22
161:21, 162:17
176:10, 176:12
177:3, 194:11
198:23, 201:12
201:22, 202:20
202:21, 202:23
205:8, 205:13
207:20, 209:23
209:23, 210:21
210:25, 211:2
211:15, 212:2
212:5, 212:6
232:1, 233:13
237:11, 239:4
260:3, 274:6

284:1, 308:4
317:4, 323:9
**ways** 114:19
156:4, 208:3
208:3, 208:20
210:23, 210:24
211:1, 304:13
323:12, 324:3
324:7
**we've** 92:14
102:11, 110:25
110:25, 111:3
111:14, 111:23
140:9, 215:18
235:10, 246:3
249:20, 251:18
277:14, 288:24
305:2, 320:11
325:11, 335:10
**wear** 142:13
204:20
**wears** 196:18
**website** 155:3
**week** 44:7
44:12, 81:1
81:22, 82:8
127:22, 127:23
196:8, 286:20
286:21
**weekly** 81:3
82:2, 82:4
82:11
**weeks** 135:1
135:5
**weighs** 243:24
**weight** 236:20
236:21
**welcome** 283:10
**well-being**
291:3
**went** 16:15
16:15, 17:2
195:14, 255:9
277:4
**West** 3:5
**whatsoever** 46:5

115:6
**wheel** 238:23
242:25
**White** 6:23
27:8, 27:10
27:13, 27:15
65:22, 65:22
80:18, 81:25
82:3, 82:4, 93:6
98:19, 131:21
136:19, 197:7
218:20, 218:21
218:24, 220:22
221:13, 230:13
236:12, 268:25
282:11, 284:19
287:3, 288:20
292:17, 295:9
299:16, 300:2
334:8
**White's** 136:13
136:20
**widely** 269:13
**wife** 38:1
**willing** 51:15
51:20
**window** 287:11
299:20
**wish** 270:25
271:8, 271:19
271:24, 272:8
272:9, 274:15
274:25
**withheld** 296:19
297:6, 298:15
299:4, 299:7
299:12
**withhold** 297:10
299:23
**witness** 1:15
4:2, 8:7, 8:9
26:14, 42:9
134:6, 165:16
216:2, 254:15
255:8, 296:12
301:11, 313:19

327:9, 329:23
337:3, 337:24
339:23, 341:2
343:16, 343:18
343:20
**witnessed** 26:19
133:23, 312:17
**witnesses** 19:2
19:2, 48:4
284:8, 305:2
305:6
**word** 69:12
69:21, 97:5
99:16, 102:1
103:16, 112:20
133:4
**words** 40:24
45:10, 57:17
69:23, 71:3
72:12, 123:8
133:24, 160:12
186:16, 194:2
216:19, 224:9
237:19, 255:5
**work** 13:8
13:10, 15:10
15:10, 29:14
33:16, 37:22
43:9, 53:22
60:17, 61:1
63:22, 64:4
67:5, 68:21
69:7, 74:14
88:22, 108:22
148:7, 161:6
190:2, 192:1
192:1, 230:23
231:8, 231:13
231:14, 232:9
234:13, 253:16
258:1, 260:7
261:9, 261:13
261:14, 261:22
262:7, 269:10
273:15, 273:16
274:17, 275:13

282:23, 284:20
320:5, 320:15
321:17, 321:20
334:22
**work-wise**
335:16
**worked** 16:2
62:12, 65:9
67:9, 268:13
**worker** 40:13
**workers** 40:8
68:11, 68:15
68:20, 258:20
269:8, 269:25
276:13
**working** 15:22
15:25, 26:13
54:13, 55:9
58:8, 58:21
60:20, 93:1
111:4, 126:14
128:16, 136:21
137:2, 137:9
165:9, 186:14
189:25, 191:2
191:5, 191:11
191:15, 191:24
192:2, 192:3
192:6, 192:12
193:5, 193:11
194:22, 194:25
195:5, 195:15
196:3, 196:4
198:18, 199:16
204:13, 204:17
217:23, 254:16
254:18, 254:25
255:7, 256:14
258:18, 272:15
273:10, 273:13
283:6, 291:17
292:18, 321:8
**workmen**
259:16
**workmen's**
259:9, 259:13

288:4, 288:4
288:8
**workmens**
259:5
**workplace** 37:9
207:14, 259:10
**works** 34:13
161:11, 226:12
282:25, 291:15
**Worksheet** 7:7
317:15
**world** 99:24
221:24
**worst-case**
43:10
**worth** 152:6
152:17
**wounded** 46:8
51:23
**Wow** 303:7
303:9
**write** 33:1
133:21, 133:21
134:8, 134:9
134:16, 288:11
**writes** 102:24
**writing** 50:22
74:6, 175:8
**written** 26:7
70:3, 70:11
70:16, 83:14
92:14, 101:13
102:22, 184:18
189:1, 251:9
**wrong** 50:12
50:15, 50:16
50:18, 133:21
173:2, 173:16
173:25, 174:4
174:12, 176:3
176:7, 177:11
**wrote** 68:8, 74:4
296:5
**WTH** 307:14
**www.shaunabe...**
344:14, 345:21

**X**

**Xavier** 6:24
282:17, 282:17
282:18, 283:22
284:20, 298:2

**Y**

**yard** 60:21
153:19, 226:24
227:3, 227:7
227:14, 228:12
231:17, 231:18
234:20, 235:1
237:6, 268:13
320:4
**yeah** 46:11, 50:4
67:24, 106:18
113:8, 120:12
125:4, 145:19
146:15, 156:3
208:11, 209:2
221:22, 224:1
224:5, 224:6
226:18, 226:20
227:7, 227:24
228:5, 260:16
286:13, 303:11
307:20, 317:8
327:24
**year** 24:6, 79:14
80:14, 113:15
113:24, 119:23
199:10, 205:24
215:3, 223:13
242:7, 250:18
250:20, 255:22
283:19, 285:5
**yearly** 75:21
249:5
**years** 9:17, 16:1
21:14, 54:14
57:5, 57:10
75:21, 75:22
76:3, 105:4

114:3, 114:7
114:8, 119:21
140:6, 173:12
181:1, 230:19
230:21, 233:10
246:8, 249:19
249:25, 250:1
250:1, 250:18
251:20, 278:5
278:15, 279:6
280:1, 280:14
336:16
**yell** 255:11
**yelled** 253:25
**yelling** 254:11
255:15
**yes-or-no** 281:2
**yesterday** 11:23
12:6, 28:8
28:11
**you-all** 82:17
119:23, 186:22
275:15, 276:18
319:20, 322:9
332:15
**you-all's** 307:11

**Z**

**Zoom** 81:24

**0**

**0** 343:25
**04/30/2026**
344:9, 345:17

**1**

**1** 5:5, 5:6, 53:10
53:11, 90:4
168:25, 179:2
200:3, 202:6
250:18, 250:20
341:4
**1:27** 130:19

130:20
**10** 6:17, 171:1
248:13, 252:18
252:20
**10:23** 1:18, 8:1
8:3
**10:30** 301:8
304:17, 304:24
**10:33** 304:4
**100** 151:21
154:2, 154:2
154:3, 344:12
345:20
**10th** 344:6
**11** 6:21, 281:21
281:22, 295:4
**11:24** 66:4, 66:5
**11:30** 242:13
**11:37** 66:6, 66:8
**11077** 344:12
345:19
**1177** 3:5
**12** 7:1, 299:9
305:12, 305:13
327:10
**12:47** 130:17
130:18
**124** 6:2
**13** 7:6, 131:14
317:10
**131** 5:12
**14-hour** 327:10
**15** 289:2
**154** 5:16
**1560** 2:6
**166** 5:20
**17th** 317:17
**18** 54:14, 57:10
119:21, 119:23
222:15, 225:22
**18-wheeler**
61:24, 244:12
**18-wheelers**
62:2, 273:2
**19** 119:23
**19.10** 59:9

59:17, 59:20
59:23, 73:7
168:1
**1917** 72:24
**1980** 344:12
345:20

**2**

**2** 5:8, 5:18
66:12, 66:13
66:16, 72:15
74:8, 168:20
169:2, 202:10
254:14, 284:2
305:25, 341:4
**20** 114:7, 114:8
237:3, 249:25
250:1, 279:6
280:1, 280:14
289:2, 292:11
**20/20** 89:21
**2000** 105:1
**2006** 9:10, 57:3
**2012** 222:15
227:8, 231:9
233:11
**2013** 223:11
**2015** 226:17
233:8, 233:17
249:1, 268:25
**2016** 242:5
249:1, 252:17
**2017** 133:7
325:17, 326:8
326:13, 327:17
**2018** 82:14
82:14, 82:18
83:9, 131:14
132:18, 132:21
136:23, 268:17
268:17, 268:20
**2021** 254:17
254:18, 255:22
**2022** 5:10, 8:21
19:18, 23:24

24:2, 38:23
82:9, 83:7, 87:2
87:5, 87:11
112:4, 137:2
192:11, 214:10
254:15, 266:21
267:6, 284:2
333:25, 337:9
337:22
**2022-63980** 1:1
343:1
**2023** 22:13
22:15, 112:18
123:15, 267:2
317:18, 325:23
326:1
**2024** 1:12, 1:18
8:3, 22:14
22:18, 162:23
181:24, 341:3
342:20, 343:12
344:6, 345:13
**203** 344:4, 345:1
**203.3** 345:11
**206** 6:1
**20-feet** 248:13
**20-foot** 228:13
229:23, 244:20
**215TH** 1:9
343:9
**2-17-23** 7:8
**22** 42:13, 79:13
80:14, 119:9
132:21, 221:9
242:5
**222** 6:4
**233** 6:9
**24** 246:8
**241** 6:13
**24-hour** 36:10
**24-year** 246:7
**25** 233:7, 233:17
**250** 60:15
**252** 6:17
**27** 1:12, 8:2
22:18, 162:23

341:3, 343:12
**27th** 1:17, 75:23
**281** 6:21
**2925** 2:6
**2nd** 44:9

**3**

**3** 5:12, 130:25
131:1, 169:9
187:24, 201:18
202:14, 205:1
341:4
**3:21** 232:18
232:19
**3:30** 232:20
232:21
**30** 114:3, 295:5
**30,000-pound**
56:23
**304** 5:22
**305** 7:1
**317** 7:6
**32** 206:19, 207:9
**331** 344:13
345:21
**338** 4:5
**341** 4:8
**343** 4:10
**360** 35:9
**3828** 344:9
345:16
**39** 7:4

**4**

**4** 5:16, 7:8
154:23, 154:24
169:11, 177:16
324:10, 341:5
**40** 105:4, 229:24
**400** 60:13
**40-foot** 229:25
**43** 39:5
**4300** 1:22, 2:15
**48** 127:25

**5**

**5** 5:20, 6:24
166:2, 166:3
169:13, 169:15
169:17, 170:20
177:13, 177:14
**5(a** 321:5
**5:20** 337:25
**5:21** 1:18, 340:2
340:3
**50** 287:18
**52,000** 169:6
**52,000-capacity**
243:12
**52,000-pound**
227:20, 263:21
279:8
**52002** 228:1
**53** 5:5

**6**

**6** 6:1, 206:8
206:9, 206:19
**6,000** 242:20
242:20
**6/18/12** 6:5
**600** 330:7
**6-13-18** 5:13
**6455** 344:25
345:25
**65** 237:2
**65,000-capacity**
243:12
**65,000-pound**
236:14, 237:3
**650** 95:23
**66** 5:8

**7**

**7** 6:4, 6:11
170:14, 222:7
222:8, 254:15
**713** 344:13

345:21
**7-22-16** 6:15
**77002** 1:22, 2:16
**77027** 3:6
**77056** 344:13
345:20
**77098** 2:7

**8**

**8** 4:4, 6:7, 6:9
6:19, 170:17
170:21, 232:14
232:25, 233:1
**8:14** 305:25
306:7
**8:15** 233:17
**8:17** 306:10
306:16
**8:26** 306:20
**8:27** 306:23
**8:28** 307:19
**8:30** 307:7
**8:31** 284:3
**8:45** 290:6
**8:46** 292:11
**8:54** 295:5
**8:56** 296:6
299:4
**8-25-15** 6:11

**9**

**9** 6:13, 6:15
170:24, 241:19
241:20, 252:16
252:17
**9:00** 308:19
**9:08** 299:7
**901** 2:15
**910** 1:21
**9-13-22** 7:2
**9-2** 6:22, 7:2
**9-5-22** 6:22
**9955** 344:13
345:21